UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DENISE W.,

                              Plaintiff,

v.                                                          1:18-CV-0446
                                                            (TWD)
ANDREW M. SAUL,[1]
Comm'r of Soc. Sec.,

                              Defendant.

_____

APPEARANCES:                                      OF COUNSEL:

DENISE W.
  Plaintiff, *Pro se*
6 Barclay Street
Albany, NY 12209

U.S. SOCIAL SECURITY ADMIN.                       DANIEL TARABELLI, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
  Counsel for Defendant
26 Federal Plaza - Room 3904
New York, NY 10278

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## DECISION and ORDER

Currently before the Court, in this Social Security action filed by Denise W. ("Plaintiff")

against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to

42 U.S.C. § 405(g), are Plaintiff's motion for judgment on the pleadings and Defendant's motion

for judgment on the pleadings.  (Dkt. Nos. 16 and 18.)  For the reasons set forth below,

Plaintiff's motion for judgment on the pleadings is denied and Defendant's motion for judgment

---

[1]      Andrew M. Saul became the Commissioner of Social Security on June 17, 2019.  The
Clerk of Court is respectfully directed to amend the caption.

on the pleadings is granted.  The Commissioner's decision denying Plaintiff's disability benefits is affirmed, and Plaintiff's Complaint is dismissed.

## I.    RELEVANT BACKGROUND

### A.    Factual Background

Plaintiff was born in 1981, making her 32 years old at the alleged onset date and 35 years old at the date of the ALJ's decision.  She has a bachelor's degree and has previous work as an information systems administrator, information specialist, and general office clerk (as identified by the vocational expert).  Plaintiff initially alleged disability due to a neuropathy on the right side of her body, musculoskeletal Lyme disease, and depression.

### B.    Procedural History

Plaintiff applied for a period of disability and disability insurance benefits on November 8, 2014, alleging disability beginning March 29, 2014.  Her application was initially denied on February 3, 2015, after which she timely requested a hearing before an Administrative Law Judge ("ALJ").  She appeared at three administrative hearings before ALJ Paul F. Kelly, dated September 29, 2016, December 22, 2016, and April 26, 2017.  (T. 30-98.) [2]  On June 2, 2017, the ALJ issued a written decision finding Plaintiff was not disabled under the Social Security Act.  (T. 8-29.)  On February 9, 2018, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (T. 1-5.)

---

[2]    The Administrative Transcript is found at Dkt. No. 12.  Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

### C.     The ALJ's Decision

The ALJ found Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2020, and also found Plaintiff has not engaged in substantial gainful activity since March 29, 2014, the alleged onset date.  (T. 13.)  Plaintiff's right-sided neuropathic pain syndrome, Lyme disease, obesity, major depressive disorder, and anxiety disorder were found to be severe impairments.  (*Id*.)  However, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"); and the ALJ also reviewed SSR 02-1p in considering Plaintiff's obesity.  (T. 14-16.)  The ALJ concluded Plaintiff has the residual functional capacity ("RFC") to perform light work except she

> is limited to right occasional foot control operation.  [She] can occasionally climb ramps or stairs, balance, stoop, kneel, and crouch.  [She] can never climb ladders, ropes or scaffolds.  [She] is limited to occasional overhead reaching with the right upper extremity.  [She] should avoid all exposure to extreme cold and extreme heat, and should avoid moderate exposure to wetness and humidity.  [She] is limited to work that consists of simple and routine tasks.

(T. 16.)  She is unable to perform any past relevant work; however, she can perform other jobs existing in significant numbers in the national economy.  (T. 22-23.)  The ALJ therefore concluded Plaintiff is not disabled.

### D.     The Parties' Briefings on Their Cross-Motions

#### 1.     Plaintiff's Motion for Judgment on the Pleadings

On April 12, 2018, Plaintiff filed this action *pro se*.  (Dkt. No. 1.)  On April 13, 2018, Plaintiff was mailed the *pro se* notice with the *pro se* handbook and local rules being provided and explained at the time the complaint was filed.  (Dkt. No. 6.)  On May 10, 2018, an

acknowledgement of the *pro se* handbook and notice was filed. (Dkt. No. 11.) This Court *sua sponte* extended the deadline for the filing of Plaintiff's brief to October 19, 2018. (Dkt. No. 15.)

Plaintiff filed a letter brief on October 17, 2018, indicating she has been battling a relapse of chronic Lyme disease making her unable to work and requiring her to frequently use a cane to ambulate. (Dkt. No. 16.)

### 2. Defendant's Motion for Judgment on the Pleadings

Defendant argues the ALJ properly evaluated Plaintiff's Lyme disease, and substantial evidence supports the ALJ's RFC determination. (Dkt. No. 18 at 3-13.)[3] Defendant also contends the ALJ's RFC accurately portrayed Plaintiff's limitations and the ALJ properly relied on the vocational expert's testimony in making his Step Five finding that Plaintiff was not disabled. (*Id*. at 12.)

## II. RELEVANT LEGAL STANDARD

### A. Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal

---

[3]    Page references to documents identified by docket number refer to the page number inserted by the Court's electronic filing system maintained by the Clerk's Office.

principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

**B.      Standard to Determine Disability**

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987).

The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III. ANALYSIS

### A. Substantial Evidence Supports the ALJ's Analysis of Plaintiff's Impairments

At Step Two, the ALJ must determine whether the claimant has a severe impairment that significantly limits her physical or mental abilities to do basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities include walking, standing, sitting, lifting, carrying, pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, remembering and carrying out simple instructions, using judgment, and responding appropriately to supervision, co-workers, and usual work situations. *Taylor v. Astrue*, 32 F. Supp. 3d 253, 265 (N.D.N.Y. 2012)

(citing *Gibbs v. Astrue*, 07-CV-10563, 2008 WL 2627714, at *16 (S.D.N.Y. July 2, 2008); 20

C.F.R. §§ 404.1521(b)(1)-(5)).  "Although the Second Circuit has held that this step is limited to

'screening out *de minimis* claims,' [] the 'mere presence of a disease or impairment, or

establishing that a person has been diagnosed or treated for a disease or impairment' is not, by

itself, sufficient to render a condition severe."  *Taylor*, 32 F. Supp. 3d at 265 (quoting *Dixon v.

Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y.

1995)).  Overall, the claimant retains the burden of presenting evidence to establish severity.  *Id.*

(citing *Miller v. Comm'r of Soc. Sec.*, 05-CV-1371 (FJS/GJD), 2008 WL 2783418, at *6-7

(N.D.N.Y. July 16, 2008)).

This Court has indicated the failure to find a specific impairment severe at Step Two is

harmless where the ALJ concludes (a) there is at least one other severe impairment, (b) the ALJ

continues with the sequential evaluation, and (c) the ALJ provides explanation showing she

adequately considered the evidence related to the impairment that is ultimately found non-severe.

*Fuimo v. Colvin*, 948 F. Supp. 2d 260, 269-70 (N.D.N.Y. 2013) (citing *Dillingham v. Astrue*, 09-

CV-0236 (GLS/VEB), 2010 WL 3909630 (N.D.N.Y. Aug. 24, 2010), *Report and

Recommendation adopted by* 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010)); *see also Reices-

Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding that any error in failing to find

plaintiff's anxiety and panic disorder severe at Step Two would be harmless because the ALJ

found other severe impairments present, continued through the sequential evaluation process,

and specifically considered plaintiff's anxiety and panic attacks at those subsequent steps).

At Step Two, the ALJ found Plaintiff has severe impairments including right-sided

neuropathic pain syndrome, Lyme disease, obesity, major depressive disorder, and anxiety

disorder.  (T. 13.)  The Court notes Plaintiff has not argued the ALJ failed to find an alleged

impairment severe.  (Dkt. No. 16.)  Defendant argues the ALJ properly evaluated Plaintiff's Lyme disease and substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 14.09.  (Dkt. No. 18 at 4-9).  The Court finds Defendant's arguments persuasive.

The ALJ found several impairments severe at Step Two including Plaintiff's Lyme disease and continued the sequential evaluation.  (T. 13-23.)  The ALJ's characterization of Plaintiff's physical impairments including right-sided neuropathic pain syndrome and Lyme disease status post-treatment with multiple arthralgias appears to consider the full gambit of Plaintiff's complaints, particularly given the unclear nature of her Lyme disease diagnosis.  (T. 13, 33-34, 59-61.)  The ALJ went on to consider Plaintiff's impairments in light of the listings including Listing 14.09 relating to inflammatory arthritis.  (T. 14-16.)  The ALJ explained how Plaintiff did not meet any of the criteria of subsections A through D of that listing and cited to medical expert Dr. Smiley's testimony that Plaintiff's impairments did not meet or equal the criteria of the listings.  (T. 14, 20, 37-39.)  The ALJ also addressed the severity of Plaintiff's mental impairments, finding Plaintiff had mild limitations in understanding, remembering or applying information and interacting with others and moderate limitations in concentrating, persisting or maintaining pace and adapting or managing oneself.  (T. 14-16.)  In so doing, the ALJ discussed the January 2015 examination and opinion of consultative examiner Brett Hartman, Psy.D.[4]  (T. 15-16, 317-21.)  The ALJ concluded Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.04 or 12.06.  (T. 15-16.)  Further, the ALJ's continued analysis in his decision indicates he adequately considered Plaintiff's various

---

[4]     The Court addresses the ALJ's consideration of the opinion evidence further in Section III.B. of this Decision and Order.

impairments throughout the sequential evaluation.  (T. 13-23.)  Therefore, the Court finds the ALJ's Step Two analysis is proper.

**B.      Substantial Evidence Supports the ALJ's Analysis of the Opinion Evidence and Plaintiff's RFC**

RFC is defined as "'what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'"  *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (internal citations omitted).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Pardee*, 631 F. Supp. 2d at 210 (citing 20 C.F.R. § 404.1545(a)).  "Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'"  *Hendrickson v. Astrue*, 11-CV-0927 (ESH), 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting Social Security Ruling ("SSR") 85-15, 1985 WL 56857, at *8).  The RFC determination "must be set forth with sufficient specificity to enable [the Court] to decide whether the determination is supported by substantial evidence."  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

The Second Circuit has long recognized the "treating physician rule" set out in 20 C.F.R. § 404.1527(c).  "'[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'"  *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).  However, there are situations

where the treating physician's opinion is not entitled to controlling weight, in which case the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)).  The factors for considering opinions from non-treating medical sources are the same as those for assessing treating sources, with the consideration of whether the source examined the claimant or not replacing the consideration of the treatment relationship between the source and the claimant.  20 C.F.R. §§ 404.1527(c)(1)-(6).

### i.    *The ALJ's Analysis of the Opinion Evidence*

In January 2015, Plaintiff underwent a consultative internal medicine examination conducted by Dr. Puri, who noted Plaintiff appeared to be in no acute distress, had a normal stance and gait, could walk on her heels and toes without difficulty, had a mildly decreased squat, used no assistive devices, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty.  (T. 323.)  At that time, a lumbosacral spine x-ray showed moderate straightening and a cervical spine x-ray showed straightening.  (T. 326-27.)  Dr. Puri diagnosed a history of Lyme disease (status post treatment with multiple arthralgias and being followed up), high blood pressure, depression and anxiety, acid reflux disease, and obesity.  (T. 324-25.)  Dr. Puri opined Plaintiff did not have any objective limitations to communication, fine motor, or gross motor activity and indicated there were no objective limitations to her gait or activities of daily living on examination.  (T. 325.)  She recommended Plaintiff not carry out strenuous activity or lift heavy weights.  (*Id.*)

In January 2017, Plaintiff underwent a second consultative examination conducted by Dr. Puri who again observed Plaintiff appeared to be in no acute distress, had a normal gait and stance, could walk on her heels and toes without difficulty, had a mildly decreased squat though she sat with no difficulty, and used a cane for pain and weight bearing. (T. 578.) Plaintiff reported always using the cane and that it was prescribed by a doctor; however, her gait with and without the cane was the same, therefore Dr. Puri did not feel it was necessary. (*Id.*) Plaintiff needed no help changing for the exam or getting on and off the exam table, and she was able to rise from a chair without difficulty. (*Id.*) A sensory examination showed light touch was decreased on the right compared to the left. (T. 579.) Dr. Puri diagnosed a history of Lyme disease (status post treatment), multiple symptoms of unknown etiology being followed up, high blood pressure, depression, and obesity. (T. 580.) Dr. Puri opined Plaintiff did not have any objective limitations to communication or fine motor or gross motor activity and there were no objective limitations to her gait or activities of daily living on examination. (T. 580.) She indicated Plaintiff had mild limitations to squatting, bending, stooping, kneeling, and lifting weights and recommended Plaintiff be seen by a psychologist and not carry out strenuous activity. (*Id.*)

More specifically, Dr. Puri opined Plaintiff could continuously lift and carry up to 20 pounds, and occasionally lift up to 50 pounds; sit for three hours at a time for a total of eight hours; stand for two hours at a time for a total of five hours; walk for one hour at a time for a total of four hours; continuously use her upper extremities for reaching, handling, fingering, feeling and pushing/pulling; continuously use her feet for the operation of foot controls; frequently climb stairs and ramps, and frequently balance, stoop, kneel, crouch and crawl; occasionally climb ladders or scaffolds, and occasionally tolerate unprotected heights and

extreme cold/heat; and continuously tolerate moving mechanical parts, operating a motor vehicle, humidity, wetness and vibrations. (T. 581-85.) Dr. Puri indicated Plaintiff did not require the use of a cane to ambulate. (T. 582.)

The ALJ afforded great weight to Dr. Puri's consultative opinions from January 2015 and January 2017, explaining that she was a medical doctor who personally examined Plaintiff and who was familiar with the social security disability regulations. (T. 18-19.) The ALJ also indicated that Dr. Puri's physical examinations were consistent with the physical examinations in Plaintiff's treatment notes and that Dr. Puri's opinions were generally reasonable in light of these examinations except for her opinion on Plaintiff's ability to stand and walk, which were not consistent with her notes about Plaintiff's gait. (T. 19.) In that regard, the ALJ agreed with medical expert Dr. Smiley's findings that Plaintiff would be limited to the light exertional level, indicating she could stand or walk for six hours in an eight-hour day. (T. 19, 41-42.)

In January 2015, consultative examiner Dr. Hartman noted Plaintiff was cooperative and pleasant, yet anxious; she had a coherent and goal-directed thought process, anxious affect, dysphoric mood, mildly impaired attention and concentration, and generally intact recent and remote memory skills. (T. 319.) He diagnosed moderate major depressive disorder, unspecified anxiety disorder, and the need to rule out mild neurocognitive disorder. (T. 320.) Dr. Hartman opined Plaintiff was able to follow and understand simple directions and perform simple tasks and had a fair ability to learn new tasks and make appropriate decisions. (*Id*.) She had mild difficulty maintaining attention and concentration, maintaining a regular schedule, and performing complex tasks independently as well as mild-to-moderate difficulty relating adequately with others and moderate problems dealing appropriately with the normal stressors of life. (*Id*.) Within his RFC analysis, the ALJ afforded some weight to Dr. Hartman's January

2015 opinion, noting he was not a treating source and examined Plaintiff once for a consultative examination. (T. 19-20.) The ALJ concurred with Dr. Hartman's opinion regarding Plaintiff's non-exertional limitations, which the ALJ concluded was consistent with his examination of her and with the record. (T. 20.) The ALJ explained, however, that the record showed Plaintiff had mild limitations in interacting with others rather than mild-to-moderate limitations. (T. 20, 320.)

At the initial determination level in February 2015, State Agency consultant T. Harding, Ph.D., opined Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning and concentration, persistence or pace, and no repeated episodes of decompensation each of extended duration. (T. 104.) The ALJ afforded little weight to this opinion, noting Dr. Harding did not personally examine Plaintiff and rather reviewed the record as it existed in February 2015. (T. 20.) The ALJ also indicated Dr. Harding's justification for finding Plaintiff's mental impairments non-severe was not consistent with Dr. Hartman's opinion, which showed Plaintiff had moderate limitations dealing appropriately with the normal stressors of life. (*Id*.)

At the April 2017 administrative hearing, medical expert Dr. Smiley noted Plaintiff used a cane to ambulate but cited to the consultative examination indicating Dr. Puri did not find any objective reason for Plaintiff to need the cane and noticed her gait was normal without it. (T. 37.) He opined Plaintiff's medical impairments did not meet or medically equal a listing either individually or in combination. (T. 37-39.) He indicated there was a significant question as to whether Plaintiff actually had Lyme disease with the etiology of her right-sided symptoms remaining unclear. (T. 39.) Dr. Smiley noted serological work-up did not show that she had any autoimmune disease including scleroderma and the fact that her serological tests were negative meant, in all probability, that she did not have scleroderma or any autoimmune problem. (*Id*.)

Dr. Smiley opined, assuming the consultative exam was accurate and noting there was no objective limit to her fine motor or gross motor function, Plaintiff ought to be able to function at the light level. (T. 41-42.) He indicated there was no objective evidence that she could not function at any level but because of her symptoms, he thought it would be highly unlikely that she would be able to function at the medium level in the workplace. (T. 42.)

The ALJ afforded great weight to Dr. Smiley's opinion, noting he was a medical expert familiar with the social security regulations who had the opportunity to review the entire medical record and listen to Plaintiff's testimony. (T. 20.) The ALJ concurred with Dr. Smiley that the objective medical evidence did not show Plaintiff warranted significant exertional or non-exertional limitations, but agreed with Dr. Puri's opinion indicating Plaintiff had additional non-exertional limitations beyond limitation to the light exertional level. (T. 20-21.)

### ii. *The Court's Analysis*

Defendant argues substantial evidence supports the ALJ's RFC determination. (Dkt. No. 18, at 10-12.) After reviewing the ALJ's decision and the record, the Court agrees for the following reasons.

First, the ALJ indicated that he considered Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529 and SSR 96-4p. (T. 16.) The ALJ also noted he considered the opinion evidence in accordance with 20 C.F.R. § 404.1527 and SSR 17-2p. (*Id*.) The Court's review indicates that the ALJ's overall decision represents a detailed consideration of the various opinions of record and the medical evidence as well as Plaintiff's alleged impairments, testimony, and activities of daily living. (T. 13-22.)

Second, as detailed above, the ALJ provided specific reasons for the various weights afforded to the multiple opinions of record including explanation for the instances in which he did not fully agree with particular opinions or portions of opinions. (T. 18-22.) For example, although he afforded great weight to Dr. Smiley's opinion, the ALJ explained that, based on Plaintiff's symptoms, he concurred with Dr. Puri's opinion showing Plaintiff had additional non-exertional limitations beyond a limitation to the light exertional level as indicated by Dr. Smiley. (T. 21.) The Court finds the reasons underlying the weight the ALJ gave to the various opinions of record to be valid and supported by substantial evidence.

Third, the Court notes the ALJ was tasked with reviewing all of the evidence which was before him, resolving any inconsistencies therein, and making a determination consistent with the evidence as a whole. *See Bliss v. Colvin*, 13-CV-1086 (GLS/CFH), 2015 WL 457643, at *7 (N.D.N.Y., Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *Petell v. Comm'r of Soc. Sec.*, 12-CV-1596 (LEK/CFH), 2014 WL 1123477, at *10 (N.D.N.Y., Mar. 21, 2014) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."). Indeed, the ALJ ultimately explained the RFC assessment was supported by the medical evidence of record, the opinions of Dr. Puri and Dr. Smiley, and, to a lesser extent, Dr. Hartman's opinion and Plaintiff's allegations and testimony. (T. 22.) The Court's review of the ALJ's decision and the record does not indicate otherwise.

For the reasons outlined above, the ALJ's analysis of the medical opinions and Plaintiff's RFC is supported by substantial evidence. Remand is therefore not required on these bases.

### C. Substantial Evidence Supports the ALJ's Evaluation of Plaintiff's Symptoms and His Step Five Determination

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); SSR 16-3p)). SSR 16-3p indicates the evaluation of symptoms involves a two-step process.[5] 2017 WL 5180304, at *2. The Social Security Administration ("SSA") "will first consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms." *Id*. at *3. "[O]nce an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, [SSA will then] evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities . . . ." *Id*. If SSA cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, it will "carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms." *Id*. at *6. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, factors to be considered include: (1) claimant's daily activities; (2) location, duration, frequency, and

---

[5]     The Court notes that the standard for evaluating subjective symptoms has not changed in the regulations. Rather, use of the term "credibility" has been eliminated and SSR 16-3p makes it clear that the subjective symptom evaluation is not an evaluation of the claimant's character. 2017 WL 5180304.

intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2017 WL 5180304, at *7-8.

The burden shifts to the Commissioner at Step Five "'to show there is other work that [the claimant] can perform.'" *McIntyre*, 758 F.3d at 150 (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012)). An ALJ may rely on a vocational expert's testimony regarding a hypothetical [question] as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' [and]. . . [the hypothetical question] accurately reflect[s] the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)). If a hypothetical question does not include all of a claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Pardee*, 631 F. Supp. 2d at 211 (citing *Melligan v. Chater*, 94-CV-0944, 1996 WL 1015417, at *8 (W.D.N.Y. Nov. 14, 1996)).

Here, the ALJ indicated that he evaluated Plaintiff's consistency with the record under the factors described in 20 C.F.R. § 404.1529(c)(3) and SSR 16-3p and that there were several reasons why her allegations of disabling symptoms were not wholly consistent with the evidence. (T. 21.) Specifically, Plaintiff's statements were not supported by the medical evidence of record and the record lacked objective medical evidence to show she had significant impairments. (*Id.*) The ALJ cited to physical examinations which did not show her impairments

caused her significant exertional and non-exertional limitations, her lack of mental health treatment despite her allegations of mental impairments, and her benign psychiatric results during physical examinations. (*Id.*) The ALJ also noted Plaintiff's use of a cane, Dr. Puri's observation that she had the same gait with or without it, and Dr. Puri's determination that the cane was not medically necessary. (T. 21, 462, 578.) Plaintiff's treatment regimen prescribed by her treating physicians did not suggest her conditions were especially limiting with the treatment being essentially routine and conservative in nature, including medication and physical therapy. (T. 21.) The record did not contain any opinions from any treating sources opining any physical or mental limitations. (T. 21-22.)

At Steps Four and Five, the ALJ found Plaintiff was unable to perform any past relevant work but that she could perform other jobs existing in significant numbers in the national economy including sales attendant, information clerk, and survey worker based on the vocational expert testimony. (T. 22-23, 45-48.) Defendant contends the ALJ's RFC accurately portrayed Plaintiff's limitations and the ALJ properly relied on the vocational expert's testimony in making his Step Five finding that Plaintiff was not disabled. (Dkt. No. 18, at 12.) The Court agrees.

The ALJ's overall decision indicates he properly evaluated Plaintiff's symptoms in considering her treatment records, reports, and testimony with sufficient explanation to support his finding that her statements were not fully consistent with the medical evidence. (T. 13-23.) The Court finds the ALJ's Step Five finding is supported by substantial evidence because it is based on vocational expert testimony in response to a hypothetical which accurately reflected the RFC, and which the Court has already indicated is supported by substantial evidence. Plaintiff has not established additional limitations beyond those included in the RFC.

Thus, the Court finds substantial evidence supports the ALJ's evaluation of Plaintiff's symptoms and his Step Five determination. Remand is therefore not required on these bases.

**D.  Plaintiff Was Not Prejudiced by Her Lack of Representation at the Administrative Hearings and the ALJ Properly Developed the Record**

"A claim of entitlement to social security benefits triggers Due Process Clause protections." *Pokluda v. Colvin*, 13-CV-0335 (GLS/ESH), 2014 WL 1679801, at *3 (N.D.N.Y. Apr. 28, 2014) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332-33 (1976)). Generally, due process requires only that the proceedings in the context of an administrative social security hearing be "full and fair." *Id.* (citing *Richardson*, 402 U.S. at 401-02; *Echevarria v. Sec'y of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)).

"Claimants have a statutory right to notification of their options for obtaining legal representation in [Social Security disability] claims." *Grant v. Astrue*, 05-CV-1138 (LEK/DRH), 2008 WL 2986393, at *4 (N.D.N.Y. July 31, 2008) (citing 42 U.S.C. §§ 406(c), 1383(d)(2)(B)). "At the hearing itself, 'the ALJ must ensure that the [plaintiff] is aware of [her] right [to counsel].'" *Sindoni v. Colvin*, 14-CV-0633 (GTS), 2015 WL 3901955, at *4 (N.D.N.Y. June 25, 2015) (quoting *Robinson v. Sec'y of HHS.*, 733 F.2d 255, 257 (2d Cir. 1984)). Notably, "[t]he Second Circuit rejected the 'enhanced disclosure requirements' established in some circuits." *Sindoni*, 2015 WL 3901955, at *4 (citing *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508 (2d Cir. 2009)). "Even if an ALJ does not sufficiently inform a plaintiff of his/her rights, the lack of counsel, in and of itself, is not a sufficient ground upon which remand or reversal may be based." *Grant*, 2008 WL 2986393, at *5 (citing *Alvarez v. Bowen*, 704 F. Supp. 49, 53 (S.D.N.Y. 1989)). Rather, "Plaintiff must show prejudice or unfairness in the proceeding." *Grant*, 2008 WL 2986393, at *5 (citing *Evangelista v. Sec'y of HHS*, 826 F.2d 136, 142 (1st Cir. 1987)). Additionally, "[t]he Commissioner of Social Security is not obligated to provide a claimant with

counsel," though where a claimant proceeds pro se, "the ALJ has a duty 'to scrupulously and conscientiously probe into, inquire of, and explore all relevant facts.'" *Lamay*, 562 F.3d at 509 (quoting *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980)).

It is well-settled that, because a hearing on disability benefits is a non-adversarial proceeding, the ALJ has an affirmative duty to develop the record, whether or not a plaintiff is represented. *Melville*, 198 F.3d at 51. Despite the duty to develop the record, remand is not required where the record contains sufficient evidence from which the ALJ can assess the plaintiff's RFC. *Weed Covey v. Colvin*, 13-CV-6602, 2015 WL 1541864, at *13 (W.D.N.Y. Apr. 6, 2015) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013)). "Where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)).

"When a claimant properly waives his right to counsel and proceeds pro se, the ALJ's duties are 'heightened.'" *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). "The ALJ must 'adequately protect a pro se claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered' and by 'scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts.'" *Moran*, 569 F.3d at 112 (quoting *Cruz*, 912 F.2d at 11). "And when a claimant appears pro se and is otherwise impaired, we must 'make a searching investigation of the record to make certain that the claimant's rights have been adequately protected.'" *Id*.

Plaintiff appeared at three administrative hearings taking place in September 2016, December 2016, and April 2017. (T. 30-98.) At each hearing, Plaintiff appeared unrepresented.

(T. 32, 54, 78, 80.)  At the September 2016 hearing, Plaintiff indicated she did not have enough time to find a representative and the ALJ explained she could go forward with the hearing without representation and he would give her extra time if she wanted more time to look for a representative.  (T. 80-82.)  Plaintiff said "No, that's okay.  I think I could tell you my story of what['s] going on with me."  (T. 81.)  The ALJ further explained Plaintiff's right to representation and again indicated she could have additional time, but when asked if she understood that right, she said yes and that she would like to proceed.  (T. 81-82.)

At the December 2016 hearing, Plaintiff was not represented and stated she was ready to go forward.  (T. 54.)  Plaintiff again stated she tried to find a representative but that whoever she contacted did not call her back and she did not have time before the hearing.  (T. 66-67.)  She also stated she felt it would be a lawyer taking money from her because she had an education and she believed she could give the ALJ her case herself.  (T. 67.)

At the April 2017 hearing, Plaintiff stated she was trying to work with a lawyer from Legal Aid but he said he could not take on her case until he got further paperwork.  (T. 41.)  At that point, the ALJ stated that he was not going to postpone the case again because they were far along in the hearing process with multiple postponements and that he would take some testimony.  (*Id.*)

The Court finds that Plaintiff was not prejudiced by her lack of representation because the ALJ fully explained her right to representation at three separate hearings and she wished to proceed at the first two hearings.  (T. 54, 81-82.)  Additionally, she stated she felt she could present her case to the ALJ herself.  (T. 67, 81.)  Plaintiff has neither argued nor shown that she was prejudiced by this lack of representation.  The Court finds remand is therefore not required on this basis.

The Court finds the ALJ properly developed the record in light of Plaintiff's lack of representation. At the September 2016 hearing, the ALJ indicated he wanted to continue the hearing to talk to a vocational expert and bring in a medical expert to review the record. (T. 94, 96-97.) He asked Plaintiff to sign another authorization form to ask for neurology records and gave her a medical statement form to take to her next doctor visit in October 2016. (T. 95-98.) He also asked Plaintiff if there were any missing records and she stated no. (T. 88.)

At the December 2016 hearing, the ALJ took testimony from medical expert Dr. Smiley who indicated a new diagnosis of scleroderma made it difficult for them to come to any definitive determination at that time. (T. 62-66.) The ALJ agreed they would have to convene on another day and try to bring Dr. Smiley back for further testimony. (T. 65, 68-70.) The ALJ also stated he was going to send Plaintiff for a consultative examination and further discussed getting more records once Plaintiff had them. (T. 72-73, 577-86.) He told Plaintiff her mother could write a letter or statement based on what she could observe of Plaintiff on a day-to-day basis. (T. 75.) Finally, the record contains multiple evidence requests sent to Plaintiff's treating providers following the initial administrative hearing with the ALJ in September 2016. (T. 514-35, 541-55.) Therefore, the Court finds the ALJ properly developed the record by taking numerous measures to ensure the record was complete including convening multiple hearings, sending Plaintiff for a second consultative examination, requesting the medical expert testimony of Dr. Smiley at two separate hearings, and requesting records from multiple treatment providers. Remand is therefore not required on this basis.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 16) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 18) is

**GRANTED**; and it is further

**ORDERED** that Defendant's decision denying Plaintiff disability benefits is

**AFFIRMED**, and it is further

**ORDERED** that Plaintiff's Complaint is **DISMISSED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Decision and Order,

along with copies of the unpublished decisions cited herein in accordance with the Second

Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).


Dated: July 19, 2019
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

2008 WL 2627714
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Cheryl GIBBS, Plaintiff,

v.

Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 07 Civ. 10563(GBD)(AJP).
|
July 2, 2008.

*REPORT AND RECOMMENDATION*

ANDREW J. PECK, United States Magistrate Judge.

**\*1 To the Honorable George B. Daniels, United States District Judge:**

Pro se plaintiff Cheryl Gibbs brings this action pursuant to § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying Gibbs disability insurance benefits and supplemental security income ("SSI") benefits. (Dkt. No. 2: Complaint.) The Commissioner has moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). (Dkt. No. 8: Notice of Motion; *see also* Dkt. No. 11: Am. Answer; Dkt. No. 9: Comm'r Br.)

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings should be *GRANTED*.

*FACTS*

*Procedural Background*

On March 12, 2003, plaintiff Cheryl Gibbs applied for disability insurance benefits and SSI benefits alleging that she had a disability since July 21, 2000. (*See* Dkt. No. 10: Administrative Record filed by the Commissioner ["R."] at 42-44, 140-43.) [1] Gibbs claimed that she could not work because of a back injury, asthma, carpal tunnel syndrome and anxiety attacks. (R. 51.) Gibbs' application was denied initially (R. 32-36, 144-45), and Gibbs requested a hearing before an Administrative Law Judge ("ALJ"). (R. 39-41.) ALJ Newton Greenberg held a hearing on August 11, 2004, at

which Gibbs testified. (R. 162-71.) On October 7, 2004, ALJ Greenberg issued a decision finding Gibbs not disabled. [2] ALJ Greenberg's decision became the final decision when the Appeals Council denied Gibbs' request for review on March 30, 2005. (R. 6-8.)

[1]    Gibbs previously applied for disability insurance and SSI benefits on August 21, 2000, alleging that she had a disability since July 14, 2000. (*See* R. 15, 23.) The "application was denied through the hearing level in an Administrative Law Judge decision dated July 15, 2002." (*See* R. 15, 23.) Gibbs did not appeal the decision. (*See* R. 15, 17, 23.) ALJ Greenberg's October 7, 2004 decision held that "the doctrine of *res judicata* bars readjudication of the period from July 21, 2000 through July 15, 2002." (R. 17.) At the hearing before ALJ Walsh, Gibbs' representative conceded that because of the prior ALJ decision, the amended onset date would be July 16, 2002. (R. 354-55 .)

[2]    ALJ Greenberg initially issued a decision on August 17, 2004, finding that Gibbs was not disabled. (R. 19-26.) Gibbs, however, did not receive a copy of the decision because it was erroneously mailed to Gibbs' previous address. (R. 14.) In addition, due to a clerical error, the decisional paragraph on Gibbs' claim for disability insurance benefits was omitted. (R. 14.) Therefore, ALJ Greenberg issued an amended decision on October 7, 2004. (R. 11-18.)

Gibbs appealed the Commissioner's decision to this court (05 Civ. 5795; *see* R. 201.) On March 6, 2006, on the parties' stipulation, Judge Daniels vacated the Commissioner's decision and remanded "pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings." (R. 210-12; *see also* R. 176, 193,208.)

On April 5, 2006, the Appeals Council vacated ALJ Greenberg's decision and remanded for further proceedings. (R. 208-09.) On remand, ALJ Sean Walsh held a hearing on February 28, 2007, at which Gibbs, amedical expert and a vocational expert testified. (R. 342-416.) On March 26, 2007, ALJ Walsh issued his decision finding that Gibbs was not disabled. (R. 190-200.) ALJ Walsh's decision became the final decision on August 25, 2007, when the Appeals Council found no reason to assume jurisdiction. (R. 172-75.)

The issue before the Court is whether the Commissioner's decision that Gibbs was not disabled is supported by substantial evidence. The Court finds that it is.

*Hearings Before the ALJs*

*Non-Medical Evidence*

Gibbs' Disability Report that she filed in connection with her claim for benefits (R. 50-59) claimed that her disability stemmed from a back injury, asthma, carpal tunnel syndrome and anxiety attacks (R. 51; *see also* R. 63).

On August 11, 2004 and February 28, 2007, hearings were held before ALJ Newton Greenberg and ALJ Sean Walsh, respectively. (R. 162-71, 342-416.) Gibbs appeared without counsel at the first hearing (R. 164), but was represented by an attorney and a non-attorney representative from the law firm of Binder & Binder at the second (R. 344, 377). [3]

[3]      On March 5, 2002, Gibbs appeared without counsel before ALJ Michael Friedman in reference to her July 14, 2000 application for disability insurance benefits and SSI benefits. (R. 152-61.)

**\*2** Gibbs was born on June 30, 1957, and completed high school and six college credits. (R. 67, 164-65, 353-54.) Gibbs worked at Verizon as a service order representative from 1979 to 1984, and then as a telephone representative until July 2000. (R. 356-58; *see* R. 64, 70.) Gibbs stopped working in July 2000 because she was "constantly getting sick," that is, every three months she became sick with asthma or back pain. (R. 156; *see also* R. 51, 63, 165, 356, 358-59, 391.) Gibbs' work as a telephone representative involved answering phones, handling clients, collecting payments and lifting files weighing no more than five pounds. (R. 52, 64, 71.) In a typical work day, Gibbs sat four hours, walked two hours, stood one hour, kneeled one hour, crouched one hour, handled, grabbed or grasped big objects one hour, and wrote, typed or handled small objects three hours. (R 52; *see also* R. 65, 71.)

Gibbs testified that she sometimes had difficulty walking, had difficulty climbing stairs, could not bend from the waist without pain, and experienced shortness of breath. (R. 363-64.) Gibbs said that she could stand comfortably about ten minutes, sit comfortably fifteen to twenty minutes and pick up five pounds [4] without pain. (R. 158,364.) Later in the hearing, however, Gibbs testified that she could sit for thirty minutes to an hour before she needed to stand for about five minutes or less, and then she could sit back down. (R. 383.) Gibbs testified that she took the bus to see her doctors two to three times each week. (R. 169.) Gibbs experienced right knee pain since 2006, and took Motrin and Relafen for pain relief. (R. 361.) Gibbs took Advair and Albuterol for

asthma (R. 361), but did not have a nebulizer (R. 157, 363). Gibbs testified at the August 11,2004 hearing that she had anxiety attacks "every time [she] would get on the subway or whatever." (R. 167.) By the time of the February 28, 2007 hearing, however, Gibbs no longer suffered from anxiety attacks; the condition resolved itself after Gibbs had been going to therapy twice a week. (R. 361.) Gibbs testified that she had carpal tunnel syndrome and that, about once each day, she suffered about five minutes of numbness in her right hand. (R. 383-84.) Gibbs stated that she had not received treatment for her carpal tunnel syndrome because she refused to have an operation. (R. 384.) Gibbs testified that she had undergone an angioplasty with the placement of a stent. (R. 166.) Gibbs' medications included Theophylline, Vanceril, Albuterol, Ibuprofen, Daypro and Alprozolan. (R. 56; *see also* R. 67. 122.)

[4]      In her Disability Report, Gibbs said she could not lift over 15 pounds. (R. 51.)

Gibbs testified that she prepared meals, cared for her cats, went for a walk or traveled three blocks to the store, washed dishes, did laundry and helped her kids with their homework. (R. 81-84, 159.) Gibbs read, watched television and listened to the radio daily, and she played cards once a week. (R. 84-85, 159.) Gibbs would go out four times a week, by herself, and can use public transportation by herself. (R. 83.) Gibbs said that she sometimes needed help putting on her socks and shoes, and getting in and out of the shower and bath. (R. 81.) She would take a nap during the afternoon because she had trouble sleeping at night. (R. 382.)

*Medical Expert Testimony at the Hearing*

**\*3** Dr. Harold Bernanke testified at the February 28, 2007 hearing. (R. 260-61, 351-53, 365-68.) Based on the medical records in evidence and Gibbs' testimony, Dr. Bernanke stated that although Gibbs would have some difficulty walking because of her knee (R. 366), he did not understand why Gibbs would have difficulty sitting for any length of time (R. 365). Dr. Bernanke stated that Gibbs had a history of asthma and had undergone surgery for pulmonary sequestration on her right lung. (R. 366.) In 2000, Gibbs had a cardio catheterization at St. Luke's Hospital; the results were negative. (R. 367.) Thus, Dr. Bernanke determined that Gibbs' impairments alone or in combination did not meet or equal one or more of the Listings. (R. 365.) Gibbs' representative agreed that Gibbs' conditions did not meet or equal a Listing. (R. 368.)

### Vocational Expert Testimony

Vocational expert Edna Clark testified at the February 28, 2007 hearing. (R. 368-77, 385-90, 392-94, 397-415.) Clark characterized Gibbs'job-customer service representative-as a sedentary, skilled job that involved lifting or carrying items no heavier than five pounds, and no walking, climbing stairs or bending. (R. 368-70.) ALJ Walsh asked vocational expert Clark a hypothetical question: whether Gibbs' past work could be done by a younger person with a twelfth grade education who could not walk, climb stairs, or bend; needed a reasonably clean air environment; could lift, carry, push or pull no more than five pounds; and would require a sit/stand option because the person could sit for half an hour to an hour and would have difficulty standing more than fifteen minutes at a particular time. (R. 369-70.) Clark responded that such a person could perform Gibbs' past relevant work, or (at step five) other sedentary jobs in the national or regional economies, including bench assembly worker, surveillance system monitor and entry-level clerical worker. (R. 370, 372-74, 398, 400-01, 413-15.) In response to a hypothetical from Gibbs' attorney, Clark stated that if the person could sit continuously only fifteen minutes, stand continuously only ten minutes and walk only three blocks, the person could not perform Gibbs' past relevant work or other sedentary jobs. (R. 373.)

### Medical Evidence Before the ALJs [5]

[5]    The Court notes that, except as to Dr. E nu (see page 24 & n. 10 below), Gibbs' representative did not assert to ALJ Walsh or the Appeals Council that any medical records were missing from the record or needed to be obtained.

### Back and Knee Pain

On April 8, 2003, consultative physician Dr. Michael Polak of DHS examined and evaluated Gibbs. (R. 96-97.) Gibbs indicated that she had "left lower lumbar pain, which radiates to the left hip." (R. 96.) Gibbs told Dr. Polak that she could not bend or pickup heavy objects. (R. 96.) Dr. Polak noted that Gibbs walked with the assistance of a cane, but could walk without it. (R. 97.) Gibbs told Dr. Polak that she lived on the third floor of a building without an elevator. (R. 96.) Gibbs had no difficulty transferring from a seated position on and off the examining table, and was able to perform flexion to fifty degrees, extension to ten degrees, left and right lateral flexion to thirty degrees, right negative at twenty-five degrees and left negative at seventy-five degrees. (R. 97.) Dr. Polak noted that Gibbs could stand on her heals and toes. (R.

97.) Gibbs had been taking Naproxen and Celebrex twice a day. (R. 96.) Dr. Polak diagnosed Gibbs with "[c]hronic back pain, rule out lumbo sacral degenerative joint disease." (R. 97.) As to Gibbs' "[f]unctional capacity to do work related activities," Dr. Polak opined that "[b]ased on [Gibbs'] history and physical examination," Gibbs "would be mildly impaired doing activities requiring: carrying/lifting, pushing/pulling, bending, sitting, walking or standing." (R. 97.)

**\*4** On April 9, 2003, Dr. Lawrence Liebman interpreted a radiographic examination of Gibbs' lumbosacral spine. (R. 94.) Dr. Liebman reported that "[t]here [was] marked narrowing of the L5-S1 disc space" and "[g]rade II spondylolisthesis of L5 over S1 with associated spondylolysis at the L5 level." (R. 94.) Dr. Liebman observed intact pedicles and no compression fracture. (R. 94.)

On May 6, 2003, a doctor (whose signature is not legible) completed a "Physical Residual Functional Capacity Assessment" of Gibbs. (R. 100-05.) An x-ray of Gibbs' spine "revealed spondylolisthesis and spondylolysis." (R. 101.) The consultative physician concluded that Gibbs could occasionally lift or carry up to twenty/fifty pounds and frequently lift or carry twenty-five pounds, could sit, stand, or walk about six hours in an eight hour day, and was unlimited as to push or pull activities. (R. 101.) The consultative physician also concluded that Gibbs could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. 102.) The consultative physician found that "based on the objective physical findings," Gibbs' allegations (back pain and limits on sitting and standing, lifting, etc.) were "not credible." (R. 104 .) The consultative physician found Dr. Polak's opinion (see pages 7-8 above) "consistent with all the evidence in [the] file and is adopted," although he seemed to believe Dr. Polak was a treating doctor (see R. 104).

On May 16, 2003, Gibbs was treated at Harlem Hospital Center after falling on her left buttocks. (R. 120.) An x-ray revealed no fracture. (R. 120.) Gibbs complained of persistent lower back pain and was referred for physiotherapy. (R. 120.)

On February2, 2004, HS Systems, Inc., a rehabilitative service, diagnosed Gibbs with a controlled unspecified backache. (R. 125.) HS Systems opined that the backache "should not interfere with [Gibbs'] ability to work." (R. 125.)

On April 28, 2006, Gibbs' treating physician Dr. Huma Masood completed a "Physician's Report of Disability Due to Physical Impairment." (R. 271-76.) Dr. Masood's report

indicated that Gibbs had been treated with Ibuprofen and physical therapy. (R. 273.) Dr. Masood concluded that during an eight hour day, Gibbs could occasionally carry six to ten pounds, could frequently reach and occasionally bend and squat, but could never climb. (R. 274, 274A.) Dr. Masood determined that Gibbs could frequently use her left foot (or both feet) but never just her right foot for repetitive movements, such as pushing and pulling leg controls. (R. 275.) Dr. Masood noted that Gibbs had mild restrictions in driving a motor vehicle and would have no difficulty traveling alone to work on a daily basis by bus or subway. (R. 275.)

On June 26, 2006, Dr. William Lathan conducted a consultative examination of Gibbs. (R. 221-30.) Gibbs reported a history of right knee pain and complained of right knee joint pain for the past year when standing and walking more than twenty minutes. (R. 221.) Gibbs reported that "the pain is aggravated nocturnally as well as when lying recumbent." (R. 221.) Gibbs said that she had been receiving physiotherapy two times each week "with temporary improvement of symptoms." (R. 221.) Gibbs was taking Relafen and Motrin. (R. 221.) Based on his examination, Dr. Lathan noted that Gibbs "appear[ed] to be in no acute distress," had a "limp favoring the right leg," and could not walk on her heels and toes. (R. 222.) Although Dr. Lathan reported that Gibbs used and required a cane for balance, he noted that Gibbs did not need help changing for the exam, did not need help getting on and off the examining table, and was able to rise from the chair without difficulty. (R. 222.) Dr. Lathan noted that Gibbs could "perform all activities of personal care." (R. 222.) Dr. Lathan reported the following about Gibbs' musculoskeletal system: "Lumbar spine show [ed] full flexion, extension, lateral flexion and full rotary movement bilaterally. Straight leg raising negative bilaterally. Full range of motion of shoulders, elbows, forearms and wrists bilaterally. Full range of motion of hips, knees and ankles bilaterally." (R. 223.) Dr. Lathan also found no muscle atrophy. (R. 233.) Dr. Lathan also found "moderate crepitation on active flexion and extension at the right knee joint." (R. 233.) Dr. Lathan diagnosed a "[h]istory of right knee arthralgia" with a "[s]table" prognosis. (R. 223.) Dr. Lathan concluded that there was a "moderate restriction for activities requiring stooping, squatting, kneeling and prolonged standing and walking." (R. 224.)

**\*5** On September 5, 2006, Gibbs' treating orthopedist Dr. Elton Strauss completed a "Physician's Report of Disability Due to Physical Impairment." (R. 264-70.) Dr. Strauss treated Gibbs from January 2006 through September 2006 (R. 264)

and prescribed physical therapy and Motrin (R. 266). Based on an August 2006 magnetic resonance imaging ("MRI") scan, Dr. Strauss diagnosed Gibbs with an osteochondral defect of the right knee lateral compartment. (R. 264-65.) Gibbs' signs included muscle atrophy and decreased motion. (R. 265.) Dr. Strauss concluded that, during an eight hour day, Gibbs could sit continuously one hour in a normal seated position; stand continuously thirty minutes at a work station without moving; and walk continuously thirty minutes. (R. 267.) Dr. Strauss found that Gibbs would have to lie down one hour every eight hours. (R. 266.) In addition, Dr. Strauss opined that Gibbs could lift or carry continuously up to five pounds and occasionally six to ten pounds, but could never lift or carry eleven or more pounds. (R. 267-68.) Dr. Strauss concluded that Gibbs could occasionally bend and reach, but could never squat, crawl or climb. (R. 268.) Finally, Dr. Strauss stated that Gibbs could use her left foot continuously and the right foot or both feet frequently for repetitive movements. (R. 269.) Dr. Strauss noted that Gibbs would have no difficulty traveling alone to work on a daily basis by bus or subway. (R. 269.)

### Asthma

On April 8, 2003, Gibbs reported to consultative physician Dr. Polak a fifteen year history of asthma with two hospitalizations and three emergency room visits for acute asthma within the previous two years. (R. 96.) Gibbs was taking two puffs of Albuterol every six hours. (R. 96.) Gibbs admitted to smoking half a pack of cigarettes per day for twenty years, as well as smoking marijuana. (R. 96.) Dr. Polak found that Gibbs' lungs were clear with "[n]o wheezes, rhonchi or rales." (R. 96.) Gibbs' pulmonary function test revealed that she had "mild restrictive airway disease, which is irreversible." (R. 97.) [6] Dr. Polak diagnosed Gibbs with asthma and cautioned Gibbs to "avoid exposure to dusts, chemicals, smoke and noxious inhalants and extremes of cold and heat." (R. 97 .)

6      Gibbs' FEV1 (*i.e.,* Forced Expiratory Volume) exceeded 1.05 liters. (R. 95.)

The May 6, 2003 "Physical Residual Functional Capacity Assessment" (R. 100-05) found Gibbs' lungs to be clear bilaterally (R. 101), but also indicated that Gibbs should avoid concentrated exposure to extreme cold or heat, wetness, humidity, and fumes, odors, dusts, gases, and poor ventilation (R. 103).

On July 24, 2003, Gibbs underwent a computerized tomography ("CT") scan of her chest, which revealed a "4.9 x 4.6 cm spiculated mass in the right lower lobe consistent with a primary lung neoplasm." (R. 137.) Dr. Maitland, however, could not rule out "local extension of the neoplastic process or a satelite [sic] lesion." (R. 138.)

On February 2, 2004, HS Systems diagnosed Gibbs with an uncontrolled "lung field ( [c]oin lesion lung)" and controlled asthma. (R. 125.) [7] HS Systems recommended a three month rehabilitation plan starting February 10, 2004. (R. 125.) HS Systems concluded that Gibbs' asthma "should not interfere with [Gibbs'] ability to work." (R. 125.)

[7]    Gibbs' FEV1 exceeded 1.05 liters. (R. 335.)

 **\*6** On June 15, 2004, Gibbs' pulmonary function test results were normal except for a "flow volume loop with obstructive (early) contour." (R. 334.) The technician noted that Gibbs often had a productive cough and that, upon exertion, Gibbs usually experienced shortness of breath. (R. 337.)

On July 21, 2004, Gibbs received a chest CT scan that revealed a right lower lobe lung mass that was "mostly cystic," but also contained "multiple enhancing septations and a more solid component inferiorly." (R. 332.) "Etiologies include[d] cavitating lesions[,] ... pneumatoceles, congenital cysts .... Less likely etiologies include[d][a] tumor ... or infectious etiologies such as staphylococcus abscesses ...." (R. 332.)

On August 17, 2004, an RN and a physician at North General Hospital completed an "Initial Interdisciplinary Assessment" ofGibbs. (R. 304-11.) Gibbs indicated that she did not walk up flights of steps. (R. 304.) The assessment revealed that Gibbs had ahistory of asthma and back problems. (R. 306.) The pulmonary testing and cardiac catheterization results were normal. (R. 310.) The same day, Gibbs underwent a right thoracotomy and a right lower lobectomy. (R. 302, 312-14.) The postoperative diagnosis was a "[l]arge abscess, right lung lower lobe, most likely secondary to necrotic infected intrapulmonary sequestration." (R. 312.) On August 27, 2004, Gibbs was discharged and instructed not to carry heavy loads. (R. 301.) Gibbs was diagnosed with "right lower lobe lung: intralobar sequestration, right lower lobe, with acute and chronic inflammation." (R. 321,324, 327.)

On April 28, 2006, Dr. Masood diagnosed Gibbs with right trochanteric bursitis, bronchial asthma and status-post pneumonectomy (R. 271), and treated Gibbs with Advair and an Albuterol inhaler (R. 273). Dr. Masood concluded that Gibbs had no "restrictions involving ... [e]xposure to marked changes in temperature and humidity" and moderate "restrictions involving ... [e]xposure to dusts, fumes, gases, noxious odors and poor ventilation." (R. 275.)

On June 26, 2006, Gibbs reported to consulting physician Dr. William Lathan a history of right lung surgery and bronchial asthma. (R. 221.) Gibbs had undergone a partial right pneumonectomy after being diagnosed with congenital pulmonary abnormality. (R. 221.) Gibbs had been using Advair and Albuterol inhalers. (R. 221-22.) Gibbs stated that she smoked cigarettes and drank alcohol occasionally, but denied the use of "street drugs." (R. 222.) Dr. Lathan found Gibbs to have "[n]o significant chest wall abnormality" and a "healed right posterior lateral thoracotomy incisional scar." (R. 222-23.) Dr. Lathan noted that the results of the pulmonary function test were invalid because of poor reproducibility (R. 223, 225), and recommended that Gibbs "avoid smoke, dust and noxious fumes" (R. 224). [8]

[8]    Gibbs' FEV1 exceeded 1.05 liters. (R. 225-30.)

On September 5, 2006, treating physician Dr. Strauss determined that Gibbs had no "restrictions involving ... [e]xposure to marked changes in temperature and humidity" nor "[e]xposure to dusts, fumes, gases, noxious odors and poor ventilation." (R. 269.)

 **\*7** On September 14, 2006, Gibbs' treating pulmonologist Dr. Rahman completed a "Physician's Report of Disability Due to Physical Impairment." (R. 277-83.) Gibbs' symptoms included shortness of breath and exertional dyspnea. (R. 278.) Dr. Rahman diagnosed Gibbs with sequestration of lung and bronchial asthma [9] (R. 277), and treated Gibbs with Albuterol and Advair inhalers and resection of lung for sequestration (R. 279). Dr. Rahman determined that, during an eight hour day, Gibbs could sit continuously in a normal seated position eight hours; stand continuously at a work station without moving eight hours; and walk continuously. (R. 280.) Dr. Rahman also concluded that Gibbs could occasionally carry eleven to twenty pounds. (R. 281.) Dr. Rahman opined that Gibbs did not need to lie down during the day. (R. 279.)

[9]    Gibbs was also diagnosed with "s/p [status post] [r]esection." (R. 277.)

*Anxiety*

On April 8, 2003, consultative psychiatrist Dr. Richard King of DHS examined and evaluated Gibbs. (R. 92-93.) Dr. King indicated that Gibbs had received outpatient treatment at the Northside Community Center for anxiety and depression from 1998 to 2000, and again since 2001, but with "no history of any psychiatric hospitalizations." (R. 92.) Dr. King reported the following about Gibbs' mental status: "Affect was fairly well modulated, friendly, and appropriate. Mood was euthymic, not significantly depressed or anxious. There were no hallucinations, delusions, suicidal ideations, and ideas of reference or paranoid trends elicited." (R. 92.) Dr. King diagnosed Gibbs with "[a]djustment disorder of adult life, anxious and depressed mild degree," and concluded that Gibbs "ha[d] a satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting." (R. 93.) Dr. King recommended that Gibbs would benefit from psychiatric treatment. (R. 93.)

On May 12, 2003, consultative psychiatrist Dr. Richard Nobel examined and evaluated Gibbs. (R. 106-19.) Dr. Nobel diagnosed Gibbs with "adjustment disorder of adult life, anxious and depressed mild degree," but concluded that the impairment was not severe. (R. 106, 109.) Dr. Nobel determined that Gibbs had no functional limitations, that is, no restrictions of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of deterioration. (R. 116.) On February 2, 2004, HS Systems diagnosed Gibbs with the following controlled disorders: "[d]epressive disorder ... [n]eurotic disorders ... [and][a]lcohol abuse." (R. 125.) HS Systems concluded that these conditions "should not interfere with [Gibbs'] ability to work." (R. 125.)

### Carpal Tunnel Syndrome
On April 8, 2003, consultative DHS physician Dr. Polak reported that Gibbs' finger and hand dexterity were intact, and that Gibbs had full use of both hands when dressing and undressing. (R. 97.) The May 6, 2003 "Physical Residual Functional Capacity Assessment" indicated that Gibbs had no "manipulative limitations." (R. 102.) On April 28, 2006, Dr. Masood concluded that, during an eight hour day, Gibbs could frequently use either hand for repetitive action, such as handling, fingering, and pushing and pulling arm controls. (R. 274.) On June 26, 2006, Dr. Lathan reported that Gibbs' "[h]and and finger dexterity [were] intact" and that her "[g]rip strength [was] 5/5 bilaterally." (R. 223.) Finally, on September 5, 2006, Dr. Strauss determined that, during an eight hour day, Gibbs could "[c]ontinuously" use either hand for repetitive action. (R. 268.)

### Heart Condition
**\*8** On July 22, 2004, Gibbs underwent single photon emission computed tomography ("SPECT") imaging of her heart at North General Hospital. (R. 331,333.) Gibbs' Radiology Report indicated an "apparent small, mild reversible anterolateral defect extending from apex to proximal ventricle." (R. 331,333.) The reversible anterolateral defect could represent a "small zone of mild inducible ischemia estimated to encompass less than 5 percent of the left ventricular myocardium" or a "differential breast attenuation artifact." (R. 331,333.)

On July 29, 2004, Gibbs underwent a "[l]eft [h]eart [c]ath[eteriztion], [l]eft [v] entriculogram, [c]oronary [a]ngiogram[ ][and] lleo-femoral angiogram" at St. Luke's Roosevelt Hospital Center. (R. 285-85A, 329-30; see also R. 129 .) The procedure revealed normal coronary arteries (R. 130, 285-85A, 329-30), and Gibbs was diagnosed with an unremarkable cardiac catheterization (R. 129.) On June 26, 2006, Dr. Lathan reported that Gibbs' heart had a regular rhythm and that "[n]o murmur, gallop or rub [was] audible." (R. 223.)

### The ALJs' Decisions

### ALJ Greenberg's October 7, 2004 Decision
On October 7, 2004, ALJ Greenberg denied Gibbs' applications for disability insurance benefits and SSI benefits in a written decision. (R. 11-18.)

ALJ Greenberg reviewed Gibbs' hearing testimony and the medical evidence in the record. (R. 15-18.) ALJ Greenberg found that Gibbs' claims regarding her functional abilities were "not fully credible" (R. 17), and that Gibbs "ha[d] no limitations in activities of daily living, social functioning, and concentration, persistency and pace" and "no documented episode of decompensation" (R. 17-18).

ALJ Greenberg noted that Gibbs had been diagnosed with chronic back pain. (R. 17.) The medical evidence indicated that following a fall on her left buttock and leg, Gibbs was examined at the Health Network on May 16, 2003, where an x-ray revealed that there was no fracture, and the doctors recommended physiotherapy. (R. 16.) ALJ Greenberg reviewed Dr. Polak's April 8, 2003 report, which stated that

Gibbs walked with the assistance of a cane, but was able to walk without it; Gibbs had no difficulty transferring from a seated position on and off the examining table; and Dr. Polak diagnosed Gibbs with chronic back pain but ruled out lumbosacral degenerative joint disease and found only mild limitations in carrying/lifting, bending, sitting and walking/ standing. (R. 16.)

ALJ Greenberg also noted that Gibbs hadbeen diagnosed with asthma and lungmass. (R. 16, 17.) A July 24, 2003 CT scan of Gibbs' chest revealed nodules in the left lower lobe, and a bone scan was recommended to exclude bony metastatic disease. (R. 16.) On April 8, 2003, Dr. Polak found mild restrictive airway disease, and environmental restrictions. (R. 16.) At the August 11, 2004 hearing, Gibbs had testified that she was scheduled to undergo lung surgery on August 17, 2004. (R. 16.) Gibbs further testified that although she had asthma, she could attend to her household chores. (R. 16.) ALJ Greenberg stated that there were no medical records from 2002 and "that both consultative physicians found, essentially, that [Gibbs] could function in the workplace." (R. 16 .)

**\*9** ALJ Greenberg also acknowledged that Gibbs had been diagnosed with mild adjustment disorder. (R. 17.) A July 2, 2004 note indicated that Gibbs was scheduled to see a social worker on July 30, 2004. (R. 16.) On April 8, 2003, consultative psychiatrist Dr. King examined Gibbs, who reported that she could perform routine activities of daily living. (R. 16.) After noting that Gibbs' intellectual functioning was average and memory was grossly intact, Dr. King diagnosed Gibbs with "adjustment disorder of adult life, anxious and depressed to a mild degree," but he concluded that Gibbs could function in the workplace. (R. 16.)

With regard to Gibbs' heart condition, ALJ Greenberg noted that Gibbs underwent a cardiac catheterization on July 29, 2004. (R. 16.) ALJ Greenberg did not discuss Gibbs' alleged carpal tunnel syndrome. (*See* R. 14-18.)

After reviewing the evidence, ALJ Greenberg performed the appropriate five step legal analysis, as follows: At the first step, ALJ Greenberg found that Gibbs had "not engaged in substantial gainful activity since July 21, 2000." (R. 15.) At the second and third steps, ALJ Greenberg found that although Gibbs' chronic back pain, asthma, lung mass and mild adjustment disorder constituted "severe" impairments, they did "not meet or equal a listing in Appendix 1, SubpartP, Regulations No. 4." (R. 15.) At the fourth step, ALJ

Greenberg found that Gibbs retained the residual functional capacity to "sit for 4 hours, stand/walk for 3 hours and lift up to 10 pounds in an environment free of environmental irritants." (R. 15, 17.) ALJ Greenberg found that Gibbs could perform her past relevant work, which he characterized as "sitting for 4 hours, standing/walking for 3 hours and lifting 10 pounds in an environment that was free of environmental irritants." (R. 17-18.) ALJ Greenberg concluded that Gibbs was not under a disability as defined in the Social Security Act at any time since July 16, 2002, and therefore denied Gibbs' application for disability insurance benefits and SSI benefits. (R. 15, 18.)

### Review of ALJ Greenberg's Decision Leads To A Remand

On March 30, 2005, the Appeals Council denied Gibbs' request for review of ALJ Greenberg's decision. (R. 6-8.) As noted above, Gibbs brought an action in this court, and on March 6, 2006, on the parties' stipulation, Judge Daniels vacated the Commissioner's decision and remanded "pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings." (R. 201. 210-12: *see also* R. 176,193,208.)

On April 5, 2006, the Appeals Council vacated ALJ Greenberg's decision and remanded for further proceedings "in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence." (R. 208-09.) The Appeals Council noted that Gibbs' "Disability Report indicate[d] that she was treated by Dr. Enu for asthma," yet "the record contain[ed] no treatment records from Dr. Enu or any records of treatment for asthma from any source." (R. 208.) The Appeals Council also noted that because ALJ Greenberg's decision was rendered on the same day as Gibbs' scheduled surgery for the removal of a lung mass, there were "no records of treatment for [Gibbs'] lung condition and no records regarding [Gibbs'] status following the surgery." (R. 208.) The Appeals Council also noted that Gibbs testified that she "had undergone an angioplasty with [the] placement of a stent," but that the record contained no "treatment records for [Gibbs'] heart condition and her symptoms and functional limitations." (R. 208.) The Appeals Council specifically directed the ALJ to "obtain treatment records and updated medical evidence concerning [Gibbs'] asthma, removal of a lung mass and heart condition." (R. 208.)

### ALJ Walsh's March 26. 2007 Decision

**\*10** As noted above, on February 28, 2007, Gibbs, Dr. Bernanke and vocational expert Clark testified at a hearing before ALJ Walsh. (R. 342-416; *see* pages 3-7 above.)

On March 7, 2007, Claudia Costa, Gibbs' Non-Attorney Representative, wrote to ALJ Walsh requesting that "no weight be given to Ms. Clark's testimony as it is flawed" or, if any weight be given, "that Ms. Clark address [certain] issues ... at a supplemental hearing." (R. 181-83.) Costa argued that there were fewer sedentary surveillance system monitors in the national and local economy than Clark testified to. (R. 182.) Costa also maintained that the identification numbers to which Clark testified were not in the DOT, Clark used the wrong number for bench assembly worker, and the jobs to which Clark testified were inappropriate for the hypothetical person posed by ALJ Walsh. (R. 181-82.) Costa also noted that although Clark classified a bench assembly worker as "sedentary, unskilled, SVP two" work (R. 398), the correct classification is light work (R. 182-83.)

ALJ Walsh denied Gibbs' applications for disability insurance benefits and SSI benefits in a written decision on March 26, 2007. (R. 190-200.) ALJ Walsh reviewed the testimony from Gibbs' hearing and the medical evidence in the record. (R. 195-200.) ALJ Walsh noted that Gibbs "alleged that she cannot bend or climb stairs and is limited to standing for ten minutes at one time, sitting for fifteen to twenty minutes, and lifting five pounds." (R. 199.) ALJ Walsh pointed out that Gibbs' treating pulmonologist Dr. Rahman concluded that Gibbs could sit and stand eight hours and could occasionally lift and carry up to twenty pounds. (R. 199.) ALJ Walsh determined that the "objective evidence [did] not show any abnormalities that would reach the level of the listings of Section 1.00," Musculoskeletal System. (R. 196.)

ALJ Walsh acknowledged that Gibbs testified that she had asthma with shortness of breath, but did not use a nebulizer. (R. 199.) ALJ Walsh noted that physical exams revealed that Gibbs' lungs were frequently clear and pulmonary function tests consistently revealed mild to moderate asthma. (R. 199.) ALJ Walsh stated that although Gibbs reported at her hearing and consultative exam a history of emergency room visits due to asthma, no records of any of these visits were provided. (R. 196.) ALJ Walsh determined that the record did not contain any "valid results of [a] pulmonary function test that would meet or medically equal Listings 3.02 or 3.03," dealing with respiratory systems. (R. 196.)

ALJ Walsh also noted that Gibbs testified that she had anxiety attacks twice a week. (R. 199.) ALJ Walsh stated, however, that the medical evidence did not include any recent psychiatric treatment and that "the consultative psychiatrist's report [was] consistent with the available evidence." (R. 199.) ALJ Walsh determined that although the record revealed that Gibbs had mild anxiety, which caused "mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace," it did not meet the "B" or "C" criterion of Listings 12.04 or 12.06, mental disorders. (R. 196.)

**\*11** ALJ Walsh did not make any conclusions regarding Gibbs' alleged carpal tunnel syndrome or heart condition. (*See* R. 193-200.) ALJ Walsh merely noted that the results of Gibbs' July 29, 2004 cardiac catheterization were normal. (R. 197.)

After considering Gibbs' statements to physicians, as well as the medical evidence, ALJ Walsh determined that Gibbs' "medically determinable impairments could reasonably be expected to produce the alleged symptoms," but that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (R. 199.)

After reviewing the evidence, ALJ Walsh performed the appropriate five step legal analysis, as follows: At the first step, ALJ Walsh found that Gibbs had not engaged in substantial gainful activity since July 21, 2000, Gibbs' claimed disability onset date. (R. 195.) At the second step, ALJ Walsh found that Gibbs' asthma, back and right knee pain and mild anxiety constituted severe impairments based upon medical evidence. (R. 196.) At the third step, ALJ Walsh found that while Gibbs had severe impairments, she did not have "an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 196.) At the fourth step, ALJ Walsh found that Gibbs retained the residual functional capacity to perform "sedentary work, consisting of the ability to lift no more than five pounds, sit for six hours, and stand and walk for two hours in an eight-hour workday, with a sit/stand option and a reasonably clean air environment." (R. 196.) ALJ Walsh found that Gibbs could perform her past relevant work as a customer service representative, which he characterized as "sedentary SVP 2 work and would ... allow for requirements of a sit/stand option, lifting a maximum of five pounds, and a reasonable clean air environment." (R. 200.) ALJ Walsh concluded

that Gibbs was not "under a disability, as defined in the Social Security Act, from July 21, 2000 through the date of this decision," and denied Gibbs' applications for disability insurance benefits and SSI benefits. (R. 200.)

On August 3, 2007, Gibbs' non-attorney representative Costa appealed ALJ Walsh's March 26, 2007 decision, asking the Appeals Council to reverse the decision or, in the alternative, remand the case for proper adjudication. (R. 176-78.) First, Costa argued that ALJ Walsh erroneously relied on flawed vocational expert testimony. (R. 177.) Costa referenced her March 7, 2007 letter in which she had claimed that Clark's testimony was inconsistent with the DOT, and the representative occupations were inconsistent with the hypothetical residual functional capacity posed by ALJ Walsh. (R. 177.) Costa asked for remand in order to clarify Clark's testimony. (R. 177.) Second, Costa argued that ALJ Walsh failed to consider all of Gibbs' functional limitations. (R. 177.) Costa specifically stated that Dr. Strauss' opinion (namely, Gibbs' need to lie down one hour each eight hours) supported a finding of disability. (R. 177.) Third, Costa argued that ALJ Walsh failed to follow remand orders by not obtaining any medical records from Dr. Enu or discussing any treatment rendered by Dr. Enu, not obtaining medical records regarding an angioplasty or a stent, and not discussing Gibbs' cardiac condition. (R. 177-78.)

**\*12** ALJ Walsh's decision became the final decision on August 25, 2007, when the Appeals Council found no reason to assume jurisdiction. (R. 172-75.) The Appeals Council responded to Gibbs' representative's August 3, 2007 letter as follows: First, ALJ Walsh found that Gibbs had "the residual functional capacity to perform sedentary work, consisting of the ability to lift no more than five pounds, sit for six hours, and stand and walk for two hours in an eight-hour workday, with a sit/stand option in a reasonably clear air environment." (R. 172.) Clark testified that Gibbs could "perform her past work as a customer service representative with the limitations in her" residual functional capacity. (R. 172.) Second, although Dr. Strauss opined that Gibbs needed to lie down one hour during the day, other portions of Dr. Strauss' assessment as well as the assessments of Dr. Rahman and Dr. Masood supported the residual functional capacity in ALJ Walsh's decision. (R. 172.) Third, pursuant to the remand order, the record contained the operative report of Gibbs' lung mass removal, pulmonary function test results, Dr. Masood and Dr. Rahman's diagnoses and opinions, and the results of the cardiac catheterization (R. 172-73.) Additionally, Dr. Enu treated Gibbs in the past [10]

and his treatment records were in Gibbs' prior file, and are relevant to the prior (unappealed) July 15, 2002 decision denying benefits. (R. 173 .)

[10]    Gibbs' "Disability Report-Adult" dated March 12, 2003 (R. 50-59) indicated that she had last seen Dr. Enu in 2001 and had no further appointments scheduled with him (R. 53, 66).2001 was before Gibbs' eligibility date for DIB or SSI benefits.

## *ANALYSIS*

## I. *THE APPLICABLE LAW*

### A. *Definition of Disability*

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3) (A); *see, eg., Barnhart v. Thomas,* 540 U.S. 20, 23, 124 S.Ct. 376, 379 (2003); *Bamhart v. Walton,* 535 U.S. 212, 214, 122 S.Ct. 1265, 1268 (2002); *Betances v. Comm'r of Soc Sec.,* 206 Fed. Appx. 25, 26 (2d Cir.2006); *Surgeon v. Comm'r of Soc Sec.,* 190 Fed. Appx. 37, 39 (2d Cir.2006); *Rodriguez v. Bamhart,* 163 Fed. Appx. 15, 16 (2d Cir.2005); *Malone v. Barnhart,* 132 Fed. Appx. 940, 941 (2d Cir.2005); *Butts v. Barnhart,* 388 F.3d 377, 383 (2d Cir.2004), *amended on other grounds, 416 F.3d 101 (2d Cir.2005).* [11]

[11]    *See also, e.g., Green-Younger v. Bamhart,* 335 F.3d 99, 106 (2d Cir.2003); *Veino v. Bamhart.* 312 F.3d 578, 586 (2d Cir.2002); *Draegert v. Bamhart.* 311 F.3d 468, 472 (2d Cir.2002); *Shaw v. Chater.* 221 F.3d 126, 131 (2d Cir.2000); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Brown v. Apfel,* 174 F .3d 59, 62 (2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996).

An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

**\*13** 42 U.S.C. §§ 423(d)(2)(A)(B), 1382c(a)(3)(B)(G); *see, e.g., Barnhart v. Thomas,* 540 U.S. at 23, 124 S.Ct. at 379; *Bamhart v. Walton.* 535 U.S. at 218, 122 S.Ct. at 1270; *Betances v. Comm'r of Soc Sec.* 206 Fed. Appx. at 26; *Butts v. Barnhart,* 388 F.3d at 383; *Draegert v. Barnhart,* 311 F.3d at 472. [12]

> [12]    *See also, e.g., Shaw v. Chater,* 221 F.3d at 131-32; *Rosa v. Callahan,* 168 F.3d at 77; *Balsamo v. Chater,* 142 F.3d at 79.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Mongeur v. Heckler.* 722 F.2d 1033, 1037 (2d Cir.1983) (per curiam). [13]

> [13]    *See, e.g., Brunson v. Callahan,* No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); *Brown v. Apfel,* 174 F.3d at 62; *Carroll v. Sec'y of Health & Human Servs.,* 705 F.2d 638, 642 (2d Cir.1983); *Rivas v. Barnhart,* 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, 2005).

**B. *Standard of Review***

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination. *E.g., Acierno v. Barnhart,* 475 F.3d 77, 80-81 (2d Cir.), *cert. denied,* 127 S.Ct. 2981 (2007); *Halloran v. Barnhart* 362 F.3d 28, 31 (2d Cir.2004), *Jasinski v. Barnhart,* 341 F.3d 182, 184 (2d Cir.2003); *GreenYounger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir.2003); 42 U.S.C. § 405(g). [14] " 'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.' " *Morris v. Barnhardt,* 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002). [15]

> [14]    *See also, e.g., Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Vapne v. Apfel,* 36 Fed. Appx. 670, 672 (2d Cir.), *cert. denied,* 537 U.S. 961, 123 S.Ct. 394 (2002); *Horowitz v. Bamhart,* 29 Fed. Appx. 749, 752 (2d Cir.2002); *Machadio v. Apfel,* 276 F.3d 103, 108

(2d Cir.2002); *Shaw v. Chater,* 221 F .3d 126, 131 (2d Cir.2000); *Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000); *Brown v. Apfel,* 174 F.3d 59, 61 (2d Cir.1999); *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991); *Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983); *Dumas v. Schweiker,* 712 F.2d 1545. 1550 (2d Cir.1983); *Rodriguez v. Barnhart,* 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004), *aff'd,* 163 Fed. Appx. 15 (2d Cir.2005).

> [15]    *See also, e.g., Duran v. Barnhart,* 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 7, 2003); *Florencio v. Apfel,* 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (internal quotations & alterations omitted).

The Supreme Court has defined "substantial evidence" as " 'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Peralesu,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); *accord, e.g., Rosa v. Callahan,* 168 F.3d at 77; *Tejada v. Apfel,* 167 F.3d at 773-74. [16] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." *Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), *cert. denied,* 459 U.S. 1212, 103 S.Ct. 1207(1983). The Court must be careful not to " 'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.' " *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991). However, the Court will not defer to the Commissioner's determination if it is " 'the product of legal error.' " *E.g., Duvergel v. Apfel,* 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); *see also, e.g., Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004), *amended on other grounds,* 416 F.3d 101 (2d Cir.2005); *Tejada v. Apfel,* 167 F.3d at 773 (citing cases).

> [16]    *See also, e.g., Halloran v. Barnhart,* 362 F.3d at 31; *Jasinski v. Barnhart,* 341 F.3d at 184; *Green-Younger v. Barnhart,* 335 F.3d at 106; *Veino v. Barnhart,* 312 F.3d at 586; *Shaw v. Chater,* 221 F.3d at 131; *Curry v. Apfel,* 209 F.3d at 122; *Brown v. Apfel,* 174 F.3d at 61; *Perez v. Chater,* 77 F.3d at 46.

**17**      *See also, e.g., Colling v. Barnhart,* 254 Fed. Appx. 87, 88 (2d Cir.2007); *Veino v. Barnhart,* 312 F.3d at 586; *Toles v. Chater,* No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416 .920; *see, e.g., Barnhart v. Thomas,* 540 U.S. 20, 24-25, 124 S.Ct. 376, 379-80 (2003); *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> **\*14**   Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a fivestep sequential evaluation process to determine disability. *See* 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income). If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." §§ 404.1520(b), 416.920(b). [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404 .1520(d), 416.920(d). [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas,* 540 U.S. at 24-25, 124 S.Ct. at 379-80 (fns.omitted); **18** *accord, e.g., Williams v. Comm'r of Soc. Sec .,* 236 Fed. Appx. 641, 643 (2d Cir.2007); *Betances v.*

*Comm'r of Soc. Sec.,* 206 Fed. Appx. at 26; *Rosa v. Callahan,* 168 F.3d at 77; *Tejada v. Apfel,* 167 F.3d at 774. **19**

**18**      Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. *See* 68 Fed.Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); *see also Barnhart v. Thomas,* 540 U.S. at 25 n. 2, 124 S.Ct. at 380 n. 2. The amendments, *inter alia,* added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; *see* 68 Fed.Reg. 51156. The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. *See* 68 Fed.Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case. (*See* pages 21-24 above.)

**19**      *See also, e.g., Jasinski v. Barnhart,* 341 F.3d at 183-84; *Green-Younger v. Barnhart,* 335 F.3d at 106; *Draegert v. Barnhart.* 311 F.3d 468, 472 (2d Cir.2002); *Shaw v. Chater,* 221 F.3d at 132; *Curry v. Apfel,* 209 F.3d at 122; *Brown v. Apfel,* 174 F.3d at 62; *Balsamo v. Chater,* 142 F.3d at 79-80; *Schaal v. Apfel,* 134 F.3d at 501; *Perez v. Chater,* 77 F.3d at 46; *Dixon v. Shalala,* 54 F.3d 1019, 1022 (2d Cir.1995); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. *See, e.g., Barnhart v. Thomas,* 540 U.S. at 25, 124 S.Ct. at 379-80. **20**

**20**      *See also, e.g., Williams v. Comm'r of Soc Sec.,* 236 Fed. Appx. at 643; *Betances v. Comm'r of Soc Sec.* 206 Fed. Appx. at 26; *Butts v. Bamhart.* 388 F.3d 377, 383 (2d Cir.2004); *Green-Younger v. Barnhart,* 335 F.3d at 106; *Draegert v. Barnhart,* 311 F.3d at 472; *Curry v. Apfel,* 209 F.3d at 122; *Rosa v. Callahan,* 168 F.3d at 80; *Perez v. Chater,* 77 F.3d at 46; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

### C. The Treating Physician Rule

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

**\*15** 20 C.F.R. § 404.1527(d)(2); *see, e.g., Colling v. Barnhart,* 254 Fed. Appx. 87, 89 (2d Cir.2007); *Lamorey v. Barnhart,* 158 Fed. Appx. 361, 362 (2d Cir.2006). [21]

[21] *See also, e.g., Foxman v. Barnhart,* 157 Fed. Appx. 344, 346 (2d Cir.2005); *Tavarez v. Barnhart,* 124 Fed. Appx. 48, 49 (2d Cir.2005); *Donnelly v. Barnhart,* 105 Fed. Appx. 306, 308 (2d Cir.2004); *Halloran v. Barnhart,* 362 F.3d 28, 32 (2d Cir.2004); *Green-Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *Kamerling v. Massanari,* 295 F.3d 206, 209 n. 5 (2d Cir.2002); *Jordan v. Barnhart,* 29 Fed. Appx. 790, 792 (2d Cir.2002); *Bond v. Soc. Sec. Admin.,* 20 Fed. Appx. 20, 21 (2d Cir.2001); *Shaw v. Chafer,* 221 F.3d 126, 134 (2d Cir.2000); *Rosa v. Callahan,* 168 F.3d 72, 78-79 (2d Cir.1999); *Clark v. Comm'r of Soc. Sec,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); *see, e.g., Foxman v. Barnhart,* 157 Fed. Appx. at 346-47; *Halloran v. Barnhart,* 362 F.3d at 32; *Shaw v. Chater,* 221 F.3d at 134;

*Clark v. Comm'r,* 143 F.3d at 118: *Schaal v. Apfel,* 134 F.3d at 503 [22]

[22] *See also, e.g., Kugielska v. Astrue,* 06 Civ. 10169, 2007 WL 3052204 at \*8 (S.D.N.Y. Oct. 16, 2007); *Hill v. Barnhart,* 410 F.Supp.2d 195, 217 (S.D.N.Y.2006); *Klett v. Barnhart,* 303 F.Supp.2d 477, 484 (S.D.N.Y 2004); *Rebull v. Massanari,* 240 F.Supp.2d 265, 268 (S.D.N.Y.2002).

The Commissioner's "treating physician" regulations were approved by the Second Circuit in *Schisler v. Sullivan.* 3 F.3d 563, 568 (2d Cir.1993).

## II. *THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE STEP SEQUENCE, BECAUSE GIBBS' COMPLAINT IS CONCLUSORY AND SHE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION* [23]

[23] For additional decisions by this Judge discussing the grant of judgment on the pleadings to the Government in Social Security cases where the plaintiff has filed no opposing papers (or only conclusory papers) in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Anderson v. Astrue,* 07 Civ. 7195, 2008 WL 655605 at \*9-10 (S.D.N.Y. Mar. 12, 2008), *report & rec. adopted,* 2008 WL 2463885 (S.D.N.Y. June 18, 2008); *Snipe v. Barnhart,* 05 Civ. 10472, 2006 WL 2390277 at \*10-11 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), *report & rec. adopted.* 2006 WL 2621093 (S.D.N.Y. Sep. 12, 2006); *Feliciano v. Bamhart.* 04 Civ. 9554, 2005 WL 1693835 at \*9-10 (S.D.N.Y. July 21, 2005) (Peck, M.J.); *Morgan v. Barnhart,* 04 Civ. 6024, 2005 WL 925594 at \*9-10 (S.D.N.Y. Apr. 21, 2005) (Peck, M.J.), *report & rec. adopted,* 2007 WL 2609897 (S.D.N.Y. Sept. 5, 2007); *Rodriguez v. Bamhart.* 04 Civ. 4514, 2005 WL 643190 at \*8-9 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Bamhart.* 03 Civ. 0077, 2003 WL 21526937 at \*9 (S.D.N.Y. July 8, 2003) (Peck, M.J.), *report & rec. adopted,* 2003 WL 21755932 (S.D.N.Y. July 30, 2003); *De Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at \*10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at \*6-8 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), *report & rec. adopted,* 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); *Morrel v. Massanari,* 01 Civ. 0186, 2001 WL 776950 at \*7 (S.D.N.Y. July 11, 2001) (Peck, M.J.); *Casiano v. Apfel,* 39 F.Supp.2d 326, 327-28 (S.D.N.Y.1999) (Stein,

D.J. & Peck, M.J.), *aff'd mem., No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (2d Cir. Jan. 14, 2000).*

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. *See, e.g., Curry v. Apfel, 209 F.3d 117, 122 (2d Cir.2000); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir.1999)* ("The claimant generally bears the burden of proving that she is disabled under the statute ..."); *Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir.1981)* ("It is well established that the burden of proving disability is on the claimant ."); *Dousewicz v. Harris, 646 F.2d 771, 772 (2d Cir.1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir.1980); Adams v. Flemming, 276 F.2d 901, 903 (2d Cir.1960)* ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established ..., namely, 'the burden of sustaining the claim for benefits is on the claimant' and 'The findings of the Social Security Agency are final and binding if there is a substantial basis for them.' "). [24]

[24] *See also, e.g., Pena v. Barnhart, 01 Civ 502, 2002 WL 31487903 at * 8 (S.D.N.Y. Oct. 29, 2002); Reyes v. Barnhart, 01 Civ 1724, 2002 WL 31385825 at *5 (S.D.N.Y. Oct. 21, 2002); Ortiz v.. Shalala, 93 Civ. 3561, 1994 WL 673630 at *1 (S.D.N.Y. Dec. 1, 1994); Morton v. Heckler, 586 F.Supp. 110, 111 (W.D.N.Y.1984);* Harvey L. McCormick, *Soc. Sec. Claims & Proc.* § 14:16 (5th ed. 1998) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the burden of establishing the correctness of his or her contention. The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure....").

Here, Gibbs' pro se complaint states only that she should receive disability insurance benefits and SSI because of "COPD, anxiety, [and] lung sequesion [sic]." (Dkt. No. 2: Compl. ¶ 4.) Gibbs has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings, and the filing deadline for doing so has passed. (*See* Dkt. Nos. 6 & 7: 1/14/08 & 2/25/08 Orders.) Thus, Gibbs does not point to any specific testimony or evidence which she believes ALJ Walsh overlooked or unjustly weighed. Gibbs' complaint is conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings. *See* cases cited in fn.23 above; *see also, e.g., Loper v. Barnhart, No. 05-CV-6563, 2006 WL 1455480 at *2 (W.D.N.Y. May 9, 2006)* (citing my *Alvarez* decision); *Winegard v. Barnhart, No. 02-CV-6231, 2006 WL 1455479 at *9-10 (W.D.N.Y. Apr. 5, 2006)* (same); *Reyes v. Barnhart, 01 Civ. 4059, 2004 WL 439495 at *3 (S .D.N.Y. Mar. 9, 2004)* (following my decisions in *Jiang, Alvarez* and *Morrel* );

*Counterman v. Chater, 923 F.Supp. 408, 414 (W.D.N.Y.1996)* (Court rejects plaintiff's allegations that the ALJ "failed to consider [minor claimant's] parent's testimony as medical evidence, failed to consider all the medical evidence, failed to consider [child's] mother's testimony with respect to the IFA analysis, and failed to render his decision based upon the record as a whole," on the ground that they are "broad and conclusory. She offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); *Steiner v. Dowling, 914 F.Supp. 25, 28* n.l (N.D.N.Y.1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiffs-providing only a single conclusory paragraph in their Statement of Undisputed Facts ..., and in their Attorney's Affirmation...."), *affd, 76 F.3d 498 (2d Cir.1996); see generally* S.D.N.Y. Local Civil Rule 7.1 ("all motions and all oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon in support of or in opposition to the motion .... Willful failure to comply with this rule maybe deemed sufficient cause for the denial of a motion or for the granting of a motion by default.").

## III. *APPLICATION OF THE FIVE STEP SEQUENCE TO GIBBS' CLAIMS*

**\*16** For the reasons set forth in Point II above, the Court need not apply the five-step sequence to Gibbs' claims. Even if the Court were to do so, however, the Commissioner's decision that Gibbs was not disabled should be affirmed since it is supported by substantial evidence.

### A. *Gibbs Was Not Engaged in Substantial Gainful Activity*

The first inquiry is whether Gibbs was engaged in substantial gainful activity after her applications for disability insurance benefits and SSI. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. ALJ Walsh's conclusion that Gibbs was not engaged in substantial gainful activity during the applicable time period (R. 195; *see* page 23 above) benefits Gibbs and is not disputed by the Commissioner. (*See* Dkt. No. 9: Comm'r Br. at 17.)

### B. *Gibbs Demonstrated Severe Physical Impairments That Significantly Limited Her Ability To Do Basic Work Activities*

The next step of the analysis is to determine whether Gibbs proved that she had a severe impairment or combination of impairments that "significantly limit [ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> ... walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, and remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations.

20 C.F.R. § 404.1521(b)(l)-(5). The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999) (citing 20 C.F.R. § 404.1520(C)). On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken. See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12, 107 S.Ct. 2287, 2298 n. 12 (1987)).

ALJ Walsh determined that the medical evidence indicated that Gibbs' asthma, back and right knee pain, and mild anxiety were impairments that were severe within the meaning of the Regulations. (R. 196; see page 23 above.) These findings benefit Gibbs and are not disputed by the Commissioner. (See Dkt. No. 9: Comm'r Br. at 17-18.) The Court therefore proceeds to the third step of the five part analysis.

## C. Gibbs Did Not Have A Disability Listed in Appendix 1 of the Regulations

**\*17** The third step of the five-part test requires a determination of whether Gibbs had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir.1995).

ALJ Walsh found that while Gibbs' medical conditions were "severe," Gibbs "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 196.) Appendix 1 provides a categorization of physical impairments, including the musculoskeletal, respiratory and cardiovascular systems, as well as mental disorders and malignant neoplastic diseases. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 3.00, 4.00, 12.00, 13.00. At the hearing before ALJ Walsh, Gibbs* representative agreed that her impairments did not meet or exceed the Listings. (R. 368; see page 6 above.) The Court nevertheless will conduct a third step analysis.

### 1. Gibbs' Knee and Back Pain Do Not Satisfy Appendix 1

Sections 1.02 and 1.04 outline the conditions required to establish disorders of the joint and spine. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.02, 1.04. Gibbs' knee pain must qualify as "Major dysfunction of a joint" to constitute as an Appendix 1 impairment:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e ., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. "Inability to ambulate effectively" means

an extreme limitation of the ability to walk; *i.e.,* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P.App. 1, § 1.00(B)(2)(b)(l). "To ambulate effectively,"

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

**\*18** 20 C.F.R., Pt. 404, Subpt. P.App. 1, § 1.00(B)(2)(b)(2).

ALJ Walsh found that Gibbs' right knee pain constituted a severe impairment but did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (*See* page 23 above.) Dr. Bernanke testified at the February 28, 2007 administrative hearing that Gibbs would have some difficulty walking. (*See* page 6 above.) Gibbs indicated, however, that although she had experienced right knee pain since 2006, and sometimes had difficulty walking, she was able to go for walks or travel three blocks to the store. (*See* pages 4-5 above.) An April 8, 2003 examination by Dr. Polak found that while Gibbs walked with the assistance of a cane, Gibbs could walk without it. (*See* page 7 above.) On May 6, 2003, a consultative physician found that Gibbs could walk about six hours in an eight hour day. (*See* page 8 above.) Doctors stated that Gibbs would have no difficulty traveling alone to work on a daily basis by bus or subway. (R. 269, 275.) Indeed, Gibbs herself said she used public transportation (R. 83) and took the bus to see her doctors (R. 169). Therefore, because Gibbs' knee pain did not seriously interfere with Gibbs' ability to independently initiate, sustain or complete activities, it does not qualify as a major dysfunction of the joint.

In addition, Gibbs' back pain would have to qualify as a "Disorder[ ] of the spine" to qualify as an Appendix 1 impairment. Specifically, an individual must have a disorder

(e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion

of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.

ALJ Walsh found that Gibbs' back pain constituted a severe impairment, but did not meet or medically equal a Listed impairment. (*See* page 23 above.) Gibbs was diagnosed with chronic back pain and "[g]rade II spondylolisthesis of L5 over S1 with associated spondylolysis at the L5 level." (R. 94.) Even if spondylolisthesis or spondylolysis qualifies as a disorder of the spine, there is no evidence that either was accompanied by the conditions listed in § 1.04(A), (B) or (C). As to subsection A, Dr. Strauss noted muscle atrophy and decreased motion (R. 265), and Dr. Polak noted "left lower lumbar pain, which radiate[d] to the left hip" (R. 96). Dr. Polak, however, found that Gibbs had no difficulty transferring from a seated position on and off the examining table and that straight leg raising was negative. (*See* page 7 above.) In addition, Dr. Lathan found no limitation of motion and "straight leg raising negative bilaterally ." (R. 223.) In the absence of evidence indicating nerve root compression, sensory or reflex loss, and positive straight-leg testing, the presence of some muscle atrophy, limitation of motion and radiating pain is insufficient to meet the Appendix 1 Listing. *See, e.g., Otts v. Comm'r of Soc. Sec.,* 249 Fed. Appx. 887, 889 (2d Cir.2007) (plaintiff not disabled with a spinal disorder under § 1.04(A) where plaintiff's treating physician found some decreased muscle strength, motion and sensation in plaintiff's arm, but did not find nerve root compression); *McKinney v. Astrue,* No. 05-CV-0174, 2008 WL 312758 at *5 (N.D.N.Y. Feb. 1, 2008) (plaintiff not disabled under §

1.04(A) where plaintiff did not satisfy "the combination of *all* symptoms as well as evidence of a compromised nerve root or spinal cord").

**\*19** As to subsection B, although Dr. Strauss found that, during an eight hour day, Gibbs could sit continuously one hour in a normal seated position and stand continuously thirty minutes at a work station without moving (*see* page 11 above),[25] there is no evidence in the record of Gibbs being diagnosed with spinal arachnoiditis, manifested by severe burning or painful dysesthesia. In the absence of evidence indicating spinal arachnoiditis, the need for changes in position or posture more than once every two hours is insufficient to satisfy § 1.04(B).

[25]     In contrast to Dr. Strauss' finding, the May 2003 consultative physician report noted that Gibbs could sit, stand or walk about six hours in an eight hour day (*see* page 8 above), and treating physician Dr. Rahman concluded that, during an eight hour day, Gibbs could sit continuously in a normal seated position eight hours and stand continuously at a work station without moving eight hours (*see* pages 14-15 above).

As to subsection C, there is no evidence in the record of Gibbs being diagnosed with lumbar spine stenosis. In addition, the medical evidence and hearing testimony demonstrated that Gibbs' back pain did not interfere with the Gibbs' ability to independently initiate, sustain or complete activities. (*See* pages 5, 8, 9, 10 above.) As a result, Gibbs' spondylolisthesis or spondylolysis would not qualify as an Appendix 1 disability.

Substantial evidence supports ALJ Walsh's determination that Gibbs' knee and back pain did not equal one of the impairments listed in Appendix 1.

### 2. *Gibbs' Lung-Related Issues Do Not Satisfy Appendix 1*

In order to qualify for a disability, a claimant must suffer from chronic asthmatic bronchitis or asthma attacks. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.03. Gibbs suffered from bronchial asthma (*see* pages 13-14 above), which is defined as "[c]hronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ [Forced Expiratory Volume in one second] equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02(A). On April 8, 2003, June 15, 2004 and June 26, 2006, doctors performed

a pulmonary function test called a spirometry to determine the severity of Gibbs' condition (R. 95, 225-30, 335-37); the results confirmed that Gibbs' asthma was not severe enough to qualify as an Appendix I disability. [26]

26    The April 8, 2003, June 15, 2004 and June 26, 2006 spirometry results list Gibbs' height as sixty one, sixty, and sixty two inches, respectively. (R. 95, 225-30, 335-37.) Table I requires an $FEV_1$ equal to or less than 1.05 liters for someone sixty inches tall and an $FEV_1$ equal to or less than 1.15 liters for someone sixty one to sixty three inches tall (20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02A, Table 1); the results of Gibbs' tests clearly exceed the maximum $FEV_1$ allowed to qualify Gibbs' asthma as an Appendix I listed disability. (*See* pages 11,12, 14 & nn. 6-8 above.)

Additionally, Gibbs' lung mass does not qualify as an Appendix 1 impairment. The closest C.F.R. provision regarding lungs requires: "A. Non-small-cell carcinoma-inoperable, unresectable, recurrent, or metastatic disease to or beyond the hilar nodes" or "B. Small-cell (oat cell) carcinoma." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 13.14. To qualify for a disability, the impairment must be malignant. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 13.00. In the instant case, the record shows that Gibbs' lung mass was not malignant. On August 27, 2004, ten days after Gibbs underwent a right thoracotomy and a right lower lobectomy, Gibbs was diagnosed with "[r]ight lower lobe lung: intralopar sequestration, right lower lobe, with acute and chronic inflammation." (R. 321, 324, 327.) The record, therefore, contains no medical evidence that Gibbs suffered from a malignant neoplastic disease.

Substantial evidence supports ALJ Walsh's determination that Gibbs' asthma and other lung issues did not meet the requirements of the Listings.

### 3. *Gibbs' Anxiety Does Not Satisfy Appendix 1*

**\*20**  In order to qualify for a disability, a claimant must suffer from an affective disorder or an anxiety related disorder. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. Gibbs testified before ALJ Walsh at the February 2007 hearing that her anxiety had resolved by the time of the hearing. (R. 361; *see* page 5 above.)

Section 12.04 outlines the conditions required to establish affective disorders:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome ....

2. Manic syndrome ....

3. Bipolar syndrome ....

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.04.

The medical evidence in the record demonstrates that Gibbs' anxiety did not rise to the level of severity necessary to qualify as a § 12.04 disability. As to subsection A, the record contains no medically documented persistence, either continuous or intermittent, of depressive syndrome, manic syndrome or bipolar syndrome. Dr. King reported that Gibbs' "[a]ffect was fairly well modulated, friendly, and appropriate," her "[m]ood was euthymic, not significantly depressed or anxious," and there were "no hallucinations, delusions, suicidal ideations, and ideas of reference or paranoid trends elicited." (R. 92.) As to subsection B, Dr. Nobel found that Gibbs had no restrictions of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of deterioration. (See pages 15-16 above.) In fact, Gibbs testified that she cooks, cares for her cats, washes the dishes, does laundry, and helps her children with their homework. (See page 5 above.) Moreover, Dr. King opined that Gibbs "ha[d] a satisfactory ability to understand, carry out and remember instructions, and a satisfactory ability to respond appropriately to supervision, co-workers and work pressures in a work setting." (R. 93.) As to subsection C, the record contains no evidence of a medically documented history of a chronic affective disorder of at least two years of duration.

**\*21** Substantial evidence supports ALJ Walsh's determination that Gibbs' anxiety did not meet the requirements of the Listings.

In addition, section 12.06 outlines certain conditions required to demonstrate anxiety related disorders. Anxiety is "either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.06. The required level of severity "is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.06.

As to subsection 12.06(A), the record contains no medically documented findings of generalized persistent anxiety, a persistent irrational fear of a specific object, activity or situation,[27] recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent and intrusive

recollections of atraumatic experience. See Schulte v. Apfel, No. 98-CV-422, 2000 WL 362025 at \* 12 (W.D.N.Y. Mar. 31, 2000) (plaintiff's anxiety not disabling where no physician had opined that the anxiety attacks "are 'severe' and 'manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom.' "). As to subsection 12 .06(B), as noted above, Dr. Nobel found that Gibbs had no difficulties in activities of daily living or maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of deterioration. (See pages 15-16 above.) As to subsection 12.06(C), Gibbs' own statements and testimony showed that she shopped, used public transportation and took the bus to see her doctors two to three times each week (see page 5 above); Gibbs thus could function independently outside the area of her home. ALJ Walsh correctly concluded that Gibbs' anxiety was not disabling. See Ruiz v. Apfel, 26 F.Supp.2d 357, 368 (D.Conn.1998) (plaintiff's anxiety not disabling where "[t]he consultative psychiatrist [noted] the absence of symptoms resulting in a complete inability to function independently outside the home," and there was no contrary evidence from plaintiff's treating psychiatrist).

27    Although Gibbs reported a history of anxiety attacks whenever she boarded the subway, Gibbs testified at the February 28, 2007 hearing that the condition had resolved itself. (See page 5 above.)

Given the medical evidence and Gibbs' hearing testimony-and especially her testimony that her anxiety had resolved by the time of the February 2007 hearing-substantial evidence supports ALJ Walsh's determination that Gibbs' anxiety did not meet the Listing requirements.

### 4. *Gibbs' Carpal Tunnel Syndrome Does Not Satisfy Appendix 1*[28]

28    Neither ALJ Greenberg nor ALJ Walsh discussed carpal tunnel syndrome. (See pages 17-24 above.) Federal courts, however, can review an impairment even if an ALJ did not discuss it. See e.g., Mendez v. Barnhart, 05 Civ. 10568, 2007 WL 186800 at \*13 (S.D.N.Y. Jan. 23, 2007) ("In the absence of evidence showing that the ALJ failed to consider Mendez's carpal tunnel syndrome, the mere lack of a specific finding on that single impairment does not warrant remand."); Flors v. Massanari, 00 Civ. 5767, 2002 WL 100631 at \*5 (S.D.N.Y. Jan. 25, 2002) ("The ALJ is not required to cite and discuss each and every symptom or illness claimed by a disability claimant, only to consider the effect of all of his impairments. Plaintiff does not mention any

way that his various ailments interfered with his ability to work that was not taken into account by the ALJ."); *see also Berry v. Schweiker*. 675 F.2d 464, 468 (2d Cir.1982) ( "[T]he absence of an express rationale does not prevent us from upholding the ALJ's determination regarding appellant's claimed listed impairments, since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence.").

Carpal tunnel syndrome does not specifically appear in the Listings. Gibbs' carpal tunnel syndrome would have to qualify as a "Major dysfunction of a joint" to qualify as an impairment in Appendix 1:

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: ...

**\*22** B. Involvement of onemajor peripheral jointineach upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. "Inability to perform fine and gross movements" means:

an extreme loss of function of both upper extremities; *i.e.,* an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and

handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R., Pt. 404, Subpt. P.App. 1, § 1.00(B)(2)(c).

Gibbs' carpal tunnel syndrome does not satisfy the Appendix 1 requirements. Although Gibbs claimed that she had carpal tunnel syndrome, and that, about once each day, she suffered about five minutes of numbness in her right hand, consultative and treating physician examinations established that Gibbs' carpal tunnel syndrome was not disabling: Dr. Polak's examination on April 8,2003 found that Gibbs' finger and hand dexterity were intact, and that Gibbs had full use of both hands when dressing and undressing. (*See* page 16 above.) The May 6, 2003 "Physical Residual Functional Capacity Assessment" indicated that Gibbs did not have any "manipulative limitations." (R. 102.) On April 28, 2006, treating physician Dr. Masood noted that during an eight hour day, Gibbs could frequently use either hand for repetitive action, such as handling, fingering and pushing and pulling arm controls. (*See* page 16 above.) On June 26, 2006, Dr. Lathan reported that Gibbs' "[h]and and finger dexterity [were] intact" and that her "[g]rip strength [was] 5/5 bilaterally." (R. 223.) Treating physician Dr. Strauss noted on September 5, 2006 that during an eight hour day, Gibbs could continuously use either hand for repetitive action. (*See* page 16 above.)

Because Gibbs' carpal tunnel syndrome did not seriously interfere with Gibbs' ability to independently initiate, sustain or complete activities, and therefore did not result in an inability to perform fine and gross movements effectively, it does not qualify as a major dysfunction of the joint.

Substantial evidence supports that Gibbs' carpal tunnel syndrome did not meet the requirements of the Listings.

**5. *Gibbs' Heart Condition Does Not Satisfy Appendix 1***

Section 4.00 outlines certain conditions required to demonstrate a cardiovascular impairment. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4 .00. A cardiovascular impairment is defined as "any disorder that affects the proper functioning of the heart or the circulatory system (that is, arteries, veins, capillaries, and the lymphatic drainage)." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00(A)(1) (a). Gibbs' heart condition

would have to qualify as "Ischemic heart disease" to qualify as an Appendix 1 impairment:

> **\*23** *Ischemic heart disease,* with symptoms due to myocardial ischemia, as described in 4.00E3-4.00E7, while on a regimen of prescribed treatment ... with one of the following ...

> C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

> 1. Angiographic evidence ...; and

> 2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.04. Section 4.00(E)(3)-(7) discusses the following symptoms due to myocardial ischemia: typical angina pectoris, atypical angina, anginal equivalent, variant angina and silent ischemia. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 4.00.

The medical evidence in the record demonstrates that Gibbs' heart impairment did not rise to the level of severity necessary to qualify as a disability. On July 22, 2004, a SPECT imaging of Gibbs' heart revealed a reversible anterolateral defect that could represent a "small zone of mild inducible ischemia estimated to encompass less than 5 percent of the left ventricular myocardium" or a "differential breast attenuation artifact." (R. 331,333.) On July 29, 2004, however, a left heart catheterization, left ventriculogram, coronary angiogram and lleo-femoral angiogram revealed normal coronary arteries and an unremarkable cardiac catheterization. (*See* page 17 above.) Moreover, Dr. Lathan's June 26, 2006 examination found that Gibbs' heart had a regular rhythm and that "[n]o murmur, gallop or rub [was] audible." (R. 223.)

Because the medical evidence does not show coronary artery disease, Gibbs' heart impairment did not qualify as ischemic heart disease, and thus substantial evidence supports the determination that Gibbs' heart condition did not meet the requirements of the Listings.

The Court reiterates that both in post-hearing submissions to ALJ Walsh and to the Appeals Council, Gibbs' representative did not challenge ALJ Walsh's conclusion at step three that Gibbs' impairments did not meet any of the Listings. (*See* pages 21, 24 above.) To the contrary, Gibbs' representative agreed at the hearing that Gibbs' impairments did not meet the Listings requirements. (*See* page 6 above.)

### D. *Gibbs Had the Ability to Perform Her Past (Sedentary) Work (Or Other Sedentary Work)*

The fourth prong of the five part analysis is whether Gibbs had the residual functional capacity to perform her past relevant work, that is, her work as a customer service representative. (*See* page 4 above.) ALJ Walsh found that Gibbs had the residual functional capacity to perform sedentary work. (R. 196.) "Sedentary work"

> **\*24** involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a). It is generally agreed by both the Commissioner and the Second Circuit that sedentary work involves sitting six hours out of an eight hour work day. *See. e.g., Ferraris v. Heckler,* 728 F.2d 582, 587 n. 3 (2d Cir.1984); *Alvarez v. Barnhardt,* 02 Civ. 3121, 2002 WL 31663570 at \*12 (S.D .N.Y. Nov. 26, 2002) (Peck, M.J.): *Casiano v. Apfel,* 39 F.Supp.2d 326, 329 n. 2 (S.D.N.Y.1999) (Stein, D.J. & Peck, M.J.), *aff'd mem.,* No. 99-6058, 205 F.3d 1322 (table), 2000 WL 225436 (Jan. 14, 2000); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at \*9 (S.D .N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.).

Gibbs' past relevant work as a customer service representative qualifies as "sedentary work"; Gibbs' job as a customer service representative involved answering phones, handling clients, collecting payments, no walking and lifting files weighing no more than ten pounds. (*See* pages 4, 6 above.)

ALJ Walsh found that Gibbs could perform "sedentary work, consisting of the ability to lift no more than five pounds, sit for six hours, and stand and walk for two hours in an eight-hour workday, with a sit/stand option and a reasonably clean air environment." (R. 196.)

ALJ Walsh's conclusion was supported by Gibbs' testimony and the opinions of treating and consultative physicians (except for one aspect of Dr. Strauss' opinion). Gibbs testified that she could sit for 30-60 minutes before needing to stand for five minutes or less, and could carry five pounds (and elsewhere she said 15 pounds). (*See* pages 4-5 above.) Consultative physician Dr. Polak found only mild impairment as to sitting/standing. (R. 97; *see* page 8 above.) The May 6, 2003 "Physical Residual Functional Capacity Assessment" of Gibbs found she could sit, stand or walk about six hours in an eight hour day and that her allegations as to pain were "not credible." (R. 101, 104; *see* page 8 above.) HS Systems' February 2, 2004 report opined that Gibbs' back pain and asthma "should not interfere with [Gibbs'] ability to work." (R. 125; *see* pages 9, 12 above.) InJune 2006, consultative physician Dr. Lathan found only a moderate restriction on stooping or prolonged standing and walking. (R. 224; *see* page 10 above.) On September 14, 2006, Gibbs' treating pulmonologist Dr. Rahman determined that Gibbs could sit or stand for eight hours and carry 11-20 pounds, and that Gibbs did not need to lie down during an eight hour day. (R. 279; *see* pages 14-15 above.)

The only somewhat contradictory evidence came from treating physician Dr. Strauss. [29] Dr. Strauss opined that Gibbs could sit continuously one hour in a normal seated position and stand continuously thirty minutes at a work station without moving in an eight hour day, but that Gibbs needed to lie down one hour every eight hours. (*See* page 11 above.) Dr. Strauss did not indicate for how long Gibbs could sit during an eight hour day. (*See* page 11 above.) His opinion as to her sitting and standing thus is consistent with Gibbs' own testimony that she could sit for 30-60 minutes and then stand for five minutes or less, and is consistent with the other medical opinions that she could sit/stand to perform sedentary work.

---

[29] ALJ Walsh did not explicitly acknowledge the "treating physician rule" or state wh y Dr. Strauss' opinion was not entitled to controlling weight. (*See* pages 21-24 above.) This Court, however, has conducted "a searching review of the record to assure [that Gibbs] received the rule's procedural advantages," *see, e.g., Halloran v. Barnhart,*

362 F.3d 28, 32 (2d Cir.2004), and finds that ALJ Walsh's decision is supported by substantial evidence.

**\*25** Dr. Strauss' opinion that Gibbs would need to lie down for an hour during an hour during an eight hour work day, however, is inconsistent with the ability to perform sedentary work, as vocational expert Clark admitted in response to a hypothetical question. (*See* page 7 above.) Dr. Strauss, however, provided no medical or other explanation for this part of his opinion. Moreover, another of Gibbs' treating physicians, Dr. Rahman, specifically contradicted Dr. Strauss; Dr. Rahman opined that Gibbs would not need to lie down. (R. 279; *see* page 15 above.) No other treating or consultative physician opined that Gibbs needed to lie down. ALJ Walsh properly could have relied on Dr. Rahman and the other evidence over the unsupported opinion of Dr. Strauss about Gibbs' need to lie down. This Court concludes that "the substance of the treating physician rule was not traversed." *Halloran v. Barnhart,* 362 F.3d at 32; *see also., e.g., Klodzinski v. Astrue,* No. 07-1752, 2008 WL 1813222 at *2 (2d Cir. Apr. 23, 2008) (holding that the ALJ applied the substance of the treating physician rule even where the ALJ did not explicitly state in his written opinion that he was rejecting the plaintiff's treating physician's opinion and did not explain the reasons for doing so).

Substantial medical and functional capacity evidence supported ALJ Walsh's conclusion that Gibbs was capable of resuming her former employment as a customer service representative, a sedentaryjob.

Because Gibbs did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step. *See* 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."). [30] Even if the Court were to proceed to step 5, however, ALJ Walsh's conclusion is supported by substantial evidence, including the testimony of a vocational expert. (*See* pages 6-7 above.) [31]

---

[30]     *Accord, e.g., Quezada v. Barnhart,* 06 Civ. 2870, 2007 WL 1723615 at *13 (S.D.N.Y. June 15, 2007) (Peck, M.J.); *Papp v. Comm'r of Soc. Sec.,* 05 Civ. 5695, 2006 WL 1000397 at *16 (S.D.N.Y. Apr. 18, 2006) (Peck, M.J.); *Rodriguez v. Barnhart,* 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); *Jiang v. Barnhart,* 03 Civ. 0077, 2003 WL 21526937 at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *11 (S.D.N.

Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing *Rivera v. Schweiker,* 717 F.2d 719, 722 (2d Cir.1983); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); & *Velk v. Shalala,* 93 Civ. 3111,1995 WL 217516 at *5 (S.D . N.Y. April 11, 1995)).

[31] A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs. 20 C.F.R. §§ 404.1566(e).416.966(e): *see, e.g., Butts v. Barnhart,* 416F.3d 101.103-04 (2d Cir.2005); *Taylor v. Barnhart,* 83 Fed. Appx. 347, 350 (2d Cir.2003); *Jordan v. Barnhart,* 29 Fed. Appx. 790, 794 (2d Cir.2002); *Rautio v. Bowen,* 862 F.2d 176, 180 (8th Cir.1988); *Dumas v. Schweiker,* 712 F.2d 1545, 1553-54 (2d Cir.1983); *Quezada v. Barnhart,* 2007 WL 1723615 at *13 n. 20: *Snipe v. Barnhart,* 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 2621093 (S.D.N.Y. Sep. 12,2006); *de Roman v. Barnhart,* 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); *Bosmond v. Apfel,* 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); *Fuller v. Shalala,* 898 F.Supp. 212, 218 (S.D.N.Y.1995) (The "vocational expert, Edna Clarke ... provided several examples of unskilled ... jobs that are available in the local and national economies for a person with [plaintiff's] condition, age, education, and work experience.... Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only [her] physical capability, but as well [her] age, [her] education, [her] experience and [her] training." *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980); *see, e.g., Butts v. Barnhart,* 388 F.3d 377, 381 (2d Cir.2004), *amended on other grounds,* 416 F.3d 101 (2d Cir.2005); *Curry v. Apfel,* 209 F.3d 117, 122-23 (2d Cir.2000); *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999).

In meeting his burden under the fifth step, the Commissioner ordinarily will make use of the "Grid":

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances,

may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

**\*26** *Zorilla v. Chater*. 915 F.Supp. 662, 667 (S.D.N.Y.1996) (fns.omitted); *see, e.g., Heckler v. Campbell,* 461 U.S. 458, 461-62, 465-68, 103 S.Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); *Rosa v. Callahan,* 168 F.3d at 78; *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986). "The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." *Zorilla v. Chater,* 915 F.Supp. at 667 n. 2; *see* 20 C.F.R. § 404.1567(a). Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

Using the Grid, a person of Gibbs' age (forty-nine [32] (R. 164, 353), education (high school graduate) and ability to perform sedentary work is not disabled for purposes of Social Security benefits. 20 C.F.R. Part 404, Subpt. P, App. 2, §§ 201.00(h), 201.22. The conclusion under the Grid also was supported by vocational expert Clark's testimony. (*See* pages 6-7 above.) *See also* 20 C.F.R. §§ 416.945-.969a.

[32] Gibbs, who was born on June 30, 1957 (*see* page 4 above), was 49 on March 26, 2007, the date on which ALJ Walsh rendered his decision.

## CONCLUSION

For the reasons set forth above, the Commissioner's determination that Gibbs was not disabled within the meaning of the Social Security Act is supported by substantial evidence. The Commissioner's motion for judgment on the pleadings (Dkt. No. 8) should be GRANTED.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 630, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (l985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993). *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(d).

### All Citations

Not Reported in F.Supp.2d, 2008 WL 2627714

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2783418
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick W. MILLER, Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 7:05–CV–1371 (FJS/GJD).
|
July 16, 2008.

**Attorneys and Law Firms**

Conboy, McKay, Bachman & Kendall, LLP, Lawrence D. Hasseler, Esq., of Counsel, Watertown, NY, for Plaintiff.

Office of the United States Attorney, William H. Pease, Ausa, of Counsel, Syracuse, NY, for Defendant.

**MEMORANDUM–DECISION AND ORDER**

SCULLIN, Senior District Judge.

## I. INTRODUCTION

*1 Plaintiff filed an application for disability insurance benefits on May 24, 2004, alleging that he became disabled on November 12, 2003. *See* Administrative Transcript ("Tr.") at 47–49. Plaintiff's application was initially denied. *See id.* at 26. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 18, 2005, before ALJ Elizabeth W. Koennecke. *See id.* at 181–203. On June 10, 2005, the ALJ issued a decision denying Plaintiff's application for disability benefits. *See id.* at 10–20. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on September 9, 2005. *See id.* at 4–6.

On October 31, 2005, Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) for judicial review of that final decision. In support of his argument that the Court should reverse Defendant's decision and award him benefits, Plaintiff asserts that (1) the Commissioner failed to consider the medical evidence of record properly; (2) the Commissioner failed to assess the severity of Plaintiff's

conditions properly; (3) the Commissioner failed to calculate Plaintiff's residual functional capacity ("RFC") properly; (4) there was no substantial evidence to support the Commissioner's conclusion that there was significant work in the national economy that Plaintiff could perform; and (5) the ALJ failed to consider Plaintiff's credibility properly. *See* Plaintiff's Brief at 3–22.

To the contrary, Defendant contends that there is substantial evidence in the record to support the ALJ's decision and that, therefore, the Court should dismiss Plaintiff's complaint. *See generally* Defendant's Brief.

## II. BACKGROUND

### A. Personal history

Plaintiff was fifty-one years old at the time of the administrative hearing. *See* Tr. at 185. Plaintiff had obtained his high school degree, *see id.* at 186, and had past relevant work experience as a mechanic's helper and as a heavy equipment operator, *see id.* at 187. Plaintiff alleged disability due to degenerative disc disease and arthritis. *See id.* at 53.

### B. Medical evidence in the record

#### *1. Gary Berk, M.D.*

From December 5, 1995, to March 7, 2005, Plaintiff saw Gary Berk, M.D., a family practitioner. *See* Tr. at 92–99, 148–54, 174–80. Plaintiff initially complained about joint pain in his right elbow, shoulders, and right knee. *See id.* at 96. Plaintiff received instructions about how to perform shoulder rehabilitation exercises and received prescriptions for various medications. *See id.* An x-ray of Plaintiff's right knee was unremarkable, but an MRI showed possible subarticular cartilaginous damage and a possible small medial meniscal tear. *See id.* However, Dr. Berk found that Plaintiff's knee pain was "much better ... and progressively improving." *See id.*

Plaintiff subsequently complained about low back pain. *See* Tr. at 98. An MRI of Plaintiff's lumbosacral spine performed on February 6, 2003, demonstrated multiple degenerative disc disease and facet arthritic changes. *See id.* at 105. On July 2, 2003, Dr. Berk noted that there "is a definite pattern of the pain being aggravated by his job [as a mechanic's helper]." *See id.* Dr. Berk also noted that Plaintiff reported that there is a "provision in his job contract that provides for early retirement if there is a disability involved, and he would like

to apply for this, though total time to completion may be 6–9 months." *See id.*

**\*2** On October 29, 2003, Dr. Berk noted that Plaintiff continued to experience low back pain that radiated down his legs, which "occurs whenever he works at his job. His symptoms improve when he is at home off the concrete floors. He has applied for early retirement because of the disabling nature of this condition." *See id.* at 106.

On November 10, 2003, Dr. Berk noted that Plaintiff complained about "an intolerable flare of back pain due to work and cold weather." *See id.* Dr. Berk placed Plaintiff on medical leave through December 7, 2003. *See id.*

On January 4, 2004, Dr. Berk noted that Plaintiff's "attempt to return to work brings about a severe exacerbation of his back pain, which carries over into his daily activities." *See* Tr. at 107. Dr. Berk diagnosed Plaintiff as suffering from chronic degenerative disc disease and facet arthritis "with recurrent aggravation from his work, causing chronic back pain." *See id.* Dr. Berk placed Plaintiff on medical leave through February 15, 2004, "to avoid further exacerbation of his back pain." *See id.*

On February 4, 2004, Dr. Berk noted that Plaintiff "[c]ontinues to be disabled by his back pain though the symptoms are improved since he has been off work." *See id.* at 108. Dr. Berk extended Plaintiff's medical leave until March 15, 2004, due to his severe back pain. *See id.*

On April 29, 2004, Dr. Berk noted that Plaintiff continued to experience low back pain with "discomfort radiating down the side of the right leg." *See id.* Plaintiff stated that his pain "flare[d] up whenever he start[ed] to do bending and lifting. He has been unable to work because of this." *See id.* An MRI showed bulging discs and some nerve root impingement on the right side at the L4–5 level. *See id.* Dr. Berk noted that Plaintiff's application for early retirement based on disability was rejected, which "has caused him a lot of stress." *See id.* On examination, Plaintiff exhibited tenderness and spasm in his back, limited bending ability, and difficulty performing a heel-and-toe walk. *See id.* Dr. Berk opined that Plaintiff was unable "to work full time in a strenuous job that involves heavy lifting and bending." *See id.* Dr. Berk extended Plaintiff's medical leave for two months and encouraged Plaintiff to attend physical therapy "to help improve his functional status while he is off work. If he is unable to reverse the disabilities decision he probably will

have to go back to work and hopefully will be in optimal shape when he does so." *See id.* at 108–09.

On July 19, 2004, Dr. Berk noted that Plaintiff complained about continued back pain that limited his activities, particularly standing and sitting which he claimed he could perform "for about 30 minutes at a time." *See* Tr. at 149. Dr. Berk extended Plaintiff's medical leave for two months. *See id.*

On September 13, 2004, Dr. Berk noted that Plaintiff stated that he was able to tolerate more standing and sitting, "sometimes up to 2 hours." *See* Tr. at 150. However, Dr. Berk noted that Plaintiff stated that any activity beyond minimal exertion caused significant aggravation of his back pain, but he was able to "stay comfortable" using medication and a TENS unit. *See id.* Dr. Berk extended Plaintiff's medical leave until October 25, 2004. *See id.* at 151.

**\*3** On October 25, 2004, Dr. Berk noted that Plaintiff stated that his back pain was "still very easily aggravated with minor activity" and that he was also "still limited with the time he [could] stand and sit." *See id.* at 152. On examination, Plaintiff exhibited mild tenderness over the lumbar vertebrae without paraspinal muscle tenderness or spasm; normal sacroiliac ("SI") joints; full range-of-motion with minimal pain on terminal movements; and a negative straight leg raise test. *See id.* Dr. Berk extended Plaintiff's medical leave for three months.

On December 6, 2004, Dr. Berk noted that Plaintiff still had back pain and that he "still ha[d] to be careful around the house, though he [was] trying to be as active as possible. He [was] still limited with the time he [could] sit and stand." *See id.* at 153. On examination, Dr. Berk found mild tenderness over the lumbar vertebrae; mild paraspinal muscle; no spasming; little tenderness over the SI joints; full range-of-motion with minimal pain on terminal movements; and a negative straight leg raise test. *See id* . He again extended Plaintiff's medical leave for three months. *See id.* Dr. Beck noted that Plaintiff planned to start a light weight lifting program as a physical therapist had directed. *See id.*

On March 7, 2005, Dr. Berk noted that Plaintiff complained that his back "extremely limited" him. *See* Tr. at 180. Plaintiff stated that his chronic low back pain

flare[d] up after about 10 minutes of being up on his feet. He ha[d] to sit and rest every 10 minutes when he d[id] household chores and a renovation project that he [was] completing [was] going very slowly .... He frequently [had] discomfort in the neck and down both upper arms as well, which he related to his back problem. He [was] currently trying to participate in a fitness program and hope[d] to become more functional in the future.

*See id.*

An examination of Plaintiff's back showed tenderness from L1 through L4 regions of the spine and in the sciatic notch on the right side; the straight leg raising test was positive bilaterally; and he exhibited "considerable" discomfort when bending forward and "severely limited mobility of the spine in all directions." *See id.* Dr. Berk diagnosed Plaintiff as suffering from chronic low back pain. *See id.* He found no functional improvement. *See id.*

Also on March 7, 2005, Dr. Berk completed a medical Source Statement in which he indicated that Plaintiff's impairments affected his abilities to lift and carry in that he was able to lift and/or carry a maximum of ten pounds occasionally and had no ability to lift and/or carry frequently. *See* Tr. at 175. Plaintiff's impairments affected his abilities to stand and/or walk as well, in that Plaintiff was able to stand and/or walk a maximum of less than two hours in an eight-hour workday. *See id.* Dr. Berk added that Plaintiff "need[ed] to rest every 10 minutes while doing light work due to pain." *See id.* In addition, Plaintiff was able to sit a total of less than about six hours in an eight-hour workday. *See id.* at 176. Dr. Berk also noted that Plaintiff had limited abilities to push and pull. *See id.* Dr. Berk stated that he based the foregoing findings on his examination of Plaintiff and Plaintiff's subjective complaints from the March 7, 2005 office visit. *See id.* Dr. Berk also indicated that Plaintiff should never perform certain postural activities, was limited in certain manipulative activities, and had some environmental limitations. *See id.* at 176–78.

### *2. Physical therapy*

*4 On February 17, 2003, Plaintiff started to attend physical therapy due to degenerative disc disease and spinal stenosis. *See* Tr. at 110–15. Plaintiff's treatment was successful, and he was discharged on March 31, 2003. *See id.* at 115.

On April 14, 2003, Plaintiff returned to physical therapy due to low back pain that started on April 9, 2003, when he was "squatting and lifting a mounted tire at work." *See id.* at 119. Plaintiff's treatment was successful, and he was discharged on May 21, 2003. *See id.* at 121–22.

On May 5, 2004, Plaintiff began another cycle of physical therapy to treat his low back pain which radiated down his right leg. *See id.* at 125, 140–47. Plaintiff's treatment was mostly successful, and he was discharged on June 25, 2004. *See id.* at 147.

### *3. Disability analyst*

The record contains a Physical RFC Assessment form, dated July 1, 2004, which, it appears J. Tiszler, a non-physician disability analyst, completed. *See* Tr. at 26, 134–39. The analyst indicated that Plaintiff was capable of occasionally lifting and/or carrying a maximum of twenty pounds; frequently lifting and/or carrying a maximum of ten pounds; standing and/or walking for a total of about six hours in an eight-hour workday; sitting for a total of about six hours in an eight-hour workday; and was limited in his abilities to push and pull. *See id.* at 135. The analyst also indicated that Plaintiff was able to perform certain postural activities only occasionally. *See id.* at 136. Finally, the analyst found no manipulative, visual, communicative, or environmental limitations. *See id.* at 136–37.

### *4. Hospital records*

The record also contains the results of various tests performed at Canton–Potsdam Hospital. A CT scan of Plaintiff's pelvis performed on February 11, 2005, showed diverticulosis of the sigmoid colon, as well as degenerative changes in the spine. *See* Tr. at 157. Images of Plaintiff's abdomen showed a sliding hiatal hernia with no signs of any definite acute abnormalities. *See id.* at 158. Finally, a CT scan of his abdomen showed atherosclerosis of the aorta, but no acute disease. *See id.* at 156.

### III. DISCUSSION

### A. Disability determination

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

**\*5** 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering

> vocational factors such as age, education, and work experience .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *See Berry,* 675 F.2d at 467.

**B. Scope of review**

In reviewing the Commissioner's final decision, a court must determine whether the Commissioner applied the correct legal standards and whether there is substantial evidence in the record as a whole to support that decision. *See Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)) (other citations omitted). A reviewing court, however, may not affirm an ALJ's decision if it reasonably doubts that the ALJ applied the proper legal standards, even if it appears that there is substantial evidence to support that decision. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) (citations omitted). In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports his decision. *See Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984) (citation omitted).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. *See* 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991) (citations omitted). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ....' " *Williams on behalf*

*of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (quotation omitted). "It is more than a mere scintilla or a touch of proof here and there in the record." *Id.*

**\*6** "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Id.* (citations omitted). "However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision." *Lewis v. Comm'r of Soc. Sec.,* No. 6:00 CV 1225, 2005 WL 1899399, \*1 (N.D.N.Y. Aug. 2, 2005) (citations omitted).

In this case, the ALJ found that (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset date; (2) Plaintiff's degenerative lumbar disc disease was considered "severe" based on the regulations; (3) Plaintiff's impairment did not meet or medically equal any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) Plaintiff's allegations regarding his limitations were not totally credible; (5) Plaintiff retained the RFC to perform light work; [1] (6) Plaintiff was unable to perform his past relevant work; (7) Plaintiff was an individual closely approaching advanced age; (8) Plaintiff had a high school education; (9) Plaintiff had no transferable skills from any past relevant work; and (10) based on Plaintiff's RFC, age, education, and work experience, the Medical–Vocational Guidelines directed a conclusion of "not disabled." *See* Tr. at 19.

[1]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

Plaintiff takes issue with a number of the ALJ's findings and her ultimate conclusion of non-disability. The Court will address each of Plaintiff's arguments in turn.

### 1. Severity

Step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § § 404.1521(b), 416.921(b). Age, education, and work experience are not evaluated in determining if the impairment or combination of impairments is severe. *See* 20 C.F.R. §§ 404.1520(c) (, 416.920(c).

The severity analysis does no more than "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995) (citation omitted). If the disability claim rises above the *de minimis* level, then further analysis is warranted. *See id.* Where a claimant alleges multiple impairments, the ALJ must consider the combined effects of all impairments, regardless of whether any impairment, if considered separately, would be of sufficient severity. *See* 20 C.F.R. §§ 404.1523, 416.923; *Dixon,* 54 F.3d at 1031.

Plaintiff claims that the ALJ erred by failing to find that his leg pain was severe. *See* Plaintiff's Brief at 16–17. For support, Plaintiff points to progress notes from Dr. Berk, which document Plaintiff's complaints about pain radiating down his leg. *See id.* at 17. Plaintiff also cites the progress notes from his physical therapy sessions. *See id.*

**\*7** First, the Court notes that Plaintiff failed to identify leg pain as a disabling condition when identifying the illnesses, injuries, or conditions that limited his ability to work. *See* Tr. at 53. Instead, Plaintiff listed only degenerative disc disease and arthritis as his disabling conditions. *See id.*

Second, Dr. Berk's progress notes primarily document Plaintiff's subjective complaints. Moreover, one of the notes that Plaintiff cites states that Plaintiff reported that his right leg "feels great." *See* Tr. at 103. The Court further notes that Dr. Berk's most recent progress note from March 7, 2005, stated that Plaintiff was working on a home renovation project, albeit slowly, and that he was trying to participate in a fitness program. *See id.* at 180.

Third, although Plaintiff points to several progress notes that document physical therapy sessions, Plaintiff successfully completed his treatment goals. *See id.* at 110–33, 140–47.

It is Plaintiff's burden to present evidence establishing severity. *See* 20 C.F.R. § 404.1512(a), (c) ("[The claimant] must provide medical evidence showing that [he] ha[s] an impairment(s) and how sever it is during the time [he] say[s] that [he][is] disabled."). In this case, Plaintiff failed to present evidence establishing that his leg pain significantly limits his ability to do basic work activities. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). Therefore, the Court finds that there is substantial evidence in the record to support the ALJ's finding regarding this issue and, therefore, affirms that determination.

### *2. Treating physician*

The medical opinions of a treating physician are given "controlling weight" as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are not inconsistent with other substantial evidence contained in the record. 20 C.F.R. §§ 404.1527(d) 92), 416.927(d)(2). Even if substantial evidence contradicts the treating physician's opinion, which is thus not controlling, that opinion still may be entitled to significant weight "because 'the treating source is inherently more familiar with a claimant's medical condition than are other sources.' " *Santiago v. Barnhart,* 441 F.Supp.2d 620, 627 (S.D.N.Y.2006) (quoting *Gonzalez v. Callahan,* No. 94 Civ. 8747, 1997 WL 279870, at \*11 (S.D.N.Y. May 23, 1997) (citing *Schisler v. Bowen,* 851 F.2d 43, 47 (2d Cir.1988))). However, if the treating physician's opinion is not controlling, the proper weight that the ALJ gives to that opinion depends upon the following factors: (1) the length of the treatment relationship and frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the medical evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is from a specialist; and (6) any other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Omission of this analysis is considered failure to apply the proper legal standard and is grounds for reversal of the Commissioner's determination. *See* *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

**\*8** Plaintiff argues that the ALJ erred by assigning less than controlling weight to Dr. Berk's opinion as set forth in the Medical Source Statement dated March 7, 2005 ("March 2005 opinion"). *See* Plaintiff's Brief at 13–16. The record shows that the ALJ did, in fact, assign "less than considerable weight" to Dr. Berk's opinion. *See* Tr. at 17. For the following reasons, the Court finds that substantial evidence in the record

did not support the ALJ's determination in this regard and that the ALJ erred by failing to contact Dr. Berk.

Although the ALJ acknowledged that Dr. Berk was Plaintiff's treating physician, he noted that Dr. Berk's examinations of Plaintiff in October and December 2004 showed "minimal objective findings." *See id.* Indeed, on October 25, 2004, Dr. Berk noted "mild tenderness over the lumbar vertebrae without paraspinal muscle tenderness or spasm;" normal SI joints; full range-of-motion "with minimal pain on terminal movements;" and a negative straight leg raise test. *See id.* at 152. He also noted that the motor strength, sensation, and deep tendon reflexes in Plaintiff's lower extremities were intact. *See id.* Similarly, on December 6, 2004, Dr. Berk noted mild tenderness over the lumbar vertebrae, mild paraspinal muscle tenderness, no spasms, a little tenderness in the SI joints; full range-of-motion with minimal pain on terminal movements; and a negative straight leg raise test. *See id.* at 153. Dr. Berk also noted that Plaintiff's motor strength and sensation were intact, and he had normal left deep tendon reflexes. *See id.*

However, the examination that Dr. Berk performed on March 7, 2005, revealed contrary results, suggesting that Plaintiff's condition had worsened. *See* Tr. at 180. At that time, Dr. Berk noted that Plaintiff exhibited tenderness over the L1 through L4 regions of the spine, as well as in the sciatic notch on the right side. *See id.* He also stated that Plaintiff's straight leg raising test was positive bilaterally and that Plaintiff's peripheral reflexes were 2 and symmetrical; however, he also noted that Plaintiff could not forward bend without "considerable discomfort" and exhibited "severely limited mobility of the spine in all directions." *See id.* Therefore, although the examinations that Dr. Berk performed in October and December 2004 showed limited clinical findings, the examination that he performed on March 7, 2005, suggested that Plaintiff's condition had worsened.

The ALJ also found that Dr. Berk failed to explain on what evidence he relied to determine that Plaintiff had certain postural, manipulative, and environmental limitations. *See* Tr. at 17. Indeed, Dr. Berk identified no evidence to support the limitations in question. *See id.* at 176–78. However, under the regulations, an ALJ has an obligation to develop the record, which includes recontacting a claimant's treating physician if the information received from that physician or other medical source is inadequate to determine whether the claimant is disabled. *See* *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (citing 20 C.F.R. § 404.1512(e)). The regulations provide that

**\*9** [w]e will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. § 404.1512(e)(1).

This is not a mere salutary requirement; the opinion of a treating physician plays a central role in evaluating Social Security claims. " '[A] treating source's opinion on the issue(s) of the *nature and severity of [a claimant's] impairments'* will be given 'controlling weight' if the opinion is 'well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003) (quoting 20 C.F.R. § 404.1527(d)(2)) (other citations omitted). Moreover, the duty to develop the record faithfully exists even in instances where a claimant is represented, owing to the fact that such proceedings are not viewed as adversarial in nature. *See Gecevic v. Sec'y of Health & Human Servs.,* 882 F.Supp. 278, 287 (E.D.N.Y.1995) (quotation and other citations omitted).

In light of the fact that Dr. Berk is the only treating physician in the record and the only medical source who rendered a detailed opinion about Plaintiff's abilities, the Court concludes that the ALJ should have contacted Dr. Berk so that Dr. Berk could supply all of the necessary information to support his opinion. Accordingly, because the ALJ failed to fulfill her duty to develop the record, the Court is unable to find that there is substantial evidence to support the ALJ's determination and, therefore, the Court must remand the matter. *See Geracitano v. Callahan,* 979 F.Supp. 952, 957 (W.D.N.Y.1997) (holding that the ALJ erred by failing to investigate the incomplete medical evidence that the longstanding treating physician had provided).

*3. Credibility*

When the evidence demonstrates a medically determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]" *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979) (citations omitted). The ALJ, however, retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Id.* When a claimant's testimony regarding pain suggests a greater severity of impairment than the objective medical evidence shows, the ALJ must consider the following factors in evaluating a claimant's symptoms and complaints of pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes to alleviate pain or other symptoms; (5) any measures the claimant uses to relieve pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. § 404 .1529(c)(3)(i)-(vii), 416.929(c)(3)(i)-(vii). If there is substantial evidence in the record to support the Commissioner's findings, "the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir.1984) (citations omitted).

**\*10** Plaintiff argues that the ALJ erred by finding him less than totally credible. *See* Plaintiff's Brief at 20–22. Specifically, Plaintiff claims that the ALJ failed to apply the factors set forth in the regulations and failed to consider his work history. *See id.*

In her decision, the ALJ reviewed Plaintiff's testimony and determined that he was not entirely credibly. *See* Tr. at 17. In making this determination, the ALJ discussed the factors set forth in the regulations. *See id.* The ALJ noted Plaintiff's daily activities, which included trying to do housework such as doing dishes, sweeping, and vacuuming. *See id.* at 17, 197. The ALJ also pointed out that Plaintiff was completing a home renovation project, albeit slowly, which Dr. Berk noted in his March 7, 2005 progress note. *See id.* at 17, 180.

The ALJ also discussed the location, duration, frequency, and intensity of Plaintiff's pain and other symptoms. *See* Tr. at 16–17. The ALJ recognized that Plaintiff experienced pain in his

back, as well as headaches, hypertension, and concentration problems. *See id.*

The ALJ reviewed precipitating and aggravating factors, specifically Plaintiff's claim that standing or sitting more than ten minutes, walking on an incline or stairs, or lifting more than ten pounds increased his back pain. *See* Tr. at 17. The ALJ also pointed out that the record indicated that Plaintiff experienced an increase in back pain after squatting and lifting a mounted tire while at work. *See id.* at 17, 119. The ALJ noted, however, that the record suggested that Plaintiff's symptoms were reduced with light or sedentary activity. *See id.* at 17. Indeed, Dr. Berk noted on several occasions that Plaintiff's job aggravated his condition and that his condition improved when he was away from his job. *See id.* at 105–08.

The ALJ discussed the type and effectiveness of medication that Plaintiff took to alleviate pain or other symptoms. *See id.* at 17. The ALJ pointed out that Plaintiff took no medication other than Tylenol with codeine. *See id.* At the hearing, Plaintiff testified that he took only Tylenol with codeine if he "absolutely had to," which on average was one time per week. *See id.* at 195. Plaintiff stated that "it help[ed] some." *See id.*

The ALJ reviewed the treatment, other than medication, that Plaintiff received for relief of pain or other symptoms. *See* Tr. at 17. The ALJ noted that Plaintiff underwent physical therapy and was given a weight lifting program. *See id.* at 15, 17. The ALJ also pointed out that Plaintiff was trying to participate in a fitness program. *See id.* at 17. Indeed, Dr. Berk's March 7, 2005 progress note stated that Plaintiff was "currently trying to participate in a fitness program and hope[d] to become more functional in the future." *See id.* at 180.

The ALJ also considered measures that Plaintiff used to relieve pain or other symptoms. *See id.* at 15, 17. The ALJ noted that Plaintiff had used a TENS unit that provided relief and that Plaintiff admitted that he did not use a cane. *See id.* at 15. She also noted that Plaintiff did not have a herniated nucleus pulposus and had had no back surgery. *See id.* at 17.

**\*11** The ALJ further reviewed Plaintiff's work history. *See* Tr. at 18. The ALJ specifically noted that Plaintiff had past relevant work history as a heavy equipment operator and mechanic's helper. *See id.*

The foregoing demonstrates that the ALJ analyzed Plaintiff's credibility in accordance with the factors set forth in the regulations and that there is substantial evidence in the record

to support this analysis. Therefore, the Court affirms the ALJ's decision in this regard.

#### 4. Plaintiff's RFC

Plaintiff argues that the ALJ improperly determined his RFC and that the substantial evidence in the record did not support that determination. *See* Plaintiff's Brief at 17–19.

RFC describes what a claimant is capable of doing despite his impairments, considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms. *See Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945. "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Smith v. Apfel,* 69 F.Supp.2d 370, 378 (N.D.N.Y.1999) (citation omitted).

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, \*1 (SSA July 2, 1996). The ALJ then uses the RFC to determine whether the claimant can perform his past relevant work in the national economy. *See New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1560, 416.960.

In determining Plaintiff's RFC, the ALJ reviewed the medical evidence and then stated the weight she assigned to several opinions. *See* Tr. at 15–17. However, the ALJ failed to clarify on what evidence she relied to determine Plaintiff's RFC.

First, the ALJ assigned "some weight" to an opinion that Dr. Berk rendered on April 29, 2004. *See* Tr. at 16. As noted, on that date, Dr. Berk opined that Plaintiff was unable to work full-time in a strenuous job that involved heavy lifting and bending. *See id.* Although the ALJ found that Dr. Berk's

finding of "no strenuous activity" was "consistent with other evidence of record and with [an RFC] of light work," the ALJ failed to explain why she rejected the portion of Dr. Berk's opinion that Plaintiff was unable to bend.

Second, the ALJ weighed the opinion of the disability analyst. *See* Tr. at 16. The ALJ stated that she assigned only "little weight" to this opinion because a "non-medical, non-examining source" completed this assessment. *See id.*

Third, as noted, the ALJ gave less than considerable weight to Dr. Berk's March 2005 opinion. *See* Tr. at 16–17. As previously discussed, the Court is unable to conclude that the ALJ's finding in that regard was proper.

**\*12** In light of the foregoing, the Court is unable to find that there is substantial evidence in the record to support the ALJ's RFC finding. It is unclear on what evidence the ALJ relied because she assigned only some weight to Dr. Berk's April 2004 opinion, little weight to the disability analyst's opinion, and less than considerable weight to Dr. Berk's March 2005 opinion. Moreover, the ALJ failed to point out any specific supporting evidence. Therefore, the Court concludes that it must remand this matter for a re-evaluation of Plaintiff's RFC. On remand, the ALJ must provide a narrative describing how the evidence supports each conclusion, citing specific medical facts, e.g., laboratory findings, and nonmedical evidence, e.g., daily activities, observations. *See* SSR 96–8p, 1996 WL 374184, at \*7.

### 5. Medical-vocational guidelines

Plaintiff argues that the ALJ improperly used the Medical–Vocational Guidelines (the grids"). *See* Plaintiff's Brief at 19–20. Plaintiff is apparently asserting that the ALJ erred in using Medical Vocational Rule 202.14, which requires the ability to perform light work, because he is unable to perform even sedentary work. *See id.*

When a claimant is able to demonstrate that his impairments prevent him from returning to his past relevant work, the burden shifts to the Commissioner at step five to prove that a job exists in the national economy that the claimant is capable of performing. *See Curry v. Apfel,* 209 F.3d 117, 122 (2d Cir.2000) (quotation and other citations omitted); 20 C.F.R. §§ 404.1560(c), 416.960(c). Work exists in the national economy when it exists in significant numbers either in the region where the claimant lives or in several other regions in the country. *See* 20 C.F.R. §§ 404.1566(a), 416.966(a). In making this determination, the ALJ may apply the

grids or consult a vocational expert. *See Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. pt. 404, subpt. P, App. 2. If the claimant's "characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." *Pratts v. Chater,* 94 F.3d 34, 39 (2d Cir.1996). However, if a claimant suffers from non-exertional impairments that " 'significantly limit the range of work permitted by his exertional limitations,' " the ALJ should elicit testimony from a vocational expert to determine if jobs exist in the economy that the claimant can still perform. *Id.* (quoting [*Bapp v. Bowen,* 802 F.2d 601,] 605–06 [ (2d Cir.1986) ] ); 20 C.F.R. §§ 404.1566(e), 416.966(e). The vocational expert may testify about the existence of jobs in the national economy and about the claimant's ability to perform any of those jobs given his functional limitations. *See Colon v. Comm'r of Soc. Sec.,* No. 6:00CV0556, 2004 WL 1144059, \*6 (N.D.N.Y. Mar. 22, 2004) (citation omitted).

In this case, the ALJ consulted the grids and found that Plaintiff was not disabled. *See* Tr. at 18. However, because the Court is remanding this matter for a re-evaluation of Dr. Berk's opinion and for a re-evaluation of Plaintiff's RFC, it is unable to conclude that the there is substantial evidence in the record to support the conclusion that the ALJ reached after consulting the grids.

## IV. CONCLUSION

**\*13** After carefully reviewing the entire file in this case, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the Commissioner's final decision denying disability benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g),[2] for further proceedings consistent with this Order; and the Court further

[2]   Sentence four provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).

**ORDERS** that, because the referral of this matter to a magistrate judge under Local Rule 72.3 has been **RESCINDED,** any appeal that a party takes from this Order shall be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2783418

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Fuimo v. Colvin, N.D.N.Y., June 7, 2013

2010 WL 3909630
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shawn G. DILLINGHAM, Plaintiff,
v.
Michael J. ASTRUE, Commissioner
of Social Security, Defendant.

No. 09–CV–236 (GLS/VEB).
|
Aug. 24, 2010.

**REPORT AND RECOMMENDATION**

VICTOR E. BIANCHINI, United States Magistrate Judge.

### I. INTRODUCTION

**\*1** In November of 2004, Plaintiff Shawn G. Dillingham applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act. Plaintiff alleges that he has been unable to work since August 15, 2004, due to several physical and mental impairments. The Commissioner of Social Security denied Plaintiff's applications. Plaintiff, by and through his attorneys, Olinsky & Shurtliff, Jaya Shurtliff, Esq., commenced this action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

On July 22, 2010, the Honorable Norman A. Mordue, Chief United States District Judge, referred this case to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket No. 19).

### II. BACKGROUND

The relevant procedural history may be summarized as follows:

Plaintiff applied for SSI benefits and DIB on November 5, 2004, alleging disability beginning on August 15, 2004. (T at 44, 165). [1] The applications were denied initially on February 3, 2005. (T at 29). Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), but completed and signed a written waiver of his right to appear at the hearing. (T at 35).

[1] Citations to "T" refer to the Administrative Transcript. (Docket No. 9).

On January 26, 2006, ALJ Joseph G. Medicis, Jr. issued a decision denying Plaintiff's applications. (T at 16–22). Plaintiff timely requested review by the Appeals Council, which denied the request on May 18, 2006. (T at 6–8). On July 17, 2006, Plaintiff, through counsel, commenced an action in the United States District Court for the Northern District of New York, which was assigned case number 06–CV–862. On April 12, 2007, the Honorable Randolph F. Treece, United States Magistrate Judge, issued a Consent Order remanding the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). (T at 194–95). On remand, the Appeals Council referred the matter to ALJ Medicis for further proceedings. (196–99).

ALJ Medicis held a hearing on January 17, 2008, in Syracuse, New York. Plaintiff appeared with counsel and testified. (T at 385–416). On February 13, 2008, the ALJ issued a decision denying Plaintiff's applications. (T at 183–93). The ALJ's decision became the Commissioner's final decision on January 17, 2009, when the Appeals Council denied Plaintiff's request for review. (T at 169–171).

Plaintiff timely commenced this action on February 26, 2009. (Docket No. 1). The Commissioner interposed an Answer on July 22, 2009. (Docket No. 8). Plaintiff filed a Brief in support of the action on January 4, 2010. (Docket No. 13). The Commissioner filed a Brief in opposition on February 18, 2010. (Docket No. 18).

Pursuant to General Order No. 18, issued by the Chief District Judge of the Northern District of New York on September 12, 2003, this Court will proceed as if both parties had accompanied their briefs with a motion for judgment on the pleadings.

For the reasons that follow, it is respectfully recommended that the Commissioner's motion be denied, Plaintiff's motion be granted, and that this case be remanded for further administrative proceedings.

### III. DISCUSSION

#### A. Legal Standard

**\*2** A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.,* 906 F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ( "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled as defined under the Social Security Act. *See* 20 C.F.R. §§ 416.920, 404.1520. The United States Supreme Court recognized the validity of this analysis in *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d

119 (1987), and it remains the proper approach for analyzing whether a claimant is disabled. [2]

[2]   This five-step process is detailed as follows:

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.

If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

If the claimant has such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.

If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam); *see also Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir.1999); 20 C.F.R. §§ 416.920, 404.1520.

While the claimant has the burden of proof as to the first four steps, the Commissioner has the burden of proof on the fifth and final step. *See Bowen,* 482 U.S. at 146 n. 5; *Ferraris v. Heckler,* 728 F.2d 582 (2d Cir.1984).

The final step of the inquiry is, in turn, divided into two parts. First, the Commissioner must assess the claimant's job qualifications by considering his or her physical ability, age, education, and work experience. Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 416.920(g); 404.1520(g); *Heckler v.. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

#### B. Analysis

##### 1. Commissioner's Decision

**\*3** The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through March 31, 2009. (T at 186). The ALJ also determined that Plaintiff had not engaged in substantial gainful activity since August 15, 2004, the alleged onset date. (T at 186). The ALJ concluded that Plaintiff had the following impairments considered severe under the Act: generalized anxiety disorder (mild-to-moderate) and alcohol abuse in questionable remission. (T at 186). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments set forth in 20 CFR Part 404, Subpart P, Appendix I (the "Listings"). (T at 189).

The ALJ determined that Plaintiff had the residual functional capacity to perform medium work, with some non-exertional limitations. (T at 190). The ALJ concluded that Plaintiff had not demonstrated an inability to perform his past relevant work but, out of an abundance of cautions, he proceeded on the assumption that Plaintiff had made such a showing. (T at 192).

Considering Plaintiff's age (47 on the date of alleged onset), education (limited), work experience, and RFC, the ALJ concluded that Plaintiff was able to perform a significant number of jobs in the national economy. (T at 192). Thus, the ALJ found that Plaintiff had not been under a disability as defined under the Act from the date of onset to the date of the ALJ's decision. (T at 192). As noted above, the ALJ's decision became the Commissioner's final decision on January 17, 2009, when the Appeals Council denied Plaintiff's request for review. (T at 169–171).

### 2. Plaintiff's Claims

Plaintiff challenges the Commissioner's decision. He offers five (5) principal arguments in support of this position. First, Plaintiff contends that the ALJ erred with respect to the severity analysis at step two of the sequential evaluation. Second, he argues that the ALJ failed to follow the treating physician's rule. Third, Plaintiff challenges the ALJ's RFC determination. Fourth, Plaintiff asserts that the ALJ did not properly evaluate his credibility. Fifth, he contends that the ALJ should have consulted a vocational expert. This Court will address each argument in turn.

### a. Severity of Impairments

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his or her physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1520(c), 416.920(c). The following are examples of "basic work activities": "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling ... seeing, hearing, and speaking ... [u]nderstanding, carrying out, and remembering simple instructions ... [u]se of judgment ... [r]esponding appropriately to supervision, co-workers and usual work situations." Gibbs v. Astrue, No. 07–Civ–10563, 2008 WL 2627714, at \*16 (S.D.N.Y. July 2, 2008); 20 C.F.R. § 404.1521(b)(l)-(5). The claimant bears the burden of presenting evidence establishing severity. Miller v. Comm'r of Social Sec., No. 05–CV–1371, 2008 WL 2783418, at \*6–7 (N .D.N.Y. July 16, 2008); see also 20 C.F.R. § 404.1512(a).

**\*4** Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." Coleman v. Shalala, 895 F.Supp. 50, 53 (S.D.N.Y.1995). Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' " Rosario v. Apfel, No. 97–CV–5759, 1999 WL 294727 at \*5 (E.D.N.Y. March 19,1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12 (1987)).

In this case, the ALJ rejected Plaintiff's arguments that his diverticulitis, degenerative disc disease of the lumbar spine, transitional rib pain, and unspecified sleep disorder were "severe" impairments. (T at 186). Plaintiff challenges the ALJ's decision as to the degenerative disc disease of his lumbar spine and his diverticulitis. Plaintiff contends that these impairments are severe.

With regard to the lumbar spine, Plaintiff points to x-ray testing indicating spondylosis between the L3 and L5 vertebrae. (T at 311). Plaintiff was treated with pain medication by his primary care physician. (T at 328, 338, 362, 365). A report from the New York Pain Center indicated a diagnosis of lumbar paraspinous tenderness and antalgic gait, with an initial impression of mechanical low back pain and lumbar radiculopathy. (T at 325). MRI results indicated mild disc bulging and early degenerative changes. (T at 326). Plaintiff testified that he experiences "constant" back pain, which he described as a "quite severe" stabbing pain. (T at 396–97). Plaintiff described the pain as a nine or a ten on a

scale of one to ten, with ten being the most severe pain. (T at 397). He indicated that the pain would prevent him from sitting for more than ten minutes before needing to change positions. (T at 398). Plaintiff testified that he could only stand for fifteen minutes before needing to sit down. (T at 398).

Concerning diverticulitis, Plaintiff points to September 2005 treatment in the emergency room for abdominal pain, at which point CT scans indicated diverticulitis of the sigmoid colon. (T at 290, 297). Repeat CT scans continued to show diverticulitis, along with other gastrointestinal disorders. (T at 242, 285).

For the following reasons, this Court finds the ALJ's conclusion that these impairments were not "severe" as defined under the Act was supported by substantial evidence. Regarding Plaintiff's lumbar issues, when asked in December 2004 to state the illnesses, injuries, or conditions that limit his ability to work, Plaintiff listed "Sleep disorder/depression," with no mention of any back pain. (T at 49). [3] In fact, Plaintiff indicated that his illness, injuries, or conditions did not cause him pain. (T at 50).

[3] Plaintiff also did not mention any gastrointestinal problems in the December 2004 disability report, but this is not as significant because Plaintiff was not diagnosed with diverticulitis until September of 2005.

**\*5** In addition, the clinical findings were generally mild and frequently associated with heavy lifting or other rigorous activities. For example, Plaintiff was treated in an emergency room for lower back pain in September 2005 following an altercation with his brother. (T at 304). Images of Plaintiff's lumbar spine showed normal vertebral body height and alignment and no bone destruction. (T at 310). A mild narrowing of the disc space between L4 and L5 was noted. (T at 310). Plaintiff was discharged with Motrin and Tylenol. (T at 305).

An October 2007 visit to the Pain Center was brought on by heavy lifting. (T at 324). Although the treating nurse practitioner gave an initial impression of mechanical low back pain and lumbar radiculopathy (T at 325), subsequent imaging showed only "mild" disc bulging and early degenerative changes, with no evidence of focal disc herniation or nerve root entrapment. (T at 326).

With respect to diverticulitis, a July 2006 treatment note indicated that Plaintiff's condition was "better now" and he was not planning to see a gastrointestinal specialist.

(T at 360). Dr. Ajoy Roy performed a colonoscopy and esophagogastroduodenoscopy on April 12, 2007. Notes from a follow-up visit indicated that Plaintiff had no complaints and had not experienced any return of abdominal pain. (T at 314). Endosonographic images of the rectum were taken on December 12, 2007, and noted to be "unremarkable." (T at 320).

As noted above, the claimant bears the burden of proving severity. In light of the foregoing, this Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff did not meet that burden with respect to these two impairments.

Lastly, because the ALJ concluded that Plaintiff's anxiety disorder was a severe impairment and continued with the sequential analysis, any errors in his findings at step two of the analysis were harmless. *See Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir.1987) ("[T]he Secretary found that Maziarz suffered from the severe impairment of coronary artery disease, status post right coronary artery angioplasty and angina pectoris. Accordingly, the Secretary continued with the remaining steps in his disability determination. Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error."); *McCartney v. Commissioner of Social Sec.,* Civil Action No. 07–1572, 2009 WL 1323578, at \*16 (W.D.Pa. May 8, 2009) ("Even if the Court was to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments."); *Portorreal v. Astrue,* No. C.A. 07–296ML, 2008 WL 4681636, at \*3 (D.R.I. Oct. 21, 2008).

**\*6** Accordingly, this Court finds no reversible error as to this aspect of the ALJ's decision does not recommend remand as to this issue.

**b. Treating Physician's Rule**

Under the "treating physician's rule," the ALJ must give controlling weight to the treating physician's opinion when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); *Halloran v. Barnhart,* 362 F.3d 28, 31–32 (2d Cir.2004); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000). [4]

[4]   "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion." *de Roman v. Barnhart,* No.03–Civ.0075, 2003 WL 21511160, at *9 (S.D.N.Y. July 2, 2003).

Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it "extra weight" under certain circumstances. In this regard, the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court. C.F.R. § 404.1527(d)(1)-(6); *see also de Roman,* 2003 WL 21511160, at *9; *Shaw,* 221 F.3d at 134; *Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir.1998); *Schaal v. Apfel,* 134 F.3d 496, 503 (2d Cir.1998).

In this case, Plaintiff's treating physician, Dr. Mohammed Ahmed, completed a Physical & Mental Medical Source Statement in January of 2008. Dr. Ahmed indicated that Plaintiff's pain and other symptoms were severe enough to interfere with attention and concentration constantly. (T at 329). He opined that Plaintiff had a marked limitation in his ability to deal with work stress and could sit or stand for less than 2 hours in an 8–hour work day. (T at 329). Dr. Ahmed indicated that Plaintiff would need to take an unscheduled break every 10 to 15 minutes during the day. (T at 330). He assessed that Plaintiff could frequently lift less than 10 pounds, but could never lift more than that. (T at 330).

Concerning Plaintiff's mental impairments, Dr. Ahmed opined that he had poor or no ability to complete a regular workday and workweek without interruptions from psychologically based symptoms; and poor to no ability to perform at a consistent pace without an unreasonable number and length of rest periods. (T at 332).

Dr. Ahmed indicated that Plaintiff's impairments or treatment would cause him to be absent from work more than three times a month. (T at 333).

The ALJ concluded that Dr. Ahmed's assessment of Plaintiff's limitations was contradicted by his own treatment notes, MRI results, and the overall conservative course of treatment. (T at 189). Concerning Dr. Ahmed's mental health assessment, the ALJ described the doctor as "a very caring but perhaps not entirely thoroughgoing reporter." (T at 191). In addition, the ALJ noted that Dr. Ahmed was not a psychiatric specialist. (T at 191). Further, the ALJ concluded that Plaintiff's non-compliance with psychiatric treatment indicated that the symptoms were not as severe as indicated by Dr. Ahmed. (T at 191).

### i. Physical Limitations

**\*7** This Court finds that the ALJ's evaluation of Dr. Ahmed's opinion with respect to Plaintiff's physical limitations was supported by substantial evidence. The ALJ was obligated to consider the consistency of Dr. Ahmed's opinion with the record as a whole. *See Pardee v. Astrue,* 631 F.Supp.2d 200, 210 (N.D.N.Y.2009). In this regard, the ALJ correctly noted that Dr. Ahmed's finding of dramatic physical limitations was contradicted by the clinical notes made over the long course of Plaintiff's treatment. These notes described largely generalized complaints of "aches and pains," with a conservative course of treatment.

For example, a November 2004 note indicated that Plaintiff had pulled a muscle behind his left knee a month earlier and experienced some relief by wearing an ace bandage. (T at 126). Notes from February and March of 2006 explained that Plaintiff continued to "have his usual aches and pains ...." (T at 365, 367). Plaintiff denied any acute illness. (T at 365). Plaintiff was concerned about a pain in the bottom of his foot. (T at 365). A June 2006 note indicated that Plaintiff was "still working lite duties." (T at 361).

In general, the treatment notes demonstrated a pattern of routine visits primarily associated with adjustments to medication and prescription refills, with some complaints of "usual aches and pains." These notes are clearly at odds with Dr. Ahmed's assessment of constant, disabling pain and severe exertional limitations. Moreover, as the ALJ noted, Plaintiff was never referred to an orthopedic specialist, which would be expected if his limitations were as severe as Dr. Ahmed indicated. [5] Moreover, as mentioned above, an MRI of the spine in October 2007 showed only mild disc bulging and early degenerative changes. (T at 326).

5    By way of comparison, Dr. Ahmed referred Plaintiff to a specialist for treatment of a callus on his foot. (T at 365).

Further support for the ALJ's conclusion is found in the consultative report prepared by Dr. Kalyani Ganesh. Dr. Ganesh noted that Plaintiff appeared to be in no acute distress, with normal gait, and the ability to walk on heels and toes without difficulty, squat full, and arise from a chair without difficulty. (T at 136). Dr. Ganesh found that Plaintiff's cervical spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally. No abnormality was noted in the thoracic spine. The lumbar spine showed full flexion, extension, lateral flexion, and full rotary movement bilaterally. (T at 136). A full range of motion was noted as to shoulders, elbows, forearms, hips, knees, ankles, and wrists bilaterally. (T at 136). Dr. Ganesh assessed "[n]o physical limitations to sitting, standing, walking, or the use of upper extremities." (T at 137). In addition, a State Agency review analyst indicated that Plaintiff had no exertional, postural, manipulative, visual, communicative, or environmental limitations. (T at 143–45).

Plaintiff argues that the ALJ was obliged to re-contact Dr. Ahmed to explain the inconsistency between his assessment and the overall medical record. However, as the Second Circuit has held, "[w]hile the opinions of a treating physician deserve special respect, ... they need not be given controlling weight when they are contradicted by other substantial evidence ..." *Veino v. Barnhart,* 312 F.3d 578, 588 (2nd Cir.2002) (citations omitted); *see also Hogue v. Barnhart,* No. 03–CV–4963, 2005 WL 1036336, at *14 (S.D.N.Y.2005) ( "An ALJ need not seek further explanation from treating physicians each time there is an inconsistency in medical opinions."). Moreover, the ALJ's responsibility to weigh the evidence would be "rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported by the record, the ALJ were required to summon that physician to conform his opinion to the evidence." *Rebull v. Massanari,* 240 F.Supp.2d 265, 273 (S.D.N.Y.2002).

**\*8** Here, the record contained numerous treatment notes and records from Dr. Ahmed and other providers, covering an extensive period of time, along with clinical findings and diagnostic test results. The record also contained a consultative report and assessment of a State Agency review analyst. In other words, the medical record concerning Plaintiff's physical limitations was complete and well-documented. Accordingly, this Court finds that the ALJ was not obliged to re-contact Dr. Ahmed concerning Plaintiff's

physical limitations. Moreover, this Court finds that a remand is not necessary as to this issue.

### ii. Mental Limitations

The Court does, however, find error with regard to the ALJ's decision to discount Dr. Ahmed's mental limitation findings. As noted above, Dr. Ahmed opined that Plaintiff had poor or no ability to complete a regular workday and workweek without interruptions from psychologically based symptoms; and poor to no ability to perform at a consistent pace without an unreasonable number and length of rest periods. (T at 332). He also indicated that Plaintiff had only a "fair" ability to deal with normal work stress, travel in unfamiliar places, or use public transportation. (T at 332).

Dr. Ahmed's assessment was consistent with his treatment notes, which indicated frequent and continuing complaints of anxiety and the treatment of Plaintiff's mental problems with varying doses of prescription medication. (T at 126, 128, 356, 362, 365, 367). An April 2005 treatment note indicated that Plaintiff "cannot work [with] people, phobic, disability." (T at 375).

In support of his decision to discount Dr. Ahmed's assessment, the ALJ points to a January 2005 treatment note indicating that Plaintiff was having sleep and anxiety problems, but was not interested in seeing a psychiatrist at that time. (T at 128). Apparently, the ALJ intended this reference to suggest that Plaintiff's lack of interest in seeking treatment was indicative of a less severe impairment. However, Plaintiff did, in fact, follow Dr. Ahmed's recommendation and was evaluated at the Oswego Hospital Behavioral Services Division on March 22, 2005. (T at 382). Thus, Plaintiff's stated lack of interest in seeking psychiatric help in January 2005 has very little probative value, given his decision shortly thereafter to seek such help.

Moreover, this aspect of the ALJ's decision highlights a larger problem with his analysis. The ALJ clearly discounted Dr. Ahmed's findings and Plaintiff's testimony concerning mental limitations because of Plaintiff's non-compliance with psychiatric treatment. However, the ALJ's assessment in this regard is not supported by the evidence. The facts concerning Plaintiff's psychiatric treatment are as follows:

Plaintiff was assessed by a social worker at the Oswego Hospital Behavioral Services Division in March 2005. (T at 382). Dr. Stanley Poreba of the Behavioral Services Division performed a psychiatric/outpatient assessment in May of that

year. (T at 380). Dr. Poreba saw Plaintiff again a month later. (T at 379). Plaintiff was seen by Dr. Lewis Malgieri in August of 2006. (T at 378).

**\*9** A termination summary indicates that Plaintiff was terminated from the Behavioral Services Division because he failed to appear for one appointment and had no contact with the facility thereafter. (T at 377). The termination date is unclear, as the "termination summary" is initially dated September 30, 2005, but indicates dictation and transcription dates in September and October of 2006. (T at 377). The summary was prepared by Robin Brown, SWA and the date beneath her signature is October 24, 2006. These facts strongly support the conclusion that the report was prepared in the fall of 2006. As such, the summary is inaccurate in that it states that Plaintiff had no contact with the facility since a June 2005 visit with Dr. Poreba. In fact, Plaintiff was seen by Dr. Malgieri in August 2006. (T at 378).

The ALJ made the following finding: "the termination report subsequently issued by that agency [the Behavioral Services Division] shows that he only came for his sessions for about a month and then simply failed to show up for further scheduled appointments, suggesting that symptoms probably were not so bad after all." (T at 188).

This finding is problematic in several respects. First, the ALJ accepted the termination summary uncritically. However, as noted above, a review of the record shows that the termination summary does not accurately report Plaintiff's treatment history (in that is fails to account for an August 2006 visit). Second, contrary to the ALJ's references to "further scheduled appointment*s*" (emphasis added) and "several missed sessions," the termination report references only one missed appointment. (T at 377). This Court expresses some surprise that a mental health facility would terminate a patient after one missed appointment, even if the patient made no further attempts to contact the facility. Moreover, the August 2006 visit with Dr. Malgieri obviously qualifies as a contact with the facility, a point the termination summary ignores. In any event, the record does not support the ALJ's finding of multiple missed appointments. In fact, it appears Plaintiff may have been terminated from the program based upon incorrect information. The ALJ took no note of any of these puzzling contradictions and inconsistencies and thus made no attempt to reconcile them with his findings.

Third, the ALJ relied upon his questionable findings of Plaintiff's non-compliance with treatment to discount Dr.

Ahmed's findings. However, the ALJ did not adequately account for the fact that other evidence in the record was consistent with Dr. Ahmed's findings. For example, the ALJ makes no mention of Dr. Poreba's May 2005 assessment. Dr. Poreba gave Plaintiff a Global Assessment Functioning ("GAF") score of 50. (T at 381). "A GAF range of 41–50 indicates that the individual has a 'serious impairment in one of the following: social, occupational, or school functioning.' " *Pollard v. Halter,* 377 F.3d 183, 186 n. 1 (2d Cir.2004). Dr. Poreba described Plaintiff's affect as "constricted" and his mood as "depressed." (T at 381). Likewise, Dr. Malgieri described Plaintiff as suffering from a "great deal of tension." (T at 378). Dr. Barry, the consultative examiner, described Plaintiff's prognosis as "guarded," and indicated that he appeared anxious and to have difficulty handling stressors. (T at 140–41). Dr. Barry further assessed that Plaintiff would have difficulty relating adequately with others and that Plaintiff's allegations were consistent with the examination results. (T at 140). Dr. Barry recommended psychiatric treatment with medication. (T at 141).

**\*10** Finally, although the Commissioner generally gives "more weight to the opinion of a specialist upon medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist," 20 C.F.R. § 404.1527(d)(5), the fact that Dr. Ahmed was not a psychiatrist does not, without more, justify the ALJ's decision to discount his findings.

As noted above, Dr. Ahmed's mental limitation findings were consistent with his treatment notes and other evidence. Important evidence supporting Dr. Ahemd's assessment (*e.g.* Dr. Poreba's GAF score) was not even discussed. Further, the ALJ placed heavy emphasis upon Plaintiff's termination from treatment without reconciling apparent discrepancies concerning the basis and timing of termination. This error was compounded by the ALJ's failure to re-contact the Behavioral Services Division and/or ask Plaintiff about the circumstances or reasons for his non-compliance with treatment. Accordingly, this Court finds that the ALJ's decision to discount Dr. Ahmed's mental limitation findings was not supported by substantial evidence and that a remand is therefore required. On remand, Dr. Ahmed's mental limitation findings should be revisited, with proper consideration given to the other evidence of record. In addition, to the extent that Plaintiff's non-compliance with treatment is deemed to contradict Dr. Ahmed's findings, further development of the record is necessary to determine the nature and extent of the non-compliance.

### c. RFC Determination

Residual functional capacity ("RFC") is defined as: "what an individual can still do despite his or her limitations." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*

When making a residual functional capacity determination, the ALJ considers a claimant's physical abilities, mental abilities, symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a). An RFC finding will be upheld when there is substantial evidence in the record to support each requirement listed in the regulations. *LaPorta v. Bowen,* 737 F.Supp. 180, 183 (N.D.N.Y.1990).

In this case, the ALJ found that Plaintiff retained the RFC to perform medium work "except perhaps work involving unusually high cognitive/emotional demands such as complex intellectual work or constant unusual stressors." (T at 190). The ALJ concluded that Plaintiff could "certainly perform all the basic mental demands of basic, simple, repetitive entry level work." (T at 190).

Plaintiff challenges the RFC assessment on two (2) grounds. First, Plaintiff contends that it is at odds with Dr. Ahmed's assessments. Second, Plaintiff argues that the ALJ erred by failing to provide a function-by-function finding of Plaintiff's ability to perform exertional work activities.

**\*11** For the reasons stated above, this Court finds that the ALJ's decision to discount Dr. Ahmed's opinion as to Plaintiff's physical limitations was supported by substantial evidence. In contrast, the ALJ's RFC determination with regard to Plaintiff's mental impairments was flawed and will necessarily need to be revisited on remand for the reasons outlined above. This leaves the question of whether the ALJ's RFC determination concerning Plaintiff's physical limitations can be sustained even though the ALJ did not provide a function-byfunction analysis.

SSR 96–8p provides that the ALJ's RFC assessment must include a function-byfunction analysis of the claimant's

functional limitations or restrictions and an assessment his or her work-related abilities on a function-by-function basis. With regard to physical limitations, this means the ALJ must make a function by function assessment of the claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch. 20 C.F.R. § 404.1513(c)(1); §§ 404.1569a(a), 416.969a(a); *Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999). Once the function-by-function analysis is completed, the RFC be expressed in terms of exertional levels of work, e.g., sedentary, light, medium, heavy, and very heavy. *Hogan v. Astrue,* 491 F.Supp.2d 347, 354 (W.D.N.Y.2007).

The Commissioner concedes that the ALJ failed to set forth a function-by-function analysis, as required by SSR 96–8p. (Docket No. 18, at p. 13–14). The Second Circuit has not yet decided whether non-compliance with SSR 96–8p is *per se* grounds for a remand.

At least two circuit courts of appeals have concluded that "[a]lthough a function-by-function analysis is desirable, the ALJ need not discuss each factor in his written opinion." *Delgado v. Comm'r of Soc. Sec.,* 30 Fed. App'x 542, 547–48 (6th Cir.2002) (quoting *Bencivengo v. Comm'r of Soc. Sec.,* 251 F.3d 153 (3d Cir.2000)).

District courts in the Second Circuit have reached different conclusions, with courts in the Northern District of New York generally concluding that a remand is required. *See, e.g., Wood v.. Comm'r of Soc. Sec.,* No. 06–CV–157, 2009 WL 1362971, at *6 (N.D.N .Y. May 14, 2009) (collecting cases); *McMullen v. Astrue,* 05–CV–1484, 2008 WL 3884359, at *6 (Aug. 18, 2008); *Brown v. Barnhart,* No. 01–CV–2962, 2002 WL 603044, at *5–7 (E.D.N.Y.Apr.15, 2002) ("In sum, because the ALJ did not properly apply the legal standard in Social Security Ruling 96–8p for assessing residual functional capacity, I cannot properly conclude that his finding that the claimant retained the residual functional capacity to do her past work was supported by substantial evidence."); *Matejka v.. Barnhart,* 386 F.Supp.2d 198, 208 (W.D.N.Y.2005) ( "The ALJ's decision did not address the plaintiff's ability to sit, stand, or walk ... Since the ALJ failed to make a function-by-function analysis of plaintiff's RFC, his determination that she had the RFC for sedentary work is not supported by substantial evidence."); *but see Casino–Ortiz v. Astrue,* 2007 WL 2745704, at *13 (S.D.N.Y. Sept. 21, 2007) (sustaining ALJ's decision, notwithstanding failure to provide function-byfunction analysis); *Novak v. Astrue,* No. 07 Civ. 8435, 2008 WL 2882638, at *3 & n. 47 (S.D.N.Y. July 25,

2008) ("The A.L.J. must avoid perfunctory determinations by considering all of the claimant's functional limitations, describing how the evidence supports her conclusions, and discussing the claimant's ability to maintain sustained work activity, but she need not provide a narrative discussion for each function."); *Martin v.. Astrue,* No. 05–CV–72, 2008 WL 4186339, at *16 (N.D.N.Y. Sept. 9, 2008) (declining to remand, despite finding that the ALJ grouped the functions in his function-by-function analysis because "treating the activities separately would not have changed the result of the RFC determination").

**\*12** This Court is inclined toward the view that, in limited circumstances, the ALJ's failure to provide a function-by-function analysis might constitute harmless error, provided (for example) that the absence of the analysis did not frustrate meaningful review of the ALJ's overall RFC assessment.[6] However, the issue need not be resolved in this particular case. Given that remand is recommended on other grounds, this Court suggests that remand likewise be ordered for the ALJ to provide a function-by-function assessment of Plaintiff's exertional limitations, as required under SSR 98–6p.

[6]    Several courts have recognized the general applicability of the harmless error rule to the review of disability denial claims. *See, e.g., Duvergel v. Apfel,* No. 99 Civ. 4614, 2000 WL 328503, at *11 (S.D.N.Y.Mar.29, 2002); *Walzer v. Chater,* 93 Civ. 6240, 1995 WL 791963 at *9 (S.D.N.Y.Sept.26, 1995).

### d. Credibility
The claimant's credibility is an important element in DIB and SSI claims, and such evidence must be thoroughly considered. *See Ber v. Celebrezze,* 333 F.2d 923 (2d Cir.1994). Further, if an ALJ rejects a claimant's testimony of pain and limitations, he or she must be explicit in the reasons for rejecting the testimony. *See Brandon v. Bowen,* 666 F.Supp. 604, 609 (S.D.N.Y.1997).

However, subjective symptomatology by itself cannot be the basis for a finding of disability. A claimant must present medical evidence or findings that the existence of an underlying condition could reasonably be expected to produce the symptomatology alleged. *See* 42 U.S.C. §§ 423(d)(5)(A), 1382c (a)(3)(A); 20 C.F.R. §§ 404.1529(b), 416.929; SSR 96–7p; *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419 (S.D.N.Y.1995).

"An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." *Lewis v. Apfel,* 62 F.Supp.2d 648, 651 (N.D.N.Y.1999) (internal citations omitted).

To this end, the ALJ must follow a two-step process to evaluate the plaintiff's credibility, set forth in SSR 96–7p:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) ... that could reasonably be expected to produce the individual's pain or other symptoms ....

> Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ....

According to 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii), if the plaintiff's pain contentions are not supported by objective medical evidence, the ALJ must consider the following factors in order to make a determination regarding the plaintiff's credibility:

1. [Plaintiff's] daily activities;

2. The location, duration, frequency and intensity of [Plaintiff's] pain or other symptoms;

3. Precipitating and aggravating factors;

4. The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate ... pain or other symptoms;

**\*13** 5. Treatment, other than medication [Plaintiff] receive[s] or ha[s] received for relief of ... pain or other symptoms;

6. Any measure [Plaintiff] use[s] or ha[s] used to relieve ... pain or other symptoms;

7. Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

If the ALJ finds that the plaintiff's contentions are not credible, he or she must state his reasons "explicitly and with

sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief." *Young v. Astrue,* No. 7:05–CV–1027, 2008 WL 4518992, at *11 (N.D.N.Y. Sept. 30, 2008) (quoting *Brandon v. Bowen,* 666 F. Supp 604, 608 (S.D .N .Y.1987)).

In this case, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce only some of the alleged symptoms, and that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (T at 191). The ALJ's decision to discount Plaintiff's credibility was based upon three principal points: discrepancies in the record concerning alcohol abuse, Plaintiff's poor earnings record, and his non-compliance with treatment.

As discussed above, the ALJ placed particular reliance upon the non-compliance with treatment, indicating that Plaintiff's termination from the Behavioral Services Division program suggested "that [the psychiatric] symptoms were not so bad after all." (T at 188).

However, the ALJ did not apply the proper legal standard when considering Plaintiff's non-compliance with treatment. SSR 96–7p provides, in pertinent part, that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed." Under that ruling, however, an ALJ must not draw an adverse inference from a claimant's failure to seek or pursue treatment "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *Id.*

In this case, the ALJ placed nearly exclusive reliance on the termination summary provided by the Behavioral Services Division as the basis for his finding of non-compliance. For the reasons outlined above, that summary appears to contain incorrect information and the termination may well have been hasty on the part of the facility. In any event, even assuming that Plaintiff was terminated for the reasons stated in the summary, the ALJ had an opportunity to ask Plaintiff to explain his non-compliance with treatment, but failed to do so. At the outset of the hearing, Plaintiff told the ALJ that he was no longer treating at the Behavioral Services Division. (T at 389). The ALJ did not ask any follow-up

questions as to why Plaintiff discontinued treatment. Plaintiff later indicated that he never learned to drive (T at 391), which at least suggests a possible explanation for his failure to attend treatment sessions. Further, the ALJ could have used the hearing to explore the apparent factual discrepancy in the termination summary *(e.g.* by asking Plaintiff to state or at least estimate the number of missed appointments).

**\*14** Alternatively and/or additionally, the ALJ could have re-contacted the facility to request an explanation of its termination decision. At the very least, SSR 96–7p required some meaningful development of the record in this regard before the ALJ reached the conclusion that the reason for non-compliance was that Plaintiff's "symptoms were not so bad after all." Lastly, the ALJ stated that Plaintiff "has been using medications for anxiety and depression but apparently with quite good success." (T at 191). The ALJ's suggestion of "quite good success" is not accompanied by any supporting citation to the record and, indeed, is actually contradicted by it.

Accordingly, this Court recommends a remand for reconsideration of Plaintiff's credibility in light of the considerations outlined above.

### e. Use of the Grids

At step 5 in the sequential evaluation, the ALJ was required to perform a two part process to first assess Plaintiff's job qualifications by considering his physical ability, age, education, and work experience, and then determine whether jobs exist in the national economy that Plaintiff could perform. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); *Heckler v. Campbell,* 461 U.S. 458, 460, 103 S.Ct. 1952, 1954, 76 L.Ed.2d 66 (1983). In this, and other social security cases, the second part of this process is generally satisfied by referring to the applicable rule of the Medical–Vocational Guidelines set forth at 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly called "the Grids" or the "Grid"). *See Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986).

The function of the Grids was succinctly summarized by the court in *Zorilla v. Chater,* 915 F.Supp. 662, 667 (S.D.N.Y.1996) as follows:

> In meeting [his] burden of proof on the fifth step of

the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid." The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

*Id.*

"The Grid classifies work into five categories based on the exertional requirements of the different jobs. Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* at 667 n. 2; *see* 20 C.F.R. § 404 .1567(a). Upon consideration of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled." 20 C.F.R. § 404.1569, § 404 Subpt. P, App. 2, 200.00(a).

**\*15** In this case, the ALJ used the Grids in reaching his disability determination. (T at 192). However, the ALJ's consultation of the Grids was based upon his RFC assessment with regard to Plaintiff's physical and mental limitations, namely that he was capable of performing medium work and that his non-exertional impairments had little or no substantial effect on the routine occupational base of unskilled medium work. (T at 192). The ALJ's RFC determination was impacted by the errors discussed above. As such, the step 5 analysis must be revisited on remand.

**3. Remand**

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the case

for a rehearing.' " *Butts v. Barnhart,* 388 F.3d 377, 385 (2d Cir.2002) (quoting 42 U.S.C. § 405(g)). Remand is "appropriate where, due to inconsistencies in the medical evidence and/or significant gaps in the record, further findings would ... plainly help to assure the proper disposition of [a] claim." *Kirkland v. Astrue,* No. 06 CV 4861, 2008 WL 267429, at \*8 (E.D.N.Y. Jan. 29, 2008). Given the deficiencies in the record as outlined above, it is recommended that the case be remanded for further proceedings consistent with this Report and Recommendation.

**1. Request for Expedited Hearing and Interim Benefits**

Plaintiff filed his application for benefits in November of 2004, nearly six years ago. This is the second time the matter has been reviewed by a federal court and, if this Court's recommendation is adopted, the matter will be remanded for the second time for further administrative proceedings. In the event of a remand, Plaintiff requests that this Court impose an injunction setting a firm deadline for the Commissioner to provide Plaintiff with a new hearing and order the Commissioner to pay interim benefits.

The Second Circuit has held that district courts have the power to direct that interim benefits be provided to SSI claimants. *See Day v. Schweiker,* 685 F.2d 19, 24 (2d Cir.1982) (per curiam), *rev'd on other grounds, Heckler v. Day,* 467 U.S. 104 (1984) (holding district court cannot "prescribe mandatory deadlines with respect to the adjudication of disability claims under Title II of the [Social Security] Act," but declining to "address the propriety of that part of the [d]istrict [c]ourt's order requiring payment of interim benefits"); *see also State of New York v. Sullivan,* 906 F.2d 910 (2d Cir.1990) (stating that a district court has "remedial power to award interim benefits prior to administrative readjudication of [SSI and Social Security Disability Insurance] claims").

As discussed further below, the initial remand resulted from legitimate confusion on the Commissioner's part concerning whether Plaintiff had waived his right to appear at a hearing before the ALJ. As such, the responsibility for the delay in this matter cannot be solely attributed to the Commissioner. Further, although the ALJ had an affirmative and independent obligation to develop the record concerning Plaintiff's non-compliance with treatment, Plaintiff's counsel certainly could have undertaken greater efforts in that regard by, for example, questioning Plaintiff about this issue at the hearing. This Court's review of the case law indicates that interim benefits

are granted sparingly, often when the claimant is a child, and when the unreasonable delay is substantially attributable to the Commissioner. *See, e.g., Nieves ex rel. Nieves v. Barnhart,* No. 02 Civ.9207, 2004 WL 2569488, at \*10 (S.D.N.Y. Nov. 12, 2004). These criteria are not sufficiently satisfied in this case. Accordingly, this Court recommends that the request for interim benefits and an injunction be denied.

### 2. Assignment to a Different ALJ

**\*16** This Court is mindful that courts in this Circuit typically refrain from directing the Commissioner to assign a different ALJ upon remand. *See, e.g, Hartnett v. Apfel,* 21 F.Supp.2d 217, 222 (E.D.N.Y.1998). However, in limited instances, it is appropriate to consider whether "a fresh look by another ALJ [upon remand] would be beneficial[.]" *Vicari v. Astrue,* 05 CV 4967, 2009 WL 331242, at \*6 (E.D.N.Y. Feb. 10, 2009).

In such circumstances, courts, including the Second Circuit, have directed that a different ALJ be assigned on remand. *See, e.g., Kolodnay v. Schweiker,* 680 F.2d 878, 880–81 (2d Cir.1982); *Maggipinto v. Astrue,* 541 F.Supp.2d 477, 479–80 (D.Conn.2007); *Hartnett v. Apfel,* 21 F.Supp.2d 217, 223 (E.D.N.Y.1998); *Sutherland v. Barnhart,* 322 F.Supp.2d 282, 292 –293 (E.D.N.Y.2004); *Miles v. Chater,* 84 F.3d 1397, 1400–01 (11th Cir.1996); *Ventura v. Shalala,* 55 F.3d 900, 904–05 (3d Cir.1995).

This Court believes that assignment to a different ALJ on remand is warranted in this particular case. Some background is necessary to understand the issue. As noted above, Plaintiff's SSI and DIB applications were filed *pro se.* After the applications were denied initially, Plaintiff requested a hearing before the ALJ, but signed a waiver of his right to personal appearance. (T at 35). Plaintiff explained that he would be too nervous and uncomfortable to appear because of his mental impairments. (T at 35). ALJ Medicis issued a decision denying Plaintiff's applications in January of 2006. (T at 16–22). In that decision, the ALJ noted that Plaintiff had waived his right to make a personal appearance at the hearing. (T at 16). In a letter dated March 20, 2006, requesting review of that decision, Plaintiff indicated that he "had requested to be at the hearing" and expected that this case would not be reviewed until April of that year. (T at 12). The Appeals Council denied the request for review. (T at 6).

Plaintiff retained an attorney and filed an action seeking District Court review. Judge Treece issued a Consent Order to Remand. Per the Order, the purpose of the remand was to allow the ALJ "to re-contact all medical sources for complete and update[d] records and clarify plaintiff's wishes with respect to appearing at a hearing and proceed in accordance with those wishes." (T at 194–95). On remand, the Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. (T at 198). The Appeals Council, without faulting the ALJ, noted that it was unclear as to whether Plaintiff intended to waive his right to appear at the hearing. (T at 199). The ALJ was directed to "offer the claimant the opportunity for a hearing and, in connection therewith, clarify his wishes with respect to appearing at the hearing and proceed in accordance with his wishes." (T at 199).

On remand, ALJ Medicis held a hearing on January 17, 2008. Plaintiff appeared with his counsel. After questions by the ALJ and Plaintiff's counsel concerning Plaintiff's limitations, the ALJ began a lengthy colloquy concerning the prior proceedings. The transcript indicates that the ALJ was annoyed and distressed, to say the least, by the apparent misunderstanding with respect to Plaintiff's waiver of personal appearance.

**\*17** The ALJ essentially cross-examined Plaintiff as to whether he understood the waiver of personal appearance form and a follow-up letter sent by the Commissioner. (T at 411–12). He then engaged in a lengthy defense of the finding that he made in his January 2006 decision to the effect that Plaintiff had waived his right to appear. (T at 412–13). The defense even included a criticism of the Appeals Council: "That person, Christopher Field, the Administrative Appeals Judge, they're not Administrative Law Judges, and I don't know if they're lawyers of [*sic* ] not, at least they're not Administrative Law Judge [*sic* ]." (T at 413). ALJ Medicis further stated that the Appeals Judge was "absolutely incorrect." (T at 413). He then proceeded to demand that Plaintiff produce documentary evidence indicating that he had revoked his waiver of appearance. (T at 414). The following passage is illustrative:

> Do you want a hearing? Well I'm not sure. Well I can't tell you that. You have got to make up your mind ... I don't want to give anybody a hard time, but we're short-handed here. But there's nothing in the record. I want that clear.

(T at 415).

The ALJ then asked Plaintiff's counsel if she had anything to say. She explained that perhaps Plaintiff had misunderstood some of the forms. Counsel then asked the ALJ whether his file contained the waiver of appearance. The ALJ responded: "Hearing closed." (T at 415–16).

The ALJ's extended discussion and defensiveness was unnecessary and inappropriate. As noted above, no one had faulted him for his January 2006 finding that Plaintiff had waived his right to appear. More importantly, the Appeals Council had not asked him to ascertain whether, in fact, Plaintiff had changed his mind in 2006. Rather, the ALJ was directed to discern Plaintiff's present wishes in that regard and proceed accordingly. Instead, the ALJ spent nearly a fifth of the hearing (measured by transcript pages) seeking personal vindication rather than developing the record by, for example, asking Plaintiff questions about relevant issues. Moreover, the ALJ had no warrant to demand that Plaintiff or his counsel produce documentary evidence not relevant to any issue before him.

This Court is very concerned that, upon a further remand, the ALJ will once again be more concerned about vindicating his prior rulings than obtaining the correct result. Given the tenor of the colloquy as evidenced by the transcript, this Court is concerned wonder whether the ALJ can be fair and impartial in this particular case. The ALJ was quick to dismiss Plaintiff's assertions concerning his mental limitations (notwithstanding the medical evidence supporting those assertions), suggesting possible animus arising from the waiver issue. A fresh look by another ALJ upon remand would clearly be beneficial and the Commissioner should be directed to make such an assignment on remand.

### IV. CONCLUSION

For the foregoing reasons, it is respectfully recommended that Plaintiff's motion for judgment on the pleadings be granted, Defendant's motion for judgment on the pleadings be denied, the decision of the Commissioner be reversed, that the case be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings

consistent with this Report and Recommendation, and that the Commissioner be ordered to assign a different ALJ on remand.

### V. ORDERS

**\*18** Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd .,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3909630

---

    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3893906
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Shawn G. DILLINGHAM, Plaintiff,

v.

Michael J. ASTRUE Commissioner
of Social Security, Defendant.

Civil Action No. 5:09–cv–236 (GLS/VEB).
|
Sept. 30, 2010.

**Attorneys and Law Firms**

Olinsky, Shurtliff Law Firm, Jaya Shurtliff, Esq., of Counsel,
Syracuse, NY, for the Plaintiff.

Social Security Administration, Office of Regional General
Counsel, Ellen E. Sovern, Esq., Vernon Norwood, Esq., of
Counsel, New York, NY, for the Defendant.

### ORDER

GARY L. SHARPE, District Judge.

**\*1** The above-captioned matter comes to this court
following a Report–Recommendation by Magistrate Judge
Victor E. Bianchini, duly filed August 24, 2010. Following
ten days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report–Recommendation
for clear error, it is hereby

ORDERED, that the Report–Recommendation of Magistrate
Judge Victor E. Bianchini filed August 24, 2010 is
ACCEPTED in its entirety for the reasons state therein, and
it is further

ORDERED, that Plaintiff's motion for judgment on the
pleadings is GRANTED, and it is further

ORDERED, that Defendant's motion for judgment on the
pleadings is DENIED, and it is further

ORDERED, that the decision of the Commissioner
is REVERSED and the case is REMANDED to the
Commissioner pursuant to sentence four of 42 U.S.C. §
405(g) for further administrative proceedings consistent with
the Report–Recommendation, and it is further

ORDERED, that the Commissioner be ordered to assign a
different ALJ on remand, and it is further

ORDERED, that the Clerk of the Court is to mail copies of
the Order to the parties.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3893906

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 7784156
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Ray HENDRICKSON, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of the
Social Security Administration, Defendant.

Civil Action No. 5:11–927.
|
Dec. 11, 2012.

### *REPORT AND RECOMMENDATION*

EARL S. HINES, United States Magistrate Judge.

**\*1** Plaintiff Kenneth Ray Hendrickson ("Hendrickson") brings this action under 42 U.S.C. § 405(g) for review of a decision denying his application for disability-based benefits under the Social Security Act. Complying with General Order # 18, the parties join issues through competing briefs.[1]

[1]    General Order # 18 is dated September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

### I. Background

Hendrickson applied for disability insurance ("DIB") and supplemental security income ("SSI") benefits claiming disability due to *depression* and *anxiety.* (T. 106–13, 136).[2] His applications, filed on June 25, 2007, alleged that disability commenced on April 28, 2007. *Id.* After being denied benefits initially (T. 66–67), Hendrickson requested a hearing before an administrative law judge ("ALJ"). (T. 76).

[2]    "T." followed by a number refers to the page of the administrative

ALJ Thomas John S. Pope ("ALJ Pope") conducted a video evidentiary hearing on September 10, 2009. (T. 19, 29–65). Hendrickson was represented by counsel, Jason Mintz, Esq., at the hearing. (T. 19, 29, 31). Hendrickson and an impartial vocational expert gave testimony.[3] ALJ Pope received additional evidence consisting of Hendrickson's

medical records, a psychiatric evaluation of a state agency psychiatric consultative examiner, Kristen Barry, Ph.D., and a psychiatric review report and mental residual functional capacity assessment of a state agency psychology medical consultant, E. Kamin, Ph.D.

[3]    ALJ Pope presided over the hearing from Chicago, Illinois. Hendrickson appeared and testified through interactive video in Syracuse, New York. The impartial vocational expert, Edward Pagella, appeared by telephone. (T. 19).

When ALJ Pope denied Hendrickson's applications (T. 19–28), Hendrickson appealed to the Appeals Council of the Social Security Administration's Office of Hearings and Appeals. (T. 13–14). On June 28, 2011, the Appeals Council denied Hendrickson's request to review. (T. 3–5). This rendered ALJ Pope's opinion the final decision. *See Sims v. Apfel,* 530 U.S. 103, 107 (2000).

Represented by new counsel, Howard D. Olinsky, Esq., Hendrickson timely instituted this case on August 4, 2011. (Dkt. No. 1).

### II. Preliminary Discussion

An initial discussion of the Social Security benefit programs at issue and the administrative decision-making process (including certain terms of art) will aid comprehension of Hendrickson's underlying claim, ALJ Pope's decision and Hendrickson's challenges thereto.

#### A. Eligibility for Benefits
*Disability Insurance benefits,* authorized by Title II of the Social Security Act and funded by social security taxes, provide income to insured individuals forced into involuntary, premature retirement by reason of disability. *Supplemental Security Income* benefits, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provide an additional resource to assure that disabled individuals' income does not fall below the poverty line.

Maximum benefits available under SSI are considerably less than under DIB. Here, ALJ Pope found that Hendrickson meets the insurance requirements of the DIB program. The practical effect of that finding makes Hendrickson's SSI application superfluous since Hendrickson, if found to be

disabled, obviously would elect the higher benefit available under DIB.

**\*2** The Social Security Act defines disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3).

*B. Sequential Evaluation Procedure*
The law requires *individualized* determinations. *See Heckler v. Campbell,* 461 U.S. 458, 467 (1983). Hence, Commissioner Astrue generally must make both medical and vocational assessments in every case. To satisfy this requirement, the Commissioner utilizes a five-step, sequential evaluation procedure for adjudicating disability-based claims. *See* 20 C.F.R. §§ 404.1520(a), 416.920. [4] This model is "sequential" in the sense that when a decision can be made at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920. It enjoys judicial approval as a fair and just way for determining disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (citing *Heckler,* 461 U.S. at 461) (use of the sequential evaluation process "contribute[s] to the uniformity and efficiency of disability determinations")).

[4]     In this circuit, the Commissioner's five-step sequential procedure is described as follows:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, claimant has an impairment [that meets or equals a] listed [impairment] in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000) (citing *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing 20 C.F.R. §§ 404. 1520, 416.920)).

Claimants bear the burden to prove their disability under the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998). When they do, a *prima facie* case of disability has been proven. *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984). The burden then shifts to the Commissioner in Step 5 to show "that there is work in the national economy that the claimant can do." *Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico,* 134 F.3d at 1180; *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); 20 C.F.R. § 416.966.

Specialized rules—some imposed externally by courts—govern the Commissioner's applications of these five steps. Those particularly pertinent to Hendrickson's case are described in the remainder of this section:

*1. Step 2 Severity Determination*
In the Commissioner's view, "[a] 'severe' impairment is one that significantly limits an individual's physical or mental ability to do 'basic work activities.' " *Meadors v. Astrue,* 370 Fed. App'x 179, 182 (2d Cir.2010) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)); *Green–Younger v. Barnhart,* 335 F.3d 99, 106 (2d Cir.2003); *see also* 20 C.F.R. § 416.921(b) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities"). The phrase "significantly limits," however, is not tantamount to an ultimate determination of disability. In this circuit, a Step 2 severity inquiry serves only to "screen out *de minimis* claims." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir.1995). Consequently, "[a] finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' ... [with] ...'no more than a minimal effect on an individual's ability to work.' " *Rosario v. Apfel,* No. 97 CV 5759, 1999 WL 294727, at \*5 (E.D.N.Y. Mar. 19, 1999) (quoting *Bowen,* 482 U.S. at 154 n. 12).

**\*3** When mental impairments are present, determining severity thereof is a complex undertaking. The Commissioner has promulgated additional regulations that require application of a "special technique" at the second (and third) steps of the five-step framework. *Kohler v. Astrue,* 546 F.3d 260, 265 (2d Cir.2008) (citing 20 C.F.R. §

404.1520a). This technique requires an initial determination of whether the claimant has a "medically determinable mental impairment." 20 C.F.R. § 404.1520a(b)(1). If so, the reviewing authority must then rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c), § 404.1520a(b)(2), which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) *concentration, persistence, or pace* (underscored because of relevance to instant case); and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). When the degree of limitation in each of the first three areas is rated "mild" or better, and no episodes of decompensation are identified, the claimant's mental impairment is not "severe." 20 C.F.R. § 404.1520a(d)(1).[5] Conversely, when a mental impairment is severe, evaluation proceeds to Step 3 to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. 20 C.F.R. § 404.1520a(d)(2)(3).

[5]   "[A] pplication of the special technique [must] be documented." *Petrie v. Astrue,* 412 Fed. App'x 401, 408 (2d Cir.2011) (citing 20 C.F.R. § 404.1520a(e)). "Generally, a medical or psychological consultant will complete a standard document, known as a 'Psychiatric Review Technique Form' ('PRTF')." *Id.* "Pursuant to the regulations, the ALJ's written decision must 'reflect application of the technique, and ... "include a specific finding as to the degree of limitation in each of the [four] functional areas." ' " *Id.* (quoting 20 C.F.R. § 404.1520a(e)(2)).

2. *Step 4 Residual Functional Capacity Determination*
When making a Step 4 finding (as to whether a severely impaired claimant can perform past relevant work), an ALJ must first assess and articulate that claimant's "residual functional capacity" ("RFC"), *i.e.,* what that claimant can still do in a work setting (8 hours a day, 5 days a week, or equivalent scheduled) despite physical and/or mental limitations caused by impairments and any related symptoms, such as pain. *See* 20 C.F.R. § 404.1545, 416.945(a); *see also Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (defining RFC). Administrative law judges thus decide whether applicants, notwithstanding their impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed.Reg. 34474, 1996 WL 374184, at *4 (SSA July 2, 1996).

When *physical* impairments are at issue, the Commissioner's regulation and an internal policy ruling (a) identify various ordinary physical functions to be considered in context of an ordinary work schedule, (b) require function-byfunction assessments of those activities, and (c) dictate that the ultimate RFC determination account for limitations imposed by both severe and non-severe impairments. *See* 20 C.F.R. §§ 404.1545(a)(2), 404.1545(b), 416.945(a)(2), 416.945(b); SSR 96–8p, 1996 WL 374184, at * *5, 7.

When *mental impairments* are in the picture, the RFC assessment ("mental RFC") involves an even more detailed analyses of claimants' functional limitations than were undertaken at Step 2. Mental RFC consists of four broad categories (*i.e.,* understanding and memory; sustained concentration and persistence; social interaction; and adaptation) with a total of twenty subparts that are each reviewed and rated (*i.e.,* "not significantly limited"; "moderately limited"; "markedly limited"; "no evidence of limitation in this category"; and "not ratable on available evidence"). (T. 389–391). Ultimately, "[a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment." SSR 85–15, THE MEDICAL–VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857, at *5–6 (SSA 1985).

3. *Step 5 Evidentiary Burden When Nonexertional Impairments Exist*
**\*4** At Step 5, the Commissioner can satisfy his burden to show that a claimant can still do work existing in the national economy by eliciting or consulting several extrinsic sources of relevant evidence.[6] In limited circumstances, moreover, the Commissioner may take administrative notice of disability *vel non* by adopting findings published in *"Medical–Vocational Guidelines,"* commonly called *"the grids." See Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When only exertional impairments[7] are in play, and when an ALJ's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009); *see also* 20 C.F.R. Part 404, Subpart P, Appendix

2; *see also Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir.2003) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"). [8]

[6] Generally, the Commissioner elicits or consults two principal sources of evidence relevant to whether claimants can perform alternative, available work. First, witnesses qualified as "Vocational Experts" may testify as to whether jobs exist for a person with the claimant's precise abilities. *See* 20 C.F.R. §§ 404.1566(e), 416. 966(e); *see also* SSR 00–4p, POLICY INTERPRETATION RULING: TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS, 2000 WL 1898704, at *1–2 (SSA Dec. 4, 2000). Second, a United States Department of Labor publication titled *Dictionary of Occupational Titles* ("DOT") can assist in determining when a claimant's residual work skills can be used in other work and the specific occupations in which they can be used. *See* 20 C.F.R. §§ 404.1560(d)(1), 416.966(d)(1); *see also* SSR 00–4p, 2000 WL 1898704, at *1–2.

[7] "An exertional impairment is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet ... strength demands of jobs (*i.e.*, sitting, standing, walking, lifting, carrying, pushing, and pulling)." *Bogardus–Fry v. Astrue*, No. 7:11–CV–883 (MAD), 2012 WL 3779132, at *15 n.14 (N.D.N.Y. Aug. 31, 2012) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *Rodriguez v. Apfel*, No. 96 Civ. 8330(JGK), 1998 WL 150981, at *10, n.12 (S.D.N.Y. Mar. 31, 1998)).

[8] The grids are a matrix of general findings—established by rule—as to whether work exists in the national economy that a person can perform. "The grids take into account a claimant's RFC, as well as [his] age, education, and work experience." *Calabrese v. Astrue*, 358 Fed. App'x 274, 276 & n.1 (2d Cir.2009) (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir.1999)). Ultimately, the grids yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F.Supp. 662, 667 & n.2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

But, when claimants also suffer from nonexertional impairments, [9] direct application of the grids to determine disability is not permitted. The Commissioner nonetheless permits administrative law judges to consult them as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by ... nonexertional limitations." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e) (2). SSR 85–15 addresses this "framework" analysis, and directs that when evaluating nonexertional impairments, an administrative law judge should first consult the grids, along with consideration of the claimant's RFC and vocational factors, to determine the extent of impairment caused by *exertional* limitations. *See* SSR 85–15, 1985 WL 56857, at *3. The administrative judge should next determine how much that claimant's "occupational base," (the entire exertional span from sedentary work through heavy work), is *further reduced* by effects of *nonexertional* impairments. *See id.*

[9] "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect [ing] only your ability to meet ... demands of jobs other than ... strength demands...." *See* 20 C.F .R. §§ 404.1569a(c)(1), 416.969a(c)(1). A nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions (*e.g.*, difficulty tolerating some physical features of certain work settings, such as dust and fumes) are also considered to be nonexertional limitations. *See* 20 C.F.R. §§ 404.1569a (c)(1) (v), 416.969a (c)(1)(v).

The net effect is that when both exertional and nonexertional impairments are present, an administrative law judge theoretically can find a claimant *disabled* when the grids direct such a finding solely on the basis of severity of exertional impairments. But, when exertional impairments alone generate a grids finding of *not disabled,* an administrative judge then must determine (usually from other evidence) how much nonexertional impairments further diminish that claimant's occupational base. Only when a meaningful occupational base remains can an administrative judge then deny a claim using the grids as a framework. *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.1996) (a claimant's work capacity is "significantly diminished" if there is an additional loss of work capacity that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity).

### III. The Commissioner's Decision

**\*5** ALJ Pope utilized the sequential evaluation procedure described earlier. (T. 19–28). Findings generally favorable to Hendrickson at the first four steps established a *prima facie* case of disability. At Step 5, however, ALJ Pope concluded that Hendrickson "has not been under a disability" and his claim was denied. (T. 27–28).

ALJ Pope's complete findings and conclusions appear on pages 21—27 of the administrative transcript contained in the record before the court. (Dkt. No. 9). For present purposes, however, it is necessary to identify and then amplify certain findings at sequential Steps 2, 4 and 5:

| | |
|---|---|
| Step 2 | Hendrickson has severe impairments consisting of depression, anxiety, and substance abuse. (T. 21–23). |
| Step 4 | (a) Hendrickson has *physical capacity* to perform a full range of work at all exertional levels; (b) his *mental capacity* for work at all levels is diminished by depression, anxiety and substance abuse; and, consequently, (c) his overall *residual functional capacity* is limited to unskilled work that does not involve working closely with others. (T. 23–26). |
| Step 5 | (a) The grids (Medical–Vocational Rule 204.00) indicate "not disabled" with reference to Hendrickson's exertional impairments (none); (b) Hendrickson's nonexertional limitations, however, erode the occupational base of unskilled work at all exertional levels by 70%; but (c) many remaining jobs exist in the national economy for individuals with Hendrickson's residual functional capacity. (T. 27). |

*A. Step 4 Residual Functional Capacity Assessment*

When making his Step 4 findings summarized above, ALJ Pope gave "great weight" to the opinions and analyses of the two state agency experts identified earlier. Dr. Barry examined Hendrickson. Dr. Kamin conducted an "extensive review of [Hendrickson's] medical records and objective tests from all the claimant's treatment providers." (T. 27). Their respective evaluations relating to concentration, persistence and pace chronicled that Hendrickson:

- has a difficult time handling stress and making appropriate decisions (T. 373, 391);

- has a "guarded" prognosis (T. 374);

- is moderately limited in ability to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances (T. 389);

- is moderately limited in ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (T. 390);

- is moderately limited in ability to respond appropriately to changes in the work setting (T. 390);

- is moderately limited in ability to work in coordination with or proximity to others without being distracted by them (T. 390); and

- is moderately limited in his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 390).

**\*6** Dr. Kamin also concluded from his overall review of Hendrickson's medical records that Hendrickson has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace, and one or two repeated episodes of deterioration (each of extended duration). (T. 385).

In ALJ Pope's view, this information indicates that Hendrickson's capacity for work-related activity is limited to performing unskilled work and only when not required to work closely with others. ALJ Pope explained:

"[T]he residual functional capacity finding by the undersigned accommodates some difficulties in the

claimant's ability to concentrate and focus and his anxiety by providing for unskilled work which does not require working closely with other people. *The unskilled work will allow for a lower level of concentration and focus, and the limited contact with others should lessen the claimant's anxiety level and accordingly reduce the risk of panic attacks."*

(T. 25) (emphasis added).

### B. Step 5 Finding Regarding Ability to Perform Alternative Work

Hendrickson cannot perform his past relevant work under the RFC rating ascribed to him above. Consequently, the sequential analysis proceeded to Step 5 where the burden rests with the Commissioner to show that Hendrickson can still perform alternative, available work. There, ALJ Pope could not apply the grids (Medical–Vocational Guidelines) directly because Hendrickson has nonexertional impairments. Consequently, ALJ Pope properly elicited extrinsic evidence from an impartial vocational expert, Edward Pagella, CRC, LCPC ("VE Pagella"). (T. 58–64, 101).

As is customary in these type proceedings, VE Pagella provided expert opinions in response to hypothetical questions. (T. 58–64). ALJ Pope asked VE Pagella to assume that a person of Hendrickson's age, education and experience has limitations requiring that he engage only in unskilled work that does not require working closely with others. (T. 59–60). Based on those assumptions, VE Pagella opined that such a person's occupational base will be reduced by 70%. (T. 60–61). VE Pagella also opined that thousands of jobs in the light and sedentary categories exist in the remaining 30% of the occupational base. *Id.* He identified several representative occupations within this remaining occupational base. *Id.*

In sum, VE Pagella provided testimony concerning (a) extent of erosion of Hendrickson's occupational base caused by limitations posed in the hypothetical question posed and (b) availability of a meaningful remaining occupational base for a person with such limitations. Given this evidence, ALJ Pope concluded that Hendrickson is not disabled because there are jobs that he can perform despite his limitations. (T. 27).

### IV. Alleged Errors

Hendrickson claims that ALJ Pope committed multiple errors in his application of sequential Steps 4 and 5. Specifically, Hendrickson contends:

**\*7** • The ALJ failed to develop the record by failing to obtain opinions from Plaintiff's treating physicians.

• The ALJ failed to obtain opinions from Plaintiff's social workers, nurse, and counselors.

• The ALJ's residual functional capacity finding is not supported by substantial evidence and is the product of legal error.

• The ALJ failed to apply appropriate legal standards in assessing Plaintiff's credibility.

• The ALJ's Step 5 determination is unsupported by substantial evidence and is the product of legal error.

(Dkt. No. 12, pp. 1, 8–24).

In response, the Commissioner maintains that ALJ Pope properly evaluated his RFC assessment with substantial evidence at Step 4, sufficiently developed the record of Hendrickson's impairments, and correctly found that Hendrickson could perform other work existing in significant numbers in the national economy at Step 5. (Dkt. No. 14, pp. 15–25).

### V. Judicial Review

The court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1503 (2010); *Berry,* 675 F.2d at 467; *see also* 42 U.S.C. § 405(g). When proper principles of law were applied, and when the Commissioner's decision is supported by substantial evidence, [10] the Commissioner's findings are conclusive and must be affirmed. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also* 42 U.S.C. § 405(g); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004).

[10]     "Substantial evidence" is a term of art. It means less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *See Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009); *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004). Stated another way, to be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.,* 306 U.S. 262, 299–300 (1939), *cited in* Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed.1991).

### VI. Discussion and Analysis

Hendrickson's proffered errors regarding inadequate development of the record and a flawed credibility determination need not be addressed on their merits because a necessary and proper disposition reveals itself by focusing initially on points arguing that (a) correct principles of law were not applied to the Step 4 RFC finding and (b) substantial evidence does not support the Step 5 finding that Hendrickson can still perform alternative, available work. These two points, while analytically distinct, are closely entwined.

*A. Failure to Apply Correct Principles of Law at Step 4*
A legally-correct RFC determination must account for all of a claimant's limitations imposed by both severe and non-severe impairments. *See* discussion in Section II.*B*.2, *supra.* ALJ Pope, giving great weight to the state agency experts' findings and opinions, found Hendrickson's capacity to perform a full range of work at all exertional levels to be limited only to the extent that such work must be (a) unskilled and (b) not involve working closely with others. (T. 23, 26). This RFC assessment clearly accounts for the state agency experts' determinations that Hendrickson has moderate limitations in working in coordination with or proximity to others, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (T. 25–26). It does not, however, reckon the remaining limitations found by Dr. Barry and Dr. Kamin unless those limitations are subsumed in a generic, catch-all limitation for "unskilled work."

**\*8** ALJ Pope's written decision is thoughtful, considerate and generally meticulous. [11] Hendrickson undisputably has long-standing and severe mental limitations, [12] and ALJ Pope obviously intended to factor them into his residual functional capacity analysis. His unskilled-work limitation is

problematic, however, if he intended it to account for all of Hendrickson's other mental impairments.

[11] ALJ Pope acknowledged that SSR 96–8p requires that the mental residual functional capacity assessment used at steps 4 and 5 requires a more detailed assessment by itemizing the various functions contained in the broad categories found in paragraph B and paragraph C of the adult mental disorders listing in 12.00 of the Listing impairments. (T. 22–23).

[12] Treatment notes and a multitude of Global Assessment of Functioning ("GAF") scores document Hendrickson's serious mental limitations. "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.' " *Kohler,* 546 F.3d at 262 n.1 (citing *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.2000)). GAF "ranks psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *Pollard v. Halter,* 377 F.3d 183, 186 (2d Cir.2004).

Hendrickson has been diagnosed with several GAF ratings, ranging in June 2007 from 20 (GAF score 11–20 indicates an individual is in "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication") (T. 251–52) to a GAF of 35 (GAF score 31–40 indicates an individual has "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood") (T. 233). *See Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV–TR" )* 34 (4th ed.2000). In July 2007, he was diagnosed with a GAF of 30 (T. 278, 299, 300). *See id.* In January 2008, his GAF was rated at 37 (T. 397) and, later, at 42 (GAF score 41–50 indicates an individual has "[s]erious symptoms ... or any serious impairment in social, occupational, or school functioning") (T. 402). *See id.* In August 2009, Hendrickson's GAF was scored at 50. *See id.*

Treatment notes also reflect that Hendrickson's episodes are triggered by major stresses. (T. 427).

First, it is not *self-evident* that a person with limited ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances will function more acceptably when assigned only unskilled tasks. Second, the Commissioner's *official definition* of unskilled work does not support such premise, nor does it indicate that unskilled work ameliorates stress, or better enables a worker to complete a normal workday and workweek

without interruptions from psychologically-based symptoms, or to work at a consistent pace, or to respond appropriately to changes in the work setting. [13] Third, no *extrinsic evidence* presented to ALJ Pope shows that unskilled work appropriately addresses these additional limitations, and, finally, the Commissioner's brief cites no *other authoritative sources* supporting that supposition.

[13]    The basic demands of unskilled work include abilities (on a sustained basis) to understand, carry out and remember simple instructions; make simple work-related decisions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 96–9, POLICY INTERPRETATION RULING TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK–IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 1996 WL 374185, at *9 (SSA July 2, 1996).

Intuitively, one might suppose that unskilled work probably involves less stress. In an interpretive Ruling, however, the Commissioner cautions against making such broad assumptions. In SSR 85–15, the Commissioner states unequivocally that "*[a] claimant's condition [due to stress and mental illness] may make performance of an unskilled job as difficult as an objectively more demanding job.*" The Ruling elucidates that mentally impaired individuals' reactions to demands of work stress are highly individualized, and that in some cases, they have difficulty meeting requirements of even low stress jobs. And, of special relevance here, the Ruling emphasizes that "*the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job.*" *Id.* Accordingly the Ruling directs that (a) ALJs make particularized findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work, and (b) every impairment-related limitation created by an individual's response to demands of work be reflected in the RFC assessment. *Id.*

Finally, interpretive jurisprudence generally rejects the idea that a broad limitation of "unskilled work" suffices as a detailed assessment of the type required by SSR 96–8p, 1996 WL 374184, at *4. Thus, an administrative judge may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work. *See, e.g., Thompson v. Astrue,* No. 10–CV–6576 CJS, 2012 WL 2175781, at *13 (W.D.N.Y. May 30,

2012) (when making findings about a claimant's RFC, an ALJ may not avoid conducting such a detailed assessment by merely indicating that the claimant can perform simple, unskilled work); *Sweat v. Astrue,* No. 08–CV–1108 (FJS/VEB), 2011 WL 2532932, at *6 (N.D.N.Y. May 23, 2011) (on remand ALJ admonished to address the consultative examiners' findings that claimant had difficulty dealing with stress during the relevant time period, as ALJ did not explain how he reconciled those findings with his RFC assessment).

**\*9** For all these reasons, a conclusion that ALJ Pope did not apply correct principles of law when making his RFC determination is warranted. He did not make particularized findings about the nature of Hendrickson's stress, the circumstances that trigger it, and how those factors affect his ability to work. He did not—possibly could not under evidence before him—sufficiently connect the dots between all of Hendrickson's impairments and his RFC finding.

*B. Substantial Evidence Error at Step Five*

Given a legally-flawed RFC finding, a Step 5 error was sure to follow. ALJ Pope used his RFC as the basis for his hypothetical question to the vocational expert. Thus, his hypothetical question failed to include all of Hendrickson's nonexertional limitations. (T. 58–64). Specifically, ALJ Pope's hypothetical question to the vocational expert did not include limitations related to Hendrickson's stress or three of the five other moderate impairments listed earlier. (T. 58–64, 373, 389–91).

For expert vocational opinion to constitute substantial evidence, the hypothetical question posed to the vocational expert must include all limitations supported by medical evidence in the record. *See Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983) (The Commissioner may rely on a vocational expert's testimony concerning the availability of jobs suited to a hypothetical person's capabilities so long as the hypothetical is based on substantial evidence.); *see also Burns v. Barnhart,* 312 F.3d 113, 123 (3d Cir.2002) ("A hypothetical question posed to a vocational expert must reflect all of a claimant's impairments.... Where there exists in the record medically undisputed evidence of specific impairments not included in a hypothetical question ..., the expert's response is not considered substantial evidence." (internal citations and quotation marks omitted)). The reason for this requirement is that it is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare an

applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.

VE Pagella expressed opinions concerning the extent to which Hendrickson's job base is eroded by nonexertional limitations and also the existence and extent of jobs within the remaining occupational basis that Hendrickson can perform. Because the hypothetical question on which VE Pagella based these opinions failed to account for additional specific impairments that are medically undisputed, his testimony does not constitute substantial evidence.[14] ALJ Pope adduced no other evidence that Hendrickson is capable of performing jobs existing in significant numbers in the national economy. Thus, his conclusion that Hendrickson is not disabled lacks substantial evidentiary support. In this circumstance, reversal and remand are warranted.

[14]   The Second Circuit has nor directly addressed the question of whether an ALJ's hypothetical question to a VE must specifically account for limitations in concentration, persistence, and pace. Other circuits, however, have addressed the issue and answer in the affirmative. *See, e.g., Winschel v. Commissioner of Soc. Sec.,* 631 F.3d 1176, 1180–81 (11th Cir.2011) (ALJ erred by failing to either "explicitly include[ ]" or "implicitly account for" moderate limitations in maintaining concentration, persistence, and pace in a hypothetical); *Stewart v. Astrue,* 561 F.3d 679, 685 (7th Cir.2009) (restricting hypothetical to ability to do "simple, routine tasks that do not require constant interactions with coworkers or the general public" does not accurately describe documented limitations in concentration, persistence, or pace); *Bowers v. Astrue,* 271 Fed. App'x 731, 733 (10th Cir.2008) (hypothetical including limitations for simple, repetitive, and routine work with a low stress level and only brief contact with the public did not account for impairment in concentration and attention); *Ramirez v. Barnhart,* 372 F.3d 546, 554 (3d Cir.2004) (hypothetical restriction to simple one or two-step tasks did not account for limitations in concentration); *Kasarsky v. Barnhart,* 335 F.3d 539, 544 (7th Cir.2003) (hypothetical about a person with borderline intelligence did not account for deficiencies in concentration); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir.1996) (hypothetical limiting claimant to performing only simple tasks did not account for deficiencies in concentration, persistence, or pace).

## VII. Recommendation

1. The Commissioner's decision should be **REVERSED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further proceedings including reexamination of: (a) Hendrickson's difficulties in handling stress, including but not limited to his moderate limitations in the areas of ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and ability to respond appropriately to changes in the work setting; and (b) the extent to which Hendrickson's occupational base is eroded by his difficulties handling stress and the moderate limitations listed above.

 **\*10** 2. To guard against necessity for further actions seeking judicial review, the court also should request that, on remand, the Commissioner also reflect on *all* errors asserted in this action as set forth herein at Section IV.

## VIII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *10* day of *December* 2012.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 7784156

---

2015 WL 457643
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard Allen BLISS, Plaintiff,

v.

Carolyn W. COLVIN, Commissioner,
Social Security Administration, Defendant.

No. 3:13–cv–1086 (GLS/CFH).
|
Signed Feb. 3, 2015.

**Attorneys and Law Firms**

Legal Services of Central New York, Christopher Cadin, Esq., of Counsel, Syracuse, NY, for the Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Jason P. Peck, Special Assistant U.S. Attorney, of Counsel, Syracuse, NY, Steven P. Conte, Regional Chief Counsel, Social Security Administration, Office of General Counsel, Region II, New York, NY, for the Defendant.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1** Plaintiff Richard Allen Bliss challenges defendant Commissioner of Social Security's denial of social security disability insurance benefits (DIB) and supplemental security income (SSI), seeking review under 42 U.S.C. § 405(g).[1] (Compl., Dkt. No. 1.) In a Report–Recommendation and Order (R & R) filed August 8, 2014, Magistrate Judge Christian F. Hummel recommended that the Commissioner's decision be affirmed and Bliss' complaint be dismissed. (Dkt. No. 19.) Pending are Bliss' objections to the R & R. (Dkt. No. 20.) For the reasons that follow, the court adopts the R & R in its entirety.

[1]   42 U.S.C. § 1383(c)(3) renders section 405(g) applicable to judicial review of SSI claims.

### II. *Background*[2]

[2]   The court incorporates the factual recitations of the parties and Judge Hummel. (Dkt. No. 17 at 1–6; Dkt. No. 18 at 2; Dkt. No. 19 at 2.)

On September 13, 2010, Bliss filed an application for DIB and SSI under the Social Security Act. (Tr.[3] at 93–99, 100, 188–94, 195–200.) After his application was denied, (*id.* at 27, 101–06), Bliss requested a hearing before an Administrative Law Judge (ALJ), which was held on April 12, 2012, (*id.* at 21–23, 43–92). On May 10, 2012, the ALJ issued a decision denying the requested relief, (*id.* at 24–42), which became the Commissioner's final determination upon the Social Security Administration Appeals Council's denial of review, (*id.* at 1–5).

[3]   Page references preceded by "Tr." are to the Administrative Transcript. (Dkt. No. 13.)

Bliss commenced the present action by filing a complaint on September 4, 2013, seeking judicial review of the Commissioner's determination. (*See generally* Compl.) After receiving the parties' briefs, Judge Hummel issued an R & R recommending dismissal of Bliss' complaint. (Dkt. No. 19.)

### III. *Standard of Review*

By statute and rule, district courts are authorized to refer social security appeals to magistrate judges for proposed findings and recommendations as to disposition. *See* 28 U.S.C. § 636(b) (1)(A), (B); N.D.N.Y. L.R. 40.1, 72.3(d); General Order No. 18. Before entering final judgment, this court reviews report and recommendation orders in cases it has referred to a magistrate judge. If a party properly objects to a specific element of the magistrate judge's findings and recommendations, this court reviews those findings and recommendations *de novo. See* Almonte v. N.Y. State Div. of Parole, No. Civ. 904CV484GLS, 2006 WL 149049, at *3, *5 (N.D.N.Y. Jan. 18, 2006). In those cases where no party has filed an objection, only vague or general objections are made, or a party resubmits the same papers and arguments already considered by the magistrate judge, this court reviews the findings and recommendations of the magistrate judge for clear error. *See id.* at *4–5.

## IV. *Discussion*

Bliss purports to object to the R & R on several grounds. (Dkt. No. 20 at 5–24.) First, he asserts that the ALJ erred in determining the severity of his impairments. (*Id.* at 5–8.) Second, Bliss contends that the ALJ improperly failed to develop the record by not re-contacting one of Bliss' treating physicians. (*Id.* at 8–10.) Third, Bliss argues that the ALJ should have given controlling weight to the opinion of one of his treating physicians, and that the ALJ's credibility determination with respect to Bliss' own statements regarding his symptoms was flawed. (*Id.* at 11–13, 20–22.) Next, Bliss asserts that the ALJ's residual functional capacity determination "is inaccurate, incomplete, and not supported by substantial evidence." (*Id.* at 13–20.) Lastly, Bliss contends that the other alleged errors in the ALJ's analysis tainted the step five determination that there were a significant number of jobs in the national economy that Bliss could perform. (*Id.* at 22–24.)

**\*2** The substance of these arguments, however, was previously raised in Bliss' initial memorandum of law and considered and rejected by Judge Hummel. (*Compare id.* at 5–24, *with* Dkt. No. 17 at 10–25.) Bliss' objections are, in fact, nearly identical to, and appear to be, for the most part, copied directly from, the arguments raised in his original brief. He makes only passing references to the R & R, and has not identified any specific errors made by the magistrate judge. Instead, he reiterates his assertions that the ALJ erred in his analysis. Bliss' "objections," therefore, are general and do not warrant *de novo* review. *See Gusky v. Astrue,* 954 F.Supp.2d 180, 184 (W.D.N.Y.2013) ( "[W]hen the objections simply reiterate previous arguments ... the Court should review the report for clear error."); *Almonte,* 2006 WL 149049, at \*4. The court, having carefully reviewed the record, finds no clear error in the R & R and accepts and adopts it in its entirety.

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Christian F. Hummel's August 8, 2014 Report–Recommendation and Order (Dkt. No. 19) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Bliss' complaint (Dkt. No. 1) is **DISMISSED;** and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

## IT IS SO ORDERED.

## REPORT–RECOMMENDATION AND ORDER [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff Richard Allen Bliss ("Bliss") brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for benefits under the Social Security Act. Compl. (Dkt. No. 1). Bliss moves for a finding of disability and seeks to have the decision vacated and reversed, or alternatively, remanded to the Commissioner for further proceedings. Pl.'s Mem. (Dkt. No. 17) at 6. The Commissioner cross-moves for a judgment on the pleadings. Def.'s Mem. (Dkt. No. 18) at 3. For the following reasons, it is recommended that the Commissioner's decision be affirmed.

## I. Background

### A. Facts

Born on May 6, 1967, Bliss was forty-three years old when he applied for disability benefits. Tr. at 95, 188. [2] Bliss did not complete high school, finishing only the eleventh grade in special education. Tr. at 49. While in high school, Bliss attempted, but did not complete, a vocational food service training program. Tr. at 53. Bliss has attempted his GED three times, leaving the program prior to completion each time. Tr. at 52–53. Bliss was previously employed as a dishwasher, salad maker, prep cook, and housekeeper in addition to working at a country club and multiple stints in the fast food industry. Tr. at 56, 61–62, 64–65, 221. Bliss alleges disability

from diabetes, degenerative disc disease of the lower lumbar spine, high blood pressure, anxiety, depression, borderline personality disorder, high cholesterol, asthma, and lower back pain. *See* Tr. at 65, 95, 309.

2       "Tr." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 13.

### B. Procedural History

**\*3** On November 8, 2010, Bliss protectively filed an application for social security disability insurance ("SSDI") and social security income ("SSI") benefits pursuant to the Social Security Act, 42 U.S.C. § 401 *et seq.* claiming an alleged onset date of July 1, 2005. That application was denied on January 21, 2011. Tr. at 27, 101–06. Bliss requested a hearing before an administrative law judge ("ALJ"), John Ramos, which was held on April 12, 2012. Tr. at 43–92 (transcript of the administrative hearing). In a decision dated May 10, 2012, the ALJ found that Bliss was not entitled to disability benefits. Tr. at 27–38. Bliss's representative filed a timely request for review with the Appeals Council and on July 1, 2013, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. Tr. at 1–5. This action followed.

### II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (citing *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 72 (N.D .Y.2005) (citing *Ferraris v. Heckler,* 728 F.2d

582, 587 (2d Cir.1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 USC § 405(g) (2006); *Halloran,* 362 F.3d at 31.

### B. Determination of Disability [3]

3       While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." *Donato v. Sec 'y of Health and Human Servs.,* 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

"Every individual who is under a disability shall be entitled to a disability ... benefit...." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. *Id.* § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses, or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." *Ventura v. Barnhart,* No. 04–CV–9018(NRB), 2006 WL 399458, at \*3 (S.D.N.Y. Feb. 21, 2006) (citing *Mongeur v. Heckler,* 722 F.2d 1033, 1037 (2d Cir.1983)).

**\*4** The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful

activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry,* 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing *Berry,* 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. *Id.* at 1180 (citing *Berry,* 675 F.2d at 467).

## C. ALJ Ramos's Findings

Bliss, accompanied by a non-attorney representative, testified at a hearing held on April 12, 2012. Tr. at 43–92. At the start of the hearing, Bliss's representative amended the alleged disability onset date to August 20, 2010. Tr. at 48. Using the five-step disability sequential evaluation, the ALJ found that Bliss: (1) had not engaged in substantial gainful activity

since August 20, 2010; (2) had the following severe medically determinable impairments: degenerative disc disease of the lumbar spine, diabetes, and mood disorder; (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [ ("RFC") ] to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) ... but should avoid work requiring more complex interaction or joint effort to achieve work goals, and handle reasonable levels of simple, work-related stress in that he can make decision directly related to the performance of simple tasks in a position with consistent job duties that does not require [Bliss] to supervise or manage the work of others"; (5) could not perform past relevant work; and (6) given his age, education, work experience, and RFC, was able to perform a significant number of jobs in the national economy. *See* at Tr. 29–37. Therefore, a determination of not disabled was made. Tr. at 38.

## D. Bliss's Contentions

**\*5** Bliss first contends the ALJ's severity determination is inaccurate, incomplete, and not based on substantial evidence. Pl.'s Mem. at 15. Bliss next claims the ALJ did not fully develop the record. *Id.* at 17. Bliss then asserts the ALJ failed to follow the treating physician's rule. *Id.* at 18. Bliss next argues the RFC is inaccurate, incomplete, and not based upon substantial evidence. *Id.* at 20. Bliss then contends the ALJ's credibility determination is inaccurate and insufficient. *Id.* at 26. Lastly, Bliss argues the Commissioner failed to meet her burden to show other work Bliss can do based on his RFC. *Id.* at 28.

## 1. ALJ's Severity Determination

Bliss contends that the ALJ's determination of the severity of his impairments is not supported by substantial evidence. Pl.'s Mem. at 15. As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. *See* subsection II(B) *supra.* Thus, a diagnosis alone is insufficient to establish a severe impairment as, instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic

work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." *Id.* Basic work activities which are relevant for evaluating the severity of an impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.; see also Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996); Social Security Ruling ("SSR") 85–28, 1985 WL 56856, at *3–4 (S.S.A.1985).

Bliss's contends that because his depressive disorders, anxiety, anger, intermittent explosive disorder, and antisocial personality disorder have more than a *de minimis* effect on his ability to engage in substantial gainful activity, the ALJ should have included them in the severity discussion. Pl.'s Mem. at 15, 17. After a review of the record, this claim is found to be without merit. In fact, the ALJ did in fact address these non-exertional limitations. *See* Tr. at 29–30. The ALJ considered these limitations though he termed them collectively to be a "mood disorder" for the purpose of his analysis. *See id.* The ALJ, in making his determination of Bliss's severe impairments, discussed the reports of Drs. Dubro and Carr, and concluded that mood disorders did list among Bliss's severe impairments. Tr. at 30. Thus, any dispute between Bliss and the ALJ on this point is a result of the ALJ's decision to consider all of Bliss's non-exertional limitations collectively termed as a mood disorder. Accordingly, the ALJ properly considered the severity of Bliss's depressive disorders, anxiety, anger, intermittent explosive disorder, and antisocial personality disorder.

**\*6** Bliss also claims that the ALJ failed to properly evaluate the severity of his pain and consider said pain as a severe impairment. Pl.'s Mem. at 15. This claim also fails. *See* 20 C.F.R. §§ 404.1528(a) ("Symptoms are your own description of your physical or mental impairment. Your statements alone are not enough to establish that there is a physical or mental impairment."), 404.1529(b) ("Your symptoms, such as pain ... will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). Symptoms such as pain are to be considered by the ALJ in making a determination as to how a severe impairment may impact an individual's ability to engage in substantial gainful activity, but only when the symptoms are attributable to a medically-determinable physical or mental impairment. 20 C.F.R. § 404.1529(a). Such symptoms cannot be considered to be severe impairments independent of a medical condition to which they can be attributed. *See id.* The pain Bliss complained of was not a separate severe impairment, but, rather, Bliss's own perception of his degenerative disc disease of the lumbar spine. As such, the ALJ should only consider complaints of pain to the extent Bliss's degenerative disc disease alters Bliss's ability to engage in substantial gainful activity. Here, in the RFC discussion, the ALJ evaluated how Bliss's pain, in connection with the affect of degenerative disc disease, would have an impact on Bliss's ability to engage in substantial gainful activity. *See id.;* Tr. at 34–35.

As the ALJ properly considered Bliss's depressive disorders, anxiety, anger, intermittent explosive disorder, antisocial personality disorder, and pain, there was no error made in determining Bliss's severe impairments. Accordingly, the Commissioner's decision on this issue should be affirmed.

### 2. Development of the Record

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. *See Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (citations omitted); *see also* 20 C .F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application...."); 20 C.F.R. § 404.1512(e) (explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005) (citation omitted); *see also Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999) ("[W]here there are no obvious gaps in the

administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted); *Roat v. Barnhart,* 717 F.Supp.2d 241, 264 (N.D.N.Y.2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks, altercations, and citation omitted).

**\*7** It appears Bliss was attempting to argue that the record was not fully developed because the ALJ did not consider his Wechsler Adult Intelligence Scale ("WAIS–IV") IQ score of 72. Pl.'s Mem. at 17–18. Bliss argues that his IQ score, in conjunction with his physical or mental disorders, may meet Listing 12.05C. *Id.;* POMS DI 24515.056 D.1.c. [4] However, this contention is without merit. In his decision, the ALJ gave reduced weight to the report completed by Dr. Moore, a psychologist, who administered the WAIS–IV test for Bliss. Tr. at 37, 361. This was because the ALJ found Dr. Moore's report to be inconsistent with the longitudinal medical evidence in the record and based primarily on Bliss's own reports. Tr. at 37.

[4]    Specifically,

Listing 12.05C is based on a combination of an IQ score with an additional and significant mental or physical impairment.

The criteria for this paragraph are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70–75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

POMS DI 24515.056 D.1.c.

With respect to inconsistencies, the ALJ noted several in his RFC determination. The ALJ noted Dr. Dubro, a consultative examiner, concluded that Bliss is able to follow, understand, attend to, and remember directions and instructions. Tr. at 35, 436–37. Dr. Dubro had also found that Bliss is able to perform daily and complex tasks independently on a regular basis and capable of making appropriate decisions. Tr. at 35, 437. The ALJ noted the opinions of the administration's

psychiatric consultant, Dr. Mata, who found that Bliss's ability to remember locations and work-like procedures and to understand short and simple instructions was not significantly limited and that the ability to understand and remember detailed instructions was only moderately limited. Tr. at 36, 439. Moreover, Bliss has not cited to any medical evidence in the record to support his assertion that his IQ score of 72 renders him mentally deficient. [5] Any intellectual deficits were incorporated into the ALJ's RFC determination. Tr. at 33–34.

[5]    As noted *supra,* an IQ score of 72 falls in the slightly higher IQ range. *See* note 4 on Listing 12.05C. Further, Dr. Moore had assessed Bliss with a verbal/comprehension index of 83, perceptual/reasoning index of 73, working/memory index of 74, and processing/speed index of 76. Tr. at 360.

Despite the conflicting opinions, the ALJ determined that he could properly render a decision on the 271–page medical record. In his decision, an ALJ is not required to discuss every piece of evidence before him. *See Mongeur,* 722 F.2d at 1040 ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he ... have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between [two medical] reports ... we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

It also appears that Bliss was attempting to contend the ALJ should have recontacted Dr. Moore after finding such inconsistencies. However, an ALJ is required to recontact a treating source only if the records received were inadequate to determine whether the claimant was disabled. *Perez,* 77 F.3d at 47. That is not the case here. "The mere fact that medical evidence is conflicting ... does not mean that an ALJ is required to re-contact a treating physician." *Micheli v. Astrue,* 501 F. App'x 26, 29 (2d Cir.2012). It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such. *Id.* at 29–30. The ALJ weighs all evidence to determine whether a claimant is disabled based on the evidence before him or her. *See Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). As such the ALJ has adequately developed the administrative record and his

determination was supported by substantial evidence. *See id.; Johnson* 312 F.Supp.2d at 426; *Rosa,* 168 F.3d at 82–83.

**\*8** Accordingly, the Commissioner's decision on this issue should be affirmed.

### 3. Treating Physician's Rule

When evaluating a claim seeking disability benefits, factors to be considered by the ALJ include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. *Harris v. R.R. Ret. Bd.,* 948 F.2d 123, 126 (2d Cir.1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw v. Chater,* 221 F.3d 126, 134 (2d Cir.2000). "This rule applies equally to retrospective opinions given by treating physicians." *Campbell v.. Astrue,* 596 F.Supp.2d 445, 452 (D.Conn.2009) (citations omitted). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(I) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal,* 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999) (citation omitted). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. *Id.* at 133–34; *see* 20 C.F.R. § 404.1527(e) (2005).

Bliss contends that the treating physician's rule was disregarded by the ALJ when the ALJ failed to assign controlling weight to the opinions of Dr. Carr, Bliss's treating mental health professional. *See* Pl.'s Mem. at 19–20. The ALJ did not assign controlling weight because of inconsistencies between Dr. Carr's treatment notes and the report he provided

to the ALJ. Tr. at 36. The ALJ, instead, assigned the report only "some weight" in recognition of Dr. Carr's long treatment history with Bliss. *Id.* Specifically, the ALJ points to Dr. Carr's treatment notes where Dr. Carr concludes that Bliss is "feeling better about life." Tr. at 428. Additionally, the treatment notes indicate that at times Bliss was well dressed and groomed (Tr. at 427) and overall achieving a higher level of functionality (*See* Tr. at 422) than Dr. Carr's report to the ALJ would indicate. *See* Tr. at 525. For the aforementioned reasons, the ALJ determined that Dr. Carr's report was not entirely credible and assigned it reduced weight. Tr. at 36.

**\*9** The ALJ also appears to have relied on consultant physician testimony in determining not to afford controlling weight to Dr. Carr's report. *See* Tr. at 36–37; *Mongeur,* 722 F.2d at 1039 (finding that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence and the report of a consultative physician may constitute such evidence.") (citations omitted). The ALJ notes that he assigns at least some weight to the reports of Drs. Mata, Dubro, Hare, and Moore. *See* Tr. at 36–37. In particular, the report of Dr. Mata, the administration's psychiatric consultant, is given relatively high weight because of "her programmatic expertise, review of the claimant's medical records, and the relative consistency of her opinions with the longitudinal medical evidence in the record." Tr. at 36. The ALJ used these competing evaluations to conclude that Dr. Carr's testimony was not worthy of controlling weight because it was not supported by other substantial evidence.

As there exists substantial evidence to support the ALJ's decision to not assign controlling weight to Dr. Carr's opinions, the ALJ did not err in failing to apply the treating physician's rule. *See Halloran,* 362 F.3d at 31; *Berry,* 675 F.2d at 467. Accordingly, the Commissioner's decision on this issue should be affirmed.

### 4. RFC

Bliss contends that the ALJ's RFC determination was not supported by substantial evidence and the ALJ had improperly applied the regulations. RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. *Martone v. Apfel,* 70 F.Supp.2d 145,150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945.

"In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Martone,* 70 F.Supp.2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." *Pourpre v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009).

> Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient ... Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

**\*10** *DiVetro v. Comm'r of Soc. Sec.,* No. 05–CV–830 (GLS/DEP), 2008 WL 3930032, at \*2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Under the regulations, if a claimant's symptoms suggest a greater severity of impairment than supported by the objective medical evidence, other factors will be considered, including: daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; treatment, other than medication, received for relief of symptoms; any measures used to relieve symptoms; and other factors concerning functional limitations due to the symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). However, statements about a claimant's pain or symptoms alone are not enough to establish a disability. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ determined that Bliss retained the RFC

to perform sedentary work ... in that [Bliss] is able to lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. Additionally, [Bliss] retains the ability to understand and follow simply instructions and directions, perform simple tasks with supervision and independently, maintain attention and concentration for simple tasks, regularly attend to a routine and maintain a schedule, relate to and interact appropriately with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals, and handle reasonable levels of simple, work-related stress in that he can make decision[s] directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others.

Tr. at 34–35.

Bliss first contends that the RFC does not consider how his exertional limitations limit his ability to consistently perform an activity. According to SSR 96–9P and POMS DI 25015.020,

> **Standing and walking:** The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8–hour workday. If an individual can stand and walk for a total of slightly less than 2 hours per 8–hour workday, this, by itself, would not cause the occupational base to be significantly eroded.
>
> ...
>
> **Sitting:** In order to perform a full range of sedentary work, an individual must be able to remain in a seated position

for approximately 6 hours of an 8–hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2–hour intervals. If an individual is unable to sit for a total of 6 hours in an 8–hour work day, the unskilled sedentary occupational base will be eroded.

**\*11** ...

The fact that an individual cannot do the sitting required to perform the full range of sedentary work does not necessarily mean that he or she cannot perform other work at a higher exertional level.

...

**Alternate sitting and standing:** An individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.

SSR 96–9P, 1996 WL 374185, at \*6–7 (S.S.A. July 2, 1996). Bliss further cites to SSR 83–12, under which an individual who may sit for a time but must get up and stand or walk before returning to sitting is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work or the prolonged standing or walking contemplated for most light work. SSR 83–12, 1983 WL 31253 (S.S.A.1983).

Bliss maintains that he is incapable of performing prolonged sitting or standing; thus, his occupational base is limited. With respect to his subjective complaints, Bliss contends that physical pain prevents him from standing for longer than fifteen minutes and sit for longer than thirty minutes before having to change positions. Tr. at 254. Bliss notes that he has reported difficulty standing and sitting, suffers from back pain, experiences pain radiating from lower back to both legs. Tr. 286, 304, 307–08, 318, 324, 327, 330. Furthermore, in March 2006, a treating physician noted that Bliss could not stand for more than one hour at a time. Tr. at 307.

Here, the ALJ's RFC determination on Bliss's exertional limitations is supported by substantial evidence. The ALJ noted that Dr. Magurno, a consultative internal medicine

examiner, had opined Bliss shows marked limitations for lifting and carrying, moderate limitations for walking and squatting, and mild limitations for standing. Tr. at 35, 433. Dr. Magurno further opined that Bliss had no limitations for sitting and fine motor activity. Tr. at 35, 433. As for gait and station, Dr. Magurno found Bliss to have a slow gait but can stand on heels and toes, squat half way down, had a normal stance, did not use assistive devices, did not require assistance with changing for the exam or getting on and off the exam table, and had mild difficulty rising from a chair. Tr. at 431. Dr. Magurno found that Bliss's cervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. Tr. at 432. Bliss's lumbar spine flexion was limited to forty degrees but had full extension, lateral flexion bilaterally, and full rotary movement bilaterally. Tr. at 432. Bliss has full range of movement for in the shoulder, elbows, forearms, wrists, knees, ankles, and hip except for flexion limited to ninety degrees bilaterally. Tr. at 432. The above medical evidence constitutes substantial evidence supporting the ALJ's RFC determination that Bliss can lift or carry ten pounds occasionally and less than ten pounds frequently, stand or walk for two hours in an eight-hour workday, and sit for six hours in an eight-hour workday. *Pennay v. Astrue,* No. 05–CV–0673 (FJS/DEP), 2007 WL 5465987, at \*7 (N.D.N.Y. Aug. 3, 2007) ("The opinions of a consultative examiner can provide substantial evidence to support an ALJ's determination.") (citing *Barringer v. Comm'r of Soc. Sec.,* 358 F.Supp.2d 67, 79 (N.D.N.Y.2005) (Sharpe, J.) (indicating that state agency consultative examiners "are qualified as experts in the evaluation of medical issues in disability claims. As such their opinions may constitute substantial evidence if they are consistent with the record as a whole.")).

**\*12** Furthermore, the ALJ noted that Bliss has reported going camping, swimming, fishing, and drinking water from a waterfall. Tr. at 35, 376. The ALJ further noted that Bliss has little or no recent treatment for back pain. Tr. at 35. Bliss reported to Dr. Magurno that he cooks five times a week, cleans once or twice a week, does laundry once a month, shops once a month, carries out childcare each day, and dresses daily. Tr. at 430. As such, the ALJ has considered Bliss's daily activities as well as the types of treatment received for alleviating symptoms. 20 C.F.R. §§ 404.1529(c) (3), 416.929(c)(3). *Rivera v. Harris,* 623 F.3d 212, 216 (2d Cir.1980) ("[Plaintiff's] testimony showed that despite her pains and shortness of breath, she can cook, sew, wash and shop, so long as she does these chores slowly and takes an afternoon rest. Taken as a whole, appellant's testimony did not

preclude the possibility that she could perform gainful activity of a light, sedentary nature").

Bliss next contends that the RFC does not consider how his social functioning limitations affect his ability to consistently perform an activity. Bliss contends that he has great difficulty in socializing with other people, becomes nervous around people, and has drastic mood changes, anger, and depression. Tr. 56–7, 59–60, 62, 72. Bliss contends that the ALJ disregarded his difficulty with concentration, which limits his persistence and pace. Bliss asserts that he stays at home, watches television, and is easily confused and frustrated. Bliss further points to his GAF scores, which range from 45 to 55 between November, 2008, and January, 2012. Tr. 505, 535.

In this case, the ALJ's RFC determination on Bliss's social functioning is supported 20 by substantial evidence. The ALJ noted that Dr. Dubro, a consultative examiner, opined that Bliss can follow, understand, attend to, and remember directions and instructions. Tr. at 35, 436–37. Dr. Dubro concluded Bliss only has mild limitations with attention, concentration, learning new tasks, regularly attend to a routine, and maintain a schedule and moderate limitations in interacting with others. Tr. at 35, 437. Further, Dr. Dubro found that Bliss can perform daily and complex tasks independently on a regular basis and is capable of making appropriate decisions. Tr. at 35, 437. Dr. Dubro also noted that "[u]ntil recently, [Bliss] had been attending GED preparation classes [but] stopped attending reportedly because he could not find someone to watch his daughter during the time that he was at the class." Tr. at 434. This was not due to any social functioning limitation. Finally, with regard to GAF scores, defendant points out that in November 2010, Bliss was given a GAF score of 59, an increase from 50 in May, 2008. Tr. 422, 426. In short, the social functioning portion of the ALJ's RFC determination is supported by the above substantial evidence.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 5. Credibility Determination

**\*13** "The ALJ has discretion to assess the credibility of a claimant's testimony regarding disabling pain and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979). If plaintiff's testimony concerning the

intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her symptoms are consistent with the objective medical and other evidence. *See* SSR 96–7p, 1996 WL 374186, at \*2 (SSA 1996). One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record. SSR 96–7p, 1996 WL 274186, at \*5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony. *Saxon v. Astrue,* 781 F.Supp.2d 92, 105 (N.D.N.Y.2011) (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence. *Melchior v. Apfel,* 15 F.Supp.2d 215, 219 (N.D.N.Y.1998) (quoting *Brandon v. Bowen,* 666 F.Supp. 604, 608 (S.D.N.Y.1987) (citations omitted)). The Commissioner may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and his own activities during the relevant period. *Howe–Andrews v. Astrue,* No. CV–05–4539 (NG), 2007 WL 1839891, at \*10 (E.D.N.Y.2007). The ALJ must also consider whether "good reasons" exist for failing to follow the prescribed treatment, e.g. religious objections, lack of ability to pay, significant risks associated with treatment. SSR 82–59; *see also Grubb v. Apfel,* No. 98 CIV. 9032(RPP), 2003 WL 23009266, at \*4–8 (S.D.N.Y.2003). The ALJ determines issues of credibility and great deference is given his judgment. *Gernavage v. Shalala,* 882 F.Supp. 1413, 1419, n. 6 (S.D.N.Y.1995).

The ALJ gave reduced weight to Bliss's statements regarding the degree to which he was limited by his disorders, stating: "the [ALJ] finds that [Bliss's] ... impairments could

reasonably be expected to cause the alleged symptoms; however, [Bliss's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible." Tr. at 35. To support his decision, the ALJ cites numerous occasions where Bliss would act contrary to the symptoms he claimed to be experiencing, both mentally and physically. *See id.* With respect to Bliss's mental impairments, the ALJ concluded "[Bliss] appears only to treat his mental health issues when motivated by probation or a social service agency monitoring his ability to care for his daughter." *Id.* Bliss admitted to Dr. Greggo that he had been off of his psychotropic medication for multiple weeks while Dr. Greggo indicated that it was likely longer. Tr. at 476. Rite Aid Pharmacy confirmed that Bliss had not filled various mental health prescriptions in approximately four months, seven months, and two years. *See* Tr. at 476.

**\*14** Concerning Bliss's physical impairments, the ALJ also determined that Bliss's actions contradicted his assertions on the level to which his physical impairments actually impeded his ability to work. *See* Tr. at 35. While Bliss testified that he had severe physical limitations including being unable to drive due to back pain (Tr. at 50), having to take a ten-minute break when climbing ten to fifteen stairs (Tr. at 50–51), being unable to stand while working without regular breaks to sit (Tr. at 57, 61–63), and being unable to bend (Tr. at 64), the ALJ noted that some of Bliss's actions contradict these claims. *See* Tr. at 35. The ALJ specifically mentions Bliss's admission to Dr. Greggo that he was considering engaging in sexual activity and that he had recently gone fishing, camping, swam in a lake, and drank from a waterfall. *See* Tr. at 35, 368, 376. The ALJ concludes his discussion by noting "[Bliss's] criminal record and poor work history over the years demonstrates a weak attachment to the work force, which detract from his credibility regarding motivation to work." Tr. at 35.

Given the ALJ's discussion on Bliss's hearing testimony, medication, activities of daily living, and ability to work, substantial evidence exists supporting the ALJ's determination of Bliss's credibility. *See Halloran,* 362 F.3d at 31; *Berry,* 675 F.2d at 467. As such, the ALJ did not err in assessing Bliss's credibility and Bliss's motion on this ground should be denied. Accordingly, the Commissioner's decision on this issue should be affirmed.

### 6. Commissioner's Burden

Lastly, Bliss claims that the Commissioner failed to meet her step-five burden. Pl.'s Mem. at 28. Under the Social Security Act, the Commissioner bears the burden of proof for the final determination of disability. *Pratt v. Chater,* 94 F.3d 34, 38 (2d Cir.1996). Generally speaking, if a claimant suffers only from exertional impairments, then the Commissioner may satisfy his burden by resorting to the applicable grids. [6] *Pratt,* 94 F.3d at 39. The grids "take[ ] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Rosa,* 168 F.3d at 79. Ordinarily, the ALJ need not consult a vocational expert, and may satisfy this burden "by resorting to the applicable medical vocational guidelines (the grids)." *Id.* at 78 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).

[6]    An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (i.e. sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b); *see also Rodriguez v. Apfel,* 1998 WL 150981, at *10, n. 12 (S.D.N.Y.1998).

The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance" on the grids. [7] *Bapp v. Bowen,* 802 F.2d 601, 605 (2d Cir.1986). The testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform is required only when "a claimant's nonexertional impairments significantly diminish his ability to work—over and above any incapacity caused solely from exertional limitations—so that he is unable to perform the full range of employment indicated by the medical vocational guidelines." *Id.* The use of the phrase "significantly diminish" means the "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 606. Under these circumstances, to satisfy his burden at step five, the Commissioner must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform ." *Rosa,* 168 F.3d at 78 (quoting *Bapp,* 802 F.2d at 604). Therefore, when considering nonexertional impairments, the ALJ must first consider the question—whether the range of work the plaintiff could perform was so significantly diminished as to require the introduction of vocational testimony. *Samuels v. Barnhart,* No. 01 Civ. 3661(MBM), 2003 WL 21108321, at *12 (S.D.N.Y.2003) (holding that the regulations require an ALJ to consider the combined effect of a plaintiff's mental

and physical limitations on his work capacity before using the grids).

7    A "nonexertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Examples of nonexertional limitations are nervousness, inability to concentrate, difficulties with sight or vision, and an inability to tolerate dust or fumes. 20 C.F.R. §§ 404.1569a(a), (c)(i), (ii), (iv), (v), 416.969a(a), (c)(i), (ii), (iv), (v); see also Rodriguez, 1998 WL 150981, at * 10, n. 12.

**15** The ALJ should elicit testimony from the expert by posing hypothetical questions. If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability. Melligan v. Chater, No. 94–CV–944S, 1996 WL 1015417, at *8 (W.D.N.Y.1996). The "[p]roper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform." Lugo v. Chater, 932 F.Supp. 497, 503 (S.D.N.Y.1996). Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir.1983).

Here, Bliss claims the RFC assessment that he can perform unskilled sedentary work is flawed because the ALJ discounted certain treating and examining physicians' opinions. As discussed supra, the ALJ's RFC analysis was supported by substantial evidence. There is no support for Bliss's contention that he suffered from additional impairments that were improperly omitted from the RFC. Further, Bliss has not set forth any other argument with respect to the ALJ's assessment at step five of the sequential analysis. Thus, the Court concludes that the ALJ's decision is supported by substantial evidence.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED** and Bliss's motion for judgment on the pleadings (Dkt. No. 17) be **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993); Small v. Sec'y of Health & Human Servs., 892 F.2d 15 (2d Cir.1989); 28 U.S.C § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Date: August 8, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 457643

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1123477
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Frederick Paul PETELL, Jr., Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY, Defendant.

No. 7:12–CV–1596 (LEK/CFH).
|
Signed March 21, 2014.

**Attorneys and Law Firms**

Conboy, McKay Law Firm—Carthage Office, Lawrence D. Hasseler, Esq., of Counsel, Carthage, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney for the Northern District of New York, Vernon Norwood, Esq., Special Assistant United States Attorney, of Counsel, Syracuse, NY, for Defendant.

## *ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This is an action for judicial review of the Social Security Administration's ("SSA") decision denying Plaintiff Frederick Paul Petell, Jr. ("Plaintiff") disability benefits. The matter comes before the Court following a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3 filed on February 28, 2014, by the Honorable Christian F. Hummel, U.S. Magistrate Judge, affirming the SSA's decision. Dkt. No. 26 ("Report–Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b); L.R. 72.1(c). "If no objections are filed ... reviewing courts should review a report and recommendation for clear error." Edwards v. Fischer, 414 F.Supp.2d 342, 346–47 (S.D.N.Y.2006); see also Cephas v. Nash, 328 F.3d 98, 107 (2d Cir.2003) ("As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report

waives further judicial review of the point."); Farid v. Bouey, 554 F.Supp.2d 301, 306 (N.D.N.Y.2008).

No objections to the Report–Recommendation were filed within the allotted time period. See generally Docket. The Court has conducted a thorough review of the record and the Report–Recommendation and finds no clear error.

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 26) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED,** that the Social Security Administration's decision is **AFFIRMED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION AND ORDER [1]

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(d).

CHRISTIAN F. HUMMEL, United States Magistrate Judge.

Plaintiff Frederick Paul Petell, Jr. ("Petell") brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for benefits under the Social Security Act. Compl. (Dkt. No. 1). Petell moves for a finding of disability and the Commissioner cross-moves for a judgment on the pleadings. Dkt. Nos. 12, 15. For the following reasons, it is recommended that the Commissioner's decision be affirmed.

### I. Background

#### A. Facts

Born May 18, 1971, Petell was thirty-seven years old when he applied for disability benefits. Tr. at 128. [2] Petell attended

special education classes but was expelled from ninth grade. Tr. at 39–40, 138. Petell can read and write English. Tr. at 132. Petell was previously employed as a herdsman, linesman, and a construction worker. Tr. at 40, 200. Petell alleges disability from dyslexia, migraines stemming from a brain injury, and mental health issues. Tr. at 133.

2    "Tr." followed by a number refers to the pages of the administrative transcript filed by the Commissioner. Dkt. No. 8.

### B. Procedural History

**\*2** Petell protectively filed an application for supplemental security income ("SSI") benefits on January 28, 2009 and social security disability insurance ("SSDI") benefits on February 1, 2009 pursuant to the Social Security Act, 42 U.S.C. § 401 et seq. claiming an alleged onset date of September 1, 2008. Tr. at 16, 128. That application was denied on June 5, 2009. Tr. at 16, 62–68. Petell requested a hearing before an administrative law judge ("ALJ"), Marie Greener, which was held on July 27, 2010. Tr. at 69–70, 34–60 (transcript of the administrative hearing). In a decision dated September 14, 2010, the ALJ found that Petell was not entitled to disability benefits. Tr. at 16–27. Petell's counsel filed a timely request for review with the Appeals Council and on August 24, 2012, the request was denied, thus making the ALJ's findings the final decision of the Commissioner. Tr. at 1–9. This action followed.

### II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir.2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971)) (internal quotation marks omitted).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a

court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 72 (N.D.N .Y.2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir.1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g) (2006); Halloran, 362 F.3d at 31.

### B. Determination of Disability [3]

3    While the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec'y of Health and Human Servs., 721 F.2d 414, 418 n. 3 (2d Cir.1983) (citation omitted).

"Every individual who is under a disability ... shall be entitled to a disability ... benefit...." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment ... which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience. Id. § 423(d)(2)(A). Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques." Id. § 423(d)(3). Additionally, the severity of the impairment is "based [upon] objective medical facts, diagnoses or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04–CV–9018(NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) [4] (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.1983)).

4    All Social Security Rulings and unpublished opinions cited to by the Court in this Report–Recommendation are, unless otherwise noted, attached to this Recommendation.

**\*3** The Second Circuit employs a five-step analysis, based upon 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work. Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

*Berry,* 675 F.2d at 467. The plaintiff bears the initial burden of proof to establish each of the first four steps. *DeChirico v. Callahan,* 134 F.3d 1177, 1179–80 (2d Cir.1998) (citing *Berry,* 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. *Id.* at 1180 (citing *Berry,* 675 F.2d at 467).

### C. ALJ Greener's Findings

Petell, represented by counsel, testified at a hearing held on July 27, 2010. Tr. at 16–27. In addition, Petell's wife, Eva Petell, also testified. *Id.* Using the five-step disability sequential evaluation, the ALJ found that Petell: (1) had not engaged in substantial gainful activity since September 1, 2008, the alleged onset date; (2) had severe medically determinable impairments of gastroesophageal reflux disease ("GERD")[5] and intermittent explosive disorder ("IED");[6] (3) did not have an impairment, alone or in combination, sufficient to meet the listed impairments in Appendix 1, Subpart P of Social Security Regulation Part 404; (4) maintains "the residual functional capacity [ ("RFC") ] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[7] except no more than occasional contact with supervisors, co-workers, or the public"; (5) could not perform past relevant work; and (6) given his age, education, work experience, and RFC, was capable of engaging in employment which exists in significant numbers in the national economy. Tr. at 18–27. Therefore, a determination of not disabled was made.

5    "Gastroesophageal reflux" refers to the "reflux of the stomach and duodenal contents into the esophagus, which may sometimes occur normally ... or as a chronic pathological condition." DORLAND'S ILLUSTRATED MED. DICTIONARY 1439 (28th ed.1994) [hereinafter "DORLAND'S"].

6    Intermittent explosive disorder is a behavioral disorder characterized by repeated episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which the individual reacts grossly out of proportion to the situation. *Intermittent Explosive Disorder: Definition,* MAYO CLINIC, http://www.mayoclinic.com/he   alth/intermittent-explosive-disorder/DS00730 (last visited Feb. 28, 2014).

7    *"Medium work* involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20. C.F.R § 416.967(b).

### D. Petell's Contentions

**\*4** Petell first contends that the ALJ failed to assess the severity of his migraine headaches and lower back pain. Petell

next contends that the ALJ's RFC assessment was erroneous because she improperly applied the treating physician's rule, failed to recontact a treating source, failed to afford weight to the opinions of Petell's social worker, and failed to support it with substantial evidence. Petell then asserts that the ALJ improperly evaluated Petell's credibility. Petell next contends that the ALJ failed to apply the psychiatric review technique ("PRT") required for evaluating mental impairments. Lastly, Petell claims that the ALJ failed to support the Step 5 conclusion with substantial evidence.

### 1. Severity

As mentioned above, step two of the sequential evaluation process requires a determination as to whether the claimant has a severe impairment which significantly limits the physical or mental ability to do basic work activities for a continuous period of time of not less than one year. *See* subsection II(B) *supra.* Thus, a diagnosis alone is insufficient to establish a severe impairment as instead, the plaintiff must show that the medically determinable impairments significantly limit the ability to engage in basic work activities. 20 C.F.R. § 404.1521(b). The ability to do basic work activities is defined as "the abilities and activities necessary to do most jobs." *Id.* Basic work activities which are relevant for evaluating the severity of an impairment include:

(1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

*Id.; see also Pickering v. Chater,* 951 F.Supp. 418, 424 (S.D.N.Y.1996); *see also* Social Security Ruling ("SSR") 85–28, 1985 WL 56856, at *3–4 (S.S.A.1985).

### i. Migraine Headaches

Petell argues substantial evidence shows that his migraine headaches impose at least more than a minimal limitation. Pl.'s Mem. of Law (Dkt. No. 12) at 12. Since a syncopal episode [8] in November 2007, Petell asserts he has consistently sought treatment for headaches. *Id.* Petell notes that in April 2009, he was referred to a consultative examiner ("C E") and neurologist, Dr. Harbinder Toor ("Toor"), M.D., who opined that Petell's "headaches can interfere with [Petell's] daily routine." Tr. at 289. However, Dr. Toor does not specify how such migraine headaches significantly limit Petell's ability to do basic work activities. 20 C.F.R. § 404.1521(b). Further, Dr. Toor's opinion was not based on any medical exams but solely on Petell's statements, which contradict other treatment notes of record. Tr. at 287, 289. Petell next notes that, in August 2008, Petell advised his treating source Richard Edwards ("Edwards"), RPA–C, a registered physician assistant, that he was having approximately two headaches each week. Tr. at 264. Additionally, Petell points to treatment notes dated December 2011 where Edwards noted Petell's continued headaches despite modification to his medication. Tr. at 443–44.

[8]   A "syncope" is "a faint or swoon." DORLAND'S at 1622.

**\*5** Despite the above record evidence indicating that Petell has had migraines since November 2007, the ALJ's finding that Petell's migraines were non-severe are supported by substantial evidence. Tr. at 18. The ALJ expanded on this conclusion at length. The ALJ noted that objective medical evidence, namely CT scans, revealed Petell's syncopal episode was likely caused by migraines without aura. Tr. at 212–13, 219, 222. The ALJ considered contrary evidence, namely that Petell advised Neurologist Dr. Edward J. Mazdzer, M.D. ("Mazdzer") in October 2008 that he had no headaches since November 2007 but reported to Dr. Toor in April 2009 that he had daily headaches. Tr. at 258, 287. In December 2007, Edwards noted that Petell has a history of prior migraines but they had been dormant and placed Petell on Nadolol to treat the headaches. [9] Tr. at 238.

[9]   Nadolol is a beta-blocker that is used to treat chest pains, high blood pressure, and other conditions as determined by a physician. Available at http://www.drugs.com/cdi/nadolol html (last visited Feb. 27, 2014).

The ALJ cited 2008 treatment notes indicating that Petell's headaches were stable and under control. Tr. at 18–19. In April 2008, Petell reported to Edwards that he had "no headaches whatsoever." Tr. at 241. On July 22, 2008, Petell

reported to Edwards having no headaches since November 2007 and Petell was advised to avoid driving and climbing until seen by a neurologist. Tr. at 239. As Petell noted, the ALJ also considered that on August 20, 2008, Petell claimed he had approximately two headaches each week though that were "very mild," "not associated with weakness, dizziness, faintness, loss of consciousness, numbness, tingling, or any visual disturbances," and "usually respond[ed] to Tylenol." Tr. at 243, 264. Petell claimed a "little dizziness" when he stood up from a chair, although the dizziness was transient, mild, and dissipated after a few seconds. Tr. at 243. Edwards concluded that Petell's migraines were stable. Tr. at 244. The ALJ further noted that in October 2008, Dr. Mazdzer concluded that Petell "could safely operate a motor vehicle and return to work without restrictions." Tr. at 258.

The ALJ next cited 2009 treatment notes also indicating that Petell's migraine headaches were controlled. In February 2009, Petell reported to Edwards that he had no syncopal episodes, severe headaches, or other problems. Tr. at 247. In May 2009, Petell reported to Edwards that he was having several headaches per week and was prescribed Topamax. [10] Tr. at 249–50. In June 2009, Petell advised Edwards that the Topamax gave him some morning drowsiness but had no headaches. Tr. at 251. In July 2009, Petell reported fainting and vomiting while lifting weights. Tr. at 253. As a result, Petell's Nadolol dosage was decreased and was advised to refrain from exercising over the weekend only. Tr. at 253. Petell was also diagnosed with symptomatic bradycardia [11] that was likely induced in part by valsalva maneuver [12] and the Topamax dosage was increased. Tr. at 253–54. In August 2009, Petell continued to have syncopal symptoms and vomiting when lifting heavy weights during his workouts but had no headaches. Tr. at 255. These symptoms were absent when conducting other activities. *Id.* Thus, Petell was advised to find another exercise method, take Nadolol and Topamax, and avoid heavy lifting. *Id.*

[10]   "Topamax (topiramate) is a seizure medication ... also used to prevent migraine headaches in adults. It will only prevent migraine headaches or reduce the number of attacks. It will not treat a headache that has already begun." Available at http://www.drugs.com/topamax html (last visited Feb. 28, 2014).

[11]   "Bradycardia" is the "slowness of the heartbeat." DORLAND'S at 223.

[12]   "Valsalva maneuver" refers to "forcible exhalation effort against a closed glottis ... interfer[ing] with venous return to the heart." *Id.* at 985.

**\*6**  Lastly, the ALJ noted that recent treatment notes, ranging from December 5, 2007 through January 13, 2010, reveal that Petell's migraines were under control. Tr. at 19, 238–55, 259–70, 293–95, 345–50, 373–80. The ALJ concluded no record evidence shows that Petell's migraines imposed significant-related restrictions and no such evidence was provided from Petell's treating source. Tr. at 19. Additionally, in January 2012, Petell reported to Edwards that his headaches were "adequately controlled with current medications." Tr. at 445.

Given the above relevant record evidence dated November 2007 through December 2011 where there were only two changes to Petell's medications, a reasonable mind could accept as adequate to support the ALJ's conclusion that Petell's migraine headaches were not sufficiently severe to significantly limit Petell's ability to engage in basic work activities. *Halloran,* 362 F.3d at 31. Further, the Second Circuit has found that an ALJ's error at step two is not reversible error if the ALJ found other severe impairments and proceeded beyond step two. *Stanton v. Astrue,* 370 F. App'x 231, 233 n. 1 (2d Cir.2010). Here, the ALJ found Petell had severe medically determinable impairments of GERD and IED. Furthermore, the ALJ expressly considered the "combination of impairments" in making her determination of not disabled. *Stanton,* 370 F. App'x at 233 n. 1. Moreover, the ALJ discussed Petell's headaches at length in her RFC assessment. Tr. at 25. *Spina v. Colvin,* No. 11–CV–1496, 2014 WL 502503, at *4 (N.D.N.Y. Feb. 7, 2014) ("[B]ecause the ALJ found that plaintiff had the severe impairment of neurocardiogenic syncope, he continued to consider plaintiff's disability under Steps Three through Five of the disability analysis. Even if it had been error to find plaintiff's migraines to be a nonsevere impairment, the error would have been harmless."). Thus, any error in finding Petell's migraine headaches to be non-severe would be merely harmless.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### ii. Lower Back Pain

Petell next contends that substantial evidence shows his lower back pain imposes at least more than a minimal limitation. Pl.'s Mem. of Law at 13. In December 2010, Petell was referred for physical therapy where his reduced

lumbar flexion and extension were noted. Tr. at 420–21. In March 2011, Dr. John Savage, M.D., an orthopedic surgeon, noted that a compression examination caused pain and tenderness in the lower back and an x-ray showed wedging of T11, suggesting a compression fracture. Tr. at 437–38. In April 2011, Petell was diagnosed with a "fairly high-grade foraminal narrowing at L4–5 and L5–SI due to combination of disk bulging and facet hypertrophy." Tr. at 440. Readings of a MRI dated April 2012 showed "broad-based disk bulges at all lumber levels L1 through L5–S1," with "the most significant foraminal narrowing ... at L4–L5." Tr. at 450. Petell was referred to a specialist Dr. Craig T. Montgomery, M.D. who noted that steroid injections, aggressive physical therapy, pain management, and nonsteroidal anti-inflammatories failed to control the condition. Tr. at 450.

**\*7** Defendant did not address this issue with good reason. As the Appeals Council noted, the ALJ could not have addressed Petell's medical records relating to lower back pain because that condition, and any relevant medical records concerning the condition, was raised for the first time after the ALJ issued her decision on September 14, 2010. *See* Tr. at 420 (noting that in December 2010, while at work, a bull struck Petell's lower back, causing him lower back pain). The Appeals Council is only obligated to consider new and material evidence that relates to the period on or before the date of the ALJ hearing decision. *Shrack v. Astrue,* 608 F.Supp.2d 297, 302 (D.Conn.2009) (citing *Perez v. Chater,* 77 F.3d 41, 45 (2d Cir.1996); 20 C.F.R. § 404.970(b)). Thus, the Appeals Council correctly explained, "[w]e found that some of the evidence was after the [ALJ's] decision.... If you want us to consider whether you were disabled after September 14, 2010, you need to apply again. We are returning the evidence to you to use in your new claim." Tr. at 2.

Accordingly, the Commissioner's decision on this issue should be affirmed and any arguments pertaining to Petell's purported lower back condition will not be further addressed in this Report–Recommendation.

## 2. RFC

The ALJ determined that Petell retained the RFC "to perform medium work ... except no more than occasional contact with supervisors, co-workers, or the public." Tr. at 21. Petell contends that the ALJ erred when she failed to: (1) apply the treating physician's rule to the opinions of psychiatrist

Dr. M.U. Saleem, M.D. and recontact Dr. Saleem for further development of the record; (2) afford proper weight to social worker Bob Bower's opinions; and (3) support her RFC assessment with substantial evidence. Defendant did not specifically address the first two issues in her motion papers.

### i. Treating Physician's Rule and Recontact

When evaluating a claim seeking disability benefits, factors to be considered include objective medical facts, clinical findings, the treating physician's diagnoses, subjective evidence of disability, and pain related by the claimant. *Harris v. R.R. Ret. Bd.,* 948 F.2d 123, 126 (2d Cir.1991). Generally, more weight is given to a treating source. Under the regulations, a treating source's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw,* 221 F.3d at 134. "This rule applies equally to retrospective opinions given by treating physicians." *Campbell v.. Astrue,* 596 F.Supp.2d 445, 452 (D.Conn.2009) (citations omitted). Before a treating physician's opinion can be discounted, the ALJ must provide "good reasons." *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

The ALJ is required to assess the following factors in determining how much weight to accord the physician's opinion: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal,* 134 F.3d at 503. If other evidence in the record conflicts with the opinion of the treating physician, this opinion will not be deemed controlling or conclusive, and the less consistent the opinion is, the less weight it will be given. *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999). Ultimately, the final determination of disability and a claimant's inability to work rests with the Commissioner. *Id.* at 133–34; *see* 20 C.F .R. § 404.1527(e) (2005).

**\*8** Petell contends that Dr. Saleem's opinions should have been given controlling weight. Dr. Saleem saw Petell in January 2009 and noted that Petell had IED and a history of anger management problems; however, Petell did not receive any mental health treatment for it since 1997. Tr. at 259. Petell was appropriately dressed with good hygiene, cooperative,

coherent, and in a positive mood. Tr. at 250. Petell's memory was intact, attention and concentration were fair, insight and judgment were fair, and denied suicidal/homicidal ideations and hallucinations. *Id.* Dr. Saleem evaluated Petell with a Global Assessment of Functioning ("GAF") 65. [13] Tr. at 260.

[13] GAF rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning. A GAF in the range of 61 to 70 indicates "[s]ome mild symptoms (*e.g.*, depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

*Zabala v. Astrue,* 595 F.3d 402, 405 (2d Cir.2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM–IV"), at 34 (4th ed. rev.2000)).

In August 2009, Dr. Saleem and Bob Bowser ("Bowser"), a licensed social worker, provided a medical source statement ("MSS") for Petell based on sessions between January 14, 2009 and August 26, 2009. Tr. at 334. Dr. Saleem concluded that Petell's IED slightly affected Petell's ability to understand, remember, or carry out short and simple instructions. *Id.* Petell's ability to make judgments on simple work-related decisions was moderately affected. *Id.* Petell's ability to understand, remember, and carry out detailed instructions were severely impaired. *Id.* The MSS continued, noting that Petell's ability to interact appropriately with the public, supervisors, and co-workers was slightly affected. Tr. at 335. Petell's ability to respond appropriately to work pressures and changes in a routine work setting was markedly affected. *Id.*

Petell contends that Dr. Saleem's opinions are uncontradicted. To the extent that this argument references Dr. Saleem's diagnoses of IED, this is true. This is recognized by the ALJ who found the impairment to be severe in her analysis. Tr. at 18. There is no question that the psychiatric and neurological consultations and psychological review indicated Petell's complaints of IED. Tr. at 287. Rather, the ALJ disagreed with Dr. Saleem's ultimate opinion regarding Petell's ability to work. This is well within the ALJ's province. SSR 96–5P, 1996 WL 374183, at *1 (S.S.A.1996) (explaining that determinations of disability are reserved for the Commissioner and to the extent a treating source comments on that issue, such commentary is "never entitled to controlling weight or special significance."); *see also Taylor*

*v. Barnhart,* 83 F. App'x 347, 349 (2d Cir.2003) (explaining that a treating physician's opinion about disability "is not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner.") (citing 20 C.F.R. § 404.1527(d)(1) & *Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir.1999)).

To be entitled to controlling weight, the treating physician's opinion must be well supported by medically acceptable evidence and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2) (2005); *Shaw,* 221 F.3d at 134. The ALJ first stated that "[w]hile [Petell] claims a history of treatment for [IED], he was seen in January 2009 for the first time [by Dr. Saleem] since his prior treatment in 1997." Tr. at 25. The ALJ noted Petell had a GAF 65, which is mild. *Id.* The ALJ found Dr. Saleem's opinion of extreme and marked limitations were unpersuasive because that opinion was not substantially supported by other evidence of record, and in a less persuasive manner, only supported by Dr. Saleem and Bowser's treatment notes. Tr. at 25. The ALJ further noted that despite Petell's allegation that he had always had difficulty getting along with others, he held jobs for fairly long periods of time, one of which for at least two years. Tr. at 25, 43, 200.

**\*9** During the psychiatric consultation dated April 18, 2009, CE and Psychiatrist Dr. Dennis M. Noia, Ph.D., noted that Petell was responsive and cooperative to questions and was calm, relaxed, and comfortable. Tr. at 282–83. Dr. Noia further noted that Petell's attention and concentration was intact. Tr. at 282. Petell's recent and remote memory skills were mildly impaired as he could recall three objects immediately and two after five minutes and restate four digits forward and three digits backward. Tr. at 283. Petell reported that he had no history of psychiatric hospitalizations and got along with friends and family. Tr. at 281, 283. Petell could regularly dress, bathe, groom himself, prepare food, do general cleaning, laundry, shopping, manage money, and take public transportation. Tr. at 283. Dr. Noia gave Petell a fair prognosis. Tr. at 284.

During the neurological consultation dated April 18, 2009, CE and Neurologist Dr. Harbinder Toor, M.D. noted that Petell had no indication of impairment in recent or remote memory, insight, or judgment and Petell's mood and affect were appropriate. Tr. at 288. Petell reported that he showers, bathes, dresses, cooks, cleans, and does laundry on a daily basis. *Id.*

On May 12, 2009, medical consultant and reviewing psychologist Dr. H. Ferrin concluded that there was no evidence that Petell was limited in his ability to understand, remember, and carry out detailed instructions. Tr. at 312. Petell's ability to work with others without being distracted was not significantly limited. *Id* . Petell's ability to respond appropriately to changes in the work setting was moderately limited. Tr. at 313.

Drs. Noia, Toor, and Ferrin are specialists and medical consults. The opinions of medical consults like Drs. Noia, Toor, and Ferrin may constitute substantial evidence.

> It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consults, since such consultants are deemed to be qualified experts in the field of social security disability. Such reliance is particularly appropriate where ... the opinions of these ... State agency medical consultants are supported by the weight of the evidence.

*See Fiozzo v. Barnhart,* No. 05–CV–561 (LEK/VEB), 2011 WL 677297, at *8 (N.D.N.Y. Jan. 19, 2011) (citations omitted); *see also Diaz v. Shalala,* 59 F.3d 307, 313 n. 5 (2d Cir.1995) (explaining that "the opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record.") (citations omitted); *McEaney v. Comm. of Soc. Sec.,* 536 F.Supp.2d 252, 256 (N.D.N.Y.2008) ("the evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence ... An ALJ must treat such evaluations as expert opinion evidence of non-examining sources ... This treatment extends to ... RFC assessments [because] ... [s]tate agency consultants are experts in evaluating the medical issues of disability claims.") (citations omitted). The record does show that Petell received medical and therapeutic treatment for IED from Dr. Saleem and Bowser. Tr. at 167, 334. But the record also shows that despite Petell's continued claim that he had always had anger management problems, he never exhibited outbursts at any visit with a medical personnel from as early as November 2007. The ALJ "is entitled to rely not only on what the record says, but also on what it does not say." *Dumas v..*

*Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (citations omitted). The record fails to support such sweeping and broad restrictions as Dr. Saleem has proffered. As such, given Dr. Saleem's opinions were inconsistent with other substantial record evidence, the ALJ did not err in declining to apply the treating physician's rule to the opinions of Dr. Saleem.

**\*10** Accordingly, the Commissioner's decision on this issue should be affirmed.

### b. Failure to Develop the Record

An ALJ has an affirmative duty to develop the administrative record during Social Security hearings, even when the claimant is, as in this case, represented by counsel. *See Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (citations omitted); *see also* 20 C .F.R. § 404.1512(d) (describing Commissioner's duty to develop a "complete medical history for at least the [twelve] months preceding the month in which [claimant] file[s an] application...."); 20 C.F.R. § 404.1512(e) (explaining how the Commissioner will attempt to retrieve the entire medical history from claimant's treating sources as opposed to always seeking consultative examinations). Accordingly, "[t]he ALJ's duty to supplement a claimant's record is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the ALJ's reliance on an expert's conclusion that the evidence is ambiguous." *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005) (citation omitted); *see also Rosa v. Callahan,* 168 F.3d 72, 79 n. 5 (2d Cir.1999) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citation omitted); *Roat v. Barnhart,* 717 F.Supp.2d 241, 264 (N.D.N.Y.2010) (holding that where a "medical record paints an incomplete picture of [claimant's] overall health during the relevant period, as it includes evidence of the problems, the ALJ had an affirmative duty to supplement the medical record, to the extent it was incomplete, before rejecting [claimant's] petition.") (internal quotation marks, altercations, and citation omitted).

Petell argues that to the extent Dr. Saleem's opinion was unsupported or inconsistent with the record, the ALJ was required to recontact Dr. Saleem for further development of the medical opinion. An ALJ is required to recontact a treating source only if the records received were inadequate to determine whether the claimant was disabled. *Perez,* 77

F.3d at 47. That is not the case here. "The mere fact that medical evidence is conflicting ... does not mean that an ALJ is required to re-contact a treating physician." *Micheli v. Astrue,* 501 F. App'x 26, 29 (2d Cir.2012). It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such. *Id.* at 29–30. The ALJ weighs all evidence to determine whether a claimant is disabled based on the evidence before her. *See Richardson v. Perales,* 402 U.S. 389, 399 (1971) ("We therefore are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict.").

In this case, despite the conflicting opinions, the ALJ properly determined that she could render a decision on the 245–page medical record. The ALJ found inconsistency among the opinions Dr. Saleem and other medical evidence of record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1040 (2d Cir.1983) ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he ... have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); *Miles v. Harris,* 645 F.2d 122, 124 (2d Cir.1981) ("Notwithstanding the apparent inconsistency between [two medical] reports ... we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

**\*11** Accordingly, the Commissioner's decision on this issue should be affirmed.

### c. Weight Accorded to "Other Source"

Petell concedes that Bowser is not "an acceptable medical source" but argues that the ALJ had a duty to evaluate his opinion pursuant to SSR 06–03P. *Saxon v. Astrue,* 781 F.Supp.2d 92, 103 (N.D.N.Y.2011) (citation omitted). Social Security Ruling 06–03P provides, "[i]n addition to evidence from 'acceptable medical sources,' we may use evidence from "other sources," ... to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06–03P, 2006 WL 2329939, at \*2 (S.S.A.2006). A social worker is defined as "other sources." *Id.* While information from an "other source" cannot be employed to establish a medically determinable impairment, it may provide insight into the severity of an impairment and how it affects a claimant's ability to work. *Id.* In weighing such opinions, the ALJ uses the same factors as those of

"acceptable medical sources." *Saxon,* 781 F.Supp.2d at 104 (citing *inter alia* 20 C.F.R. § 404.1527(d)). The ALJ may conclude that a licensed social worker's opinion is not entitled to any weight but must provide an explanation for that decision. *Id.*

The ALJ did not fail to consider Bowser's opinions. Although the Social Security Regulation provides that the ALJ should explain the weight given to an "other source," the ALJ need only "ensure[ ] that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06–03P, 2006 WL 2329939, at \*6. Here, the ALJ referred to Bowser's opinions in the RFC assessment. The ALJ first noted an April 2009 report of contact where Bowser indicated that Petell began counseling treatments with him in January 2009 for depressive order and anger management. Tr. at 23, 167, 342–44. Bowser reported that he was not qualified to evaluate the extent of Petell's issues with memory. Tr. at 23, 167. The ALJ proceeded to discuss the MSS that Bowser had co-signed. Tr. at 24. As discussed *supra,* the ALJ took issue solely with the severe and marked limitations given in the MSS because they are not supported by other evidence of record. "Courts conducting judicial review in social security cases do not require perfect opinions or rigid, mechanical, formulaic applications of governing legal principles." *Abdulsalam v. Comm'r of Soc. Sec.,* No. 12–CV–1631 (MAD), 2014 WL 420465, at \*5 (N.D.N.Y. Feb. 4, 2014) (citation omitted). As such, "despite the lack of specific weight assigned to the opinions, the Court is able to discern with ease the ALJ's reasoning, and [her] treatment of the evidence will not be disturbed ." *Id.* (citation omitted).

Accordingly, the Commissioner's decision on this issue should be affirmed.

### d. Substantial Evidence

Petell contends that the ALJ's RFC determination was not supported by substantial evidence. RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations beyond the symptoms. *Martone v. Apfel,* 70 F.Supp.2d 145,150 (N.D.N.Y.1999); 20 C.F.R. §§ 404.1545, 416.945. "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient."

*Martone,* 70 F.Supp.2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); 20 C.F.R. §§ 404.1545, 416.960 (2003). The Second Circuit has clarified that, in Step 5 of the Commissioner's analysis, once RFC has been determined "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's [RFC]." *Pourpre v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009).

> **\*12** Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because conclusory statements regarding plaintiff's capacities are not sufficient ... Only after the ALJ has described the plaintiff's capabilities on a function-by-function basis supported by substantial evidence may RFC then be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

*DiVetro v. Comm'r of Soc. Sec.,* No. 05–CV–830 (GLS/DEP), 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) (internal quotation marks and citations omitted).

Petell first contends that the ALJ erred by failing to ascribe work-related limitations based on Petell's IED. However, the ALJ did incorporate IED limitations into Petell's RFC assessment. Namely, the ALJ concluded that Petell is limited to medium work that cannot have more than occasional contact with supervisors, co-workers, or the public. This is supported by substantial evidence. Dr. Saleem and Bowser opined that Petell had only slight limitations in interacting appropriately with the public, supervisors, and co-workers. Tr. at 335. Dr. Noia observed that Petell was responsive, cooperative, and his manner of relating, social skills, and overall presentation was adequate, and he appeared to be able to relate to and interact moderately well with others. Tr. at 282, 284. Further, Dr. Ferrin opined that Petell had no significant limitations in working in coordination with or proximity to other people, interacting appropriately with the general public, getting along with co-workers, and maintaining socially appropriate behavior. Tr. at 312–13. Thus, this contention is without merit.

Petell next contends that the RFC does not incorporate limitations imposed by Petell's GERD and migraine headaches. This is inaccurate. The RFC assessment discussed Petell's GERD. Tr. at 24. The ALJ noted that Petell was diagnosed with GERD, esophageal stricture, and gastritis. Tr. at 24, 367, 380–81. The ALJ noted that Edwards had treated Petell's GERD and limited him to no heavy lifting or weightlifting. Tr. at 25, 253. There is no other record evidence indicating limitations imposed by the GERD. The ALJ's RFC assessment also discussed Petell's migraine headaches, noting Petell's claim that he was having migraines more frequently. Tr. at 22. The ALJ stated that Petell received treatment for migraines, which became stable with medication. Tr. at 23. Petell saw Dr. Mazdzer in October 2008, who opined that Petell's neurological and cerebellar examinations were normal; thus, he could safely drive and return to work without restrictions. Tr. at 23, 245. A neurological consultative examination in April 2009 showed that Petell was having daily headaches. Tr. at 24, 323. In August 2009 and April 2010, Petell reported to Edwards that his headaches were controlled. Tr. at 24, 255, 375. As previously discussed, the relevant medical records largely indicate that Petell's headaches are controlled with medication. Ultimately, the ALJ found that "the medical records [relevant to migraine headaches] do not corroborate the frequency or intensity" as alleged. Tr. at 25. Accordingly, the ALJ did incorporate GERD and migraine headaches conditions into the RFC where appropriate and, where she disagreed, namely with respect to the frequency and intensity of the migraine headaches, she identified and outlined why.

**\*13** The ALJ found that Petell could perform medium work with occasional contact with supervisors, co-workers, and the public. Medium work consists of lifting no more than fifty pounds at a time with frequent lifting or carrying objects weighing up to twenty-five pounds. 20 C.F.R § 416.967(b). The record does not show that Petell has any exertional limitations. There is no record evidence indicating that Petell was ever in acute distress at any doctor's appointment. In July 2009, Petell reported to Edwards that he was lifting weights with Bowflex, specifically doing curls and bench presses. Tr. at 253. In October 2008, Dr. Mazdzer reported that Petell's motor exam and gait were normal and that Petell could safely operate a motor vehicle. Tr. at 257. In April 2009, Dr. Toor observed that Petell's gait and station were normal and a tandem walk from heel to toe was normal. Tr. at 288. Petell required no assistance to change for the exam, could rise from a chair without difficulty, had intact hand and finger dexterity,

and had a grip strength of 5/5 bilaterally. *Id.* Further, Petell's range of motion throughout the body was normal. *Id.* Given the above relevant evidence, a reasonable mind might accept is adequate to support the ALJ's RFC assessment. *Halloran, 362 F.3d at 31.*

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 3. Petell's Credibility

The ALJ determines whether an ailment is an impairment based on a two-part test. First, the ALJ must decide, based upon objective medical evidence, whether "there [are] medical signs and laboratory findings which show ... medical impairment(s) which could reasonably be expected to produce [such] pain...." *Barringer v. Comm'r of Soc. Sec., 358 F.Supp.2d 67, 81 (N.D.N.Y.2005); 20 C.F.R. § 404.1529 (2003).* This primary evaluation includes subjective complaints of pain. *20 C.F.R. § 404.1529 (2003).* " 'Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.' " *Barringer, 358 F.Supp.2d at 81* (quoting *Crouch v. Comm'r of Soc. Sec. Admin., No. 01–CV–0899 (LEK/GJD), 2003 WL 22145644, at *10 (N.D.N.Y. Sept. 11, 2003).*

An ALJ must consider all symptoms, including pain, and the extent to which these symptoms are consistent with the medical and other evidence. *20 C.F.R. § 404.1529 (2003).* "Pain itself may be so great as to merit a conclusion of disability where a medically ascertained impairment is found, even if the pain is not corroborated by objective medical findings." *Rivera v. Schweiker, 717 F.2d 719, 724 (2d Cir.1983)* (citing *Gallagher v. Schweiker, 697 F.2d 82, 84 (2d Cir.1983)*). However, "disability requires more than mere inability to work without pain." *Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir.1983).* Pain is a subjective concept "difficult to prove, yet equally difficult to disprove" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain. *Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir.1983).* In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." *Snell v. Apfel, 177 F.3d 128, 135 (2d Cir.1999)* (citing *Donato v. Sec'y of HHS, 721 F.2d 414, 418–19 (2d Cir.1983)*). Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial

evidence. *Aponte v. Sec'y of HHS, 728 F.2d 588, 591 (2d Cir.1984).*

**\*14** The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the applicant's ability to engage in substantial gainful employment. *See Marcus v. Califano, 615 F.2d 23, 27 (2d Cir.1978).* The ALJ must consider several factors pursuant to *20 C.F.R. §§ 404.1529(c)(3)* and *416.929(c)(3):*

(i) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate ... pain or other symptoms;

(v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of ... pain or other symptoms;

(vi) Any measures [the claimant] use[s] or ha[s] used to relieve ... pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

*20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).*

Petell contends that the ALJ's credibility determination is unsupported by substantial evidence. In this case, the ALJ found that while Petell had severe impairments, Petell's allegations of disability were not credible. Tr. at 24–25.

Petell contends that Dr. Toor indicated his migraines could interfere with his daily routine. However, as the ALJ noted and the records reflect, Petell is able to substantially perform activities of daily living. Tr. at 20, 25. The ALJ repeatedly noted that Petell's medical notes show his migraine headaches are well controlled by medication. Tr. at 18–19, 25. *Dumas v. Schweiker, 712 F.2d 1545, 1552–53 (2d Cir.1983)* ("Although [plaintiff] now complains of severe debilitating headaches, headaches did not factor significantly into any of the medical opinions concluding that [plaintiff] was unable to return to

his prior employment .... Moreover, there is evidence ... that Bufferin helped to relieve the pain.").

Petell also contends that Dr. Saleem's opinion with respect to extreme and marked limitations constitutes substantial evidence of IED's limitations on Petell's work abilities. However, substantial evidence consisting of the opinions of Drs. Noia, Toor, and Ferrin, as previously discussed, support the ALJ's determination that Petell's IED is not as disabling as Petell alleged. Further, the ALJ noted that Petell was seen for the first time in January 2009 for IED since 1997. Tr. at 25. Furthermore, the ALJ found that, despite Petell's assertion that he did not get along with other people and did not like taking orders, Petell was able to work for extended periods of time. Tr. at 25, 43. Petell also testified that he got along with his family. Tr. at 25, 50. Moreover, the ALJ recognized that not once did Petell had an outburst at a doctor's exam or appointment. Tr. at 25. Rather, the records show that Petell was always cooperative and responsive. Additionally, Petell testified that his temper tantrums consists of swearing at times and throwing a hammer but was never violent. Tr. at 52. As discussed *supra,* Dr. Saleem's opinions of severe and marked limitations were not substantially supported by other evidence of record.

**\*15** As for Petell's credibility with respect to GERD, the ALJ noted that Petell experienced faintness and vomiting after exercising and lifting heavy weights. Tr. at 25, 253. The ALJ did not dismiss this impairment; rather, there is an absence of medical records indicating that the affects of Petell's GERD was disabling or severe. Given the above relevant evidence, a reasonable mind might accept that the ALJ's credibility finding is adequately supported. *Halloran,* 362 F.3d at 31.

Accordingly, the Commissioner's decision on this issue should be affirmed.

### 4. Psychological Review Technique ("PRT")

As previously stated, in order to be considered disabled, a claimant must suffer from either a medically determinable physical or mental impairment. 42 U.S.C. § 1382(a)(3)(A). When evaluating a mental impairment, there is a "special technique" outlined in 20 C.F.R. § 404.1520a which requires consideration of four areas of potential limitation: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." *Id.* § 1520a(c) (3). Where evidence of a colorable mental impairment has

been proffered, failure to engage in the "special technique" generally requires remand. *Kohler v. Astrue,* 546 F.3d 260, 266–69 (2d Cir.2008); *see also Moore v. Barnhart,* 405 F.3d 1208, 1214 (11th Cir.2005) ( "holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete ... [the special technique]. Failure to do so requires remand.") (citations omitted).

In the written decision, an ALJ:

> must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. § 404.1520a(e)(4). "Current regulations do not require completion of the Psychiatric Review Technique Form ... by the ALJ, but do require that his or her decision document application of the special technique." *Echandy– Caraballo v. Astrue,* No. CA 06–97M, 2008 WL 910059, at \*3 (D.R.I. Mar. 31, 2008) (citing 20 C.F.R. § 404.1520a(e) (2)).

As an initial matter, Petell first contends that the ALJ should have considered that Petell suffers from IED. In this case, the ALJ concluded that Petell's IED constituted a severe medically determinable impairment though it did not meet or equal one of the impairments listed in the regulations. Thus, the record belies this contention.

Petell argues that the ALJ failed to properly apply PRT for evaluating Petell's IED by assigning him only modest limitations based on a limited review of the evidence. Here, the ALJ included in her decision specific findings as to the degree of limitation in each of the four functional areas. The ALJ stated that Petell had mild restriction in activities of daily living ("ADL") for Petell had no problems with ADL

and enjoyed fishing. Tr. at 20. The ALJ cited to Petell's ADL report, which indicates that Petell fed and walked two dogs, had no difficulties with handling personal hygiene, performed light lawn work, and occasionally handled laundry and household chores. Tr. at 153–54. Furthermore, the ALJ accurately noted in her RFC assessment that Petell testified he "goes into his shed and putters" and "helps around the house." Tr. at 22, 50–51. The ALJ next stated that Petell had moderate difficulties in social functioning. Tr. at 20. The ALJ noted that while Petell alleged he had more explosive episodes, the record showed that he was cooperative at all his examinations. *See, e.g.,* Tr. at 238–55. Petell was calm, relaxed, and comfortable at the CE examination. Tr. at 314–15. The ALJ took this into consideration in Petell's RFC, concluding that Petell should be limited to occasional contact with supervisors, co-workers, or the public. Tr. at 20. The ALJ next stated that Petell had mild difficulties in concentration, persistence, or pace. Tr. at 21. The ALJ noted that Petell did not shop but could handle money. Tr. at 21, 283. The ALJ noted while Petell alleged difficulties with memory, attention, and concentration, an April 2009 neurologic examination was unremarkable without indication of recent or remote memory impairment. Tr. at 21, 288. Further, the CE psychiatric examination showed that Petell's attention and concentration were intact. Tr. at 21, 74. Thus, Petell's allegations were not supported by the mental status examination findings. Tr. at 21. Finally, the ALJ noted Petell had no episodes of decompensation. *Id.*

**\*16** Given the ALJ's specific ratings and findings on each of the four functional areas, which are bolstered by evaluations from medical personnel who evaluated Petell, it cannot be said that the ALJ failed to carry out PRT analysis. *Cf. Kohler,* 546 F.3d at 267 (finding the ALJ failed to include specific findings with respect to each functional area).

Petell next contends that the ALJ's rating of Petell's functional limitations was inconsistent because the ALJ first stated that Petell's mental health imposed mild and moderate restrictions but later concluded that Petell's mental health would impose little or no effect on his ability to work. Tr. at 26. However, as the ALJ expressly explained, the first limitations identified were "used to rate the severity of mental impairments at steps 2 and 3" and were not a RFC assessment for steps four and five. Tr. at 21. The RFC assessment requires consideration of "the combined effect of ... impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." 20 C.F .R. § 404.1523. Furthermore, "the functional capacity to perform medium

work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work." 20 C.F.R. Part 404, Subpart P, App'x 2, § 3003.00(b). Accordingly, the ALJ's findings were not inconsistent.

Petell further contends that (1) the ALJ failed to credit Dr. Saleem's conclusions extreme and marked limitations, which are supported by Bowser and (2) the resulting informed listings analysis was flawed because of the alleged failure to apply the PRT. As discussed *supra,* because the ALJ's RFC assessment is supported by substantial evidence and the ALJ did not fail to properly apply the PRT, these arguments are rendered moot.

Finally, Petell contends that RFC assessment does not incorporate the moderate limitations as she determined the IED to have on Petell's ability to work. However, the ALJ incorporated such limitations when she limited Petell's medium work base to occasional contact with supervisors, co-workers, and the public. As such, Petell's contentions with respect to the PRT analysis are without merit.

Accordingly, remand is not necessary and the Commissioner's decision on this issue should be affirmed.

### 5. Use of the Grids

The ALJ then conducted her Step Five analysis. The ALJ may apply the Grids or consult a vocational expert ("VE"). *See Heckler v. Campbell,* 461 U.S. 458, 462 (1983); *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F.R. pt. 404, subpt. P, App. 2 (2003). "For a claimant whose characteristics match the criteria of a particular grid rule, the rule directs a conclusion as to whether he is disabled." *Pratts v. Chater,* 94 F.3d 34, 38–39 (2d Cir.1996). However, "where the claimant's work capacity is significantly diminished beyond that caused by his [or her] exertional impairment, the application of the grids is inappropriate," as the Grids do not take into account nonexertional impairments. *Bapp v. Bowen,* 802 F.2d 601, 605–06 (2d Cir.1986) (citations omitted). In this case, Petell contends that using the Grids was inappropriate and a vocational expert needed to be called regarding the effects of his migraine headaches and GERD.

**\*17** "[T]he mere existence of a nonexertional impairment does not automatically require the production of a vocational

expert nor preclude reliance on the guideline," rather such is "a case-by-case" determination considering whether the guidelines adequately reflect a claimant's abilities or whether nonexertional impairments constitute such a significantly limiting factor that other testimony is required. *Bapp v. Bowen,* 802 F.2d 601, 603, 605 (2d Cir.1986). As explained *supra,* no further testimony was required. Petell's migraine headaches were documented to have been well controlled, despite his testimony indicating otherwise. Furthermore, the record is devoid of any incident where Petell had an outburst from IED or any episode that affected his ability to work. As noted, the ALJ is entitled to rely on what the record does not say. *Dumas v. Schweiker,* 712 F.2d 1545, 1553 (2d Cir.1983) (citations omitted). These limitations do not constitute a significant diminishment of Petell's capacities so that his non-exertional impairments precluded the ALJ from using the Grids.

Accordingly, while the non-exertional limitations were considerations which the ALJ included in the RFC, further testimony was not required because the impairments did not significantly diminish Petell's abilities to the point where a vocational expert was required.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

Dated: Feb. 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1123477

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 667743
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Nuris DEL CARMEN FERNANDEZ, Plaintiff,
v.
Nancy A. BERRYHILL, Acting
Commissioner of Social Security, Defendant.

18-CV-326 (JPO)
|
Signed 02/19/2019

**Attorneys and Law Firms**

Charles E. Binder, Varsha Rambali, New York, NY, for
Plaintiff.

Elizabeth Rothstein, Social Security Administration, Office
of The General Counse, New York, NY, for Defendant.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge

**\*1** Plaintiff Nuris Del Carmen Fernandez brings this
action pursuant to 42 U.S.C. § 405(g) challenging the
final decision of the Commissioner of Social Security
(the "Commissioner") denying her application for disability
insurance benefits. Fernandez and the Commissioner have
cross-moved for judgment on the pleadings. (Dkt. Nos. 9
& 13.) For the reasons that follow, Fernandez's motion is
granted and the Commissioner's motion is denied.

**I. Background**

**A. Factual Background and Medical History**
Plaintiff Nuris Del Carmen Fernandez was born in 1964 (Dkt.
No. 8 ("R.") 351), and she has an eleventh-grade education
(R. 370). She has been in the United States for over twenty
years and passed the U.S. citizenship test sometime in 2015 or
2016. (R. 257–58, 273.) As of August 1, 2014—the date she
stopped working due to disability—Fernandez was employed
as a home attendant/home health aide. (R. 275, 351, 369–70.)
She had also held prior jobs as a factory worker and hotel
housekeeper. (R. 370, 385.) Fernandez professes to suffer
from a number of medical conditions that limit her ability
to work, including diabetes, leg pain, and issues with her

heart. (R. 369.) However, the focus of this appeal is certain
impairments relating to her mental health and cognitive
functioning. (Dkt. No. 10 at 1 n.4.)

On December 19, 2013, Fernandez first sought mental health
treatment from Catherine Roche, Ph.D., a psychologist at
the New York Presbyterian Mental Health Clinic. (R. 407.)
Dr. Roche initially diagnosed Fernandez with depressive
disorder (id.), but in February 2014 revised her diagnosis to
depressive disorder and anxiety disorder (R. 404). Fernandez
was subsequently evaluated by a psychiatrist, Jose Genua,
M.D., on May 7, 2014. (Dkt. No. 10 at 2 n.5; R. 399.) Dr.
Genua also diagnosed depressive disorder, and prescribed
Escitalopram. (R. 400–01.)

Fernandez regularly consulted Dr. Roche from July 2014
until June 2015, during which time Dr. Roche consistently
listed her "diagnostic impression" of Fernandez as "major
depressive disorder." (R. 396–98, 570, 573, 579, 585, 589,
603–05, 610, 613, 619.)[1] During this period, Dr. Roche
began to note that Fernandez was experiencing issues with
memory and cognitive functioning, and added to her
diagnosis "cognitive disorder NOS."[2] (See, e.g., R. 603–05,
610.) On October 27, 2014, Dr. Roche wrote a letter stating
that Fernandez's "symptoms are significant that would impair
work functioning," specifying that her "cognitive disorder
functions consist of memory loss and disorganization." (R.
521.) In a subsequent letter on November 13, 2014, Dr. Roche
noted that Fernandez had scored in the "Mild Cognitive
Impairment" range on a mental health examination and
exhibited memory impairment and confusion. (R. 524.)

---

[1] Fernandez also visited Giselle Rosado, a social worker
at New York Presbyterian, for counseling during this
period. (R. 540–41, 555–56, 571, 573–74, 589–90, 611–
12.)

[2] "NOS" means "not otherwise specified." (Dkt. No. 14 at
3.)

During her treatment by Dr. Roche, Fernandez was also
a patient of Mencia Gomez De Vargas, M.D., a specialist
in psychosomatic medicine at Centro Medico Dominicano.
(Dkt. No. 10 at 4 & n.7.) Dr. Gomez De Vargas
began treating Fernandez on July 16, 2014, at which
time she diagnosed Fernandez with "persistent depressive
disorder" (or "dysthymia") and prescribed medication. (R.
668–70.) Dr. Gomez De Vargas saw Fernandez for follow-
up appointments in August, September, and October 2014,
over which time her diagnosis remained consistent (R. 671–

76), though Fernandez occasionally denied having "any psychiatric problems or symptoms," (R. 673, 675).

**\*2** After a gap of a year, Fernandez returned to the Centro Medico Dominicano on November 17, 2015, with her treatment from this point forward consisting of therapy with Candida Cartegena, supervised by psychiatrist Fernando Taveras, M.D. (Dkt. No. 10 at 5 & n.10; R. 678–79.) At the initial therapy appointment, Fernandez was diagnosed as having dysthymic disorder with a global assessment of functioning (GAF) [3] score of 60. (R. 679.) Fernandez attended regular therapy visits at Centro Medico Dominicano from November 2015 to December 2016, during which Fernandez was consistently diagnosed as having dysthymic disorder and a GAF score of 60. (R. 679–707.)

[3]     A GAF score of 51 to 60 correlates to "moderate symptoms," or "moderate difficulty in social, occupational, or school functioning." (Dkt. No. 14 at 9 n.3.)

In a mental impairment questionnaire dated January 5, 2017, Dr. Taveras stated his diagnosis that Fernandez suffered from dysthymic disorder, with a GAF score of 60. (R. 710.) Dr. Taveras listed Fernandez's symptoms as including difficulty concentrating and memory problems, and indicated that she had "[m]oderate-to-marked" and "[m]arked" limitation in various activities related to "Understanding and Memory" and "Concentration and Persistence," and "[m]oderate" limitations in the category of "Social Interactions." (R. 711–13.)

In addition to her treating physicians, on October 22, 2014 Fernandez was evaluated by psychologist Lauren Feiden, Psy.D., at the direction of the Social Security Administration. (Dkt. No. 10 at 7; R. 509–13.) Dr. Feiden diagnosed Fernandez as having major depressive disorder, and noted that Fernandez was "markedly limited in her ability to maintain attention and concentration, learn new tasks, and perform complex tasks independently" as caused by "psychiatric symptoms and cognitive deficits." (R. 512.) Overall, Dr. Feiden concluded that the examination "appear[ed] to be consistent with psychiatric problems" which "may significantly interfere with the claimant's ability to function on a daily basis." (R. 512.) At the ALJ's direction, Dr. Feiden examined Fernandez again on October 10, 2016. (Dkt. No. 10 at 7; R. 647.) Dr. Feiden diagnosed unspecified depressive disorder and unspecified anxiety disorder, and again noted moderate to marked limitations in various areas. (R. 650, 652–53.)

On November 13, 2014, the medical evidence that had been submitted in support of Fernandez's application of disability benefits to date was reviewed by V. Reddy, Ph.D., a state psychologist. (Dkt. No. 14 at 6; R. 288–91.) Dr. Reddy concluded that Fernandez ranged from "not significantly limited" to only "moderately limited" on all categories of a "mental residual functional capacity assessment." (R. 289–90.)

On August 14, 2017—after the ALJ denied her application—Fernandez was evaluated by psychologist Patricia Galiotos, Psy.D. (Dkt. No. 10 at 8; R. 115–18.) After reviewing medical records and conducting a mental status exam, Dr. Galiotos diagnosed Fernandez with severe persistent depressive disorder and unspecified major neurocognitive disorder. (R. 116–18.) In a mental impairment questionnaire dated September 5, 2017, Dr. Galiotos reported that Fernandez exhibited issues with memory and thinking or concentrating, as well as a loss of intellectual ability, and various limitations of mental activities. (R. 120, 122.)

### B. Procedural History

Fernandez filed an application for Social Security disability benefits on September 4, 2014, alleging disability beginning August 1, 2014. (R. 351.) Her application was denied on November 14, 2014. (R. 295.) Fernandez requested a hearing, and an administrative law judge ("ALJ") conducted a hearing on January 18, 2017. (R. 255, 301–02.)

**\*3** At the hearing before the ALJ, Fernandez testified with the aid of a Spanish interpreter. (R. 258.) Fernandez answered questions about her physical health problems and about her mental and emotional health. (R. 259–60, 268–72.) She described feeling "always depressed" and "always tired," and indicated having difficulty concentrating and remembering things. (R. 261–62.) Fernandez also answered questions about her habits and average daily activities. (R. 263–68, 273.)

A vocational expert, Melissa Fass-Karlin, also testified at the hearing. (R. 17, 275.) She opined that an individual capable of performing a medium level of physical exertion, limited to "simple, routine, repetitive type tasks," and without fluency in English could perform work as a cleaner, kitchen helper, or cook helper. (R. 276–77.) Karlin further testified that such jobs would allow only "[u]p to 5%" time off task, and one unscheduled absence per month. (R. 277.) In response to questioning, Karlin opined that an individual who was "unable to work in coordination with others" or had "marked

limitation ... with the ability to respond appropriately to changes in the workplace" would not be able to maintain unskilled work. (R. 279.)

On February 16, 2017, the ALJ denied Fernandez's application, concluding that Fernandez is not disabled within the meaning of the Social Security Act ("SSA"). (R. 11, 17.)[4] The ALJ found that Fernandez has a number of severe impairments, including recurrent major depressive disorder, dysthymic disorder, and mild cognitive disorder. (R. 19.) However, the ALJ found that Fernandez retained the "residual functional capacity to perform medium work ... restricted to jobs involving simple, routine, repetitive type tasks and requiring only occasional contact with supervisors, coworkers and the public and also not requiring fluency in English." (R. 22.) Based on these findings, the ALJ concluded that Fernandez was unable to perform her past work as a home health aide (R. 28), but was capable of performing other work as a cleaner, kitchen helper, or cook helper (R. 29–30).

[4]      The ALJ followed the Social Security Administration's five-step process for determining whether an individual is disabled under the SSA. (R. 18–19.) Because only certain aspects of that process are at issue in this appeal —the determination of Fernandez's "residual functional capacity" and whether she is able to perform any other work in light of that capacity and relevant personal factors (R. 22–30)—the remaining portions of the ALJ's determination will not be discussed in detail here.

Fernandez requested review of the ALJ's decision, submitting new evidence in the form of Dr. Galiotos's report to support her application. (R. 346, 393–94.) The Social Security Appeals Council refused to consider the new evidence and denied the request for review on November 15, 2017. (R. 1–2.) Fernandez filed this suit on January 12, 2018. (Dkt. No. 1.)

## II. Legal Standard

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g) ). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971) ). A court may not substitute its judgment for the Commissioner's "even if it might justifiably

have reached a different result upon de novo review." Downes v. Colvin, No. 14 Civ. 7147, 2015 WL 4481088, at *6 (S.D.N.Y. July 22, 2015) (quoting DeJesus v. Astrue, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) ). Accordingly, this Court determines only whether the ALJ's decision was based on sufficient evidence and applied proper legal standards. The Court does not decide whether Fernandez is in fact disabled.

## III. Discussion

*4 Fernandez contends that the review of her application for disability benefits was flawed in three respects: (1) the ALJ failed to properly weigh medical opinion evidence; (2) the ALJ failed to properly evaluate Fernandez's testimony; (3) the Appeals Council impermissibly declined to consider new medical evidence. In support of its cross-motion for judgment on the pleadings, the Commissioner counters that the ALJ's decision was supported by substantial evidence and attempts to refute the three arguments raised by Fernandez. The Court addresses each argument in turn.

### A. Framework for Disability Claims

To establish a disability under the SSA, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1) (A). The disability at issue must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration employs a five-step procedure to analyze disability determinations. The Commissioner considers whether: (1) the claimant is currently engaged in substantial gainful activity; (2) the claimant has a "severe" impairment as defined in Social Security Administration's regulations; (3) the claimant has an impairment listed in Appendix I of the regulations; (4) the claimant has a residual functional capacity to perform her past work; and (5) there is other work the claimant could perform. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (Sotomayor, J.); see also 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proof at the first four steps; the Commissioner bears the burden at the final step. Rosa, 168 F.3d at 77. In conducting its analysis, the ALJ has an affirmative duty to "develop the record." Swiantek v. Comm'r

*of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ).

### B. Medical Opinion Evidence

Fernandez first argues that the ALJ erred by giving improper weight to certain medical opinion evidence in determining her residual functional capacity ("RFC"). (Dkt. No. 10 at 11–18.) Specifically, Fernandez challenges the ALJ's decision to afford "no weight" to the opinion of Dr. Taveras, only "moderate weight" to the opinion of Dr. Feiden, and "great weight" to the opinion of a "non-examining state agency psychologist"—Dr. Reddy. (Dkt. No. 10 at 12.)

### 1. Dr. Fernando Taveras

In providing an overview of the medical evidence in this case, the ALJ's determination summarized the treatment records from Fernandez's therapy with Candida Cartagena (supervised by Dr. Taveras), and Dr. Taveras's January 2017 assessment report. (R. 25.) The ALJ observed a "stark contrast between the findings in [Taveras's January 2017] assessment and his treatment notes detailed above." (R. 25.) Later in the determination, in explaining how much weight to afford the various medical opinions, the ALJ again noted "how [Taveras's] assessment"—that Fernandez exhibited "persistent depressed mood" and "difficulty thinking or concentrating"—"contrasted greatly with his treatment ... which showed only occasional depressive and anxiety symptoms." (R. 27.) The ALJ also noted how Dr. Taveras's "treatment notes showed a global assessment of function (GAF) of 60 (moderate symptoms) which is inconsistent with his medical source statement." (*Id.*) The ALJ thus concluded that Dr. Taveras's "opinion is given no weight." (*Id.*)

**\*5** Fernandez objects to this treatment of Dr. Taveras's medical opinion on two bases: (a) the failure to afford his opinion "controlling weight" due to inconsistencies between his medical opinion and his treatment notes; and (b) the failure to consider required factors in determining how much weight to afford the opinion.

### a. Failure to Afford Opinion Controlling Weight

In support of her argument that the ALJ impermissibly disregarded the opinion of Dr. Taveras, Fernandez invokes the "treating physician rule," which binds ALJs in making

disability benefit determinations. *Kessler v. Colvin*, No. 14 Civ. 8201, 2015 WL 6473011, at \*4 (S.D.N.Y. Oct. 27, 2015). The rule mandates that "[t]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.' " *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2) ); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106–07 (2d Cir. 2003) (holding that an ALJ erred in not giving a treating physician's diagnosis of fibromyalgia controlling weight). "The reason for this rule is that treating physicians offer a 'unique perspective to the medical evidence' that cannot otherwise be obtained from the record." *Mancebo v. Comm'r of Soc. Sec.*, No. 16 Civ. 6400, 2017 WL 4339665, at \*3 (S.D.N.Y. Sept. 29, 2017) (quoting 20 C.F.R. § 404.1527(c)(2) ).

The Commissioner contends that the ALJ "properly gave [Dr. Taveras's] opinion no weight, as it was inconsistent with the therapy notes from his own clinic ... and the treatment notes from Plaintiff's other providers." (Dkt. No. 14 at 18–19.) The Commissioner is incorrect, however, to the extent she characterizes the ALJ as relying on the latter of these two reasons. Although the ALJ's reasoning is not comprehensively presented, the ALJ apparently decided not to give Dr. Taveras's opinion controlling weight solely because his "assessment contrasted greatly with his treatment [notes]," and specifically that "his treatment notes showed" a GAF score "which is inconsistent with his medical source statement." (R. 27.) The ALJ did observe earlier in the determination that there was a "contrast between the findings in treatment notes from Centro Medico Dominican, which showed waxing and waning depressive and anxiety symptoms with no concentration deficits, and treatment notes from the [New York Presbyterian clinic], which showed persisting depressive symptoms and poor immediate memory." (R. 25.) But the ALJ did not opine that Dr. Taveras's ultimate *opinion* was inconsistent with the notes from the New York Presbyterian clinic. Indeed, the ALJ could not have done so, because the upshot of the ALJ's observations is that Dr. Taveras's opinion was arguably *more* consistent with the notes from the New York Presbyterian clinic than his own treatment notes. [5]

5  The ALJ could have relied on any other inconsistencies between Dr. Taveras's opinion and the observations and opinions of other physicians to attempt to support a

decision to discount the weight of Dr. Taveras's opinion. *See Burgess,* 537 F.3d at 128 (noting that an ALJ need not give a treating physician opinion controlling weight where it is "inconsistent with the other substantial evidence in the case record" (brackets omitted) ). But the ALJ did not do so here, and the Court may not "affirm an administrative action on grounds different from those considered by the agency." *Estrella o/b/o M.R.E. v. Berryhill,* No. 15 Civ. 6966, 2017 WL 2693722, at *23 (S.D.N.Y. June 22, 2017) (quoting *Burgess,* 537 F. 3d at 128).

**\*6** The only reason the ALJ actually gave for discounting Dr. Taveras's opinion was its alleged inconsistency with Dr. Taveras's own treatment notes. (R. 27.) In making this observation, the ALJ was indicating that Dr. Taveras's opinion was "inconsistent with the other substantial evidence in [the] case record," *Burgess,* 537 F.3d at 128, the other "substantial evidence" being Dr. Taveras's own treatment notes.

However, such evidence is insufficient on its own to permit an ALJ to decline to give controlling weight the opinion of a treating physician. The Second Circuit has held that an ALJ "err[s] in rejecting the opinions of [treating] physicians solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings." *Balsamo v. Chater,* 142 F.3d 75, 80 (2d Cir. 1998). More recently, the Circuit reaffirmed in a summary order that "an ALJ may not reject a treating physician's disability opinion based 'solely' on internal conflicts in that physician's clinical findings." *Carvey v. Astrue,* 380 F. App'x 50, 52 (2d Cir. 2010) (quoting *Balsamo,* 142 F.3d at 80).

None of the cases cited by the Commissioner are to the contrary. (Dkt. No. 14 at 19.) Rather, they stand for the proposition that an ALJ may reject a treating physician's opinion where it is inconsistent with the physician's own notes *and* conflicts with other evidence in the record. *See Monroe v. Comm'r of Soc. Sec.,* 676 F. App'x 5, 8 (2d Cir. 2017) (rejecting physician's opinion because it was "contrary to his own treatment notes" and "refuted by" evidence of the claimant's "recreational activities"); *Legg v. Colvin,* 574 F. App'x 48, 49 (2d Cir. 2014) (citing inconsistencies with a doctor's "own treatment notes" as one factor—in addition to conflicts with "the objective medical evidence" and "the reports of other physicians"—that collectively justified discounting opinion of treating physician).

Here, the only reason given by the ALJ for declining to give Dr. Taveras's opinion controlling weight, as required by 20 C.F.R. § 404.1527(c)(2), is the opinion's inconsistency

with Taveras's own findings in his treatment notes. (R. 27.) Because that is an inadequate basis for rejecting a treating physician's medical opinion, remand is required to correct this error.[6]

[6]    The bulk of the parties' arguments regarding the treating physician rule focus on whether the ALJ's finding—that Dr. Taveras's opinion was inconsistent with his treatment notes and GAF scores—is supported by substantial evidence, particularly given the nature of psychiatric diagnosis. (Dkt. No. 10 at 12–14; *see* Dkt. No. 14 at 19–21.) However, because the ALJ erred on a more fundamental basis, the Court need not address these arguments.

### b. Failure to Consider Required Factors in Determining Weight

Fernandez also contends that the ALJ failed to consider the required factors in deciding to afford Dr. Taveras's opinion no weight. (Dkt. No. 10 at 16–17.) If an ALJ decides not to give controlling weight to a treating physician's assessment, the ALJ must consider the following factors to determine how much weight to give the opinion:

> (1) the length of treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence in support of the opinion; (4) the opinion's consistency with the record as a whole; (5) whether the opinion is that of a specialist; and (6) any other relevant factors.

**\*7** *Monroe,* 676 F. App'x at 7 (citing 20 C.F.R. § 404.1527(c) ). After considering these factors, the ALJ must "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion." *Id.* (quoting *Burgess,* 537 F.3d at 129). "Failure to provide such good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Byrne v. Berryhill,* No. 18-622, 2019 WL 495133, at *1 (2d Cir. Feb. 8, 2019) (summary order) (quoting *Burgess,* 537 F.3d at 129–30).

Here, it is not clear that the ALJ considered the relevant factors, and he failed to comprehensively set forth good reasons for not crediting Dr. Taveras's opinion. The ALJ mentioned the length of treatment and the nature of the treatment relationship in giving a summary of medical evidence (R. 25), but he gave no indication why those important considerations did not affect his decision to give no weight to Dr. Taveras's opinion. Nor did the ALJ ever acknowledge the extent to which the opinion was consistent with the record as a whole, the significance of Dr. Taveras's status as a specialist, or the unique nature of psychiatric diagnosis. Instead, the ALJ's determination briefly notes an apparent internal inconsistency between Dr. Taveras's own treatment notes and his ultimate opinion, and concludes: "This opinion is given no weight." (R. 27.)

The Commissioner is correct that an "ALJ need not 'slavishly recite ... each and every factor where the ALJ's reasoning and adherence to the regulation are clear.' " *Batchelor v. Berryhill*, No. 18 Civ. 1424, 2019 WL 422527, at *4 (S.D.N.Y. Feb. 4, 2019) (brackets omitted) (quoting *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) ). But in this instance, the "reasoning and adherence to the regulation" are not clear.

The Court thus concludes that the ALJ's apparent failure "to consider the statutory factors" and failure to "provide 'good reasons' for assigning" no weight to Dr. Taveras's opinion "contravene[ ] the regulations and requires remand." *Byrne*, 2019 WL 495133, at *2.

## 2. Dr. V. Reddy

Next, Fernandez challenges the ALJ's reliance on the opinion of Dr. V. Reddy, a non-examining psychologist. (Dkt. No. 10 at 14–15.) Describing Dr. Reddy as a "state agency psychological consultant," the ALJ noted that Dr. Reddy "found that claimant has only moderate functional limitations indicating claimant can do simple work." (R. 28.) The ALJ decided to give Dr. Reddy's assessment "great weight, as it is consistent with evidence of impaired attention, concentration and memory, as well as a lack of motivation to interact socially, but an inability to be cooperative and relate adequately, support a conclusion the claimant's ability to complete tasks and interact with others detailed above [*sic*]." (R. 28.) The ALJ gave Dr. Reddy's opinion greater weight than the opinion of any other physician. (R. 27–28.)

Fernandez contends that the ALJ's decision to rely on Dr. Reddy's assessment is contrary to relevant regulations and case law. (Dkt. No. 10 at 14.) The relevant regulations provide that ALJs generally "give more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]," and generally "give more weight to medical opinions from [ ] treating sources." 20 C.F.R. § 404.1527(c)(1)–(2). And courts in this Circuit routinely indicate that non-examining and non-treating physicians should be generally given less weight. *See, e.g., Byrne*, 2019 WL 495133, at *1 ("[W]e have cautioned that 'ALJs should not rely heavily on the findings of consultative physicians after a single examination.' " (quoting *Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ) ); *Brown v. Comm'r of Soc. Sec.*, No. 06 Civ. 3174, 2011 WL 1004696, at *4 (E.D.N.Y. Mar. 18, 2011) ("The ALJ's heavy reliance on [the SSA physician's] testimony also contravened the clear guidance of SSA regulations, as [the physician] was a nonexamining source whose opinions are to be accorded less weight than those of examining sources and especially treating sources.").

**\*8** Fernandez further contends that reliance on Dr. Reddy's assessment was particularly inappropriate here, given that Dr. Reddy's opinion was based on review of a near-empty treatment record, and the nature of the psychiatric treatment and diagnoses make in-person examination uniquely valuable. (Dkt. No. 10 at 15–16.) The Commissioner responds that ALJ compensated for any gaps in Dr. Reddy's review by adequately considering the rest of the evidence in the record. (Dkt. No. 14 at 22.) But the ALJ himself did not offer this justification in relying on Dr. Reddy's opinion. As particularly relevant to Fernandez's argument here, the court notes the importance of the ALJ's "duty to adequately explain his reasoning in making the findings on which his ultimate decision rests." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010). It is crucial "that a determination by the ALJ must contain a sufficient explanation of her reasoning to permit the reviewing court to judge the adequacy of her conclusions." *Pacheco v. Barnhart*, No. 03 Civ. 3235, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004) (brackets and citation omitted).

In a similar case where the disability at issue involved mental health, Magistrate Judge Dolinger reviewed the determination of an ALJ that credited the opinion of a non-examining physician over that of treating physicians. *Rodriguez v. Astrue*, No. 07 Civ. 534, 2009 WL 637154, at *26 (S.D.N.Y. Mar. 9, 2009). Judge Dolinger concluded that the findings of

the non-examining physician "should have been discounted or addressed with some s[k]epticism because they were largely inconsistent with the examining physicians' findings and did not account for the 'subjective nature of the patient's disease.' " *Id.* (citation omitted). But because the ALJ failed to do so, failed "to explain why the medical evidence dictated a different result," and "failed to give 'good reasons' for adopting the non-examiner's conclusions," *id.*, Judge Dolinger recommended remanding the case.

Similarly here, the ALJ did not adequately explain his decision to give "great weight" to the opinion of Dr. Reddy, particularly in light of several significant factors that counseled against personally relying on that opinion, including: Reddy's status as a consultant who did not personally examine Fernandez, given the relevant regulations about the relative of such opinions; Reddy's review of only a small portion of the treatment record; the conflicts between Reddy's opinion and the opinions of treating physicians; and the importance of in-person examination in the assessment of mental health limitations. Given these countervailing considerations, the ALJ's statement that Dr. Reddy's assessment was "consistent" with uncited evidence in the record constitutes an insufficient explanation of the reasoning by which he gave the opinion "great weight." Accordingly, remand is warranted for the ALJ to revisit his decision to give the opinion of Dr. Reddy "great weight."

### 3. Dr. Lauren Feiden

Finally, Fernandez objects to the weight given by the ALJ to the opinions of Dr. Feiden. (Dkt. No. 10 at 17–19.) The ALJ acknowledged Dr. Feiden's opinion that Fernandez was "markedly limited in her ability to maintain attention and concentration, learn new tasks, and perform complex tasks independently," but observed that those findings of marked limitation "are contrary to reports that claimant was able to study for and pass her citizenship examination and that she could verbalize and repeat key points in a conversation." (R. 27–28.) The ALJ ultimately gave Dr. Feiden's opinion "moderate weight." (R. 28.)

Fernandez contends that this treatment of Dr. Feiden's opinion was flawed in two respects. First, Fernandez asserts that the ALJ erred in rejecting Dr. Feiden's opinion regarding marked limitations based on Fernandez's citizenship test. (Dkt. No. 10 at 17.) Fernandez argues that the ALJ was incorrect in relying on the fact that Fernandez "was able to study for"

the citizenship test, because she specifically testified that she "didn't study" for the test. (Dkt. No. 10 at 17; R. 275.) However, Fernandez also testified that she *did* study for the citizenship test. The relevant passages of the transcript provide:

**\*9** Q. ... Did you have to study for the citizenship test?

A. Well, how could I say? I studied some and some other things I knew from school.

...

ALJ. Your psychiatrist said you had problems concentrating, but you were able to concentrate enough to study for the exam and you had enough concentration to take the exam. Is that correct?

A. No. I didn't study. I studied but it was a coincidence. They questions they asked I knew....

(R. 273–75.) Given this somewhat confusing testimony, it was reasonable for the ALJ to rely on the fact that Fernandez did at least some studying for the test and passed. Fernandez also argues that the citizenship test is irrelevant to her ability to function in a work environment. (Dkt. No. 10 at 17.) But Fernandez offers no support for this proposition, and the ALJ could reasonably find that the ability to study for and pass a test is relevant to an individual's ability to maintain attention and concentration, and perform a complex task. Accordingly, the Court concludes that the ALJ did not err in partially discounting Dr. Feiden's testimony in this regard.

Second, Fernandez contends that the ALJ failed to properly consider other aspects of Dr. Feiden's opinion, specifically that Fernandez had moderate limitations in her ability to deal with stress, maintain a schedule, and make decisions. (Dkt. No. 10 at 17; R. 512, 650.) However, the ALJ specifically acknowledged these moderate limitations identified by Dr. Feiden in the determination. (R. 27.) And he later concluded that Dr. Feiden "noted moderate-to-marked limitations that do not prevent simple work." (R. 28.) The Court agrees with the Commissioner that this discussion adequately took account of these aspects of Dr. Feiden's opinion, and that the ALJ reasonably concluded that these limitations were consistent with a capacity to perform medium exertion unskilled work. (*See* Dkt. No. 14 at 21.) Accordingly, the Court rejects Fernandez's challenges to the ALJ's consideration of Dr. Feiden's medical opinion based on the record before the ALJ in February 2017.

* * *

Overall, the ALJ erred by discounting the opinion of treating physician Dr. Taveras on an improper basis, failing to consider required factors in deciding to give Dr. Taveras's opinion no weight, and failing adequately explain the great weight given to Dr. Reddy's opinion. The Court does not hold that Fernandez is disabled or that she is entitled to disability insurance benefits. The Court holds only that the case should be remanded to the Commissioner for further proceedings that assign the proper weight to the various medical opinions of Fernandez's doctors and adequately explains the reasons for doing so.

### C. Claimant's Testimony

As an additional basis for remand, Fernandez contends that the ALJ failed to properly evaluate her testimony at the hearing. (Dkt. No. 10 at 18–20.) [7] In determining "whether a claimant who has a severe impairment nonetheless has the 'residual functional capacity' ('RFC') to perform work," an ALJ "is required to take the claimant's reports of pain and other limitations into account." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must "carefully consider" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including "daily activities" and the "location, duration, frequency, and intensity of [their] pain or other symptoms." 20 C.F.R. § 404.1529(c)(3); *see* Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169–70 (Mar. 16, 2016). [8] But in considering this evidence, the ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Barry v. Colvin*, 606 F. App'x 621, 622–23 (2d Cir. 2015) (quoting *Genier*, 606 F.3d at 49).

[7] The Court notes that Fernandez does not appear to have raised this particular objection in her request to the Appeals Council for review of the ALJ's determination. (R. 389–94.) However, whether a claimant has "fully exhaust[ed] his administrative remedies before obtaining judicial review," is a " 'waivable' — *i.e.*, prudential" element of "the right to appeal pursuant to § 405(g)." *Adelman v. Berryhill*, 742 F. App'x 566, 571 (2d Cir. 2018) (alteration in original) (quoting *Smith v. Schweiker*, 709 F.2d 777, 780 (2d Cir. 1983) ). Because the Commissioner did not object to the consideration of this argument on the grounds of administrative

exhaustion, the Court deems any such objection to be waived.

[8] To the extent Fernandez argues that an ALJ commits reversible error by failing to expressly consider each of seven factors in determining whether to credit a claimant's testimony (Dkt. No. 10 at 20), the Court disagrees. Consistent with the relevant regulations, an ALJ need consider only those factors on which claimant has offered evidence. *See* 20 C.F.R. § 404.1529(c)(3) ("[W]e will carefully consider any other information you may submit about your symptoms."); SSR 16-3p, 81 FR 14166-01 at 14170 ("We will consider other evidence to evaluate only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case. We will discuss the factors pertinent to the evidence of record.").

**\*10** "The ALJ must explain the decision to reject a claimant's testimony 'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether [the ALJ's] decision is supported by substantial evidence.' " *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 743 (S.D.N.Y. 2018) (alterations in original) (quoting *Calzada*, 753 F. Supp. 2d at 280) (internal quotation marks omitted). The ALJ's determination regarding the claimant's credibility is entitled to deference. *See id.*

In addressing non-medical evidence of Fernandez's symptoms and limitations, the ALJ summarized her testimony at the hearing along with other evidence from the record. (R. 26–27.) Regarding Fernandez's testimony at the hearing, the ALJ ultimately concluded that

> [C]laimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. Accordingly, these statements have been found to affect claimant's ability to work only to the extent they can reasonably be accepted

as consistent with the objective medical and other evidence. (R. 27.)

Fernandez objects to the ALJ's treatment of her testimony on two grounds. First, she contends that the ALJ failed to adequately explain why her testimony was not supported by the record. (Dkt. No. 10 at 19–20.) The Commissioner responds that the ALJ properly found Fernandez's statements to be inconsistent with the record, and the finding was supported by substantial evidence. (Dkt. No. 14 at 23–24.)

Looking to the language of the determination, the Court agrees with the Commissioner. As the ALJ went through and summarized the relevant non-medical evidence bearing on Fernandez's symptoms, he repeatedly juxtaposed statements from Fernandez's testimony with references to other evidence in the record that was not wholly consistent with the testimony. (R. 26.) For example, the ALJ noted that Fernandez "testified that she does not read or listen to the radio," but she had earlier indicated to a doctor that "[s]he can sustain concentration for watching television, listening to the radio, and reading." (R. 26 (referencing R. 658).) Similarly, Fernandez testified that she "does not cook," but had indicated to doctors that she "spends her days cooking." (R. 26 (referencing R. 649); see R. 515.) The ALJ also highlighted various instances in which Fernandez's statements at the hearing regarding her daily activities and accomplishments were internally inconsistent. (R. 26–27.) And he contrasted Fernandez's statements about physical limitations and pain with medical evidence in the record that he had discussed earlier in the determination. (R. 26 (referencing discussion of musculoskeletal impairments on R. 23).)

Thus, when he concluded that "claimant's statements ... are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision" (R. 27), the ALJ was referring to the inconsistencies apparent in that paragraph and the preceding paragraph. The Court concludes that in highlighting those inconsistencies, often with citations to the record, the ALJ explained his decision to reject Fernandez's testimony "with sufficient specificity." *Rousey*, 285 F. Supp. 3d at 743. Furthermore, the Court concludes that the ALJ's decision not to fully credit those statements was an acceptable exercise of his discretion.

**\*11** Second, Fernandez asserts that the ALJ erred by failing to explicitly weigh Fernandez's testimony regarding "her psychiatric symptoms" and "limited activities of daily living,"

which were the relevant factors raised by Fernandez to support the testimony about her symptoms and limitations. (Dkt. No. 10 at 20.) The Commissioner counters that the ALJ adequately assessed Fernandez testimony regarding her daily activities. (Dkt. No. 14 at 23–24.)

Again, the Court agrees with the Commissioner. As an initial matter, the "failure to specifically reference" a particular relevant factor "does not undermine the credibility assessment if there is substantial evidence supporting the ALJ's credibility determination." *Rousey*, 285 F. Supp. 3d at 744 (brackets omitted) (second quoting *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) ). Additionally, where it is "clear from the record that the ALJ was aware of" the factor because the ALJ "asked [claimant] about it at the hearing and relied on it in [the] disability determination," the failure to expressly weigh the factor separately is harmless. *Id.*

Here, the ALJ expressly acknowledged Fernandez's testimony about her psychiatric symptoms in the determination—noting that she testified to being "always depressed and tired" and reported "difficulty concentrating and focusing, remembering, and being around people." (R. 26.) The ALJ also noted Fernandez's testimony that "her psychiatric medications are sometimes helpful." (*Id.*) Additionally, the ALJ expressly discussed Fernandez's daily activities, including grooming, cooking, shopping, attending church, and visiting family. (R. 26–27.) And Fernandez identifies no other relevant evidence that she introduced but that the ALJ failed to assess in his determination. (*See* Dkt. No. 10 at 20.)

Ultimately, the Court concludes that the ALJ did not err in his assessment of Fernandez's testimony, and remand on this particular ground is not warranted.

### D. New Medical Evidence on Appeal

Finally, Fernandez contends that the Appeals Counsel erred in declining to consider new medical evidence submitted after the ALJ issued his determination. (Dkt. No. 10 at 20–22.) Under the relevant Social Security regulations, "[t]he Appeals Council is obligated to consider 'new and material' evidence that 'relates to the period on or before the date of the administrative law judge hearing decision.' " *Patterson v. Colvin*, 24 F. Supp. 3d 356, 372 (S.D.N.Y. 2014) (quoting 20 C.F.R. § 404.970(b) ); *accord Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996). To be "material," evidence must be "both relevant to the claimant's condition during the time period for which benefits were denied and probative," and there

must be "a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Patterson,* 24 F. Supp. 3d at 372 (alternation in original) (quoting *Lisa v. Sec'y of Health & Human Servs.,* 940 F.2d 40, 43 (2d Cir. 1991) ).

In denying Fernandez's request for review of the ALJ decision, the Appeals Council declined to consider the new evidence submitted by Fernandez. (R. 2.) As to the report from Dr. Galiotos's August 14, 2017 examination of Fernandez (R. 115–18), the Appeals Counsel stated that it "does not relate to the period at issue" (R. 2). With respect to the mental impairment questionnaire from Dr. Galiotos (R. 119–23), the Appeals Counsel concluded that it "does not show a reasonable probability that it would change the outcome of the decision" (R. 2).

*12 Fernandez contests the assertion that Dr. Galiotos's report "does not relate to the period at issue," noting that Dr. Galiotos reviewed Fernandez's medical history and wrote a report that was retrospective in nature. (Dkt. No. 10 at 21.) The Commissioner responds that Dr. Galiotos's report was written upon examining Fernandez for the first time "six months after the end of the relevant period," after review of "only some of Plaintiff's medical records," resulting in a report that is "contradicted by extensive evidence in the record during the relevant period." (Dkt. No. 14 at 24–25.) But because the report discusses Fernandez's medial history and offers a retrospective opinion, the Commissioner's concerns pertain to how much *weight* the doctor's opinion should ultimately receive, not whether the evidence satisfies the threshold requirement of pertaining to the relevant period. *See Guile v. Barnhart,* No. 07 Civ. 259, 2010 WL 2516586, at *2 (N.D.N.Y. June 14, 2010) (holding that evidence is not relevant to the period of disability where it "provides only a snapshot of [claimant's] condition several months after the ALJ's decision, and does not ... offer any retrospective opinion as to [claimant's] condition during the relevant period").

On the question of whether there was a "reasonable probability" that Dr. Galiotos's evidence would change the outcome of the ALJ's decision, Fernandez asserts that the new evidence "may well lead to a different decision by the ALJ once the entire record is considered." (Dkt. No. 10 at 22.) The Court agrees.

The key question before the ALJ involved how to weigh various medical and non-medical evidence in determining Fernandez's RFC. The ALJ ultimately gave "no weight" to the opinion of a treating psychiatrist, Dr. Taveras, and "great weight" to a non-examining state psychologist. (R. 27–28.) In deciding how to weigh these respective opinions, and the remainder of the medical opinions offered, the ALJ was required to evaluate the opinions against the background of the record as a whole. *See, e.g., Monroe,* 676 F. App'x at 7 (requiring ALJ to consider "the evidence in support of the opinion" and "the opinion's consistency with the record as a whole" in determining the weight to give to a treating physician's opinion).

In this context, an additional expert report supporting the conclusions of Dr. Taveras could have reasonably caused the ALJ to credit his opinion, which would have likely affected the ultimate conclusion regarding Fernandez's functional capacity. And indeed, the report and mental impairment questionnaire completed by Dr. Galiotos are entirely consistent with Dr. Taveras's January 2017 assessment. (*Compare* R. 119–23, *with* R. 710–714.) Furthermore, Dr. Galiotos's evidence also supports the opinion of Dr. Feiden regarding Fernandez's marked limitations (*compare* R. 122, *with* R. 512), and contradicts aspects of Dr. Reddy's opinion (*compare* R. 122, with R. 289–90). Given that both Feiden and Reddy's opinions were key to the ALJ's findings regarding Fernandez's residual functional capacity (R. 27–28), additional supporting or detracting evidence could very well have also affected how much weight those experts' opinions received.

Viewing the proffered new evidence in light of the existing record, the Court concludes that there was a "reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Patterson,* 24 F. Supp. 3d at 372 (brackets omitted). The Appeals Council's failure to consider the new evidence thus provides an additional basis to remand this case to allow the Commissioner to consider this evidence in the first instance.

### IV. Conclusion

For the foregoing reasons, Fernandez's motion for judgment on the pleadings is GRANTED, and the Commissioner's motion for judgment on the pleadings is DENIED. Pursuant to 42 U.S.C. § 405(g), the case is remanded to the Commissioner for further proceedings consistent with this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 9 and 13, and to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 667743

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

SSR 16-3P (S.S.A.), 2017 WL 5180304

Social Security Administration

[Docket No. SSA-2015-0055]

SOCIAL SECURITY RULING 16-3P TITLES II AND XVI:
EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS

SSR 16-3P
October 25, 2017

**NOTICES**

**\*1**  AGENCY: **Social Security Administration**.

ACTION: **Notice** of **Social Security Ruling** (SSR).

SUMMARY: We are republishing SSR 16-3p, a **ruling** that rescinded and superseded SSR 96-7p, with a revision detailing how we apply the SSR as it relates to the applicable date. We changed our terminology from "effective date" to ""applicable date" based on guidance from the Office of the Federal Register. We also updated citations to reflect the revised regulations that became effective on March 27, 2017. This **Ruling** is otherwise unchanged, and provides guidance about how we evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims under Titles II and XVI of the **Social Security** Act (Act) and blindness claims under Title XVI of the Act.

FOR FURTHER INFORMATION CONTACT: Elaine Tocco, Office of Disability Policy, **Social Security Administration**, 6401 **Security** Boulevard, Baltimore, MD 21235-6401, (410) 966-6356. For information on eligibility or filing for benefits, call our national toll-free number, 1-800-772-1213 or TTY 1-800-325-0778, or visit our internet site, **Social Security** Online, at http://www.socialsecurity.gov.

SUPPLEMENTARY INFORMATION: Although 5 U.S.C. 552(a)(1) and (a)(2) do not require us to publish this SSR, we are doing so in accordance with 20 CFR 402.35(b)(1).

Through SSRs, we convey to the public SSA precedential decisions relating to the Federal old age, survivors, disability, supplemental **security** income, and special veterans benefits programs. We may base SSRs on determinations or decisions made at all levels of **administrative** adjudication, Federal court decisions, Commissioner's decisions, opinions of the Office of the General Counsel, or other interpretations of the law and regulations.

Although SSRs do not have the same force and effect as statutes or regulations, they are binding on all components of the **Social Security Administration**. 20 CFR 402.35(b)(1).

This SSR will remain in effect until we publish a **notice** in the Federal Register that rescinds it, or we publish a new SSR that replaces or modifies it.

This SSR, republished in its entirety, includes a revision to clarify that our adjudicators will apply SSR 16-3p when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we also explain that we expect the court to review the final decision using the **rules** that were in effect at the time we issued the decision under review. If a court remands a claim for further proceedings after the applicable date of the **ruling** (March 28, 2016), we will apply SSR 16-3p to the entire period in the decision we make after the court's remand.

**\*2** (Catalog of Federal Domestic Assistance, Programs Nos. 96.001, **Social Security**—Disability Insurance; 96.002, **Social Security**—Retirement Insurance; 96.004, **Social Security**—Survivors Insurance; 96.006—Supplemental **Security** Income.)

Nancy A. Berryhill,

Acting Commissioner of **Social Security**.

**POLICY INTERPRETATION RULING**

**TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS**

This SSR supersedes SSR 96-7p: Policy Interpretation **Ruling** Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.

*PURPOSE*:

We are rescinding SSR 96-7p: Policy Interpretation **Ruling** Titles II and XVI Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements and replacing it with this **Ruling**. We solicited a study and recommendations from the **Administrative** Conference of the United States (ACUS) on the topic of symptom evaluation. Based on ACUS's recommendations [1] and our adjudicative experience, we are eliminating the use of the term "credibility" from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation.

Consistent with our regulations, we instruct our adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms. We evaluate the intensity and persistence of an individual's symptoms so we can determine how symptoms limit ability to perform work-related activities for an adult and how symptoms limit ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

*CITATIONS (AUTHORITY)*:

Sections 216(i), 223(d), and 1614(a)(3) of the **Social Security** Act as amended; Regulations no. 4, sections 404.1502, 404.1512(d), 404.1513, 404.1520, 404.1520c, 404.1521, 404.1526, 404.1527, 404.1529, 404.1545 and 404.1594; and Regulations No. 16 sections 416.902, 416.912(d), 416.913, 416.920, 416.920c, 416.921, 416.924(c), 416.924a(b)(9)(ii-iii), 416.926a, 416.927, 416.929, 416.930(c), 416.945, 416.994, and 416.994a.

*BACKGROUND*:

In determining whether an individual is disabled, we consider all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record. We define a symptom as the individual's own description or statement of his or her physical or mental impairment(s). [2] Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability. However, if an individual alleges impairment-related symptoms, we must evaluate those symptoms using a two-step process set forth in our regulations. [3]

**\*3** First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

This **ruling** clarifies how we consider:

· The intensity, persistence, and functionally limiting effects of symptoms,

· Objective medical evidence when evaluating symptoms,

· Other evidence when evaluating symptoms,

· The factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3),

· The extent to which an individual's symptoms affect his or her ability to perform work-related activities or function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim, and

· Adjudication standards for evaluating symptoms in the sequential evaluation process.

*POLICY INTERPRETATION*:

We use a two-step process for evaluating an individual's symptoms.

*The two-step process*:

*Step 1: We determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms*

An individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim unless medical signs or laboratory findings show a medically determinable impairment is present. Signs are anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques that can be observed apart from an individual's symptoms. [4] Laboratory findings are anatomical, physiological, or psychological phenomena, which can be shown by the use of medically acceptable laboratory diagnostic techniques. [5] We call the medical evidence that provides signs or laboratory findings objective medical evidence. We must have objective medical evidence from an acceptable medical source [6] to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms. [7]

In determining whether there is an underlying medically determinable impairment that could reasonably be expected to produce an individual's symptoms, we do not consider whether the severity of an individual's alleged symptoms is supported by the objective medical evidence. For example, if an individual has a medically determinable impairment established by a knee x-ray showing mild degenerative changes and he or she alleges extreme pain that limits his or her ability to stand and walk, we will find that individual has a medically determinable impairment that could reasonably be expected to produce the symptom

of pain. We will proceed to step two of the two-step process, even though the level of pain an individual alleges may seem out of proportion with the objective medical evidence.

**\*4** In some instances, the objective medical evidence clearly establishes that an individual's symptoms are due to a medically determinable impairment. At other times, we may have insufficient evidence to determine whether an individual has a medically determinable impairment that could potentially account for his or her alleged symptoms. In those instances, we develop evidence regarding a potential medically determinable impairment using a variety of means set forth in our regulations. For example, we may obtain additional information from the individual about the nature of his or her symptoms and their effect on functioning. We may request additional information from the individual about other testing or treatment he or she may have undergone for the symptoms. We may request clarifying information from an individual's medical sources, or we may send an individual to a consultative examination that may include diagnostic testing. We may use our agency experts to help us determine whether an individual's medically determinable impairment could reasonably be expected to produce his or her symptoms. At the **administrative** law judge hearing level or the Appeals Council level of the **administrative** review process, we may ask for and consider evidence from a medical or psychological expert to help us determine whether an individual's medically determinable impairment could reasonably be expected to produce his or her symptoms. If an individual alleges symptoms, but the medical signs and laboratory findings do not substantiate any medically determinable impairment capable of producing the individual's alleged symptoms, we will not evaluate the individual's symptoms at step two of our two-step evaluation process.

We will not find an individual disabled based on alleged symptoms alone. If there is no medically determinable impairment, or if there is a medically determinable impairment, but the impairment(s) could not reasonably be expected to produce the individual's symptoms, we will not find those symptoms affect the ability to perform work-related activities for an adult or ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

Step 2: We evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim.

Once the existence of a medically determinable impairment that could reasonably be expected to produce pain or other symptoms is established, we recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

**\*5** We will not evaluate an individual's symptoms without making every reasonable effort to obtain a complete medical history [8] unless the evidence supports a finding that the individual is disabled. We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled. We will evaluate an individual's symptoms based on the evidence in an individual's record as described below; however, not all of the types of evidence described below will be available or relevant in every case.

### 1. Consideration of Objective Medical Evidence

Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques. However, objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI claim. [9] We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.

The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. [10] These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

For example, an individual with reduced muscle strength testing who indicates that for the last year pain has limited his or her standing and walking to no more than a few minutes a day would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms.

However, we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual. [11] A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.

### 2. Consideration of Other Evidence

 **\*6** If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations. [12] For example, for a child with a title XVI disability claim, we will consider evidence submitted from educational agencies and personnel, statements from parents and other relatives, and evidence submitted by **social** welfare agencies, therapists, and other practitioners. [13]

### a. The Individual

An individual may make statements about the intensity, persistence, and limiting effects of his or her symptoms. If a child with a title XVI disability claim is unable to describe his or her symptoms adequately, we will accept a description of his or her symptoms from the person most familiar with the child, such as a parent, another relative, or a guardian. [14] For an adult whose impairment prevents him or her from describing symptoms adequately, we may also consider a description of his or her symptoms from a person who is familiar with the individual.

An individual may make statements about symptoms directly to medical sources, other sources, or he or she may make them directly to us. An individual may have made statements about symptoms in connection with claims for other types of disability benefits such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits.

An individual's statements may address the frequency and duration of the symptoms, the location of the symptoms, and the impact of the symptoms on the ability to perform daily living activities. An individual's statements may also include activities that precipitate or aggravate the symptoms, medications and treatments used, and other methods used to alleviate the symptoms. We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.

### b. Medical Sources

Medical sources may offer diagnoses, prognoses, and opinions as well as statements and medical reports about an individual's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms.

Important information about symptoms recorded by medical sources and reported in the medical evidence may include, but is not limited to, the following:

**\*7**  · Onset, description of the character and location of the symptoms, precipitating and aggravating factors, frequency and duration, change over a period of time (e.g., whether worsening, improving, or static), and daily activities. Very often, the individual has provided this information to the medical source, and the information may be compared with the individual's other statements in the case record. In addition, the evidence provided by a medical source may contain medical opinions about the individual's symptoms and their effects. Our adjudicators will consider such opinions by applying the factors in 20 CFR 404.1520c and 416.920c. [15]

· A longitudinal record of any treatment and its success or failure, including any side effects of medication.

· Indications of other impairments, such as potential mental impairments, that could account for an individual's allegations.

Medical evidence from medical sources that have not treated or examined the individual is also important in the adjudicator's evaluation of an individual's statements about pain or other symptoms. For example, State agency medical and psychological consultants and other program physicians and psychologists may offer findings about the existence and severity of an individual's symptoms. We will consider these findings in evaluating the intensity, persistence, and limiting effects of the individual's symptoms. Adjudicators at the hearing level or at the Appeals Council level must consider the findings from these medical sources even though they are not bound by them. [16]

### c. Non-Medical Sources

Other sources may provide information from which we may draw inferences and conclusions about an individual's statements that would be helpful to us in assessing the intensity, persistence, and limiting effects of symptoms. Examples of such sources include public and private agencies, other practitioners, educational personnel, non-medical sources such as family and friends, and agency personnel. We will consider any statements in the record noted by agency personnel who previously interviewed the individual, whether in person or by telephone. The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.

### d. Factors To Consider in Evaluating the Intensity, Persistence, and Limiting Effects of an Individual's Symptoms

In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3). These factors include:

1. Daily activities;

2. The location, duration, frequency, and intensity of pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

**\*8**  4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

We will consider other evidence to evaluate only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case. We will discuss the factors pertinent to the evidence of record.

### *How We Will Determine if an Individual's Symptoms Affect the Ability To Perform Work-Related Activities for an Adult, or Age-Appropriate Activities for a Child With a Title XVI Disability Claim*

If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, we will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities for an adult or reduce a child's ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim. [17] In contrast, if an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner.

We may or may not find an individual's symptoms and related limitations consistent with the evidence in his or her record. We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions. We will evaluate an individual's symptoms considering all the evidence in his or her record.

In determining whether an individual's symptoms will reduce his or her corresponding capacities to perform work-related activities or abilities to function independently, appropriately, and effectively in an age-appropriate manner, we will consider the consistency of the individual's own statements. To do so, we will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances.

 **\*9**  We will consider statements an individual made to us at each prior step of the **administrative** review process, as well as statements the individual made in any subsequent or prior disability claims under titles II and XVI. If an individual's various statements about the intensity, persistence, and limiting effects of symptoms are consistent with one another and consistent with the objective medical evidence and other evidence in the record, we will determine that an individual's symptoms are more likely to reduce his or her capacities for work-related activities or reduce the abilities to function independently, appropriately, and effectively in an age-appropriate manner. However, inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time. This may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms.

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult or the ability to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim. Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a

variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent. [18]

In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an **administrative** proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints. When we consider the individual's treatment history, we may consider (but are not limited to) one or more of the following:

· An individual may have structured his or her activities to minimize symptoms to a tolerable level by avoiding physical activities or mental stressors that aggravate his or her symptoms.

· An individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau.

 **\*10** · An individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms.

· An individual may not be able to afford treatment and may not have access to free or low-cost medical services.

· A medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual.

· An individual's symptoms may not be severe enough to prompt him or her to seek treatment, or the symptoms may be relieved with over the counter medications.

· An individual's religious beliefs may prohibit prescribed treatment.

· Due to various limitations (such as language or mental limitations), an individual may not understand the appropriate treatment for or the need for consistent treatment of his or her impairment.

· Due to a mental impairment (for example, individuals with mental impairments that affect judgment, reality testing, or orientation), an individual may not be aware that he or she has a disorder that requires treatment.

· A child may disregard the level and frequency of treatment needed to maintain or improve functioning because it interferes with his or her participation in activities typical of other children his or her age without impairments.

The above examples illustrate possible reasons an individual may not have pursued treatment. However, we will consider and address reasons for not pursuing treatment that are pertinent to an individual's case. We will review the case record to determine whether there are explanations for inconsistencies in the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them. We will explain how we considered the individual's reasons in our evaluation of the individual's symptoms.

***Adjudication—How we will use our evaluation of symptoms in our five-step sequential evaluation process to determine whether an individual is disabled***

In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

Our adjudicators must base their findings solely on the evidence in the case record, including any testimony from the individual or other witnesses at a hearing before an **administrative** law judge or hearing officer. The subjective statements of the individual and witnesses obtained at a hearing should directly relate to symptoms the individual alleged. Our adjudicators are prohibited from soliciting additional non-medical evidence outside of the record on their own, except as set forth in our regulations and policies.

 **\*11** Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments. In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities or, for a child with a title XVI disability claim, limit the child's ability to function independently, appropriately, and effectively in an age-appropriate manner.

In determining whether an individual is disabled or continues to be disabled, our adjudicators follow a sequential evaluation process. [19] The first step of our five-step sequential evaluation process considers whether an individual is performing substantial gainful activity. If the individual is performing substantial gainful activity, we find him or her not disabled. If the individual is not performing substantial gainful activity, we proceed to step 2. We do not consider symptoms at the first step of the sequential evaluation process.

At step 2 of the sequential evaluation process, we determine whether an individual has a severe medically determinable physical or mental impairment or combination of impairments that has lasted or can be expected to last for a continuous period of at least 12 months or end in death. [20] A severe impairment is one that affects an individual's ability to perform basic work-related activities for an adult or that causes more than minimal functional limitations for a child with a title XVI disability claim. [21] At this step, we will consider an individual's symptoms and functional limitations to determine whether his or her impairment(s) is severe unless the objective medical evidence alone establishes a severe medically determinable impairment or combination of impairments that meets our duration requirement. [22] If an individual does not have a severe medically determinable impairment that meets our duration requirement, we will find the individual not disabled at step 2. If the individual has a severe medically determinable impairment that has met or is expected to meet our duration requirement, we proceed to the next step.

At step 3 of the sequential evaluation process, we determine whether an individual's impairment(s) meets or medically equals the severity requirements of a listed impairment. To decide whether the impairment meets the level of severity described in a listed impairment, we will consider an individual's symptoms when a symptom(s) is one of the criteria in a listing to ensure the symptom is present in combination with the other criteria. If the symptom is not one of the criteria in a listing, we will not evaluate an individual's symptoms at this step as long as all other findings required by the specific listing are present. Unless the listing states otherwise, it is not necessary to provide information about the intensity, persistence, or limiting effects of a symptom as long as all other findings required by the specific listing are present. [23] In considering whether an individual's symptoms, signs, and laboratory findings are medically equal to the symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether the symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria. However, we will

not substitute the individual's allegations of pain or other symptoms for a missing or deficient sign or laboratory finding to raise the severity of the impairment(s) to that of a listed impairment. [24] If an individual's impairment meets or medically equals the severity requirements of a listing, we find him or her disabled. If an individual's impairment does not meet or medically equal a listing, we proceed to assess the individual's residual functional capacity at step 4 of the sequential evaluation process unless the individual is a child with a title XVI disability claim.

**\*12** For a child with a title XVI disability claim whose impairment does not meet or medically equal the severity requirements of a listing, we consider whether his or her impairment functionally equals the listings. This means that the impairment results in "marked" limitations in two out of six domains of functioning or an "extreme" limitation in one of the six domains. [25] We will evaluate an individual's symptoms at this step when we rate how a child's impairment-related symptoms affect his or her ability to function independently, appropriately, and effectively in an age-appropriate manner in each functional domain. If a child's impairment functionally equals a listing, we find him or her disabled. If a child's impairment does not functionally equal the listings, we find him or her not disabled. For a child with a title XVI disability claim, the sequential evaluation process ends at this step.

If the individual's impairment does not meet or equal a listing, we will assess and make a finding about an individual's residual functional capacity based on all the relevant medical and other evidence in the individual's case record. An individual's residual functional capacity is the most the individual can still do despite his or her impairment-related limitations. We consider the individual's symptoms when determining his or her residual functional capacity and the extent to which the individual's impairment-related symptoms are consistent with the evidence in the record. [26]

After establishing the residual functional capacity, we determine whether an individual is able to do any past relevant work. At step 4, we compare the individual's residual functional capacity with the requirements of his or her past relevant work. If the individual's residual functional capacity is consistent with the demands of any of his or her past relevant work, either as the individual performed it or as the occupation is generally performed in the national economy, then we will find the individual not disabled. If none of the individual's past relevant work is within his or her residual functional capacity, we proceed to step 5 of the sequential evaluation process.

At step 5 of the sequential evaluation process, we determine whether the individual is able to adjust to other work that exists in significant numbers in the national economy. We consider the same residual functional capacity, together with the individual's age, education, and past work experience. If the individual is able to adjust to other work that exists in significant numbers in the national economy, we will find him or her not disabled. If the individual cannot adjust to other work that exists in significant numbers in the national economy, we find him or her disabled. At step 5 of the sequential evaluation process, we will not consider an individual's symptoms any further because we considered the individual's symptoms when we determined the individual's residual functional capacity.

**\*13** This SSR is applicable on MARCH 28, 2016. [27]

CROSS-REFERENCES: SSR 96-8p, "Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims," and Program Operations Manual System, section DI 24515.064.

[FR Doc. 2017-23143 Filed 10-24-17; 8:45 am]

BILLING CODE 4191-02-P

[1]     ACUS made several recommendations in its March 12, 2015 final report, ""Evaluating Subjective Symptoms in Disability Claims." Among other things, ACUS recommended we consider amending SSR 96-7p to clarify that subjective symptom evaluation is not

an examination of an individual's character, but rather is an evidence-based analysis of the **administrative** record to determine whether the nature, intensity, frequency, or severity of an individual's symptoms impact his or her ability to work. In any revised SSR, ACUS also recommended we more closely follow our regulatory language about symptom evaluation, which does not use the term "credibility" and instead directs adjudicators to consider medical and other evidence to evaluate the intensity and persistence of symptoms to determine how the individual's symptoms limit capacity for work if he or she is an adult, or for a child with a title XVI disability claim, how symptoms limit ability to function. ACUS further recommended when revising SSR 96-7p, we offer additional guidance to adjudicators on regulatory implementation problems that have been identified since we published SSR 96-7p.

[2]     See 20 CFR 404.1502(i) and 416.902(n) for how our regulations define symptoms.

[3]     See 20 CFR 404.1529 and 416.929 for how we evaluate statements of symptoms.

[4]     See 20 CFR 404.1502(g) and 416.902(l) for how our regulations define signs.

[5]     See 20 CFR 404.1502(c) and 416.902(g) for how our regulations define laboratory findings.

[6]     See 20 CFR 404.1502(a) and 416.902(a) for a list of acceptable medical sources.

[7]     See 20 CFR 404.1521 and 416.921 for what is needed to show a medically determinable impairment.

[8]     By "complete medical history," we mean the individual's complete medical history for at least the 12 months preceding the month in which he or she filed an application, unless there is a reason to believe that development of an earlier period is necessary or the individual says that his or her alleged disability began less than 12 months before he or she filed an application. 20 CFR 404.1512(b) (ii) and 416.912(b)(ii).

[9]     See 20 CFR 404.1529(c)(2) and 416.929(c)(2).

[10]     See 20 CFR 404.1529(c)(2) and 416.929(c)(2).

[11]     See 20 CFR 404.1529 and 416.929.

[12]     See 20 CFR 404.1513 and 416.913.

[13]     See 20 CFR 404.1529(c)(3) and 416.929(c)(3)

[14]     See 20 CFR 416.924a(a)(2).

[15]     For claims filed before March 27, 2017, our adjudicators will apply the **rules** in 20 CFR 404.1527 and 416.927.

[16]     See 20 C.F.R. 404.1520c and 416.902c for claims filed on or after March 27, 2017. See 20 CFR 404.1527 and 416.927 for claims filed before March 27, 2017.

[17]     See 20 CFR 404.1529(c)(4) and 416.929(c)(4).

[18]     See 20 CFR 404.1529(c) and 416.929(c).

[19]     See 20 CFR 404.1520 and 416.920. For continuing disability, see 404.1594, 416.994 and 416.994a.

[20]     See 20 CFR 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).

[21]     See 20 CFR 416.924(c).

[22]     See 20 CFR 416.920(c) for adults and 416.924(c) for children.

[23]     See 20 CFR 404.1529(d)(2) and 416.929(d)(2).

[24]     See 20 CFR 404.1529(d)(3) and 416.929(d)(3).

[25]     See 20 CFR 416.926a.

26    See 20 CFR 404.1545 and 416.945.

27    Our adjudicators will apply this **ruling** when we make determinations and decisions on or after March 28, 2016. When a Federal court reviews our final decision in a claim, we expect the court will review the final decision using the **rules** that were in effect at the time we issued the decision under review. If a court finds reversible error and remands a case for further **administrative** proceedings after March 28, 2016, the applicable date of this **ruling**, we will apply this **ruling** to the entire period at issue in the decision we make after the court's remand. Our regulations on evaluating symptoms are unchanged.

Social Security Administration

Department of Health and Human Services
SSR 16-3P (S.S.A.), 2017 WL 5180304

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2019 Thomson Reuters. No claim to original U.S. Government Works.   12

Melligan v. Chater, Not Reported in F.Supp. (1996)

1996 WL 1015417

1996 WL 1015417
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Jane MELLIGAN, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security, [1] Defendant.

[1]   Effective March 31, 1995, the Social Security
Administration became an independent agency,
separate from the Department of Health and
Human Services. Thus, Shirley S. Chater,
Commissioner of Social Security, is substituted for
Donna E. Shalala, Secretary of health and Human
Services, in all social security cases. Social Security
Independence and Program Improvement Act of
1994, Pub.L.. No. 103–296, 108 Stat. 1464, 1477.

No. 94–CV–944S.
|
Nov. 14, 1996.

**Attorneys and Law Firms**

John Henry Kelly—Pro Se, for Plaintiff.

Thomas H. Brandt, for Defendant.

ORDER

SKRETNY, District J.

 *1  Whereas, on June 28, 1995, plaintiff filed a motion for
judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), and

Whereas, on September 1, 1995, defendant filed a
cross-motion for judgment on the pleadings pursuant to
Fed.R.Civ.P. 12(c), and

Whereas this Court, by its Order dated November 14, 1995,
referred this case to Magistrate Judge Hugh B. Scott pursuant
to 28 U.S.C. § 636(b)(1)(B); and

Whereas Magistrate Judge Scott filed a Report and
Recommendation on May 30, 1996, copies of which were
mailed to counsel for the parties by the Clerk of the Court on
June 3, 1996, recommending reversal of defendant's decision

that plaintiff is not disabled and, therefore, not entitled
to disability insurance benefits or Supplemental Security
Income benefits; and

Whereas no objections to the Report and Recommendation
have been received from either party within ten (10) days
from the date of its service, in accordance with 28 U.S.C. §
636(b)(1) and Local Rule 72.3, Subdivision 3; and

Whereas, after careful review of the Report and
Recommendation, as well as the pleadings and materials
submitted by the parties,

IT HEREBY IS ORDERED, that this Court accepts the
Magistrate Judge's recommendation that defendant's decision
be reversed, and finds that defendant's determination that
plaintiff was not under a disability subsequent to November
17, 1992, is not supported by substantial evidence.

FURTHER, that plaintiff's motion for judgment of the
pleadings pursuant to Fed.R.Civ.P. 12(c) is GRANTED.

FURTHER, that defendant's motion for judgment on the
pleadings pursuant to Fed.R.Civ.P. 12(c) is DENIED.

FURTHER, that the decision of the Commissioner is
REVERSED and REMANDED for the sole purpose of
calculations of benefits.

SO ORDERED.

PLEASE take notice of the entry of an ORDER filed on
11/14/96, of which the within is a copy, and entered 11/18/96
upon the official docket in this case. (Document No. 12 .)

Report and Recommendation

Introduction

This is an action brought pursuant to 42 U.S.C. § 405(g)
to review the final determination of the Commissioner of
Social Security that plaintiff is not disabled and, therefore, is
not entitled to disability insurance benefits and Supplemental
Security Income benefits.

Upon a review of the record, this Court finds that the
Commissioner's decision is not supported by substantial

Melligan v. Chater, Not Reported in F.Supp. (1996)

1996 WL 1015417

evidence and accordingly recommends that the determination be reversed.


Procedural Background

Plaintiff filed an application for disability insurance benefits on March 3, 1992 alleging that the onset of her disability occurred on September 14, 1991. (R. 158–161.[1]) Plaintiff's applications were denied initially and on reconsideration. (R. 162, 189.) Plaintiff then requested a hearing. (R. 45.)

[1]    References noted as "(R.___)" are to the certified record of the administrative proceedings.

On November 18, 1992, plaintiff appeared with her attorney before an Administrative Law Judge ("ALJ"), who considered the case *de novo* and concluded, in a written decision dated January 7, 1993, that plaintiff was under a disability between September 14, 1991 and November 17, 1992, but that plaintiff was not disabled after that date. (R. 300–307)

**\*2**  Plaintiff appealed the portion of the ALJ's decision which denied benefits after November 17, 1992. On July 30, 1993, the Appeals Council remanded the case back to the ALJ for a new hearing. (R. 30.) A second hearing was held on October 5, 1993. On May 20, 1994 the ALJ issued a decision once again finding that plaintiff was not disabled after November 17, 1992, and thus, denied plaintiff's claim for benefits after that date. (R. 16–27) The ALJ's decision became the final decision of the Commissioner on October 27, 1994, when the Appeals Council denied plaintiff's request for review. (R. 5–7.)

Plaintiff commenced the instant action on December 23, 1994. The Commissioner now moves, and plaintiff cross-moves, for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(f).


Factual Background

Plaintiff, Jane Melligan, is a forty-eight year old female who possesses a high-school diploma. She last worked as an aide at the Hopevale Residential Center from April 1991 to September 1991. (R. 52) In the past she has worked as a sales clerk, a routing clerk in a bank, a hairdresser, and optical clerk, and an adjustment clerk (R. 53, 55, 65, 66–70, 199–200).

Plaintiff testified that she is working toward a degree in early childhood education and hopes to open a day care center. (R. 49, 50, 78, 168).

Plaintiff claims that she is disabled due to chronic low back pain and numbness which radiates into her hips and left leg. (R. 55–59). Plaintiff has a long history of back injuries. She underwent a right L5–S1 laminotomy and microdiskectomy on November 6, 1987 performed by Dr. Roy Silvers. (R. 252–77). On October 9, 1991, she was seen by Dr. Silvers with complaints of severe and constant back pain. (R. 235–36) On October 24, 1991 Dr. Silver performed a microdiscectomy at the left L4–L5. (R. 220). After this second surgery, Dr. Silvers saw plaintiff on a monthly basis until March 12, 1992. At that time Dr. Silvers noted that plaintiff had "done well though she still has some complaints. She has intermittent numbness in her left leg and right anterior thigh. She has no leg pain. She has intermittent leg pain." (R. 229). Dr. Silvers' neurofunctional and sensory examinations did not result in any remarkable findings. Dr. Silvers concluded that plaintiff showed evidence of chronic musculoligamentous strain, but there was no evidence of further disc herniation. (R. 229). In a letter to plaintiff's primary physician, Dr. Rodolfo Villacorta, Dr. Silvers expressed reservations about plaintiff's ability to return to her previous work at the Hopevale Residential Home where her job required her to restrain unruly teenage girls, but otherwise cleared her to return to work as of March 16, 1992. (R. 230).

Thereafter, plaintiff was seen by Dr. Villacorta, her primary treating physician for the preceding nine years, on a regular basis (every 2–3 months). (R. 60–61, 241, 294, 311). In the course of his treatment of plaintiff during this period, Dr. Villacorta noted several objective findings, including (a) numbness in the left leg and foot (R. 242, 289, 294, 309, 310, 311); (b) weakness in the left leg and foot (R. 250); (c) spasms in the left leg and gluteal area (R. 287, 294, 311); and (d) edema in both legs (R. 311).

**\*3**  In his May 27, 1992 report, Dr. Villacorta opined that plaintiff could only lift up to five pounds occasionally, could stand and/or walk for less than two hours per day, could sit less than six hours per day, and could not use her left leg or foot for any length of time. (R. 250). In an October 30, 1992 report, Dr. Villacorta stated that plaintiff's "pain improved but continues to have numbness of the leg. Unable to sit, unable to stand any length of time and lifting weight of more than five pounds seem to affect her back and leg." (R. 294). Dr. Villacorta concluded that "[a]t the present time she is

Melligan v. Chater, Not Reported in F.Supp. (1996)

1996 WL 1015417

disabled and unable to perform her former occupation and any other occupation. Perhaps light duty or light work in the near future." (R. 294).

Significantly, Dr. Villacorta noted these same objective and subjective findings after his examinations of plaintiff on April 21, 1993, July 21, 1993 and December 20, 1993 (R. 310–11). On November 29, 1993 Dr. Villacorta opined that plaintiff remained "totally disabled." (R. 309).

Discussion

The only issue to be determined by this Court is whether the ALJ's decision that plaintiff was not under a disability after November 17, 1992 is supported by substantial evidence. See 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). Substantial evidence is defined as " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ' *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216–17, 83 L.Ed. 126 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S .C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B).

Plaintiff bears the initial burden of showing that her impairment prevents her from returning to her previous type of employment. *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the [plaintiff] could perform." Id.; See also *Dumas*

*v. Schweiker,* 712 F.2d 1545, 1551 (2d Cir.1983); *Parker v. Harris,* 626 F.2d 225, 231 (2d Cir.1980).

**\*4** In order to determine whether plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing her past relevant work; and

(5) whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry,* 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir.1992). However, it should be noted that in the ALJ has an affirmative duty to fully develop the record. *Gold v. Secretary,* 463 F.2d 38, 43 (2d Cir.1972).

In order to determine whether an admitted impairment prevents a claimant from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e).

1. *Failure to Give Controlling Weight to the Treating Physician's Opinion*
In the instant case, the ALJ found that plaintiff was disabled until November 17, 1992 but not after that date "primarily" upon a statement in Dr. Villacorta's October 30, 1992 report that plaintiff might be capable of light work in the near future. (R. 20). A review of Dr. Villacorta's October 30, 1992 report reveals, however, that taken in context, Dr. Villacorta's statement was hopeful speculation and not a conclusion that plaintiff would not be disabled after November 17, 1992. The relevant part of Dr. Villacorta's October 30, 1992 report states:

> At the present time she is disabled and unable to perform her former occupation and any other occupation.

Perhaps light duty or light work in the near future. (R. 294).

The speculative nature, signified by Dr. Villacorta's use of the word "perhaps," is further highlighted by Dr. Villacorta's November 29, 1993 statement that plaintiff "remains totally disabled." (R. 309).

The ALJ disregarded Dr. Villacorta's November 29, 1993 opinion on three grounds:

First, Dr. Villacorta's most recent assessment is very vague. Second, it is based on an examination that took place more than four months earlier and contradicts the claimant's own testimony in which the claimant testified "I have learned to live with it." Third, Dr. Villacorta offers no findings to support his conclusions; this brief note was at the behest of claimant's counsel, who had to wait two months after the hearing for this vague and conclusory report, which, since counsel did not request more time to obtain better information, must be presumed to be the most persuasive evidence the doctor will provide. (R. 24)

**\*5** None of the ALJ's reasons for discounting Dr. Villacorta's opinion are supported by the record. Although Dr. Villacorta's November 29, 1993 statement was indeed brief, it is not vague. It should be noted that the November 29, 1992 opinion was obtained at the request of claimant's counsel in a letter to Dr. Villacorta dated November 23, 1993. Dr. Villacorta was instructed by plaintiff's counsel to "answer in the space provided." (R. 309) In any event, in the space provided, Dr. Villacorta stated that plaintiff "continues to have left leg pain and numbness when walking and sitting." Dr. Villacorta also noted that plaintiff continued to experience leg cramps and lower back pain and concluded that she was "still totally disabled". (R. 309). Dr. Villacorta's November 29, 1993 report, albeit brief, is not vague.

The ALJ's second basis for discounting Dr. Villacorta's opinion is also unsupported by the record. Although Dr. Villacorta had last seen the plaintiff four months before giving the November 29, 1993 opinion, the objective and subjective findings from his December 20, 1993 examination of the plaintiff are consistent with his prior clinical findings and support his November 29, 1993 opinion. (R. 311).

Moreover, although the ALJ found Dr. Villacorta's statement that plaintiff remained "totally disabled" to be too vague to

warrant reliance, the ALJ did not have any difficulty in relying upon plaintiff's testimony that she had "learned to live with it [her medical problems]," and interpreting such a statement to be an admission that she is not disabled. Of course, plaintiff has had little choice but to learn to live with her medical problems. This is hardly an admission by plaintiff that she is not disabled, nor is it inconsistent with Dr. Villacorta's November 29, 1993 statement. Although the record reflects that plaintiff has been able to perform limited tasks, such as babysitting for two hours (R. 117), and attending school (R. 70), she does so only for limited periods of time and with considerable help from family members. (R. 71–73).

Finally, the ALJ erroneously discounted Dr. Villacorta's opinion on the grounds that Dr. Villacorta offered "no findings to support his conclusions." (R. 24). Once again, this proposition is not supported in the record. As discussed above, the record includes objective findings by Dr. Villacorta from examinations both before and after his November 29, 1993 opinion which are consistent with that opinion. Further, the ALJ erroneously focuses on the fact that plaintiff's counsel "had to wait two months after the hearing for this vague and conclusory report." To the contrary, the record reflects that plaintiff's counsel sent Dr. Villacorta a letter dated November 23, 1993 asking for an updated medical opinion. Dr. Villacorta responded on November 29, 1993, just six days later. In any event, the length of time it took to obtain the opinion has no logical bearing on the validity of the medical opinion expressed therein.

**\*6** The weight to be afforded to the opinion of a claimant's treating physician, once subject to the judicially created "treating physician rule," has now been codified. The regulation provides that the Secretary will give controlling weight to a "treating source's opinion on the issue(s) of the nature and severity of your impairment(s)" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2) (1994) (effective August 1991).

As discussed above, Dr. Villacorta's opinion is supported by clinical findings in the record and is not inconsistent with other substantial evidence in he record. Thus, the ALJ's determination not to give controlling weight to Dr. Villacorta's opinion was in error.

2. *The ALJ's Determination as to Medical Improvement After November 17, 1992*

Melligan v. Chater, Not Reported in F.Supp. (1996)

1996 WL 1015417

As discussed above, in a previous decision the ALJ determined that plaintiff was disabled until November 17, 1992, but not after that date. (R. 21). In the original remand order by the Appeals Council, the ALJ was directed to make an evaluation under the applicable regulations, and point to some medical improvement which established that plaintiff ceased to be disabled after that date. In this regard, the ALJ recited plaintiff's day-to-day schedule and the fact that plaintiff was able to go to school.

Once again, the ALJ's determination in this regard is not supported by the record. First, in attempting to support his finding that plaintiff's disability ceased on November 17, 1992, the ALJ erroneously stated that plaintiff testified that she returned to school in 1992. (R. 21). In fact, plaintiff testified that she returned to school in September of 1991. (R. 50). The ALJ determined that plaintiff was disabled prior to November 17, 1992 even though the record reflected that she attended school prior to to that date. The ALJ does not cite, and the record does not reflect, evidence that plaintiff's daily routine or level of activity after November 17, 1992 was different than her daily activity prior to that date.

Based on the above, the ALJ's determination that a medical improvement occurred and that plaintiff's disability ceased as of November 17, 1992 is not supported by substantial evidence in the record.

3. *The ALJ's Findings Regarding Plaintiff's Residual Functional Capacity*

After concluding that plaintiff was no longer totally disabled, the ALJ determined that although plaintiff's "exertional limitations do not allow her to perform the full range of sedentary [2] work ... there are a significant number of jobs in the national economy which she could perform." (R. 26) As examples of such jobs, the ALJ cited surveillance system monitor, dispatcher, and telephone service representative. (Id.)

[2]     It is undisputed that plaintiff can not perform heavy, medium or light work.

Once again, the ALJ's determination is not supported by the record. Under the applicable regulations, to be able to perform sedentary work a person must be able to sit for six hours out of an eight hour day and must be able to lift one to ten pounds occasionally. 20 C.F.R. § 404. 1567(a). The ALJ concedes that plaintiff's residual functional capacity will not allow her to perform these tasks. However, relying upon testimony from

a vocational expert, the ALJ determined that plaintiff could perform some jobs in the sedentary range. At the hearing, the ALJ posed the following hypothetical question to the vocational expert:

> **\*7**  Here's the [residual functional capacity] I'm going to give you. I have a younger individual with most of a college education and let's see. This individual is capable of the following: what she can do is during the course of an eight-hour day, be moving on her feet for the majority of that time, which means emphasis on walk rather than stand; can sit at times for a half an hour at a time, but those should not be just—they can't be sit half an hour, walk half an hour. Most of the day has to be spent up, up and about, with occasional periods of sitting, okay? And can stoop, but cannot and should not be required to bend over to pick things up, bend over to get things off the floor; can lift five pounds as—I guess it would be occasionally; and no climbing, no ladders, no stairs, a level environment. Let's see, that's it. (R. 142).

After being asked for a clarification, the ALJ added:

> The individual can walk continuously about three blocks, well, two blocks at a time continuously, and then can stand for a few minutes and then walk again, so the person could be standing and walking six hours a day. This is tough to quantify. Let's see. Let me make it more specific, okay? Stand, walk six hours a day, not continually. Assume would have to have a break to sit, a sit break every hour for a few minutes. Can sit up to half hour at a time, if need

Melligan v. Chater, Not Reported in F.Supp. (1996)

1996 WL 1015417

be, with an equal amount of walking allowed thereafter. Okay. (R. 142)

In response to this hypothetical, the vocational expert identified the surveillance system monitor position, a dispatcher position and a telephone service representative. The vocational expert's testimony reveals, however, that his opinion is based upon the assumption that plaintiff could perform these jobs only if she is not required to lift packages of more than five pounds as some surveillance monitors must do and that she could use a headset telephone with a long cord (to allow her to walk). It is evident from the vocational expert's testimony that not all of these positions meet such conditions. (R. 141–45). In some respects, the vocational expert's description of the cited jobs does not comport with the limitations set by the ALJ in the hypothetical. Although a person may be able to view a surveillance monitor while either sitting or standing in front of it, it would be difficult to view that monitor while walking around (the ALJ's hypothetical precluded significant standing). Although it is not stated in the record, the vocational expert's description of a person's ability to function as a dispatcher or telephone service representative while standing and/or walking, must assume that the person is not required to make constant use of a computer or refer to various manuals while doing that job. In light of the special conditions (no lifting, specific phone equipment which would allow the person to stand or walk, limited need to use computer or reference manuals) attached to the job descriptions used by the vocational expert, it is likely that the number of such jobs available are is much fewer than the numbers stated by the vocational expert. (R. 145).

**\*8** The Court need not discount the vocational expert's testimony, however, inasmuch as the record does not reflect that the plaintiff has the residual functional capacity stated by the ALJ in the posed hypothetical. The ALJ does not cite to evidence in the record to support his assessment. Dr. Villacorta's May 27, 1992 residual functional capacity report indicates that plaintiff can only stand or walk less than two hours per day. (R. 250). Plaintiff's also testified that she could not function at the level suggested by the ALJ in his hypothetical to the vocational expert. (R. 150). There is no evidence in the record to support the ALJ's conclusion that the plaintiff could function as described in his hypothetical for any sustained period of time.

In order to rely on a vocational expert's opinion:

'the hypothetical question posed to a vocational expert must fully set forth a claimant's impairments.' *Totz v. Sullivan,* 961 F.2d 727, 730 (8th Cir.1992) (citing *Shelltrack v. Sullivan,* 938 F.2d 894, 898 (8th Cir.1991)). *If a hypothetical question does not include all of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability.*

*Morse v. Shalala,* 16 F.3d 865, 874 (8th Cir.1994) (emphasis added).

As discussed above, a review of the record reflects that the hypothetical does not accurately reflect all of the plaintiff's impairments, limitations and restrictions. Thus, the ALJ erred in relying upon the vocational expert's testimony.

Conclusion

For the foregoing reasons, this Court recommends that the final decision of the Commissioner be reversed.

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy to the Report & Recommendation to all parties.

Any objections to this Report & Recommendation *must* be filed with the Clerk of this Court *within ten(10) days* after receipt of a copy of this Report & Recommendation in accordance with 28 USC § 636(b)(2) and WDNY Local Rule 72(a)(3). *Failure to file objections to this report & recommendation within the specified time or to request an extension of such time waives the right to appeal any subsequent district court's order adopting the recommendations contained herein. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d. Cir.1995); *Wesolak v. Canadair Ltd. .,* 838 F.2d 55 (2d Cir.1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See *Patterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

**Melligan v. Chater, Not Reported in F.Supp. (1996)**

1996 WL 1015417

**\*9** Finally, the parties are reminded that, pursuant to WDNY Local Rule 72(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72(a)(3)may result in the District Court's refusal to consider the objection.*

So ordered.

**All Citations**

Not Reported in F.Supp., 1996 WL 1015417

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

🏳 KeyCite Yellow Flag - Negative Treatment

Disagreement Recognized by Howard v. Commissioner of Social Security,
W.D.N.Y., August 25, 2016

2014 WL 1679801
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sara POKLUDA, Plaintiff,
v.
Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

Civil Action No. 1:13–cv–335 (GLS/ESH).
|
Signed April 28, 2014.

**Attorneys and Law Firms**

Office of Stephen J. Mastaitis, Jr., Stephen J. Mastaitis, Jr., Esq., of Counsel, Saratoga Springs, NY, for the Plaintiff.

Social Security Administration, Office of Regional General Counsel, Region II, David L. Brown, Esq., Graham Morrison, Esq., of Counsel, New York, NY, for the Defendant.

### ORDER

GARY L. SHARPE, Chief Judge.

**\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge Earl S. Hines, duly filed March 21, 2014. Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate Judge Earl S. Hines filed March 21, 2014 (Dkt. No. 17) is ACCEPTED in its entirety for the reasons stated therein; and it is further

ORDERED that Pokluda's request to remand this action is DENIED. The Commissioner's decision is AFFIRMED and

Pokluda's complaint (Dkt. No. 1) is DISMISSED; and it is further

ORDERED that the Clerk close this case and provide a copy of this Order to the parties in accordance to the local rules.

IT IS SO ORDERED.

### REPORT AND RECOMMENDATION

EARL S. HINES, United States Magistrate Judge.

Sara Michelle Pokluda ("Pokluda") seeks review of an adverse decision on her applications for disability-based benefits under the Social Security Act.

### I. Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence. *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* 559 U.S. 962, 130 S.Ct. 1503, 176 L.Ed.2d 152 (2010); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982); *see also* 42 U.S.C. § 405(g). Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision. *Yancey v. Apfel,* 145 F.3d 106, 111 (2d Cir.1998). Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue,* 465 Fed. App'x 4, 5 (2d Cir.2012) (summary order).

When reviewing acts of administrative agencies, courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights"). Thus, judicial review is quite deferential to the Commissioner's presumed expertise.

### II. Background

Pokluda, at age 24, applied for disability-based social security benefits due to fribromyalgia, migraines, and depression. (T. 173). [1] A video evidentiary hearing was held before administrative law judge Maria Teresa Mandry ("ALJ Mandry") who presided over the hearing from San Juan, Puerto Rico. (T. 17, 31–71). Pokluda attended the hearing in Albany, New York, *pro se,* and testified through interactive video. (*Id.*). Also testifying by video were medical experts, Ramon Morales, M.D. ("Dr.Morales") and Amarilis Serrano, Psy.D. ("Dr.Serrano") and a vocational expert, Marieva Puig, Ph.D. ("Dr.Puig"). (*Id.*).

[1]     "T." followed by a number refers to the page of the administrative record. (Dkt. No. 8).

**\*2** ALJ Mandry denied Pokluda's applications on September 21, 2011. (T. 17–27). Pokluda filed a *pro se* request for review with the Appeals Council of the Social Security Administration's Office of Hearings and Appeals. (T. 72–73). Pokluda then retained legal counsel who submitted a brief and also proposed additional evidence. (T. 217–19, 324, 325–31). After considering the brief and additional evidence, the Appeals Council denied Pokluda's request to review. (T. 1–6). This rendered ALJ Mandry's opinion the final decision. Pokluda then instituted this proceeding.

### III. Commissioner's Decision

ALJ Mandry utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. [2] At Step 1, she determined that Pokluda, although employed and working part-time, was not engaged in "substantial gainful activity" within the meaning of the Act. [3] (T. 19). At Step 2, she found that Pokluda suffers from certain conditions (fibromyalgia and migraine headaches) that are "severe impairments" in that they produce more than minimal functional limitations. (T. 19). She declined, however, to find that Pokluda has a severe mental impairment because she found that Pokluda's mood disorder causes no more than minimal limitations in her ability to perform basic mental work activities. At Step 3, ALJ Mandry found that Pokluda's impairments, singly or in combination, are not so extreme in degree as to be presumptively disabling under the Commissioner's listings of presumptively disabling mental and physical impairments. [4] (T. 20).

[2]     The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (citing *Heckler v. Campbell,* 461 U.S. 458, 461, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.,* No. 1:05–CV–932, 2008 WL 759076, at *1–2 (N.D.N.Y. Mar. 19, 2008).

[3]     "Substantial gainful activity" or "SGA" is "work that involves doing significant and productive physical or mental duties" done for pay or profit, and may include part-time work even if it includes less responsibility or pay than work previously performed. 20 C.F.R. §§ 404.1510(a)(b), 404.1572, 416.910(a)(b), 416.972. Generally, when earnings from employment exceed a certain threshold amount specified in the Commissioner's regulations, it is presumed that she has demonstrated the capacity to engage in substantial gainful activity. *See* 20 C.F.R. §§ 404.1574, 416.974.

[4]     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

Before proceeding to Steps 4 and 5, ALJ Mandry made a predicate finding of "residual functional capacity." [5] She found that Pokluda has residual functional capacity to perform work at the light exertional levels, but with certain non-exertional limitations limiting her to simple and repetitive jobs involving no exposure to unprotected heights or hazards, pulmonary irritants, dust or extreme temperatures, and only occasional work under fluorescent lights. [6] (T. 20–24).

[5]     "Residual functional capacity" refers to what persons can still do in work settings despite physical and/or mental limitations caused by their impairments and related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see also* SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (July 2, 1996). Regarding mental impairments, an administrative law judge must take into consideration limitations on a claimant's "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and

work pressures in a work setting ...." *See* 20 C.F.R. §§ 404.1545(c), 416.945(c).

[6] ALJ Mandry's complete "residual functional capacity" finding was:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is able to carry and list and push and pull up to 20 pounds occasionally and 10 pounds frequently, and can perform work activities that involves sitting for 6 hours and walking fo 4 hours in an 8–hour workday allowing alternating at will. She can perform simple and repetitive jobs, where she is not exposed to unprotected heights or hazards. She is occasionally able to work under fluorescent lights and is able to work were there are no pulmonary irritants, dust or extreme temperatures. She is able to work on computers in simple repetitive tasks, follow and understand directions, respond and adapt to changes, and make job related decisions.

> (T. 20).

Based on this residual functional capacity assessment, ALJ Mandry found at Step 4 that Pokluda lacks ability to perform her past relevant work as a deliverer, stock checker clerk, retail clerk, and salesperson because some required more standing and walking than Pokluda's residual functional capacity allows, and all but one (deliverer) were performed inside with fluorescent light issue and/or frequent interaction with public. (T. 24). Pokluda thus carried her burden to prove a *prima facie* case of disability [7]; the burden then shifted to the Commissioner to show at Step 5 that Pokluda can still perform alternative and available work. [8]

[7] *See Mimms v. Heckler,* 750 F.2d 180, 185 (2d Cir.1984).

[8] *See Poupore v. Astrue,* 566 F.3d 303, 306 (2d Cir.2009); *see also DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir.1998); *Berry,* 675 F.2d at 467; 20 C.F.R. §§ 404.1566, 416.966.

At Step 5 of sequential evaluation, administrative law judges determine whether claimants who have demonstrated *prima facie* cases of disability can, nevertheless, perform alternative, available work. A vocational expert, Dr. Puig, testified that a person with Pokluda's residual functional capacity and limitations can perform requirements of light and unskilled occupations such as parking lot attendant and parking lot signaler. (T. 25, 67–68). ALJ Mandry found this testimony credible. Consequently, Pokluda's applications were denied

on the basis that her impairments do not prevent her from engaging in substantial gainful employment. (T. 25–26).

## IV. Points of Alleged Error

**\*3** Pokluda proffers three alleged errors:

1. Whether the claimant was denied Due Process and Equal Protection;

2. Whether [the claimant] was capable of sustained *light* substantial gainful activity from January 1, 2009; and,

3. Whether failure to consider the claimant's obesity and mental health diagnoses is reversible error.

(Dkt. No. 10, pp. 1–2, 5–22).

In response to each point, the Commissioner argues that ALJ Mandry employed correct legal principles and that her factual findings are supported by substantial evidence.[9] (Dkt. No. 15, pp. 4–12).

[9] Under this district's practice, the parties marshal their arguments through competing briefs. *See* General Order # 18, September 23, 2003 (superseding January 24, 2002 and September 19, 2001 general orders). (Dkt. No. 3).

## V. Discussion and Analysis

### A. Constitutional Challenge

In cases of individualized decisionmaking, administratively-determined adjudicative facts and decisional protocols that allegedly violate rights protected by the Constitution are subject to judicial review. Pokluda's brief argues that she is a victim of such individualized deprivations of rights to "due process of law" and "equal protection of the laws" under the Fifth and Fourteenth Amendments. Her arguments supporting supposed violations of these rights, however, consist mostly of emotional rhetoric and conclusory statements rather than substance.

### 1. Due Process

The Fifth Amendment provides that no person will "be deprived of life, liberty or property without due process of law." U.S. Const. amend. V. A claim of entitlement to social security benefits triggers Due Process Clause protections. *Mathews v. Eldridge,* 424 U.S. 319, 332–33, 96 S.Ct. 893, 47

L.Ed.2d 18 (1976). In the context of an administrative social security hearing, however, Due Process requires only that the proceedings be "full and fair." *Richardson v. Perales,* 402 U.S. at 401–02; *Echevarria v. Secretary of Health & Human Servs.,* 685 F.2d 751, 755 (2d Cir.1982). They need not be "full-blown adversarial hearing[s]." *Bush v. Shalala,* 94 F.3d 40, 46 (2d Cir.1996). Instead, administrative proceedings can and should be "informal," "liberal," and "not strict in tone and operation." Their overall conduct ultimately "rests ... in the examiner's discretion." *Perales,* 402 U.S. at 400–01.

Pokluda's specific quarrels are addressed below, but it is worth noting as a threshold matter that her administrative hearing was "full and fair" in every sense as that term is commonly understood. Pokluda received notifications prior to the hearing explaining the process and her rights; she attended the hearing, testified, was able to hear and question all witnesses, and was allowed to present evidence. ALJ Mandry assembled and considered all of Pokluda's medical records. She considered and credited opinions expressed by Pokluda's attending physicians; she obtained an internal medicine examination and a psychiatric evaluation from consulting physicians whose findings and opinions were recorded in written reports appearing in the evidentiary record; and additionally she obtained testimony from *two* medical experts regarding Pokluda's physical and mental impairments and accompanying limitations, together with expert vocational testimony regarding Pokluda's vocational abilities with respect to her past work and potential alternative work. There is no obvious substantive or procedural due process deficiency in how ALJ Mandry adjudicated Pokluda's claim.

### a. Interactive Video Hearing

**\*4** ALJ Mandry presided and received testimony remotely utilizing interactive video technology. While Pokluda was in Syracuse, New York, and ALJ Mandry was in San Juan, Puerto Rico, they could see and hear each other and also the witnesses who testified. Jurists, legal counsel and litigants of reason may have divergent views as to whether evidentiary proceedings of this sort detract from their dignity, solemnity and effectiveness, but, as courts and administrative agencies are asked to do more with less, video proceedings are now an accepted fact of life, providing an effective and efficient means to curtail costs and expedite proceedings in an overburdened system for the benefit of claimants. The Commissioner's regulation expressly permits evidentiary hearings by video teleconferencing. 20 C.F.R. §§ 404.936(c), 416.1436(c); [10] *see also* 20 C.F.R. §§ 404.950(e), 416.1450(e) ("Witnesses may appear at a hearing in person or, ... by video teleconferencing....").

[10]       On July 29, 2013, the Regulations were amended to include testimony by telephone. 20 C.F.R. §§ 404.936(c), 416.1436(c). The regulations in effect at the time of Pokluda's hearing, however, did not address testimony by telephone.

In any event, Pokluda is in no position to complain. In July 2011, ALJ Mandry provided Pokluda an advance "Notice of Hearing" advising, *inter alia,* of her intent to use video teleconferencing ("VTC") at the hearing, but that if Pokluda did "not want to appear by video teleconference," ALJ Mandry would "arrange an in-person appearance for [her] on the next available hearing date." (T. 98). The form further gave instructions as to how Pokluda should proceed if she did not want to appear at her hearing by VTC. (*Id.*). Pokluda raised no objection.

### b. Foreign Accents

Pokluda premises a Due Process claim on an argument that her hearing was unfair because it was conducted by a Puerto Rican administrative law judge, and the three experts who testified spoke in technical terms with heavy foreign accents. (Dkt. No. 10, p. 5). This point is not cognizable on judicial review because factual assertions on which it is premised are not apparent from the evidentiary record before the court. But, even if ALJ Mandry is of Puerto Rican heritage, and even if testifying experts used technical terms and spoke with foreign accents, that is no basis for declaring a *per se* constitutional error.

Pokluda speaks English; [11] ALJ Mandry conducted the proceedings in English; all witnesses spoke in English; the transcript of testimony and all medical records are in English; and ALJ Mandry's decision is written in English. At the commencement of the hearing, ALJ Mandry admonished Pokluda that, "it's important that if you feel you don't understand something to please let me know so that I can repeat any question or clear anything that you need to understand." (T. 36). At no point during the hearing did Pokluda indicate that she was having difficulty communicating or understanding the proceedings. Rather, she responded appropriately and directly to ALJ Mandry's questions and queries.

[11] (T. 172).

Pokluda fails to identify a single instance where she was unable to understand or otherwise disadvantaged by any communication impediment issues at the hearing. Absent such a showing, there is no colorable constitutional challenge. *See Tankisi v. Commissioner of Soc. Sec.,* 521 Fed. App'x 29, 31–32 (2d Cir.2013) (summary order) (no denial of full and fair hearing where claimant failed to show specific issues that were misunderstood by allegedly ineffective interpreter); *see also Bao Jun Liu v. Holder,* 478 Fed. App'x 692, 695 (2d Cir.2012) (summary order) (no due process violation and no prejudice in immigration hearing where "alleged mistranslations did not result in any significant loss of meaning"); *Zaien Chen v. Mukasey,* 271 Fed. App'x 104, 105–06 (2d Cir.2008) (summary order) (no due process violation where petitioner failed to identify a mistranslation touching on a dispositive issue at immigration hearing); *Alvarez v. Commissioner of the Soc. Sec. Admin.,* Civil No. 10–890(JBS), 2011 WL 2600712, at *4 (D.N.J. June 28, 2011) (declining to remand to provide interpreter when at no point did claimant seek clarification of a question; there were no more apparent misunderstandings; and, none of the moments of disconnect were clearly attributable to claimant's language abilities).

*c. Transcript*

**\*5** Pokluda points out that the official transcript contains gaps and omissions, consisting of at least 17 "inaudibles" during the questioning and responses of the three expert witnesses, and complains that the Commissioner thus deprived her of Due Process by failing to provide her current attorney with an accurate or complete record for review. (Dkt. No. 10, p. 6). Incomplete administrative transcripts, however, do not warrant automatic reversals on constitutional or other grounds. The test is not whether the Commissioner has provided counsel with everything counsel might desire, but whether the transcript that remains before the court permits meaningful or informed review. [12]

[12] "The touchstone is whether the administrative record that does exist permits meaningful judicial review." *Brady v. Apfel,* 41 F.Supp.2d 659, 668 (E.D.Tex.1999) (citing *Harrison v. PPG Indus., Inc.,* 446 U.S. 578, 594, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980)).

In any event, Pokluda fails to identify even one part of the transcript that is inaccurate or incomplete and/or how any part of the hearing responses or "inaudibles"

actually disadvantaged her. Hence, on its face, she cannot assert a violation of any constitutional right. *See Brewer v. Astrue,* 2012 WL 896238, at *4 (N.D.Okla. Mar.15, 2012) (court denied remand when claimant failed to submit any evidentiary support establishing that the omission precludes meaningful judicial review; failed to establish a due process violation but simply pronounced there to be one; and failed to demonstrate any omission was "material").

*d. Notice*

Pokluda complains that her right to Due Process was abridged by not having received adequate information of her right to legal representation, her right to cross-examine witnesses, and her ability to object to a video hearing. (Dkt. No. 10, p. 6). "Although a claimant does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she choose to obtain counsel." *See Lamay v. Commissioner of Soc. Sec.,* 562 F.3d 503, 507 (2d Cir.2009), *cert. denied,* 559 U.S. 962, 130 S.Ct. 1503, 176 L.Ed.2d 152 (2010). The Commissioner must "notify each claimant in writing ... of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner...." 42 U.S.C. §§ 406(c) and 1383(d)(2)(D); *see also* 20 C.F.R. §§ 404.1705, 404.1706. Such notification must "also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge." *See id; Polhamus v. Astrue,* No. 6:12–cv–192 (GLS), 2013 WL 422092, at *1 (N.D.N.Y. Feb. 1, 2013) (quoting *Lamay,* 562 F.3d at 507). Additionally, at the hearing itself, "the ALJ must ensure that the claimant is aware of [his] right [to counsel]." *Id.* (quoting *Lamay,* 562 F.3d at 507 (internal quotation marks and citation omitted)). [13] But, once properly informed of these rights, a claimant may waive them. *Lamay,* 562 F.3d at 507.

[13] Some circuits require additional or enhanced disclosures that are broader than those mandated by statute; however, the Second Circuit has declined to adopt this approach and has found no agency error when §§ 406(c) and 1383(d)(2)(D) disclosure requirements are met. *See Lamay,* 562 F.3d at 508.

Although there always is room for subjective debate as to what is "adequate," there is no question that Pokluda received objectively reasonable notices. When Pokluda's claim was initially rejected in August 2010, she received a "Notice of Disapproved Claim" advising that if she disagreed with the

decision she could request an evidentiary hearing before an administrative law judge. That notice stated:

> **\*6** [t]he hearing is your chance to tell the ALJ why you disagree with the decision in your case. *You can give the ALJ new evidence* and bring *people to testify for you.* The ALJ also can require people to bring important papers to your hearing and give facts about your case. *You can question these people at your hearing.*

(T. 79) (emphasis added). This Notice further advised her of the *right to be represented by an attorney* and directed her to enclosed information wherein she could find more information about the hearing. (*Id.*).

In a letter dated November 17, 2010, Pokluda was advised that her request for hearing had been received. It included repetitive information and other attachments about the hearing process, and informed Pokluda again of her right to legal representation, that some private lawyers charge only if she receives benefits, that some organizations may be able to represent her free of charge, a list of groups that can help her find a representative, and information about customary fees.[14] (T. 86–93).

[14]  Regarding attorney fees, the letter provides:
Some private lawyers charge a fee only if you receive benefits. Some organizations may be able to represent you free of charge. Your representative may not charge or receive any fee unless we approve it. We are enclosing a list of groups that can help you find a representative.
(T. 87).

In July 2011, Pokluda received a Notice of Hearing from ALJ Mandry, advising of the date, time, location of hearing, the intent to use video teleconferencing ("VTC") at the hearing, advising what to do if she did not want to appear at her hearing by VTC, her right to legal representation, issues to be considered, and other things that would happen at the hearing. (T. 97–108).

Finally, on the day of the hearing, ALJ Mandry opened the hearing by informing Pokluda of her right to representation and explaining how the hearing would proceed. (T. 33–35).

This was at least the *fourth* notice to Pokluda of her right to legal counsel and of hearing procedures. Pokluda then executed a written "Waiver of Right to Representation."[15] (T. 146–147).

[15]  When signing the "Waiver of Right To Representation," Pokluda acknowledged that she understood that she had the right to be represented in the proceeding; she had received a representative referral list and was offered an opportunity to defer a decision in her appeal until she could contact sources on the list or other source representation; and that she had considered the matter and decided to waive her right to representation and chose to go forward without representation. (T. 146).

There is no basis for a reviewing court to conclude that Due Process was offended for lack of adequate notice of the right to legal representation or of hearing procedures.

### e. Mistaken Identity

Pokluda asserts (correctly) that ALJ Mandry misidentified a testifying medical expert as "Dr. German Malaret" when, in fact, the witness was Dr. Ramon Morales.

If embarrassing or inexcusable sloppiness in an administrative law judge's decision were a legitimate basis to reverse, this point might have merit on extraconstitutional grounds. ALJ Mandry's decision reveals, however, that the testimony she considered was, in fact, that of Dr. Morales, not of Dr. Malaret or any other extrinsic witness. (*Id.*) Notwithstanding the incorrect appellation, ALJ Mandry describes the substance of Dr. Morales's assessment of fibromyalgia and treatment history, her unremarkable physical findings, and history of asthma and headaches. (T. 23).

Pokluda fails to offer anything beyond a bare allegation that she has been deprived of a substantial right. There is no basis to conclude that Pokluda was deprived of her constitutional right to a full and fair hearing due to a simple, non-substantive misnomer mistake.

### f. New Evidence

**\*7**  Pokluda's final Due Process argument is that the Appeals Council failed to discuss her new evidence in any "meaningful way." (Dkt. No. 10, at pp. 7–8). While Due Process requires that administrative adjudicators consider all relevant evidence properly adduced at an administrative hearing, it does not guarantee consideration of evidence not

presented until after an administrative law judge issues a decision. Indeed, Congress acted in 1980 to limit the power of district courts to order remands for 'new evidence' in Social Security cases." *See Melkonyan v. Sullivan,* 501 U.S. 89, 100–01, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991). Reviewing courts now may order that additional evidence be taken before the Commissioner:

> only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

42 U.S.C. § 405(g).

Consistent with the 1980 Amendment, the Commissioner promulgated a regulation relating specifically to Appeals Council review of new evidence. In addition to requiring that evidence be new and material, the regulation provides:

> (b) ... if new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision.*

20 C.F.R. §§ 404.970(b), 416.1470(b) (emphasis added).

Here, Pokluda's brief filed in support of review with the Appeals Council described the proposed new evidence as *"up-to-date* and new records" (emphasis added) from Dr. Craig (Gail Casals, FNP) for "office visits 1/30/12 through 9/24/12) (15 pp)" and a sleep study performed 5/12/12 by Dr. Shoharani Sundaram, M.D., which confirmed "mild sleep disordered breathing." (T. 218). He suggested that such records were consistent with complaints of "fatigue, loss of concentration, and headaches" and a "recognized risk considering [claimant's] struggle with morbid obesity." (*Id.*).

When denying Pokluda's request for review, the Appeals Council acknowledged receipt of her counsel's brief and the additional medical evidence. Specifically, the Appeals Council noted that it *considered* some additional evidence

listed on an enclosed Order with the entire record. (T. 2, 6). [16] The Appeals Council then explained that it had *looked* at other evidence that did not warrant further review because:

[16]     In this regard, the Order of Appeals Council provides:
The Appeals Council had *considered* additional evidence which it is making part of the record. That evidence consists of the following exhibits:
   Exhibit 11E Representative Brief from Stephen J. Mastaitis dated November 4, 2012
   Exhibit 9F Medical Report from Clifton Family Health dated September 8, 2011
   Exhibit 10F Medical Records from Seton Health for Women dated January 2, 2009 through December 27, 2010
(T. 6; see also 324, 325–331). Additionally, in its denial of review, the Appeal Council also noted that it *looked* at the following:
   medical records from Clifton Park Family Health dated January 30, 2012 to September 4, 2012; laboratory results from St. Mary's Hospital dated April 23, 2012; diagnostic sleep study dated May 2, 2012; and medical records from Seton Health for Women dated April 23, 2012 through October 1, 2012.
(T. 2).

The Administrative Law Judge decided your case through September 21, 2011. *This new information is about a later time.* Therefore, it does not affect the decision about whether you were disabled beginning on or before September 21, 2011.

> If you want us to consider whether you were disabled after September 21, 2011, you need to apply again. We are returning the evidence to you to use in your new claim.

(T. 2) (emphasis added).

The Appeals Council gave an adequate reason for not giving the new evidence further consideration, and there is no basis to conclude that Pokluda was deprived of due process of law in the Appeals Council's treatment of that evidence.

### 2. *Equal Protection* [17]

[17]     The Fourteenth Amendment provides that no *state* shall deny to any person with its jurisdiction "the equal protection of the laws." U.S. Const. amend XIV. By its terms, the Equal Protection clause restrains only state governments. Nonetheless "there is a well-established equal protection component to the Fifth Amendment Due

Process Clause applicable to the federal government." *Skelly v. I.N.S.,* 168 F.3d 88, 91 (2d Cir.1999) (citing *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Furlong v. Shalala,* 156 F.3d 384, 392 (2d Cir.1998)). Equal protection claims under the Fifth amendment are treated virtually the same as those under the Fourteenth amendment. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 542 n. 21, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987).

**\*8** Pokluda's brief does not articulate any argument that specifically invokes the Equal Protection Clause. She does not claim that she is a victim of selective enforcement or application of the law, or that she was treated differently from others similarly situated on an impermissible ground, or that the Commissioner acted with malicious or bad faith intent to injure. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice to state a[n] [equal protection] claim on which relief can be granted." *Martine's Serv. Ctr., Inc. v. Town of Wallkill,* ––– Fed. App'x ––––, No. 13–1604–cv, 2014 WL 321943, at \*2 (2d Cir. Jan.30, 2014) (summary order) (internal citations and quotations omitted).

The record is devoid of any Equal Protection concerns. Rather, ALJ Mandry followed the same sequential evaluation procedure as is employed in all cases, citing and following the regulations and rulings that govern all cases.

There is no Equal Protection error.

### B. Substantial Evidence Challenges–Residual Functional Capacity

Pokluda proffers arguments in scattergun fashion, some amplified, others conclusory. In the second segment of her argument (titled "The ALJ Failed to Properly Consider The Claimant's Obesity and Mental Health Impairments"), Pokluda complains that obesity and mental impairments were ignored or improperly assessed. In the third segment (titled "Sara Pokluda Is Not Capable Of Sustained Substantial Gainful Activity") she makes a similar argument regarding ALJ Mandry's credibility assessment of Pokluda's subjective testimony. At bottom, all these points relate analytically to ALJ Mandry's findings of Step 2 impairment severity and of residual functional capacity that preceded Step 4.

#### 1. *Obesity*

Pokluda cites to various progress notes that incidentally record gradually increasing weight from 187 pounds in April,

2008; 199 pounds in April, 2009; and, 220 pounds in August, 2010. (T. 260, 249, 310). She then cites cases and an internal ruling for the proposition that administrative law judges have a duty to discuss effects of obesity on individuals' abilities to perform basic work activities. Finally, Pokluda correctly observes that ALJ Mandry did not mention or discuss her obesity at any step of the sequential evaluation process, either separately or in conjunction with other impairments.

While obesity is not in and of itself a disability, an administrative law judge should consider whether obesity, in combination with other impairments, prevents a claimant from working. *See* SSR 02–1p: TITLES II AND XVI: EVALUATION OF OBESITY, 2000 WL 33952015 (S.S.A. May 15, 2000). Here, however, it is important to factor that Pokluda did not claim disability based on obesity. Also, no medical source diagnosed Pokluda's obesity as a distinct medical condition, nor did any medical source find or opine that Pokluda's obesity is a significant factor relative to her ability to perform basic work activities. Pokluda's brief points to potential effects, but identifies no discrete item of evidence documenting that such effects exist presently.

**\*9** Under this circumstance, ALJ Mandry was under no duty to discuss Pokluda's obesity, and the omission of that discussion was not error. *See Farnham v. Astrue,* 832 F.Supp.2d 243, 261 (W.D.N.Y.2011). Indeed, there was nothing to discuss. And, in any event, the omission was of no moment because ALJ Mandry's residual functional capacity assessment limited Pokluda to performing work only at the light exertional level. *See Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir.2004) (when an administrative law judge's decision adopts the physical limitations suggested by reviewing doctors after examining the claimant, obesity is understood to have been factored into their decisions). Pokluda's brief does not identify any potential limitations occasioned by her obesity that were not subsumed and already taken into account by ALJ Mandry's residual functional capacity finding. Under these circumstances, ALJ Mandry's failure to explicitly address Pokluda's obesity does not warrant remand. *See Rutherford v. Barnhart,* 399 F.3d 546, 552–53 (3d Cir.2005); *Skarbek,* 390 F.3d at 504.

#### 2. *Mental Impairment*

ALJ Mandry did discuss Pokluda's mental impairment (mood disorder), and specifically found that it is not a severe impairment because it causes no more than minimal limitations in her ability to perform basic mental work activities. (T. 20). Pokluda argues that in a consultative

psychiatric evaluation, Dr. Brett Hartman, Psy.D. found multiple symptoms consistent with Listing 12.04. (Dkt. No. 10, p. 14). In her brief, Pokluda calls them "findings." (*Id.*).

ALJ Mandry's decision reflects that she applied a "special technique" that the Commissioner mandates for determining at Step 2 whether mental impairments are severe.[18] (T. 20). ALJ Mandry considered the four broad functional areas for evaluating mental disorders, known as "paragraph B" criteria, finding Pokluda had no limitations in the areas of activities of daily living, social functioning, and concentration, persistence or pace. (*Id.*). She further found that Pokluda had experienced no episodes of decompensation which had been of extended duration. (*Id.*). Consequently, there is no question that ALJ Mandry was aware of and did apply correct principles of law when evaluating Mandry's mood disorder.

[18]   When mental impairments are present, determinations of functional limitations stemming therefrom are accomplished in the aftermath of application of a "special technique" set out in 20 C.F.R. § 404.1520a(b)-(e), 416.920a(b)-(e); *see also Kohler v. Astrue,* 546 F.3d 260, 265–66 (2d Cir.2008) (describing analysis).

Although severity of mental impairments is evaluated under a complex and abstruse "special technique," the bottom-line issue is the same as for physical impairments, *i.e.,* whether it causes more than minimal limitations in ability to perform basic work activities. ALJ Mandry determined that Pokluda's mood disorder does not cause more than minimal limitation in Pokluda's ability to perform basic mental work activities; thus, ALJ Mandry found it to be non-severe. (T. 20).

Pokluda points to no medical evidence to the contrary. She relies on Dr. Hartman's consultative psychiatric evaluation, but a review of that evaluation demonstrates that what Pokluda's brief characterizes as medical "findings" was mere dictation of what Pokluda complained of by history. (T. 319).

**\*10**  Finally, lack of a severe mental impairment finding is of no particular significance here. ALJ Mandry found that other disorders (fibromyalgia and migraine headaches) constitute severe impairments, and then conducted a full, 5–step sequential analysis.[19] ALJ Mandry expressly acknowledged that, in those subsequent steps, she was required to consider *all* impairments, *including impairments that are not severe.* (T. 18). And, importantly, her residual functional capacity finding accounts for *functional effects* of a mild mood disorder. ALJ Mandry's residual functional capacity

assessment limits Pokluda to work involving simple and repetitive tasks. This limitation is relevant to diminished mental residual functional capacity. *See* 20 C.F.R. §§ 404.1545(c), 416 .945(c). Thus, ALJ Mandry effectively took into consideration all of Pokluda's impairments, including mood disorder when developing her residual functional capacity assessment.

[19]   *See Stanton v. Astrue,* 370 Fed. App'x 231, 233 n. 1 (2d Cir.2010) (summary order) (noting, in *dicta,* no reversible error in finding disc herniation non-severe because administrative law judge identified other severe claims at Step 2 so that claim proceeded though the sequential evaluation process and all impairments were considered in combination); *see also McCartney v. Commissioner of Soc. Sec.,* Civil Action No. 07–1572, 2009 WL 1323578, at *16 (W.D.Pa. May 8, 2009) ("Even if the Court was (*sic* ) to find that the ALJ did err in excluding headaches from the list of severe impairments, any such error was harmless because the ALJ found other severe impairments at step two and proceeded through the sequential evaluation on the basis of Plaintiff's severe and non-severe impairments.").

There is no legal or evidentiary error with respect to ALJ Mandry's treatment of Pokluda's mental impairment.

### 3. *Subjective Testimony*

ALJ Mandry summarized Pokluda's subjective testimony as follows:

The claimant testified that she is currently working 2 to 4 hours a day and has been working since December 2010, one day a week, since her father died. She drives to different places and delivers Penny savers invoices. This involves getting in and out of the car and walking, and a small amount of heavy lifting. Her mother and boyfriend help her and she splits expenses. She stated that she earns $200–$230 a week. She also indicated that she stopped working starting this month. She stated that she relates well with family members and reports that she spends her days watching television, going on the Internet, playing video games, doing light household chores, and taking care of her cat.

* * *

She further testified that she is able to walk for 30 minutes to 1 hour but standing still is hard. The claimant added that she was glad that she is able to work one day a week but

that she could not perform in a regular job because she wold have to miss too many days of work because of her unpredictable migraines and other conditions.

(T. 22–23).

ALJ Mandry weighted this evidence as follows:

> I have considered the objective evidence and subjective factors and find that there is little evidence of limitations on file. Her complaints of pain and other symptoms as stated in the hearing and on the record, find little support. She complained of pain mostly in her hips, knees, fingers and wrists. The consultative examination, however, did not find any limitations in musculoskeletal movement, joints were non-tender and not swollen. The only findings were a few trigger points in the neck, shoulder, and back. The laboratory results as she alleged was not documented and they are controlled with medications. At the consultative examination, she informed that the frequency was 1–2 per month, but at the hearing she stated the frequency was 3–4 monthly, however, as indicated previously, there are no supporting documents to explain her inconsistency. She stated that the headaches occur when she gets overheated and is exposed to fluorescent lights, if she avoids such triggers, she experiences a headaches less frequently. As for the alleged depression, there is no evidence of psychiatric treatment. As indicate above, she stated that she is currently working several hours a week, one day a week, but needs help from the mother and her boyfriend.

**\*11**  (T. 23–24).

### a. Asserted Error

Pokluda's complaint about ALJ Mandry's treatment of the subjective evidence is not very clear. At one point, she claims that ALJ Mandry "completely failed to analyze and discuss the claimant's credible testimony." (Dkt. No. 10, p. 19). Elsewhere, she appears to argue inherent error due to failure to discuss her mood disorder; and, had there been such discussion, it would reveal that Pokluda has "moderate" functional limitations in the areas of concentration, persistence or pace along with frequent headaches that limit her ability to complete a normal work day or work week, which, in turn, would preclude sustained employment. (Dkt. No. 10, pp. 14–15).

### b. Governing Rules

Testimony from claimants regarding persistence, intensity and limiting effects of symptoms is not only relevant, but desirable. On the other hand, it is subjective and may be colored by interest in obtaining a favorable outcome. An administrative law judge must, therefore, engage in a difficult task of deciding how much weight to give claimants' subjective self-evaluations.

The Commissioner provides explicit guidance. First, a formally promulgated regulation requires consideration of seven objective factors that naturally support or impugn subjective testimony of disabling pain and other symptoms.[20] Second, an interpretive ruling directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain:

[20]  An administrative law judge must evaluate a claimant's symptoms, including pain, based on medical and other evidence, including the following factors:
(i) claimant's daily activities;
(ii) location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii) precipitating and aggravating factors;
(iv) type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v) treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi) measures claimant uses or has used to relieve pain or other symptoms; and
(vii) other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

See 20 C.F.R. §§ 404.1529(c), 416.929(c).

First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) ... that could reasonably be expected to produce the individual's pain or other symptoms ....

Second, ... the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities ....

SSR 96–7p, TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, 1996 WL 374186, at *2 (July 2, 1996). The Ruling further provides that "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.*

Circuit law generally mirrors the Commissioner's Ruling. Thus, when an ALJ rejects a claimant's testimony of pain and limitations, he or she must provide explicit reasons for rejecting the testimony. *See Williams v. Bowen,* 859 F.2d 255, 260–61 (2d Cir.1988); *Carroll v. Secretary of Health & Human Servs.,* 705 F.2d 638, 643 (2d Cir.1983).

*c. Application*

Pokluda's claim that ALJ Mandry completely failed to analyze and discuss the claimant's credibility is without merit. ALJ Mandry, citing 20 C.F.R. §§ 404.1529, 416.929, SSR 96–4p, and SSR 96–7p, acknowledged all regulations and rulings that govern consideration of subjective evidence. (T. 21). She expressly referenced the two-step process for considering subjective symptoms. (*Id.*). These recitations document her awareness of and intent to apply correct legal principles.

**\*12** ALJ Mandry's decision reflects that she then considered objective factors identified in the Regulation to the extent there was evidence thereof. She summarized the medical evidence regarding mental and physical issues. (T. 21–24). Such evidence (portions of which are reported in note 22, *infra* ) encompassed all regulatory objective factors. Next, ALJ Mandry engaged in the two-step process as required by the applicable Ruling,[21] and articulated specific reasons for

finding Pokluda's subjective complaints not fully credible, all as required by circuit law. Thus, there is no legal error in ALJ Mandry's approach to assessing credibility of Pokluda's subjective testimony regarding persistence, intensity and limiting effects of her symptoms.

[21]  ALJ Mandry engaged in the two-step process, finding:
    I have considered the objective evidence and subjective factors and find that there is little evidence of limitations on file. Her complaints of pain and other symptoms as stated in the hearing and on the record, find little support. She complained of pain mostly in her hips, knees, fingers and wrists. The consultative examination, however, did not find any limitations in musculoskeletal movement, joints were non-tender and not swollen. The only findings were a few trigger points in the neck, shoulder, and back. The laboratory results as she alleged was not documented and they are controlled with medications. At the consultative examination, she informed that the frequency was 1–2 per month, but at the hearing she stated the frequency was 3–4 monthly, however, as indicated previously, there are no supporting documents to explain her inconsistence. She stated that the headaches occur when she gets overheated and is exposed to fluorescent lights, if she avoids such triggers, she experiences a headaches less frequently. As for the alleged depression, there is no evidence of psychiatric treatment. As indicate above, she stated that she is currently working several hours a week, one day a week, but needs help from the mother and her boyfriend.
    (T. 23–24).

To the extent that Pokluda complains that ALJ Mandry failed to discuss her mood disorder and any resulting limitations, she again is mistaken. ALJ Mandry notably considered the symptoms of depression (*e.g.,* sadness, crying spells, loss of energy, hopelessness, loss of interests, irritability, panic-like symptoms, including palpitations, chest pressure, trembling, *etc.*) that Pokluda reported to psychiatrist Dr. Brett T. Hartman during a consultative psychiatric evaluation. (T. 22).[22] And, importantly, ALJ Mandry factored the opinions of Dr. Hartman and Dr. Serrano related to Pokluda's mood disorder into her residual functional capacity assessment to include that she can perform simple and repetitive jobs/tasks, follow and understand directions, respond and adapt to changes, and make job-related decisions. (T. 20).

[22]  ALJ Mandry also noted that Dr. Hartman's examination found her memory, attention and concentration were

intact. (T. 22). She further observed that Dr. Hartman's finding that Pokluda has mild attention and concentration problems and mild difficulty performing complex tasks independently; she has mild-to-moderate difficulty maintaining a regular schedule and relating adequately with others; and, moderate difficulty dealing appropriately with normal stressors in life. (*Id.*).

Additionally, ALJ Mandry considered the testimony of medical expert, Dr. Serrano. (T. 23). She observed that Dr. Serrano testified that the record suggests a diagnosis of dysthymic disorder, which is a mild form of depression, as per Dr. Hartman's evaluation and that there was no other evidence in the file. (*Id.*). It was stated that Pokluda has no problems with concentration or activities of daily living. She can perform simple tasks and is able to learn new tasks. (*Id.*). Dr. Serrano stated that Pokluda's condition either singly or combination did not meet of equal a Listing. (*Id.*). Finally, it was noted that Pokluda could have some problems with irritability, but there would be no problems with concentration or with activities of daily living from the mental point of view. (*Id.*).

Taking the foregoing into consideration as well as ALJ Mandry's undisputed finding that Pokluda has not sought or received any medical treatment for a mental condition, it is clear that ALJ Mandry amply considered and discussed Pokluda's mood disorder.

### C. Challenge to Step 5 Finding of Ability to Perform Other Work

Pokluda advances two arguments supporting her contention that substantial evidence does not support ALJ Mandry's Step 5 finding that she retains residual functional capacity for alternative and available work.

#### 1. Medical–Vocational Guidelines

Pokluda first argues that reliance on the Medical–Vocational Guidelines (the "grids") to determine whether she can perform other available work was improper because her exertional limitations are compounded by nonexertional limitations. (Dkt. No. 10, p. 13).

#### a. The "Grids"

At Step 5 of sequential disability analysis, administrative law judges determine whether claimants, despite their impairments, can still do work existing in the national economy. At this stage, the burden rests with the Commissioner.

Generally, administrative law judges elicit or consult expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. In some circumstances, however, they may take administrative notice of disability *vel non* by adopting and applying findings published in "Medical–Vocational Guidelines," commonly called "the grids." [23] *See Roma v. Astrue,* 468 Fed. App'x 16, 20–21 (2d Cir.2012) (summary order); *Bapp v. Bowen,* 802 F.2d 601, 604 (2d Cir.1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[23]     The Medical–Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. They "take into account a claimant's residual functional capacity, as well as her age, education, and work experience." *Calabrese v. Astrue,* 358 Fed. App'x 274, 276 & n. 1 (2d Cir.2009) (summary order) (citing *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999)). When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater,* 915 F.Supp. 662, 667 & n. 2 (S.D.N.Y.1996) (citing 20 C.F.R. § 404.1567(a)).

**\*13** When only exertional impairments are in play, [24] and findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, administrative law judges may directly apply the grids to determine whether work exists in the national economy which claimants can perform. *See Martin v. Astrue,* 337 Fed. App'x 87, 91 (2d Cir.2009) (summary order); *Thompson v. Barnhart,* 75 Fed. App'x 842, 844 (2d Cir.2003) (summary order) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[24]     An "exertional limitation" is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only a claimant's ability to meet the strength demands of jobs (*i.e.,* sitting, standing, walking, lifting, carrying, pushing, and pulling). 20 C.F.R. §§ 404.1569a(b), 416.969a(b).

Grid rules cannot be applied directly when residual functional capacity findings do not coincide with all grid criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. And, since the grids do not take into account limiting or disabling effects of nonexertional impairments, [25] direct application of the grids to determine disability is not appropriate

when claimants' nonexertional impairments have more than a negligible impact on their ability to perform a full range of work. *See Selian v. Astrue,* 708 F.3d 409, 421 (2d Cir.2013) (quoting *Zabala v. Astrue,* 595 F.3d 402, 411 (2d Cir.2010)). In such instances, additional, extrinsic evidence from a vocational expert or equivalent source is required. *Id.* Nonetheless, the grids may still be applied directly when nonexertional limitations only slightly erode the sedentary occupational base. *See* SSR 96–9p, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed.Reg. 34478, 34481 (July 2, 1996).

25      "Nonexertional limitations" are "limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect [ing] only your ability to meet ... demands of jobs other than ... strength demands ...." *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Therefore, a nonexertional limitation is an impairment caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional. SSR 96–9p, DETERMINING CAPABILITY TO DO OTHER WORK, IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, 61 Fed.Reg. 34478, 34481 (July 2, 1996).

### b. Application

ALJ Mandry looked to the grids, and determined that Pokluda's exertional impairments alone do not qualify for a finding of "disabled." (T. 25–26). She did not, however, rely solely on the grids. Rather, she used them as an analytical framework only, and received and relied on additional evidence, *i.e.,* testimony from vocational expert, Dr. Puig, with respect to the effect of additional nonexertional limitations. (*Id.*). Dr. Puig testified that a person with Pokluda's residual functional capacity and limitations (exertional and nonexertional) can perform requirements of light and unskilled occupations such as parking lot attendant and parking lot signaler. (T. 67–68). Thus, Pokluda's argument suggesting inappropriate reliance on the grids is unavailing.

### 2. Headaches

Second, Pokluda maintains that her headaches would preclude any finding that she can engage in alternative employment. (*Id.,* at 16). This argument, however, is not borne out by evidence of record. First, the frequency of migraines as alleged is not documented, and medical evidence indicates they are controlled with medications. (T. 23, 57–58, 307). The medical experts, Dr. Morales (physical) and Dr. Serrano (psychological) testified that Pokluda's conditions did not substantiate a condition either singly or in combination that would preclude the performance of all types of work activities. (T. 56, 62,). Additionally, Dr. Puig testified that a person with Pokluda's limitations would not be precluded from all work.

**\*14** Second, Pokluda admitted at the evidentiary hearing that when she avoids triggers (*e.g.,* fluorescent lights and overheating), she suffers headaches between only one to three times a month.[26] (T. 42). Giving Pokluda the benefit of the doubt, ALJ Mandry incorporated these restrictions (limited work under fluorescent lights and limited or no exposure to environmental triggers) into her residual functional capacity assessment that the vocational expert considered when expressing opinions regarding alternative, light work, unskilled jobs that Pokluda can perform. (T. 20). Consequently, substantial evidence supports ALJ Mandry's finding that Pokluda would be able to perform substantial gainful activity. *See Mancuso v. Astrue,* 361 Fed. App'x 176, 179 (2d Cir.2010) (summary order) (citing *Dumas v. Schweiker,* 712 F.2d 1545, 1553–54 (2d Cir.1983)); *see also Butts v. Barnhart,* 388 F.3d 377, 384 (2d Cir.2004).

26      Pokluda reported during an internal medicine consultative examination that she has a history of headaches up to two times a month. (T. 307). ALJ Mandry noted that there were no supporting documents to explain her inconsistency. (T. 24).

### VI. Recommendation

Pokluda's request to remand this action should be DENIED. The Commissioner's decision should be AFFIRMED.

### VII. Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Graham v. City of New York,* 443 Fed. App'x 657, 658 (2d Cir.2011) (summary order); *FDIC v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the *21* day of *March* 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1679801

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2986393
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Janea L. GRANT, Plaintiff,
v.
Michael J. ASTRUE, [1] Commissioner
of Social Security, Defendant.

[1]  Michael J. Astrue became Commissioner of Social
Security on February 12, 2007. Pursuant to Federal
Rule of Civil Procedure 25(d)(1), Michael J. Astrue
is substituted as the Defendant in this suit.

No. 5:05-CV-1138 (LEK/DRH).
|
July 31, 2008.

**Attorneys and Law Firms**

Howard Olinsky, Olinsky, Shurtliff Law Firm, Syracuse, NY,
for Plaintiff.

Karen M. Ortiz, Stephen P. Conte, Social Security
Administration Office of Regional General Counsel, New
York, NY, William H. Pease, Office of the United States
Attorney, Syracuse, NY, for Defendant.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

## I. BACKGROUND

### A. Procedural History

**\*1** Plaintiff Janea L. Grant ("Plaintiff") filed applications
for Disability Insurance Benefits ("DIB") and Supplemental
Security Income ("SSI") on July 1, 2003. Administrative
Transcript ("AT") 52-54, 206-08. The applications were
denied initially. AT 40-46. A request was made for a hearing.
AT 47. A hearing was held before an Administrative Law
Judge ("ALJ") on June 14, 2004. AT 223-76. In a decision
dated November 5, 2004, the ALJ found that Plaintiff is not
disabled. AT 19-30. The Appeals Council denied Plaintiff's
request for review on August 12, 2005. AT 5-8. Plaintiff
commenced this action on September 9, 2005 pursuant to 42

U.S.C. § 405(g), seeking review of the Commissioner's final
decision. Dkt. No. 1.

### B. Contentions

Plaintiff makes the following claims:

(1) Plaintiff failed to make a knowing and voluntary waiver
of her right to representation and consequently suffered
prejudice. Dkt. No. 7 at 11-15.

(2) The residual functional capacity ("RFC") assessment is
not supported by substantial evidence and does not comply
with Social Security Ruling ("SSR") 96-8p. Dkt. No. 7 at
15-17.

(3) The vocational expert's testimony does not constitute
substantial evidence. Dkt. No. 7 at 18-20.

(4) The ALJ failed to fulfill his duty under SSR 00-4p to
ensure that the vocational expert's testimony was consistent
with the *Dictionary of Occupational Titles* ("DOT"). Dkt. No.
7 at 20-21.

Defendant argues that the Commissioner's determination is
supported by substantial evidence in the record, and must be
affirmed. Dkt. No. 13.

### C. Facts

Plaintiff was twenty-six years old at the time of the hearing.
AT 229. Plaintiff has her high school degree and completed
one semester of college. AT 71, 268. Plaintiff's past work
experience includes working as, *inter alia,* a toll collector and
a retail store customer service worker. AT 66. Plaintiff alleges
that she became unable to work on October 23, 2002. AT
65. She alleges disability due to back problems, depression, a
vitamin deficiency, foot problems, and a "body infection." *Id.*

#### 1. Treating Sources

From January 27, 2003 to May 18, 2004, Plaintiff was
treated on several occasions by various physicians at Upstate
Medical Center. AT 149-62, 199-204. She was treated for
abdominal pain, vitamin B 12 deficiency, neuropathy, plantar
fascitis, and depression. *Id.* Plaintiff was prescribed various
medications and stretching exercises, and received Vitamin
B12 shots and heel inserts. *Id.*

While treating at Upstate Medical Center, Plaintiff saw Ambreen Qureshi, M.D. on several occasions. AT 149-52, 199-200. In a "Physician's Statement for Determination of Employability" form, which was completed by Dr. Qureshi on October 7, 2003, Dr. Qureshi indicated that Plaintiff is unable to participate in "employment participation activities" due to depression and "back problems." AT 197-98. Dr. Qureshi also indicated that Plaintiff's impairment lasted or is expected to last for one year or more. AT 198. However, on May 18, 2004, Dr. Qureshi noted that Plaintiff "does not seem clinically depressed." AT 200.

**\*2** From April 8, 2004 to May 11, 2004, Plaintiff saw Dr. James P. Walzer, a chiropractor, [2] with complaints of pain in the neck and back. AT 188-94. Dr. Walzer noted that Plaintiff showed decreased range of motion and subluxation. AT 188-91. Plaintiff's treatment consisted of "hydrocollator and adjustment." *Id.*

[2]     Dr. Walzer's speciality is not stated clearly in his progress notes. However, Plaintiff stated that she received "chiropractic treatment" from Dr. Walzer. Dkt. No. 7 at 7.

The record contains a note from Companion Chiropractic Health Center dated May 5, 2004. AT 195. The note states that Plaintiff was totally incapacitated from April 8, 2004 to May 12, 2005. *Id.* The note is signed by "JPW/LF." *Id.*

### 2. Examining Sources

On October 3, 2003, Plaintiff underwent a consultative psychiatric examination by Jeanne Shapiro, Ph.D. AT 139-43. Dr. Shapiro diagnosed Plaintiff as suffering from depressive disorder not otherwise specified. AT 142. Dr. Shapiro noted that Plaintiff may have "some difficulty regularly attending to a routine and maintaining a schedule due to fatigue, lack of motivation, and lethargy." *Id.*

Also on October 3, 2003, Plaintiff underwent a consultative orthopedic examination by Amado Santos, M.D. AT 144-47. Dr. Santos found "no restrictions with physical activities except probably [a] mild restriction with prolonged sitting because of the low back pain or prolonged standing and walking because of her still[-]active plantar fasciitis." AT 147. An x-ray of Plaintiff's lumbar sacral spine showed that the disc space at L5-S1 is narrowed. AT 146; *see* AT 148.

### 3. Non-Examining Sources

The record contains a Physical RFC Assessment Form completed by M. McNaughton, a disability analyst, on October 29, 2003. AT 163-69; *see* AT 40. The form indicates that Plaintiff is able to lift and carry fifty pounds occasionally; lift and carry twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday. AT 164.

The record also contains a Psychiatric Review Technique form, which was completed by Carlos Gieseken, M.D., a review physician, on November 5, 2003. AT 170-83. Dr. Gieseken indicated that Plaintiff has a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of deterioration. AT 180.

Dr. Gieseken and M. McNaughton also completed a Mental RFC Assessment Form. AT 184-86. The form indicates that Plaintiff is limited moderately in several mental abilities. AT 184-85.

The record also contains an undated statement from Suzanne Skibinski, P.T., indicating that Plaintiff has been undergoing aquatic therapy for her "injuries" and chronic back pain. AT 196. Ms. Skibinski noted that Plaintiff's treatment "is going to last more than a year, due to the severity of her knee and back pain." *Id.*

## II. DISCUSSION

### A. Disability Standard

To be considered disabled, a plaintiff seeking DIB or SSI benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> **\*3** physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate claims.

First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982); see 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. Berry, 675 F.2d at 467 (citations omitted).

In this case, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since the alleged onset date. AT 23. At the second step, the ALJ determined that Plaintiff's back pain and depression are severe impairments. AT 26. At the third step, the ALJ concluded that those impairments neither met nor equaled any impairment listed in Appendix 1 of the regulations. *Id.* At the fourth step, the ALJ found that Plaintiff retains the RFC to perform a limited range of light work and then found that Plaintiff is unable to perform her past jobs. AT 27. At the fifth step, the ALJ considered the testimony of a vocational expert and concluded that Plaintiff is capable of performing work that exists in significant numbers in the national economy. AT 29. The ALJ therefore concluded that Plaintiff was not disabled. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992) (citing, *inter alia, Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir.1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson,* 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler,* 728 F.2d 582, 587 (2d Cir.1984).

*4 A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan,* 923 F.2d 964, 967 (2d Cir.1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Williams on behalf of Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842

(1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams,* 859 F.2d at 258 (citations omitted). However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir.1972); *see also Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982), cert. denied, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983).

### C. Knowing and Voluntary Waiver of Representation

Plaintiff argues that she failed to receive adequate written or verbal notice of her right to have representation at the hearing. Dkt. No. 7 at 11. She claims that this lack of notice rendered her waiver ineffective and prejudiced her case. *Id.* Defendant argues that Plaintiff knowingly waived her right to a representative at the hearing and was not prejudiced. Dkt. No. 13 at 17-21.

Claimants have a statutory right to notification of their options for obtaining legal representation in SSI and DIB claims. 42 U.S.C. §§ 406(c), 1383(d)(2)(B) ("The Commissioner of Social Security shall notify each claimant in writing, together with the notice to such claimant of an adverse determination, of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security. Such notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge."); *see also* 20 C.F.R. §§ 404.1706, 416 .1506 ("[W]e will include with the notice of that determination or decision information about your options for obtaining an attorney to represent you in dealing with us. We will also tell you that a legal services organization may provide you with legal representation free of charge if you satisfy the qualifying requirements applicable to that organization."). "Once a claimant is provided with adequate notice of his right to counsel, he may effectively waive the option to proceed with counsel in writing or orally before the judge." *Vaughn v. Apfel,* No. 98 Civ. 0025(HB), 1998 WL 856106, at *4 (S.D.N.Y. Dec.10, 1998) (citing *Frank v. Chater,* 924 F.Supp. 416, 423 (E.D.N.Y.1996)); *see*

*also Osorio v. Barnhart,* No. 04 Civ. 7515(DLC), 2006 WL 1464193, at *8 (S.D.N.Y. May 30, 2006).

**\*5** Even if an ALJ does not sufficiently inform a plaintiff of his/her rights, the lack of counsel, in and of itself, is not a sufficient ground upon which remand or reversal may be based. *Alvarez v. Bowen,* 704 F.Supp. 49, 53 (S.D.N.Y.1989). Plaintiff must show prejudice or unfairness in the proceeding. *See Evangelista v. Sec'y of Health and Human Servs.,* 826 F.2d 136, 142 (1st Cir.1987); *Osorio,* 2006 WL 1464193, at *9; and *Colondres v. Barnhart,* No. 04 Civ. 1841(SAS), 2005 WL 106893, at *5 (S.D.N.Y. Jan.18, 2005).

In this case, Plaintiff received several notices informing her of her right to representation. First, in the initial notice of denial of Plaintiff's application dated November 7, 2003, the notice states the following:

### If You Want Help With Your Appeal

You can have a friend, lawyer, or someone else help you. There are groups that can help you find a lawyer or give you free legal services if you qualify. There are also lawyers who do not charge unless you win your appeal. Your local Social Security office has a list of groups that can help you with your appeal.

If you get someone to help you, you should let us know. If you hire someone, we must approve the fee before he or she can collect it. And if you hire a lawyer, we will withhold up to 25 percent of any past due Social Security benefits to pay toward the fee. We do not withhold money from SSI benefits to pay your lawyer.

AT 43 (emphasis in original). The letter then provides a toll free telephone number for Plaintiff to call with any questions, as well as the telephone number and address of the local Social Security office. AT 44.

Second, in the form requesting a hearing by an ALJ, the following statement is printed: "I understand I have a right to be represented at the hearing." AT 47. Plaintiff signed the request and dated it November 13, 2003. *Id.*

Third, the record includes a May 5, 2004 Notice of Hearing letter from the ALJ to Plaintiff. AT 34-38. The letter advises Plaintiff of the following:

### You May Choose To Have a Person Represent You

If you want to have a representative, please get one right away. You should show this notice to anyone you may appoint. You or that person should also call this office to give us his or her name, address, and telephone number.

AT 35 (emphasis in original).

Fourth, the record contains a second letter dated May 5, 2004 from the ALJ to Plaintiff. AT 39. The letter advises Plaintiff of the following:

Your file indicated that legal counsel does not represent you. We are enclosing our leaflet, "Social Security and Your Right to Representation." The information provided in this leaflet could assist you in obtaining representation if you so desire.

*Id.*

Fifth, the following exchange took place at the hearing:

ALJ: The first thing I want to discuss with you is you know you have the right to have an attorney or another person help you with your case.

**\*6** Plaintiff: Uh-huh.

ALJ: But you want to go ahead and proceed today without representation?

Plaintiff: Uh-huh.

ALJ: All right. You'll have to say yes or no.

Plaintiff: Yes.

AT 225.

Based on the foregoing, the Court finds that Plaintiff received adequate notice of the right to representation. Plaintiff was provided with numerous written notices of her right to representation and a leaflet regarding the right to representation, and was informed of the right in person at the hearing. Also, Plaintiff signed the Request for a Hearing form that indicates that she understood her right to representation. AT 47. Moreover, Plaintiff knowingly and voluntarily waived this right based on the statements she made at the hearing. AT 47; *see Vaughn,* at 1998 WL 856106, at \*4 ("Once a claimant is provided with adequate notice of his right to counsel, he may effectively waive the option to proceed with counsel ... orally before the judge."). Therefore this claim is unavailing.

**D. Duty to Develop Record**

Plaintiff argues that the ALJ's "inquiry into the relevant facts was less than scrupulous and conscientious." Dkt. No. 7 at 15. Defendant argues that the ALJ "complied with his duty to develop [P]laintiff's claim and to provide her with a full and fair hearing." Dkt. No. 13 at 21.

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996) (citing *Echevarria v. Sec'y of HHS,* 685 F.2d 751, 755 (2d Cir.1982)). This duty is heightened when a claimant appears *pro se. See Devora v. Barnhart,* 205 F.Supp.2d 164, 172 (S.D.N.Y.2002) (citing *Cullinane v. Sec'y of HHS,* 728 F.2d 137, 139 (2d Cir.1984) (finding that remand for new hearing was appropriate where ALJ failed to assist pro se litigant in securing all relevant medical testimony)). The regulations describe this duty by stating that, "[b]efore we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources ...." 20 C.F.R. §§ 404.1512(d), 416.912(d). The duty of an ALJ to develop the record is "particularly important" when obtaining information from a claimant's treating physician due to the "treating physician" provisions in the regulations. *Devora,* 205 F.Supp.2d at 172. The regulations thus provide that, "[w]hen the evidence we receive from your treating physician ... is inadequate for us to determine whether you are disabled, ... [w]e will first recontact your treating physician ... to determine whether the additional information we need is readily available." 20 C.F.R. §§ 404.1512(e), 416.912(e).

Here, the ALJ had a heightened duty to develop the record in light of Plaintiff's *pro se* status. *See Devora,* 205 F.Supp.2d at 172 (citations omitted).

**1. Plaintiff's Therapist**

**\*7** Plaintiff argues that the ALJ erred by failing to obtain records from her therapist. Dkt. No. 7 at 14. Defendant argues that the ALJ attempted to obtain records from Plaintiff's therapist, but was unable to do so "possibly because [P]laintiff saw a different therapist than the one she identified to the ALJ." Dkt. No. 13 at 20.

First, the record contains a form dated April 20, 2004 in which Plaintiff indicated that she was treated or examined by "Dr.

Judy Gibson" on April 14, 2004. AT 128. The record also shows that an "Information Request" was sent to Dr. Gibson, requesting all clinic notes from 2004 to the present. AT 131. The record contains no response.

Second, at the hearing, the ALJ asked Plaintiff if she had any objections to the exhibits. AT 228. Plaintiff responded, "Only one. It say from Judy Gibson, which [was] supposed to have been my therapist, I never had her. My therapist's name is Pamela but they work at the same place." AT 228. Plaintiff explained, "I had [an] appointment and it kept getting rescheduled so when I actually had to go in, they gave me another therapist because she wouldn't see me .... So her name was Pamela. I don't know her last name." AT 228-29. Plaintiff later clarified that she saw Dr. Gibson on one occasion and Pamela on two occasions, but has been unable to see Pamela again because of a conflict with other appointments. AT 228-29, 251.

The pertinent regulation provides, "[w]e will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." 20 C.F.R. § 404.1512(d). "Every reasonable effort" means that "we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, *if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination."* 20 C.F.R. § 404.1512(d)(1) (emphasis added).

Regarding Dr. Gibson, an attempt was made to obtain records from this source. However, no followup request was made to Dr. Gibson. Accordingly, the ALJ erred by failing to submit a followup request to Dr. Gibson.

Regarding Pamela, the record provides no indication that an attempt was made to obtain records from this source. Accordingly, the ALJ erred by failing to contact Pamela for treatment records. [3]

[3]     Although Plaintiff was unaware of Pamela's last name, she stated that Pamela worked at the "same place" as Dr. Gibson. AT 228.

The omission of records from Dr. Gibson and Pamela is striking considering that Plaintiff claims disability due to in part to depression, which was found to be a severe impairment by the ALJ. *See* AT 26, 65. Moreover, Plaintiff's testimony contradicts the ALJ's discussion of her credibility

in which he stated that Plaintiff "does not see any mental health professionals." AT 27. Accordingly, the matter must be remanded in order for the ALJ to make every reasonable effort to obtain records from Dr. Gibson and Pamela.

**2. Plaintiff's Treating Sources**

**\*8** Plaintiff argues that the ALJ erred by failing to obtain an opinion from her treating sources as to her limitations. Dkt. No. 7 at 14. Plaintiff fails to state to which specific sources she refers. However, Plaintiff identified Dr. Qureshi as her "primary care physician" and noted that she received "chiropractic treatment" from Dr. Walzer. Dkt. No. 7 at 5, 7. Defendant argues that the record already contains the opinions of Dr. Qureshi and Dr. Walzer. Dkt. No. 13 at 13.

The relevant regulation provides as follows:

> *We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved,* the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed report from your medical source, including your treating source, or by telephoning your medical source.

20 C.F.R. § 404.1512(e) (emphasis added). "Medical sources" refers to acceptable medical sources, or other health care providers who are not acceptable medical sources. [4] 20 C.F.R. § 404.1502.

[4]     Acceptable medical sources include: (1) Licensed physicians (medical or osteopathic doctors); (2) Licensed or certified psychologists; (3) Licensed optometrists; (4) Licensed podiatrists; and (5) Qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

As noted, Dr. Qureshi completed a "Physician's Statement for Determination of Employability" form in which it is indicated that Plaintiff is unable to participate in "employment participation activities" due to depression and "back problems." AT 197-98. Dr. Qureshi also indicated that Plaintiff's impairment lasted or is expected to last for one year or more, and suggested that the "employment exemption and activity limitation" is expected to end on October 16, 2004. AT 198. However, Dr. Qureshi opined on May 18, 2004 that Plaintiff "does not seem clinically depressed." AT 200. Due to the conflicting opinions, the ALJ should have sought

clarification from Dr. Qureshi. Accordingly, the matter must be remanded for clarification of Dr. Qureshi's opinion.

Regarding Dr. Walzer, the record contains a May 5, 2004 note that indicates that Plaintiff is totally incapacitated. AT 195. It is unclear whether the note is from Dr. Walzer. *See* AT 195. Accordingly, the ALJ should have clarified the identity of the author(s) of this note. Therefore the matter must be remanded for a clarification of this note.

### 3. Intelligence Evaluation

Plaintiff argues that the ALJ erred by failing to "follow up with an intelligence evaluation where the consultative examiner indicated [that Plaintiff] may be in the borderline range of intellectual functioning." Dkt. No. 7 at 14. Defendant argues that no intelligence evaluation is necessary. Dkt. No. 13 at 21.

As noted, Dr. Shapiro indicated that borderline intellectual functioning should be ruled out. AT 142. However, Plaintiff points to no other evidence suggesting a cognitive impairment. Moreover, she alleged no cognitive impairment as a basis for disability. *See* AT 65. Further, Plaintiff indicated that she graduated from high school where she attended regular classes, and completed one semester of college and specialized nurses' aide training. AT 71, 233-34. In light of the foregoing, this claim is unavailing.

### E. RFC

**\*9** RFC describes what a claimant is capable of doing despite his or her impairments considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms. *Martone v. Apfel,* 70 F.Supp.2d 145, 150 (N.D.N.Y.1999) (Hurd, D.J.); *see* 20 C.F.R. §§ 404.1545, 416.945. "RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations." *Smith v. Apfel,* 69 F.Supp.2d 370, 378 (N.D.N.Y.1999) (citation omitted). In assessing RFC, the ALJ must make findings specifying what functions the claimant is capable of performing, not simply make conclusory statements regarding a claimant's capabilities. *Martone,* 70 F.Supp.2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. *New York v. Sullivan,* 906 F.2d 910, 913 (2d Cir.1990); see 20 C.F.R. §§ 404.1560, 416.960.

### 1. Narrative Discussion

Plaintiff argues that the ALJ erred by failing to provide a function-by-function analysis of Plaintiff's abilities as required by SSR 96-8p. Dkt. No. 7 at 17. SSR 96-8p provides that the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). SSR 96-8p, 1996 WL 374184, at \*7 (SSA July 2, 1996). In this case, the ALJ reviewed the medical evidence, discussed Plaintiff's credibility, and summarily concluded that Plaintiff is capable of performing a limited range of light work. AT 22-27. Nevertheless, the ALJ failed to include a narrative discussion describing how the evidence supports each conclusion. Therefore, the matter must be remanded.

### 2. Mental Limitations

Plaintiff also argues that the RFC determination did not encompass the mental limitations that were indicated in the Mental RFC Assessment that was completed by M. McNaughton and Dr. Gieseken. *See* AT 184-86. Defendant argues, "Dr. Gieseken's overall RFC is, in fact, covered by the mental limitations the ALJ imposed." Dkt. No. 13 at 12.

Under the regulations, the ALJ is required to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us." 20 C.F.R. § 404.1527(f)(2)(ii).

In his decision, the ALJ reviewed the assessment in question and stated that he "agrees with Dr. Gieseken's opinion that [Plaintiff's] mental impairment did not preclude all work-related activities." AT 26. While the ALJ stated that he "agree[d]" with Dr. Gieseken's opinion, the ALJ failed to state the weight he assigned to this opinion. Moreover, the significance placed on Dr. Gieseken's opinion is unclear, as Dr. Gieseken found that Plaintiff is limited moderately in several areas of functioning, AT 184-85, yet the ALJ failed to discuss these findings or include all of the limitations in the RFC determination. Therefore, the matter must be remanded based on the ALJ's failure to explain the weight given to Dr. Gieseken's opinion.

### F. Vocational Expert

**\*10** Where a claimant is able to demonstrate that his or her impairments prevent a return to past relevant work, the burden then shifts to the Commissioner to prove that a job exists in the national economy which the claimant is capable of performing. *See Curry,* 209 F.3d at 122; 20 C.F.R. §§ 404.1560(c), 416.960(c). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions in the country." 20 C.F.R. §§ 404.1566(a), 416.966(a). The ALJ may apply the grids or consult a vocational expert. *See Heckler v. Campbell,* 461 U.S. 458, 462, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir.1999); 20 C.F .R. pt. 404, subpt. P, App. 2.

The vocational expert may testify as to the existence of jobs in the national economy, and as to the claimant's ability to perform any of those jobs, given his functional limitations. *See Colon v. Comm'r of Soc. Sec.,* No. 6:00-CV-0556, 2004 WL 1144059, at \*6 (N.D.N.Y. Mar.22, 2004) (Sharpe, J.). A vocational expert's testimony is useful only if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job. *See Aubeuf v. Schweiker,* 649 F.2d 107, 114 (2d Cir.1984) (citation omitted). The ALJ is responsible for determining the claimant's capabilities based on all the evidence, and the hypothetical questions must present the full extent of the claimant's impairments to provide a sound basis for the vocational expert's testimony. *Colon,* 2004 WL 1144059, at \*6. However, there must be " 'substantial record evidence to support the assumption upon which the vocational expert based his opinion.' " *Id.* (quoting *Dumas v. Schweiker,* 712 F.2d 1545, 1553-54 (2d Cir.1983)).

Plaintiff argues that the RFC contained in the hypothetical questions posed to the vocational expert, Julie Andrews, fails to mirror the RFC finding in the decision. Dkt. No. 7 at 18-20. Specifically, Plaintiff points out that the ALJ failed to include the following limitation in the hypothetical questions posed to the vocational expert: No contact with the general public and minimum contact with co-workers. *Id.* at 18. Defendant argues that the RFC in the hypothetical questions mirrors the RFC finding in the decision. Dkt. No. 13 at 15.

In his decision, the ALJ stated that he "asked the vocational expert whether jobs exist in the national economy for an individual of the claimant's age, education, past relevant work experience and residual functional capacity as determined." AT 29. However, the VE's testimony was based on an RFC that is different than the RFC as stated in the decision. The

VE based her testimony on a hypothetical person who could have "occasional contact with coworkers and the general public." AT 274. In his decision, the ALJ stated that Plaintiff retained the RFC to perform work that, *inter alia, "should not* involve [ ] contact with the general public and have *minimum* contact with co-workers." AT 27 (emphasis added). Therefore, the hypothetical questions failed to accurately reflect the limitations contained in the RFC determination. *Colon,* 2004 WL 1144059, at \*6. Accordingly, the matter must be remanded.

### G. Social Security Ruling 00-4p

**\*11** Plaintiff argues that the ALJ failed to asked the VE whether her testimony was consistent with the DOT, as required by SSR 00-4p. Dkt. No. 7 at 20. Defendant claims that there was no need to "explore inconsistencies" between the VE's testimony and the DOT because the VE relied on the DOT. Dkt. No. 13 at 16.

SSR 00-4p requires that when a VE or vocational specialist ("VS") provides evidence about the requirements of a job or occupation, the ALJ has an affirmative responsibility to ask about any possible conflict between that vocational expert evidence and information provided in the DOT. SSR 00-4p, 2000 WL 1898704, at \*4 (SSA Dec. 4, 2000). In these situations, the ALJ is directed to do the following:

> Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and

> If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

*Id.*

In this case, the ALJ asked the VE to "describe the [past] jobs the Claimant has from the standpoint of the [DOT]." AT 269. The VE described Plaintiff's past relevant work, referencing various positions in the DOT. AT 270-72. The ALJ then posed hypothetical questions to the VE to which the VE responded by citing several positions in the DOT. AT 272-75.

While the ALJ failed to specifically ask the VE if the evidence she provided conflicts with information provided in the DOT, the VE cited only jobs listed in the DOT. Moreover, Plaintiff fails to suggest any inconsistency between the VE's testimony and the DOT. Plaintiff simply points out that the VE failed to ask whether the testimony conflicts with the DOT.

On remand, should the testimony of a VE or VS be elicited, the adjudicator should ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and if the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g) [5] for further proceedings consistent with the above; and it is further

5    Sentence four reads "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED;** and it is further

**ORDERED,** that the Clerk serve a copy of this order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2986393

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3901955
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jessica SINDONI, on behalf
of T.S., a minor, Plaintiff,
v.
Carolyn W. COLVIN, Commissioner
of Social Security, Defendant.

No. 3:14–CV–0633 (GTS).
|
Signed June 25, 2015.

**Attorneys and Law Firms**

Jonathan P. Foster, Jonathan P. Foster, Esq., of Counsel,
Sayre, PA, for Plaintiff.

U.S. Social Security Admin., Office of Reg'l Gen. Counsel-
region II, Amanda Lockshin, Esq., of Counsel, New York,
NY, for Defendant.

*DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this Social Security action
filed by Jessica Sindoni on behalf of her minor daughter,
T.S. ("Plaintiff") against the Commissioner of Social Security
("Defendant" or "the Commissioner") pursuant to 42 U.S.C.
§ 405(g), are the parties' cross-motions for judgment on
the pleadings. (Dkt.Nos.11, 16.) For the reasons set forth
below, Defendant's motion is granted, and Plaintiff's motion
is denied.

## I. RELEVANT BACKGROUND

### A. Factual Background

Plaintiff was born on June 16, 2011. (T. 101) At the time
of her hearing, she was in fourteen months old. (T. 36.)
Plaintiff's alleged disability consists of persistent pulmonary
hypertension of the newborn ("PPHN"). (T. 105.)

### B. Procedural History

On July 19, 2011, Plaintiff applied for Supplemental Security
Income on T.S.'s behalf. Plaintiff's application was initially
denied, after which she timely requested a hearing before an
Administrative Law Judge ("the ALJ"). On September 13,
2012, Plaintiff appeared before ALJ Marie Greener. (T. 33–
48.) On November 13, 2012 ALJ Greener issued a written
decision finding T.S. not disabled under the Social Security
Act. (T. 13–32.) On April 11, 2014, the Appeals Council
denied Plaintiff's request for review, rendering the ALJ's
decision the final decision of the Commissioner. (T. 1–6.)
Thereafter, Plaintiff timely sought judicial review in this
Court.

### C. The ALJ's Decision

Generally, in her decision, the ALJ made the following six
findings of fact and conclusions of law. (T. 19–29.) First, the
ALJ found that T.S. was a "young infant" at the time of filing
and an "older infant" at the time of the hearing pursuant to 20
C.F.R. § 416.926a(g)(2). (T. 19.) Second, the ALJ found that
T.S. had not engaged in substantial gainful activity since the
application date. (*Id.*) Third, the ALJ found that T.S. suffered
from the severe impairments of arterial septal defect ("ASD"),
lactose intolerance, reactive airway disease ("RAD"), and
persistent pulmonary hypertension of the newborn ("PPHN")
pursuant to 20 C.F.R. § 416.924(c). (*Id.*) Fourth, the ALJ
found that T.S. did not have an impairment or combination
of impairments that meets or medically equals one of the
listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix
I ("the Listings"). (T. 20.) Specifically, the ALJ reviewed
Listings §§ 104.05, 104.06, 103.02, and 103.03. (T. 20–21.)
Fifth, the ALJ found that T.S. did not have an impairment
or combination of impairments that functionally equals an
impairment set forth in the Listings. (T. 21–28.) Sixth, and
finally, the ALJ concluded that T.S. has not been disabled, as
defined by the Social Security Act, since July 19, 2011 the
date her application was filed. (T. 29.)

## II. THE PARTIES' BRIEFINGS

### A. Plaintiff's Arguments

Generally, in support of her motion for judgment on the
pleadings, Plaintiff makes five arguments. First, Plaintiff
argues the ALJ failed to assist the Plaintiff in developing
the record and failed to advise Plaintiff about her right
to representation. (Dkt. No. 11 at 13–18 [Pl.'s Mem. of
Law].) Second, Plaintiff argues the ALJ erred in failing to
consider Plaintiff's condition under Listing 110.00. (*Id.* at 18–
19) Third, Plaintiff argues the ALJ erred in affording great

weight to a non-examining State medical consultant. (*Id.* at 1920.) Fourth, Plaintiff argues the ALJ erred in failing to find Plaintiff had an "extreme limitation" in the health and physical well-being domain. (*Id.* at 20–21.) Fifth, and lastly, Plaintiff argues that the ALJ erred in failing to find Plaintiff had a "marked limitation" in the moving and manipulating objects domain. (*Id.* at 21.)

### B. Defendant's Argument

 **\*2** Generally, in support of her cross-motion for judgment on the pleadings, Defendant makes two arguments. Defendant argues the ALJ properly advised Plaintiff of her right to representation. (Dkt. No. 16 at 5–6 [Def.'s Mem. of Law].) Second, and lastly, Defendant argues the ALJ properly considered the medical evidence. (*Id.* at 612.)

### III. RELEVANT LEGAL STANDARD

A court reviewing a denial of disability benefits may not determine de novo whether an individual is disabled. *See* 42 U.S .C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs ., 906* F.2d 856, 860 (2d Cir.1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *see Grey v. Heckler,* 721 F.2d 41, 46 (2d Cir.1983); *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker,* 685 F.2d 60, 62 (2d Cir.1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen,* 859 F.2d 255, 258 (2d Cir.1988).

If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan,* 805 F.Supp. 147, 153 (S.D.N.Y.1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health & Human Servs.,* 733 F.2d 1037, 1041 (2d Cir.1984).

An individual under the age of eighteen (18) is disabled, and thus eligible for SSI benefits, if he or she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c(a)(3)(C)(i). However, that definitional provision excludes from coverage any "individual under the age of [eighteen] who engages in substantial gainful activity...." 42 U.S.C. § 1382c(a)(3)(C)(ii).

 **\*3** By regulation, the agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability. *See* 20 C.F.R. § 416.924; *Kittles v. Barnhart,* 245 F.Supp.2d 479, 487–88 (E.D.N.Y.2003); *Ramos v. Barnhart,* 02–CV–3127, 2003 WL 21032012, at \*7 (S.D.N.Y. May 6, 2003).

The first step of the test, which bears some similarity to the familiar five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b); *Kittles,* 245 F.Supp.2d at 488. If so, then both statutorily and by regulation the child is ineligible for SSI benefits. *See* 42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, the second step of the test next requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are properly regarded as severe, in that they cause more than a minimal functional limitation. *See* 20 C.F.R. § 416.924(c); *Kittles,* 245 F.Supp.2d at 488; *Ramos,* 2003 WL 21032012, at \*7. In essence, "a child is [disabled under the Social Security Act] if his impairment is as severe

as one that would prevent an adult from working." *Zebley v.. Sullivan,* 493 U.S. 521, 529, 110 S.Ct. 885, 890 (1990).

If the existence of a severe impairment is discerned, the agency must then determine, at the third step, whether it meets or equals a presumptively disabling condition identified in the listing of impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Listings"). *Id.* Equivalence to a listing can be either medical or functional. *See* 20 C.F.R. § 416.924(d); *Kittles,* 245 F.Supp.2d at 488; *Ramos,* 2003 WL 21032012, at *7. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. *See* 20 C.F.R. § 416.924(d)(1); *Ramos,* 2003 WL 21032012, at *8.

Analysis of functionality is informed by consideration of how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1); *Ramos,* 2003 WL 21032012, at *8. The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (i) [a]cquiring and using information; (ii)[a]ttending and completing tasks; (iii) [i]nteracting and relating with others; (iv)[m]oving about and manipulating objects; (v) [c]aring for [oneself]; and (vi)[h]ealth and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established in the event of a finding of an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a); *Ramos,* 2003 WL 21032012, at *8. An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(I).

 **\*4** Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a); *Ramos,* 2003 WL 21032012, at *8. A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(C).

## IV. ANALYSIS

### A. Whether the ALJ Failed in Her Duty to Advise Plaintiff of Her Right to Representation

After carefully considering the matter, this Court answers this question in the negative, in part for the reasons set forth in Defendant's memorandum of law. (Dkt. No 16 at 5–6 [Def.'s Mem. of Law].) The Court adds the following analysis.

Plaintiff argues the ALJ failed to properly explain "the importance of legal representation" and failed to "secure any written waiver" of the right to representation. (Dkt. No. 11 at 15 [Pl.'s Mem. of Law].) Although a plaintiff does not have a constitutional right to counsel at a social security disability hearing, she does have a statutory and regulatory right to be represented should she chose. 42 U.S.C. § 406; 20 C.F.R. § 404.1705. The applicable statute and regulations state that, when notifying a plaintiff of an adverse determination, the Commissioner must "notify [the plaintiff] in writing" of (1) her "options for obtaining [an] attorney[ ] to represent [her]" at her hearing, and (2) "the availability ... of ... organizations which provide legal services free of charge" to "qualifying claimants." 42 U.S.C. §§ 406(c), 1383(d)(2)(D); *see also* 20 C.F.R. § 404.1706. At the hearing itself, "the ALJ must ensure that the [the plaintiff] is aware of [her] right [to counsel]." *Robinson v. Sec'y of Health & Human Servs.,* 733 F.2d 255, 257 (2d Cir.1984). The Second Circuit rejected the "enhanced disclosure requirements" established in some circuits. *Lamay v. Comm'r. of Soc. Sec.,* 562 F.3d 503, 508 (2d Cir.2009) (rejecting the mandatory additional disclosures required by the Fifth, Seventh and Eleventh Circuits and finding the statutory language provided proper notice.)

The Commissioner notified Plaintiff in writing of her right to representation and her options of obtaining representation. The commissioner further supplied her with a list of organizations that provide legal services free of charge, if the Plaintiff qualified. (T. 57–58, 60–64, 78, 82–83.) At the hearing, the ALJ specifically asked Plaintiff if she was aware that she had the right to representation and Plaintiff answered, "[y]es. I did." (T. 35.) The ALJ proceeded to inform Plaintiff of her right to representation, informed her of organizations that provided services free of charge, and also of private attorneys whom Plaintiff wouldn't need to "pay upfront." (T. 35–36.) Plaintiff indicated that she understood and wished to proceed without representation. (T. 36.) Therefore, prior to the hearing the Commissioner fulfilled her statutory obligation of

informing Plaintiff of her right to representation and at the hearing the ALJ fulfilled her obligation as well.

## B. Whether the ALJ Failed to Properly Considered All the Medical Evidence

**\*5** After carefully considering the matter, the Court answers this question in the negative, in part for the reasons set forth in Defendant's memorandum of law. (Dkt. No 16 at 6–12 [Def.'s Mem. of Law].) The Court adds the following analysis.

### 1. Whether the ALJ Failed to Properly Develop the Record

Plaintiff argues the ALJ failed to fully develop the record; specifically, she failed to obtain additional records following the hearing and failed to request a functional report from Plaintiff's treating physicians and/or surgeons. To be sure, the ALJ has an affirmative duty to develop the record. *See Moran v. Astrue,* 569 F.3d 108, 112 (2d Cir.2009) ("[I]t is the well-established rule in our circuit that the social security ALJ ... must on behalf of all claimants ... affirmatively develop the record ...." (quoting *Lamay v. Comm'r of Soc. Sec.,* 562 F.3d 503, 508–09 [2d Cir.2009] ) (internal quotation mark omitted)). Re-contacting medical providers is necessary when the ALJ cannot make a disability determination based on the evidence of record. *See* 20 C.F.R. § 416.912(d). Additional evidence or clarification is sought when there is a conflict or ambiguity that must be resolved, when the medical reports lack necessary information, or when the reports are not based on medically acceptable clinical and laboratory diagnostic techniques. *See* 20 C.F.R. § 416.912(d)(1); *Rosa v. Callahan,* 168 F.3d 72, 80 (2d Cir.1999); *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998).

Moreover, an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician, including an assessment of the claimant's functional capacity, in order to afford the claimant a full and fair hearing. *See Smith v. Astrue,* 896 F.Supp.2d 163, 176 (N.D.N.Y.2012) (citing 20 C.F.R. § 404.1512(e); *Devora v. Barnhart,* 205 F.Supp.2d 164, 174 (S.D.N.Y.2002); *Hardhart v. Astrue,* No. 05–CV–2229, 2008 WL 2244995, at \*9 [E.D.N.Y. May 29, 2008] ). However, the ALJ has no duty to re-contact a source where the evidence submitted by that source is complete. Where the source's opinion includes all of the factors set forth in 20 C.F.R. § 416.913 [1] and there is no indication that further contact will result in additional information, re-contact is not necessary. *See Hluska v.. Astrue,*

No. 06–CV–0485, 2009 WL 799967, at \*17 (N.D.N.Y. Mar. 25, 2009).

[1]     Pursuant to 20 C.F.R. § 416.913(b), medical reports should include a patient's (1) medical history, (2) clinical findings, (3) laboratory findings, (4) diagnosis, (5) treatment prescribed with response and prognosis, and a(6) statement about what the patient can still do despite his or her impairments based on the findings set forth in factors (1) through (5).

This Court does not agree with Plaintiff's assertion the ALJ "lulled the Plaintiff into believing that the ALJ would get [ ] records" and "did nothing to assist the Plaintiff." (Dkt. No. 11 at 16, 18 (Pl.'s Mem. of Law.) Post-hearing ALJ requested, obtained, and reviewed additional records based on testimony taken at the hearing.

Post hearing the ALJ obtained additional medical records. (T. 16, referring to T. 250–74.) The additional records included an update from Plaintiff's primary care pediatrician, Jerry Terwilliger, Pediatrics and records from Robert Packer Hospital, which included the Gutherie Clinic, covering the period of November 2011 to August 2012. (T. 250–51 and 252–74.) Evidence submitted by these sources was complete and included all factors set forth in 20 C.F.R. § 416.913 [2]; therefore, there is no indication that further contact would result in additional information and re-contact is not necessary.

[2]     Although the records from treating sources Dr. Finnerty and Dr. Terwilliger did not contain a specific medical source statement, they did contain details of Plaintiff's social and physical functioning in light of her impairments including gross motor skills and language development. (T. 163, 283, 293, 299)

**\*6** The Plaintiff also argues the Appeals Council ("AC") failed to include medical records in the administrative transcript. (Dkt. No. 11 at 17 [Pl.'s Mem. of Law.] ) In its order, the AC acknowledged the receipt of additional evidence; however, the AC concluded that such evidence did not "provide a basis for changing the [ALJ's] decision ." (T. 1–2.) The new medical evidence was included in the administrative transcript as "Exhibit 13F: Records from Jerry W. Terwilliger, M.D., dated August 9, 2011 through September 12, 20112." (T. 4 referring to T. 27–303.)

The AC will consider new and material evidence only where it relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 416.1470(b). If it relates to that time

period, the AC will review to determine if the ALJ's actions, findings, or conclusion are contrary to the weight of the evidence currently on record. *Id.* Here, the evidence supplied does not warrant remand. (T. 275–303.) The relevant evidence is discussed in greater detail in IV.B.2. The evidence provided "does not add so much as to make the ALJ's decision contrary to the weight of the evidence;" therefore, remand is not necessary. *Rutkowski v. Astrue,* 368 F.App'x 226, 229 (2d Cir.2010.)

Of note, the Plaintiff attached to her Memorandum of Law a copy of "the original letter [to the AC] and enclosed records." (Dkt. No. 11 at 17 [Pl.'s Mem. of Law].) However, the evidence supplied does not correspond to the evidence provided to the AC. (*Id.* at App.) [3] Even if these records were properly submitted to the AC, failure to remand by the AC was harmless as the majority of the records do not relate to the relevant period of time. (Dkt. No. 11 at App. 3, pp10–94 [Pl.'s Mem. of Law].) Those records which do relate to the relevant period of time are not contrary to the ALJ's decision. After the hearing, but before the decision, the Plaintiff underwent surgery to remove an abscess which "went well." (Dkt. No 11 at App. 3, pp 3–4 [Pl.'s Mem. of Law].) Therefore, the AC's determination that the evidence provided did not alter the ALJ's decision was proper.

[3]     Plaintiff's correspondence to the AC stated "Enclosure: (1) Medical Evidence." (T. 8.) The correspondence does not state specifically what medical evidence was enclosed, who the evidence was from, or how many pages were included in the enclosure. The AC's decision refers to the receipt of additional medical evidence and the Order contains additional evidence received as including "Exhibit 13F: Records from Jerry W. Terwilliger, M.D. dated August 9, 2011 through September 12, 2012 (29 pages)." (T. 5.) Plaintiff included in her Memo of Law a copy of the request for appeal to the AC and records the Plaintiff asserted were sent contemporaneously. These records are from Dr. Pegoli, and others providers at Strong Memorial Hospital, and consisted of 91 pages dating 10/26/12–6/27/13. (Dkt. No. 11 at App.)

## 2. Whether the ALJ Erred in Providing "Great Weight" to Dr. Randall

Plaintiff argues the ALJ erred in providing "great weight" to the non-examining State agency medical consultant, J. Randall. (Dkt. No. 9 at 18 [Pl.'s Mem. of Law].) Specifically, Plaintiff argues Dr. Randall's medical opinion was unsupported by the record, the ALJ "rejected the

opinions of the treating physicians and the ALJ failed to order a consultative exam.

The ALJ's reliance on Dr. Randall's report was proper. The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record. *See* 20 C.F.R. § 416.927(e)(2)(i). Further, the Second Circuit has held that an ALJ may rely on a State agency report where the State agency consultant "was the only expert of record who specifically assessed whether [plaintiff's] impairments met or equaled a listed impairment." *Frye ex rel. A.O. v. Astrue,* 485 F.App'x 484, 487 (2d Cir.2012.) As is the case here, Dr. Randall was the only source to specifically assess plaintiff's impairments regarding the Listings.

**\*7** Dr. Randall opined Plaintiff's impairment, or combination of impairments, was severe, but did not meet, medically equal, or functionally equal the listings. (T. 237.) He opined Plaintiff had "marked" limitations in the domain of "health and physical wellbeing." (T. 241.) Dr. Randall opined that based on his review of the medical record Plaintiff was born with a congenital diaphragmatic hernia which was repaired and that she was "doing well" post discharge. (*Id.*)

Plaintiff was born June 16, 2011 and shortly after underwent surgery to correct a congenital diaphragmatic hernia. (T. 126.) On July 5, 2011 she was stable and on room air, she was transferred from Strong Memorial Hospital to Arnot Odgen Medical Center. (T. 131.) She was diagnosed with resolved persistent pulmonary hypertension of a newborn ("PPHT"). (T. 134.) While at Strong Memorial Hospital she had two episodes of supraventricular tachycardia ("SVT"). (T. 134.) A cardiologist was consulted and on July 11, 2011 Dr. Finnerty noted a moderate sized atrial septal defect. (T. 157.)

On July 14, 2011 Plaintiff was discharged from care at Arnot Ogden Medical Center with "no barriers" (T. 153) and the active diagnoses of gastroesophageal reflux disease ("GERD"), milk allergy, and SVT (T. 149). The following day Plaintiff had a "well child" visit. (T. 161–62.) James Jabile, M.D. noted that Plaintiff was doing well, feeding well, and "look[ed] well." (T. 162–63.) Plaintiff was seen on July 25, 2011 for oral thrush. (T. 159.)

Dr. Finnerty noted on August 8, 2011 that Plaintiff looked well, had good weight gain, and was "thriving." (T. 167.) On August 17, 2011 Walter Pegoli, M.D., who repaired Plaintiff's congenital diaphragmatic hernia, noted that Plaintiff's post-

surgical course was not remarkable, no special care was required so Plaintiff should follow up "as needed." (T. 182.)

A well child visit on October 17, 2011 showed a normal developmental screening and a normal exam. (T. 283.) On November 4, 2011 Plaintiff was seen at the Gutherie Clinic emergency room for congestion and the provider noted she was stable, well developed with a normal heart rate. (T. 254.) Plaintiff went to the emergency room again on November 20, 2011 for conjunctivitis. (T. 255.) Another well child visit on December 22, 2011 indicated a well-developed child and a normal exam. (T. 286.)

On March 3, 2012 Plaintiff visited the emergency room for a fever and tachycardia without evidence of tachydysrhythmia. (T. 257.) Plaintiff was advised to follow up with Dr. Terwilliger. (*Id.*) Plaintiff was back in the emergency room on March 15, 2012 and diagnosed with a respiratory virus. (T. 258.) On March 16, 2012 Plaintiff followed up with Dr. Terwilliger, who noted Plaintiff was in no acute distress, did not have a fever, and was not in pain. (T. 288.) Dr. Terwilliger saw Plaintiff for a well-child visit on April 4, 2012 and noted that she was "growing and developing normally." (T. 293.) He observed a "hernia" bulge" that self-reduced. (*Id.*) He increased Plaintiff's Pepcid dosage. (*Id.*) A follow up appointment on April 23, 2012 with Dr. Finnerty showed no evidence of tachycardia and noted Plaintiff was "certainly doing well." (T. 248–49.)

**\*8** In May of 2012 Plaintiff had "tubes" placed in her ears, she tolerated the surgery well and was discharged. (T. 253, 270.) On May 12, 2012 Plaintiff was seen at the Gutherie Clinic for a cough. (T. 295.) In June of 2012 a well-child visit showed normal development. (T. 299.) On July 14, 2012 Plaintiff presented with a fever and diagnosed with coxsackie. (T. 276–77.) On August 9, 2012 Plaintiff complained of a "painless" lump, which was believed to be either scar tissue or neoplasm. (T. 268.) On September 12, 2012 Plaintiff was seen for a cough and follow up on the lump. (T. 278.)

In September of 2012 Dr. Finnerty noted Plaintiff was stable from a cardiac standpoint, "not sickly," and showed "no cardiac symptoms." (T. 250.) He stated Plaintiff had no recurrence of SVT and was off her medication for six months or more. (T. 251.) He noted a moderate sized atrial septal defect, but no murmur. (*Id.*)

Dr. Randall's opinion was based on evidence in the record from June 2011 to August 2011. (T. 241.) However, the remainder of the evidence, as summarized here, continued to show Plaintiff's growth and development as normal.

Plaintiff again argues the ALJ should have re-contacted Plaintiff's treating physicians; however, as previously stated in section IV.A., the ALJ was not obligated in this case to re-contact the treating physician for a medical source statement as the medical evidence complied with the requirements of 20 C.F.R. § 416.913(b). The ALJ reviewed the medical evidence in the file and relied on evidence supplied by Plaintiff's treating physicians and Dr. Randall in making her decision.

Further, the ALJ was not under an obligation to order a consultative examination. A consultative exam is used to "try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [the ALJ] to make a determination or decision" on the claim. 20 C.F.R. § 416.919a(b). The decision to obtain a consultative exam is made on a case-by-case basis at the discretion of the Commissioner. *See* 20 C.F.R. §§ 416.917, 416.919–19b. To be sure, "[i]t can be reversible error for an ALJ not to order a consultative exam when an examination is required for an informed decision." *Tankisi v. Commissioner of Soc. Sec.,* 521 Fed. App'x 29, 32 (2d Cir.2013) (summary order). "However, an ALJ is not required to order a consultative examination if the facts do not warrant or suggest the need for it." *Id.* (citing *Lefever v. Astrue,* 5:07–CV–622, 2010 WL 3909487, at \*7 (N.D.N.Y. Sept. 30, 2010), *aff'd,* 443 F.App'x 608 [2d Cir.2011] ). The ALJ properly used her discretion in not ordering a consultative exam as the medical opinions in the record did not suggest a need for it.

### 3. Whether the ALJ Failed to Consider Listing 110.08(B)

Plaintiff argues she meets Listing 110.08(B) for catastrophic congenital disorder. (Dkt. No. 11, 18–19 [Pl.'s Mem. of Law].) This listing requires "a catastrophic congenital disorder" as defined in Listing 110.00D [4] and 110.00E [5], plus a "[v]ery serious interference with development or functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Specifically, Plaintiff asserts that she suffers from Fryns syndrome. The record is void of any diagnosis of Fryns syndrome, testing for Fryns syndrome, or even suspicion of Fryns syndrome by Plaintiff's physicians. Plaintiff attempts to self-diagnose, stating that she suffered from a diaphragmatic hernia. (Dkt. No. 11 at 19 [Pl.'s Mem. of Law].) The ALJ properly discussed Plaintiff's diaphragmatic hernia at step two of her analysis and determined that it was not a severe impairment.

Even if the ALJ had determined Plaintiff's diaphragmatic hernia was a severe impairment, there is no diagnosis of Ferns disease, or any other complication stemming from this condition, that would require an analysis of Listing 110.08B. Therefore, the ALJ did not err in failing to consider Listing 110.08B.

4    Some catastrophic congenital disorders, such as anencephaly, cyclopia, chromosome 13 trisomy (Patau syndrome or trisomy D), and chromosome 18 trisomy (Edwards' syndrome or trisomy E), are usually expected to result in early death. Others such as cri du chat syndrome (chromosome 5p deletion syndrome) and the infantile onset form of Tay–Sachs disease interfere very seriously with development. We evaluate catastrophic congenital disorders under 110.08. The term "very seriously" in 110.08 has the same meaning as in the term "extreme" in § 416.926a(e)(3) of this chapter.

5    We need one of the following to determine if your disorder meets 110.08A or B: 1. A laboratory report of the definitive test that documents your disorder (for example, genetic analysis or evidence of biochemical abnormalities) signed by a physician. 2. A laboratory report of the definitive test that documents your disorder that is not signed by a physician *and* a report from a physician stating that you have the disorder. 3. A report from a physician stating that you have the disorder with the typical clinical features of the disorder and that you had definitive testing that documented your disorder. In this case, we will find that your disorder meets 110.08A or B unless we have evidence that indicates that you do not have the disorder. 4. If we do not have the definitive laboratory evidence we need under E1, E2, or E3, we will find that your disorder meets 110.08A or B if we have: (i) a report from a physician stating that you have the disorder and that you have the typical clinical features of the disorder, *and* (ii) other evidence that supports the diagnosis. This evidence may include medical or nonmedical information about your development and functioning. 5. For obvious catastrophic congenital anomalies that are expected to result in early death, such as anencephaly and cyclopia, we need evidence from a physician that demonstrates that the infant has the characteristic physical features of the disorder. In these rare cases, we do not need laboratory testing or any other evidence that confirms the disorder.

### 4. Whether the ALJ Failed to Find "Extreme Limitations" in the Health and Physical Well–Being Domain

**\*9** Plaintiff argues the ALJ failed to find an "extreme limitation" in the domain of health and physical well-being. The Plaintiff fails to provide specific medical evidence to support her argument, instead Plaintiff vaguely states, "[t]he voluminous record speaks for itself." (Dkt. No. 11 at 20 [Pl.'s Mem. of Law].) The ALJ determined Plaintiff had "marked limitations" in this domain. (T. 29.) The ALJ relied on the medical opinion of Dr. Randall and testimony that Plaintiff requires monitoring for her conditions. (*Id.*) As previously stated, the ALJ properly relied on the medical opinion of Dr. Randall; therefore, the conclusion Plaintiff suffered "marked limitations" in this domain was supported by substantial evidence.

### 5. Whether the ALJ Failed to Find "Marked Limitations" in the Moving and Manipulating Domain

Plaintiff argues the ALJ erred in failing to find Plaintiff had a "marked limitation" in the moving and manipulating objects domain. (Dkt. No. 11, 21 [Pl.'s Mem. of Law.] ) To have a marked limitation, Plaintiff must show that her condition "interferes seriously with [her] ability to independently initiate, sustain, or complete activities," such that she has the functioning one would expect with standardized test scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e) (2).

The ALJ determined Plaintiff had "less than marked limitation" in moving and manipulating objects. (T. 27.) The ALJ relied on the medical opinion of Dr. Randall and evidence in the record; specifically, testimony that Plaintiff was on track with milestones, Plaintiff fed herself, used a cup, could stand, and could walk. (*Id.*)

Plaintiff argues she suffers from "bowed legs." (Dkt. No. 11 at 21 [Pl.'s Mem. of Law].) There is no evidence in the record Plaintiff suffered from "bowed legs" or had any other impairment that may cause limitations in moving and manipulating objects. As previously outline, the record shows Plaintiff performed age appropriate motor tasks (T. 283, 286, 292, 293, 300.) Further, the ALJ properly relied on opinion evidence from Dr. Randall; therefore, her conclusion Plaintiff had "less than marked limitations" in this domain was supported by substantial evidence.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is ***DENIED;*** and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 16) is *GRANTED;* and it is further

**ORDERED** that Defendant's decision denying disability benefits is *AFFIRMED;* and it is further is

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3901955

---

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Hooper v. Colvin, S.D.N.Y., August 5, 2016

96 F.Supp.3d 14
United States District Court,
W.D. New York.

Leann M. WEED COVEY, Plaintiff,

v.

Carolyn W. COLVIN, Acting Commissioner
of Social Security, Defendant.

No. 13–CV–6602 EAW.
|
Signed April 6, 2015.

**Synopsis**

**Background:** Claimant brought action for review of decision of the Commissioner of Social Security which denied her application for disability insurance benefits (DIB). Parties cross-moved for judgment on the pleadings.

**Holdings:** The District Court, Elizabeth A. Wolford, J., held that:

[1] substantial evidence supported finding that claimant's back pain was not a severe impairment;

[2] ALJ did not err in not seeking additional development of the record; and

[3] substantial evidence supported determination that claimant's allegations of pain and limiting symptoms were less than fully credible.

Commissioner's motion granted and claimant's motion denied.

West Headnotes (28)

[1] **Social Security**
    🔑 Disability Benefits

    Burden is on claimant to demonstrate that he is disabled within meaning of the Social Security Act. Social Security Act, §§ 223(d)(3), 1614(a)

(3)(D), 42 U.S.C.A. §§ 423(d)(3), 1382c(a)(3)(D).

Cases that cite this headnote

[2] **Social Security**
    🔑 Determination and Disposition

    In reviewing a decision in a social security disability benefits case, District Court may enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

Cases that cite this headnote

[3] **Evidence**
    🔑 Sufficiency to support verdict or finding

    Substantial evidence is more than a mere scintilla, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Cases that cite this headnote

[4] **Social Security**
    🔑 Disability benefits
    **Social Security**
    🔑 Disability benefits

    Where there is a reasonable basis for doubt whether ALJ applied correct legal principles in a social security disability benefits case, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that claimant will be deprived of the right to have her disability determination made according to correct legal principles.

Cases that cite this headnote

[5] **Social Security**
    🔑 Disability benefits
    **Social Security**
    🔑 Disability benefits

    Scope of District Court's review in a social security disability benefits case is limited to

determining whether Commissioner applied the appropriate legal standards in evaluating the claim, and whether Commissioner's findings were supported by substantial evidence in the record.

Cases that cite this headnote

**[6]** **Social Security**
👉 Disability benefits

**Social Security**
👉 Disability benefits

If reviewing Court finds no legal error in a social security disability benefits case, and that there is substantial evidence for Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for claimant's position.

Cases that cite this headnote

**[7]** **Federal Civil Procedure**
👉 Want of Fact Issue

**Federal Civil Procedure**
👉 Matters considered

Judgment on the pleadings may be granted where the material facts are undisputed and where judgment on the merits is possible merely by considering contents of the pleadings. Fed.Rules Civ.Proc.Rule 12(c), 28 U.S.C.A.

Cases that cite this headnote

**[8]** **Social Security**
👉 Subjective Symptoms; Pain

**Social Security**
👉 Remediable conditions or impairments; compliance with treatment

Substantial evidence supported finding, in social security disability benefits case, that claimant's back pain was not a severe impairment; medical record showed claimant's pain was well controlled with medication, and that she had no side effects from the medication, no medical imaging of claimant's spine showed evidence of disease or significant degenerative changes,

and the examining neurosurgeon reported that he could not find a source to explain claimant's pain.

1 Cases that cite this headnote

**[9]** **Social Security**
👉 Disability benefits

Any error in determination, in social security disability benefits case, that claimant's alleged back pain was not a severe impairment, was harmless; since ALJ found that claimant had several severe impairments and proceeded to step three of the sequential analysis, claimant's allegations of back pain were considered in formulation of her residual functional capacity (RFC).

1 Cases that cite this headnote

**[10]** **Social Security**
👉 Disability Benefits

**Social Security**
👉 Disability Benefits

ALJ has an affirmative duty to develop the record in a social security disability benefits case, and remand is appropriate where this duty is not discharged.

13 Cases that cite this headnote

**[11]** **Social Security**
👉 Disability Benefits

**Social Security**
👉 Counsel or other representation

ALJ's duty to develop the record in a social security disability benefits case remains the same regardless of whether claimant is represented by counsel.

1 Cases that cite this headnote

**[12]** **Social Security**
👉 Medical and other expert evidence in general

Encompassed in ALJ's duty to develop the record in a social security disability benefits case is requirement to assemble claimant's

complete medical history and re-contact treating physicians or obtain consultative examinations where the information received is inadequate to determine whether claimant is disabled. 20 C.F.R. §§ 416.912(e), 416.927(e)(2)(iii).

5 Cases that cite this headnote

**[13]    Social Security**
👉 Ability to work;  residual functional capacity

**Social Security**
👉 Disability Benefits

It is not per se error for ALJ to make the residual functional capacity (RFC) determination in a social security disability benefits case absent a medical source assessment as to what claimant can still do despite the limitations caused by his or her impairments; remand is not always required when ALJ fails in his duty to request opinions, particularly where record contains sufficient evidence from which ALJ can assess claimant's RFC.

12 Cases that cite this headnote

**[14]    Social Security**
👉 Disability Benefits

**Social Security**
👉 Medical and other expert evidence in general

Although ALJ has an affirmative duty to develop the administrative record in a social security disability benefits case even when claimant is represented by counsel, where there are no obvious gaps in the administrative record, and where ALJ already possesses a complete medical history, ALJ is under no obligation to seek additional information in advance of rejecting a claim.

10 Cases that cite this headnote

**[15]    Social Security**
👉 Medical and other expert evidence in general

Question presented when deciding whether further development of the administrative record

in a social security disability benefits case is warranted, is whether the administrative record, even lacking the opinion of a treating physician, is robust enough to enable a meaningful assessment of the particular conditions that form basis of the claim.

2 Cases that cite this headnote

**[16]    Social Security**
👉 Nature and severity of condition or impairment

ALJ did not err, in social security disability benefits case, in relying on the opinion of the state agency psychiatrist, that claimant was not disabled, and the examining neurosurgeon's statement that there was no identifiable source for claimant's alleged pain, rather than seeking additional information from claimant's treating sources or hiring a consultative examiner to develop the record with respect to claimant's limitations as a result of her mental and physical impairments; report of consultative examiner and the neurosurgeon's opinion were not inconsistent with the relatively benign clinical findings and assessments by claimant's treating physicians, and the ample medical records regarding claimant's physical impairments demonstrated no objective findings to identify a source for her alleged pain.

1 Cases that cite this headnote

**[17]    Social Security**
👉 Mental and psychological conditions or impairments

**Social Security**
👉 Remediable conditions or impairments; compliance with treatment

Substantial evidence supported finding, in social security disability benefits case, that claimant could handle work stress related to simple tasks; claimant was able to complete household chores, shop, and care for her children, her psychiatrist's treatment notes indicated that her symptoms were largely controlled with medications, claimant denied further auditory hallucinations or suicidal ideations, and she

identified coping skills such as reading, walking, listening to music, playing games with her son, spending time with family, and screaming into a pillow.

Cases that cite this headnote

**[18]** **Social Security**
🔑 Mental and psychological conditions or impairments

**Social Security**
🔑 Residual functional capacity in general

**Social Security**
🔑 Age, education, and experience

Substantial evidence with respect to disability claimant's borderline intellectual functioning supported ALJ's residual functional capacity (RFC) determination; ALJ explicitly referenced claimant's borderline intellectual functioning as a severe impairment and discussed her IQ scores, ALJ noted that claimant completed a high school education and had worked as a waitress and cashier with no indication that she left that employment due to intellectual or emotional impairments, and RFC limited claimant to simple tasks and instructions.

2 Cases that cite this headnote

**[19]** **Social Security**
🔑 Credibility of claimant

Substantial evidence supported determination, in social security disability benefits case, that claimant's allegations of pain and limiting symptoms were less than fully credible; although ALJ found that claimant's medically determinable impairments could be expected to cause the alleged symptoms, ALJ also determined that claimant's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to extent they were unsupported by competent medical evidence and opinions and contradicted by other evidence. 20 C.F.R. § 404.1529(c).

5 Cases that cite this headnote

**[20]** **Social Security**

**Social Security**
🔑 Subjective Symptoms; Pain

A disability claimant's reports of ability to complete household chores, shop, and care for her children do not by themselves contradict allegations of disability; people should not be penalized for enduring the pain of their disability in order to care for themselves.

Cases that cite this headnote

**[21]** **Social Security**
🔑 Credibility of claimant

ALJ may discount a claimant's testimony in a social security disability benefits case to extent it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period.

Cases that cite this headnote

**[22]** **Social Security**
🔑 Disability benefits

It is function of the Commissioner, and not the reviewing court, to pass on the credibility of witnesses in a social security disability benefits case, including claimant's description of symptoms and pain, and to resolve material conflicts in the testimony.

Cases that cite this headnote

**[23]** **Social Security**
🔑 Remediable conditions or impairments; compliance with treatment

ALJ must not draw an adverse inference from a disability claimant's failure to seek or pursue treatment without first considering any explanations that claimant may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

7 Cases that cite this headnote

**[24]** **Social Security**
🔑 Credibility of claimant

ALJ did not err, in social security disability benefits case, in considering claimant's noncompliance with treatment as a factor weighing against her credibility.

7 Cases that cite this headnote

**[25]** **Social Security**
👉 Credibility of claimant

ALJ did not err, in social security disability benefits case, in considering claimant's sparse work record when assessing her credibility.

Cases that cite this headnote

**[26]** **Social Security**
👉 Credibility of claimant

Although work history may be deemed probative of credibility in a social security disability benefits case, it is only one of many factors to be considered.

Cases that cite this headnote

**[27]** **Social Security**
👉 Credibility of claimant

Just as a good work history may be deemed probative of credibility in a social security disability benefits case, a poor work history may prove probative as well.

Cases that cite this headnote

**[28]** **Social Security**
👉 Ability to work; residual functional capacity

**Social Security**
👉 Examination of experts and other witnesses; hypothetical questions

ALJ did not err, in social security disability benefits case, in relying solely on the Medical–Vocational Guidelines (Grids) to find that claimant was not disabled, rather than calling a vocational expert (VE), where ALJ had determined that claimant's nonexertional impairments did not significantly diminish her ability to engage in meaningful employment.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*18** Emily Karr–Cook, Law Office of Emily Karr–Cook, Elmira, NY, for Plaintiff.

Graham Morrison, Social Security Administration, New York, NY, Kathryn L. Smith, U.S. Attorney's Office, Rochester, NY, for Defendant.

### DECISION AND ORDER

ELIZABETH A. WOLFORD, District Judge.

## I. INTRODUCTION

**\*\*1** Plaintiff Leann M. Weed Covey ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of the final decision of Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Plaintiffs application for disability insurance benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Jennifer Gale Smith was not supported by substantial evidence in the record and was based on erroneous legal standards.

Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 9, 13). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is granted, and Plaintiffs motion (Dkt. 9) is denied. Plaintiffs complaint is dismissed with prejudice.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On January 30, 2012, Plaintiff protectively filed an application for disability insurance benefits. (Administrative Transcript (hereinafter "Tr.") 136–49). In her application, Plaintiff alleged a disability onset date of August 12, 2008. (Tr. 115, 136). Plaintiff initially alleged the following disabilities: learning disability, post-traumatic stress disorder

("PTSD"), chronic depression and anxiety, and a back injury. (Tr. 141). On July 24, 2012, the Commissioner denied Plaintiff's application. (Tr. 68–71). Plaintiff timely filed a request for a hearing before an ALJ. (Tr. 74).

On April 8, 2013, Plaintiff, represented by counsel, testified at a video hearing before ALJ Smith. (Tr. 30–55). On May 17, 2013, the ALJ issued a finding that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 12–24).

On September 9, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6). On November 7, 2013, Plaintiff filed this **\*19** civil action appealing the final decision of the Commissioner. (Dkt. 1).

### B. The Non–Medical Evidence

At the time of the hearing, Plaintiff was a 31–year–old female with a high school education. (Tr. 32). Plaintiff had attended special education classes. (Tr. 45). Plaintiff had previous work experience as a cashier, hostess, waitress, bus aide, and housekeeper. (Tr. 33, 36).

Plaintiff testified that she was divorced and lived in an apartment with one of her two children. (Tr. 32, 50). Plaintiff received public assistance from the state. (Tr. 33). She stopped working in 2009 because her "back [was] all messed up" following a car accident. (Tr. 35). Plaintiff testified that the x-rays showed she had a deteriorating disc, nodes, and arthritis in her back. (Tr. 36). Plaintiff said she had used a TENS unit, participated in physical therapy, taken medicine, and received injections to treat her back pain. (Tr. 38).

**\*\*2** Plaintiff testified that she experienced mental difficulties following physical, emotional, and mental abuse from her ex-husband. (Id.). Plaintiff stated that she was diagnosed with major depression and anxiety as well as PTSD. (Id.). Plaintiff indicated that she took Klonopin, Zoloft, Effexor, and Ambien to cope with her mental difficulties. (Tr. 38–39). She stated that she had panic attacks and anxiety in crowds but was trying to get out more by going to the store with her mother or girlfriend. (Tr. 39). She testified that she had nightmares as a result of the abuse she suffered. (Tr. 46). Plaintiff claimed to hear voices, as recently as two days before the hearing. (Tr. 47). Plaintiff testified that she had attempted suicide and continued to have suicidal ideations. (Tr. 52–53).

Plaintiff stated that she could sit for five to ten minutes before needing to move. (Tr. 41). Although Plaintiff had indicated on a form that she could lift up to 50 pounds, Plaintiff testified that she could no longer lift more than approximately a gallon of milk because her back had gotten worse. (Tr. 42). Plaintiff also testified that approximately three months before the hearing she had started to feel pain down her legs. (Tr. 43).

Plaintiff testified that she was able to shower and dress herself. (Id.). She cooked, cleaned, and performed household chores with the assistance of her son. (Tr. 44).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized below.

#### 1. Physical Impairments

Plaintiff was involved in a car accident in 2009, and alleged that her various back, hip, and foot pain resulted from this accident. (Tr. 35).

On December 20, 2009, Plaintiff received a CT scan of her head, spine, chest, abdomen, and pelvis following a trauma. (Tr. 429). All scans were normal, although the CT of the thoracic spine revealed "Schmorl's nodes" with "no evidence to suggest an acute fracture." (Id.).

A February 19, 2010 MRI of Plaintiff's thoracic spine showed "no evidence of neoplastic or metastatic disease in the lumbar spine." (Tr. 416). The reviewing radiologist concluded that the MRI results were "unremarkable." (Tr. 417).

On July 7, 2010, Plaintiff had her first treatment with Nurse Practitioner ("NP") Shirley Glann at Arnot Medical Services. (Tr. 431). Plaintiff complained of thoracic pain, lumbar pain, hip pain, and left leg symptoms. (Id.). Plaintiff reported that her pain began following an automobile accident approximately six months earlier. **\*20** (Id.). NP Glann noted moderate tenderness in Plaintiff's spinal area as well as "moderate-to-severe spasms and several trigger points noted on palpation over the right and left lumbar paraspinals." (Tr. 433). NP Glann assessed lumbago, myalgia and myositis, and sacroiliitis. (Id.). Plaintiff's prescription for Vicodin was continued, and Plaintiff was prescribed Celebrex. (Id.). NP Glann scheduled Plaintiff for a SI joint injection bilaterally. (Tr. 434).

**\*\*3** Dr. Vidyasagar Mokureddy performed the steroid injection on July 20, 2010. (Tr. 427). At a follow up appointment on September 16, 2010, Plaintiff reported that she experienced a 50% pain reduction that lasted for only two days. (Tr. 424). Dr. Mokureddy noted moderate tenderness of the left SI joint, moderate tenderness of the right SI joint, and movement mildly restricted in all directions with pain reported on physical examination. (Tr. 425). Dr. Mokureddy discontinued Plaintiffs Vicodin prescription and prescribed Hydrocodone. (Tr. 426). Dr. Mokureddy assessed sacroilitis, lumbago, and myalgia. (*Id.*). At a follow up appointment on October 14, 2010, Plaintiff continued to report pain, and Dr. Mokureddy instructed Plaintiff to continue her pain medication regimen. (Tr. 422–23).

On December 3, 2010, NP Glann examined Plaintiff, who complained of "sharp, burning" pain in her thoracic spine, lumbar spine, hips, and left lower extremity. (Tr. 418). Plaintiff reported pain relief with her narcotic medications. (*Id.*). NP Glann noted moderate tenderness in the SI joints with movement mildly restricted in all directions. (Tr. 419).

On February 1, 2011, NP Glann treated Plaintiff for low back pain, and noted tenderness on palpation over the right and left sacroiliac joint as well as moderate to severe tenderness over the bilateral SI joint. (Tr. 408).

On April 1, 2011, Plaintiff treated with NP Glann, complaining of back and hip pain that had some relief with narcotic pain medication, but worsened with walking and bending over. (Tr. 404). Plaintiff had a largely normal physical examination, although NP Glann noted "moderate to severe tenderness over the left sacroiliac joint." (Tr. 405). NP Glann noted that Plaintiff used a TENS unit three times per day and reported 30–40% relief of pain. (*Id.*).

In a letter addressed to Dr. Wafaa Rizk dated April 19, 2011, David C.Y. Kung, M.D. reported that Plaintiff had no neurosurgical condition, and that Plaintiff's pain was "from unknown origin." (Tr. 415). Dr. Kung noted that Plaintiff had early disc degeneration that may indicate "Scheuermann's disease," but even if Plaintiff had that condition, there was no spinal cord compression to warrant surgical treatment. (*Id.*).

On May 3, 2011, Plaintiff complained of back pain rated at 10 out of 10 for the past 30 days. (Tr. 400). Plaintiff indicated that the pain medication was controlling her pain, and that the pain did not interfere with eating, bathing, using the toilet, dressing, or getting up from her bed or a chair. (*Id.*). Plaintiff had a limited range of motion. (Tr. 402). NP Hoffman scheduled Plaintiff for a left sacroiliac joint injection. (*Id.*).

On June 1, 2011, Plaintiff treated with NP Hoffman for back pain. (Tr. 397). Plaintiff had a limited range of motion and pain with back flexion, extension, and lateral flexion. (Tr. 398). NP Hoffman assessed low back pain, myalgia and myositis, and sacroilitis. (Tr. 399). Plaintiff reported that the medications were working well. (*Id.*). NP Hoffman advised Plaintiff to follow up with Dr. Rizk regarding her left arm numbness and possible carpal tunnel syndrome. (*Id.*).

**\*21 \*\*4** On August 29, 2011, Plaintiff informed NP Hoffman that she had numbness and problems staying asleep, and that she experienced depression and anxiety. (Tr. 393). On physical examination, Plaintiff had a limited range of motion with flexion, extension, and lateral bending on both sides. (Tr. 395). NP Hoffman assessed low back pain, myalgia and myositis, and sacroilitis. (*Id.*). Plaintiff was prescribed hydrocodone for pain, Mobic for pain, and skelaxin for muscle spasms. (*Id.*).

Plaintiff treated with NP Hoffman on October 26, 2011, for low back pain. (Tr. 391). Plaintiff was prescribed Mobic for pain, Robaxin for low back pain, and Oxycodone for pain. (*Id.*). NP Hoffman noted that Plaintiff's medications may impact her ability to return to work, drive, operate machinery, and perform other safety-sensitive work. (*Id.*).

On November 4, 2011, Plaintiff treated with Dr. Rizk, presenting with anxiety and depression. (Tr. 199). Plaintiff was working as a waitress and sought a note to be excused from work as a result of her depression. (*Id.*). Dr. Rizk assessed panic attacks, anxiety, depression, and "GERD," and noted that Plaintiff was on a waiting list for "FSCC." (Tr. 201).

On November 11, 2011, NP Karen Gallaher noted that Plaintiff complained of pain localized to her right foot, and that Plaintiff had recently suffered a fall. (Tr. 196). On physical exam, Plaintiff was unable to bear weight on her right foot and was using crutches. (Tr. 198). NP Gallaher referred Plaintiff to an orthopedist. (*Id.*).

Matthew R. Brand, M.D. of Finger Lakes Orthopedic Surgery examined Plaintiff on November 16, 2011, for a right foot injury after Plaintiff "slipped down stairs." (Tr. 412). An x-ray showed no acute fracture or abnormality, but Plaintiff

requested a cast, and Dr. Brand applied a "well-padded short leg cast." (Tr. 413).

On December 19, 2011, Plaintiff treated with NP Robyn Hoffman, complaining of mid and lower back pain radiating to her left foot at an intensity of 7 out of 10. (Tr. 193). Plaintiff had recently fallen down a flight of 13 stairs and had torn ligaments in her right foot. (*Id.*). She had been treated at the emergency department and was given an ace wrap, boot, and crutches. (*Id.*). Plaintiff requested a change in medication because oxycodone was making her sleepy. (*Id.*). Plaintiff's physical examination was largely normal; although NP Hoffman noted that Plaintiff had limited active range of motion with flexion of Plaintiff's spine. (Tr. 194). NP Hoffman assessed severe low back pain, unspecified myalgia and myositis, and sacroilitis. (Tr. 195). Plaintiff's medications were adjusted. (*Id.*).

On January 18, 2012, Dr. Rizk examined Plaintiff in a routine follow up. (Tr. 190). Plaintiff reported pain in her upper back, mid back, lower back, left thigh, left calf, left shin, and left ankle. (*Id.*). Plaintiff had recently fallen down the stairs and was directed to follow up with orthopedics for a possible torn ligament. (Tr. 192). Dr. Rizk further assessed stable bipolar disorder with depression and panic attacks. (*Id.*). Plaintiff's dosage of lamictal was increased to address panic attacks and depression. (*Id.*).

 **\*\*5** Plaintiff sought treatment on February 23, 2012, with Sam Thompson, M.D. of Priority Community Health Care, for complaints of chest tightness, coughing, and wheezing. (Tr. 232). Dr. Thompson noted that Plaintiff was moderately obese and had "diffuse expiratory wheezes." (Tr. 233). Dr. Thompson assessed anxiety, bipolar disorder, depressive disorder, shortness of breath, and acute upper respiratory infection. (*Id.*).

On February 28, 2012, Dr. Thompson examined Plaintiff, who was complaining of **\*22** wheezing and shortness of breath. (Tr. 229). Plaintiff's physical examination was largely normal, except for "expiratory wheezes" noted. (Tr. 230). Dr. Thompson assessed wheezing and anxiety, directed Plaintiff to engage in smoking cessation, and prescribed an inhaler. (Tr. 231).

Treatment notes from NP Hoffman dated March 16, 2012, indicate that Plaintiff was reporting pain in her mid-back and lower back rated at an intensity of 9 out of 10 consistently. (Tr. 187). Plaintiff indicated that medication lowered her pain to 2

out of 10 in intensity, and that relief lasted for approximately four hours. (*Id.*). Plaintiff reported that her pain worsened with activity, walking, and bending over. (*Id.*). NP Hoffman assessed that Plaintiff's pain did not interfere with eating, bathing, using the toilet, getting dressed, or getting up from her bed or a chair. (*Id.*). Plaintiff's pain was well controlled with her current medication regimen. (*Id.*). Plaintiff's physical examination was normal, except Plaintiff reported pain with back flexion. (Tr. 189).

On March 27, 2012, Plaintiff was treated by Dr. Brand for right foot pain after "stepping wrong" going down stairs. (Tr. 184). Dr. Brand noted that x-rays showed no bone abnormality and that Plaintiff's pain could last for approximately three months. (Tr. 186). Plaintiff was given a boot to wear. (*Id.*).

On March 28, 2012, Dr. Thompson noted a normal physical examination, but recommended Plaintiff "go for a psych evaluation at the ER as she is having [almost] constant severe anxiety and freq[uent] panic attacks." (Tr. 228).

On April 19, 2012, Plaintiff visited NP Rebecca Fears, who noted a normal physical examination, but referred Plaintiff to the nutrition clinic per Plaintiff's request. (Tr. 225).

On May 25, 2012, Plaintiff treated with NP Fears, who noted that Plaintiffs physical examination was normal, although Plaintiff complained of back pain that was under treatment with the pain management clinic. (Tr. 221–22).

A scan of Plaintiff's lumbosacral spine dated June 5, 2012, was normal. (Tr. 236). Views of the thoracic spine showed a minimal levoscoliosis which "may be positional." (Tr. 235). No other abnormalities appeared. (*Id.*).

On June 14, 2012, Plaintiff treated with NP Hoffman with complaints of pain in the mid and lower back radiating to her left foot. (Tr. 379). NP Hoffman noted "moderate-to-severe spasms and several trigger points noted on palpation over the right and left lumbar paraspinals" as well as "over the right and left thoracic paraspinals." (Tr. 381). NP Hoffman assessed low back pain, myalgia and myositis, sacroilitis, and tobacco use. (*Id.*). NP Hoffman set a plan to call Plaintiff in two weeks for a pill count to ensure compliance with her medications. (*Id.*).

 **\*\*6** On July 12, 2012, NP Hoffman treated Plaintiff for pain localized to the mid back and lower back that Plaintiff

claimed radiated to her left foot. (Tr. 375). NP Hoffman noted that Plaintiff had a recent fall. (*Id.*). Plaintiff appeared well developed, well nourished, in no apparent distress, with ongoing low back pain. (Tr. 376). NP Hoffman assessed low back pain, myalgia and myositis, sacroilitis, and tobacco use. (*Id.*). NP Hoffman refilled Plaintiff's prescription of hydrocodone and acetaminophen, but noted that she intended to wean Plaintiff off of the pain medication. (Tr. 377). Plaintiff was advised to stop smoking and Plaintiff chose not to participate in tobacco cessation intervention. (*Id.*).

Dr. Brand examined Plaintiff on November 12, 2012, to follow up on Plaintiff's right foot injury. (Tr. 410). Plaintiff was directed to continue using her boot, and **\*23** Dr. Brand noted that Plaintiff could engage in activities "as tolerated." (Tr. 411).

On March 6, 2013, Dr. Ashraf Sabahat of the Schuyler Hospital Pain Management Center noted a history of upper and lower back pain stemming from a 2009 motor vehicle accident, and prescribed Plaintiff with diclofenac for this pain. (Tr. 359).

### 2. Mental Impairments

On October 6, 2011, Vanessa Miller, LMSW of Family Services of Chemung County ("FSCC"), noted that Plaintiff appeared in a neutral mood with an anxious affect. (Tr. 269). Plaintiff reported that she did not feel like herself and had increased rage behaviors, such as punching walls and knocking things off desks. (*Id.*). Plaintiff cancelled or did not appear for appointments scheduled October 14, 2011, October 19, 2011, November 7, 2011, November 14, 2011, November 29, 2011, December 13, 2011, December 20, 2011, or January 26, 2012. (Tr. 270–77). Ms. Miller discharged Plaintiff from the system on January 20, 2012, as a result of Plaintiff's failure to return to her appointments. (Tr. 278). Ms. Miller noted diagnoses of depressive disorder, posttraumatic stress disorder, and bipolar disorder. (*Id.*). She further noted that Plaintiff had severe back pain, thyroid problems, and her father was "just diagnosed with cancer." (*Id.*).

Plaintiff returned to FSCC on March 7, 2012, on a referral from Dr. Thompson. (Tr. 280). Deborah Berman, LCSWR, stated that Plaintiff was well oriented and appeared alert, but had a depressed mood. (Tr. 282). Plaintiff's recent and remote memory was "mildly impaired." (*Id.*). Ms. Berman noted diagnoses of depressive disorder and post-traumatic stress disorder, as well as severe back pain and thyroid problems. (*Id.*). Plaintiff reported that she "would like to disappear," but reported no plans to hurt herself. (Tr. 285).

On March 21, 2012, Plaintiff visited Amanda Pelcher, LMFT, of FSCC. (Tr. 287). Ms. Pelcher stated that Plaintiff presented as depressed with noted financial strain and harassment from her ex-husband. (*Id.*). Ms. Pelcher noted diagnoses of depressive disorder and post-traumatic stress disorder with a history of severe back pain and thyroid problems. (Tr. 288). Plaintiff cancelled her appointment scheduled for March 28, 2012. (Tr. 291).

 **\*\*7** On March 28, 2012, Plaintiff admitted herself to St. Joseph's Hospital for depression, intrusive thoughts of suicide, anhedonia, decreased appetite, insomnia, and restlessness. (Tr. 203). Dr. Behrooz Ebrahimi–Fard determined that Plaintiff did not have bipolar disorder and discontinued Plaintiff's lithium prescription. (*Id.*). Plaintiff was prescribed Xanax and Zoloft. (*Id.*). Plaintiff was diagnosed with major depression, hypothyroidism, "GERD," and asthma. (*Id.*). Plaintiff was discharged on April 2, 2012, and was "psychiatrically stable, [was] not a danger to self or others and [did] not meet the criteria for further psychiatric hospitalization." (*Id.*).

On April 5, 2012, Plaintiff informed Ms. Pelcher that she had her mother and girlfriend take her to "the BSU" because she was "feeling overwhelmed, depressed, irritable, and crying a lot." (Tr. 292). Plaintiff reported that her stay at BSU helped, and that she was prescribed Xanax and Zoloft. (*Id.*). Plaintiff cancelled her April 12, 2012 appointment. (Tr. 295).

On April 16, 2012, Ms. Pelcher noted that Plaintiff presented as mildly depressed, but reported that she had been "doing a little better, citing a walk she took with her girlfriend, the possibility of moving to the country, and volleyball at Easter as helpful in alleviating her depressed mood slightly." (Tr. 296). Plaintiff **\*24** cancelled her April 23, 2012 appointment. (Tr. 301).

Psychiatrist Muhammad Alam of FSCC conducted an initial psychiatric examination of Plaintiff on April 24, 2012. (Tr. 300). Dr. Alam stated that Plaintiff appeared calm and cooperative with a stable affect, although she had a depressed mood. (Tr. 298). Plaintiff denied any visual hallucinations, but claimed that she sometimes heard her brother's voice calling to her. (*Id.*). Dr. Alam diagnosed PTSD, major depressive disorder, and panic disorder with agoraphobia. (Tr. 298–99).

Dr. Alam increased Plaintiff's dosage of Zoloft, instructed her to wean off of Xanax, started Plaintiff on Klonopin with a plan to taper the Klonopin as Zoloft kicked in. (Tr. 299). Plaintiff was also taking Vicodin for pain management. (*Id.*). Plaintiff cancelled her follow up appointment on May 2, 2012, and did not show up for her appointment on May 8, 2012. (Tr. 303–04).

On April 27, 2012, Ms. Pelcher stated that Plaintiff appeared quiet and depressed, and reported hearing her deceased brother's voice. (Tr. 302).

On May 11, 2012, Dr. Alam noted that Plaintiff appeared calm and cooperative with a depressed mood. (Tr. 305). Plaintiff denied any auditory or visual hallucinations. (*Id.*). Dr. Alam prescribed Seroquel to assist with Plaintiff's insomnia and to treat any auditory hallucinations. (*Id.*).

At a follow up appointment on May 15, 2012, Ms. Pelcher stated that Plaintiff reported panic attacks three to four times per day. (Tr. 308). Plaintiff presented as depressed and stressed, and reported hearing voices instructing her to do things. (*Id.*). Plaintiff cancelled her May 29, 2012 appointment due to transportation issues. (Tr. 310). Plaintiff did not show for her June 4, 2012 or June 8, 2012 appointments. (Tr. 311–13).

 **\*8** On June 15, 2012, Dr. Alam prescribed Effexor for depression and anxiety. (Tr. 314).

On June 21, 2012, Ms. Pelcher modified Plaintiff's diagnoses to include "major depressive disorder, recurrent, severe with psychotic features" because Plaintiff reported auditory hallucinations. (Tr. 316). Plaintiff did not show for her June 25, 2012 appointment. (Tr. 319).

On June 29, 2012, Ms. Pelcher stated that Plaintiff presented as "euthymic," having been awarded full custody of her son. (Tr. 320). Plaintiff reported receiving harassing texts from her former best friend, her ex-husband's new wife. (*Id.*).

Plaintiff told Dr. Alam on July 13, 2012, that she was still feeling a little depressed and anxious but was having "more better days than bad days." (Tr. 321).

Plaintiff rescheduled her July 16, 2012 appointment with Ms. Pelcher due to transportation issues, but did not show for her July 23, 2012 appointment. (Tr. 322–23). Plaintiff also failed to appear on August 1, 2012. (Tr. 324). Ms. Pelcher consulted

with Dr. Alam on August 3, 2012, noting that she had not seen Plaintiff since the end of June and requested that she be permitted to attend Plaintiff's next session with Dr. Alam. (Tr. 325). Plaintiff did not show for her scheduled appointments on August 10, 2012 or August 14, 2012 with Dr. Alam. (Tr. 326).

On July 23, 2010, State agency medical consultant L. Meade reviewed Plaintiff's treatment records and completed a Psychiatric Review Technique. (Tr. 237–54). Dr. Meade opined that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence, or pace, but no repeated episodes of deterioration of extended duration. (Tr. 247). After reviewing the record, Dr. Meade **\*25** opined that Plaintiff's alleged psychiatric impairments were credible, but not to the degree alleged. (Tr. 253). Dr. Meade found that Plaintiff was capable of performing unskilled work. (*Id.*).

Plaintiff appeared for an appointment with Dr. Alam on August 17, 2012, reporting that she was "doing bad at this time." (Tr. 328). Plaintiff stated that she ran out of medication and started feeling depressed and anxious. (*Id.*). Dr. Alam noted that Plaintiff appeared depressed and had a constricted affect. (*Id.*). Plaintiff cancelled her follow up appointment on August 24, 2012. (Tr. 330). On August 24, 2012, Ms. Pelcher noted that Plaintiff was informed she must appear for her therapist appointment and psychiatrist appointment on August 28, 2012, or her case would be closed and she would be required to seek services elsewhere. (Tr. 331).

On August 28, 2012, Plaintiff told Dr. Alam that she was feeling depressed and anxious as a result of issues with her ex-husband reporting her partner to child protective services and her grandmother passing away. (Tr. 332). Dr. Alam noted that Plaintiff was depressed with an anxious affect. (*Id.*). Senior Therapist Cindy Allington saw Plaintiff on August 28, 2012, and confirmed the attendance policy with Plaintiff, who reported transportation difficulties. (Tr. 334). Plaintiff cancelled her September 17, 2012 appointment, citing transportation difficulties. (Tr. 335).

 **\*\*9** On September 21, 2012, Plaintiff informed Ms. Pelcher that her ex-husband resumed physical placement of her son because Plaintiff did not have a car to drive her son to school. (Tr. 336). Ms. Pelcher noted diagnoses of PTSD, major depressive disorder, and panic disorder with agoraphobia. (Tr. 337).

On September 25, 2012, Dr. Alam increased Plaintiff's Effexor dosage. (Tr. 340).

Plaintiff cancelled her October 4, 2012, October 29, 2012, November 5, 2012, November 19, 2012, and December 5, 2012 appointments with Ms. Pelcher due to transportation issues. (Tr. 341–46).

On December 13, 2012, Plaintiff told Ms. Miller she was experiencing anxiety and worry over the custody battle for her youngest son. (Tr. 349).

On January 8, 2013, Ms. Miller noted that Plaintiff reported stress as a result of not seeing her son for approximately one month. (Tr. 347). Plaintiff cancelled her January 3, 2013 appointment. (Tr. 348).

Plaintiff informed Ms. Miller on February 6, 2013, that she had "signed her [rights] off to her ex for her son." (Tr. 362). Plaintiff experienced crying episodes and increased depression. (*Id.*). Plaintiff cancelled her appointment on February 27, 2013, due to poor weather conditions. (Tr. 363). Plaintiff cancelled her appointment on March 6, 2013. (Tr. 364).

On February 28, 2013, Ms. Miller and Dr. Alam diagnosed Plaintiff with PTSD, major depressive disorder and panic disorder with agoraphobia. (Tr. 368). John Thomassen performed intellectual testing on Plaintiff on February 28, 2013, and established that Plaintiff functioned at a borderline intellectual level. (Tr. 64). On the Wechsler Adult Intelligence Scale Third Edition (WAIS–III), Plaintiff attained a Full Scale IQ of 78, a Verbal IQ of 81, and a Performance IQ of 79. (*Id.*).

On March 13, 2013, Ms. Miller noted that Plaintiff appeared "somewhat depressed." (Tr. 365). Plaintiff cancelled her March 27, 2013 and April 1, 2013 appointments. (Tr. 366–67).

### D. Determining Disability Under the Social Security Act

**[1]** The Social Security Act provides that a claimant will be deemed to be disabled **\*26** "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a) (3)(A); *see Rembert v. Colvin,* No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claimant to demonstrate that he is disabled within the meaning of the Act. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if his impairment is of such severity that he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

**\*\*10** In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps.

*Shaw v. Chater,* 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

### III. DISCUSSION

### A. Standard of Review

**[2]** **[3]** **[4]** This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.' " *Emerson v. Comm'r of Soc. Sec.,* No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). 42 U.S.C. § 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to **\*27** support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

**[5]** **[6]** Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence in the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo* ). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiffs position. *See Perez v. Chater,* 77 F.3d 41, 46–47 (2d Cir.1996).

**\*\*11** **[7]** Judgment on the pleadings may be granted under Rule 12(c) where the "material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

### B. Analysis of ALJ's Determination

### 1. Step One

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 30, 2012, the date of her application. (Tr. 17). The parties do not contest this determination and it is supported by substantial evidence.

### 2. Step Two

**[8]** At the second step, the ALJ found that Plaintiff had the following severe impairments: PTSD, anxiety with agoraphobia, depression, bipolar disorder, borderline intellectual functioning ("BIF"), and asthma. (*Id.*). The ALJ also noted that Plaintiff complained of back pain, hip pain, early degenerative changes in her spine with nodes, and a right foot contusion, but determined that the medical record did not support that these were severe impairments. (*Id.*).

Plaintiff contends that it was "clear legal error" for the ALJ to fail to consider Plaintiff's complaints of back pain as a severe impairment. (Dkt. 9 at 34–36). Plaintiff notes that she treated with a pain specialist "on a consistent basis for two years" and was prescribed medication for her back pain. (*Id.* at 35). The Commissioner argues that the ALJ properly considered Plaintiff's allegations of pain as a symptom. (Dkt. 12 at 17).

In rejecting Plaintiff's allegations of back pain as a severe impairment, the ALJ noted that the medical record showed Plaintiffs pain was well controlled with medication, and that Plaintiff had no side effects from the medication. (Tr. 18). The ALJ further noted that no medical imaging of Plaintiff's spine showed evidence of disease or significant degenerative changes. (*Id.*). Neurosurgeon Dr. Kung examined Plaintiff and found that he could not find a source to explain her pain. (*Id.*). As a result, the ALJ's finding that Plaintiffs back pain was not a severe impairment was supported by substantial evidence in the record. *See Mineo v. Colvin,* No. 12–CV–410, 2014 WL 4773955, at *8 (W.D.N.Y. Sept. 24, 2014) ("Pain or other symptoms may be important factors contributing to a disability claimant's functional loss and may affect a claimant's ability to perform basic work activities if relevant **\*28** medical signs or laboratory findings show the existence of a medically determinable impairment that could reasonably be expected to cause the associated pain or other symptoms.") (citing 20 C.F.R. § 404.1529(c)(3)).

**[9]** Even if the ALJ erred in determining that Plaintiff's alleged back pain was not a severe impairment, such an error would be harmless. The ALJ found that Plaintiff had

several severe impairments and proceeded to step three of the sequential analysis, and also considered Plaintiff's allegations of back pain in formulating her RFC. (Tr. 18, 2122). "Because Step Two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment, whether attributable to a single condition or a combination of conditions, is enough to satisfy its requirements." *Kessler v. Colvin,* 48 F.Supp.3d 578, 593 (S.D.N.Y.2014); *see also Cook v. Astrue,* No. 08–CV–1351 TJM/VEB, 2011 WL 2490996, at *4 (N.D.N.Y. May 24, 2011) *report & recommendation adopted,* No. 08–CV–1351, 2011 WL 2471300 (N.D.N.Y. June 22, 2011) ("Moreover, because the ALJ concluded that Plaintiff had other impairments considered severe under the Act (*i.e.,* major depression, social/generalized anxiety, and obsessive compulsive disorder) and continued with the sequential analysis, any arguable error in his finding with respect to the severity of Plaintiff's PTSD was harmless."); *Fortier v. Astrue,* No. 3:10cv01688(MRK)(WIG), 2012 WL 3727178, at *9 (D.Conn. May 11, 2012) ("[B]ecause the ALJ found at least one impairment to be severe and continued to step three in the sequential evaluation process, her failure to recognize all of Plaintiff's severe impairments was harmless error.").

### 3. Step Three

**\*\*12** At the third step, the ALJ analyzed the medical evidence and found that Plaintiff did not have a listed impairment or combination of impairments that would render her disabled. (Tr. 19–21). Specifically, the ALJ considered Listings 1.04, 12.04, and 12.06. (Tr. 19). Plaintiff does not contest the ALJ's findings at step three, and it appears that the ALJ's findings were supported by substantial evidence.

### 4. Step Four

At the fourth step, the ALJ determined Plaintiff's residual functional capacity to perform work. (Tr. 21). The ALJ concluded that plaintiff had the following RFC:

> [t]o perform a full range of work at all exertional levels but with the following non-exertional limitations: she retains the ability to understand and follow simple instructions and directions; perform simple tasks

with supervision and independently; maintain attention/concentration for simple tasks; regularly attend a routine and maintain a schedule; can relate to and interact with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals; and can handle reasonable levels of simple work related stress in that she can make simple decisions directly related to the completion of her tasks in a stable work environment. The claimant should avoid concentrated exposure to respiratory irritants such as dust, odors, fumes and gases.

(*Id.*).

#### a. Substantial Evidence

#### i. Duty to Develop the Record

Plaintiff argues that the ALJ erred in relying on the opinion of State agency psychiatrist Dr. Meade that Plaintiff was not disabled and Dr. Kung's statement that there was no identifiable source for **\*29** Plaintiffs alleged pain, instead of seeking additional information from Plaintiff's treating sources or hiring a consultative examiner to develop the record with respect to Plaintiff's limitations as a result of her mental and physical impairments. (Dkt. 9 at 21–27). The Commissioner argues that the burden was on Plaintiff to demonstrate how her alleged impairments impacted her functioning, and that the lack of a functional assessment does not mandate remand because the record was sufficient to support the ALJ's RFC assessment. (Dkt. 12 at 10–11).

**[10]** **[11]** **[12]** "It is well settled that the ALJ has an affirmative duty to develop the record in a disability benefits case, and that remand is appropriate where this duty is not discharged." *Brown v. Comm'r of Soc. Sec.,* 709 F.Supp.2d 248, 255 (S.D.N.Y.2010) (citations omitted). "The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel." *Cruz v. Astrue,* 941 F.Supp.2d 483, 495 (S.D.N.Y.2013). Encompassed in this

duty is the requirement that an ALJ assemble the claimant's complete medical history and re-contact treating physicians or obtain consultative examinations where the information received is inadequate to determine whether the claimant is disabled. *See Wells v. Colvin,* No. 14–CV–197–JTC, 2015 WL 1280536, at *7 (W.D.N.Y. Mar. 20, 2015) (citing 20 C.F.R. §§ 416.912(e), 416.927(e)(2)(iii)).

**\*\*13** **[13]** **[14]** **[15]** Despite this duty, courts in this Circuit have found that "it is not per se error for an ALJ to make the RFC determination absent a medical source assessment as to what the claimant can still do despite the limitations caused by his or her impairments." *Housser v. Colvin,* No. 13–CV–1133–JTC, 2015 WL 162985, at *5 (W.D.N.Y. Jan. 7, 2015) (quotations omitted). "[R]emand is not always required when an ALJ fails in his duty to request opinions, particularly where ... the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Tankisi v. Comm'r of Soc. Sec.,* 521 Fed.Appx. 29, 33 (2d Cir.2013). "Although an ALJ has an affirmative duty to develop the administrative record even when a claimant is represented by counsel, where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Lowry v. Astrue,* 474 Fed.Appx. 801, 804 (2d Cir.2012) (quotations and citations omitted). The question is whether the administrative record, even lacking the opinion of a treating physician, is "robust enough to enable a meaningful assessment of the particular conditions on which the petitioner claims disability." *Sanchez v. Colvin,* No. 13 Civ. 6303(PAE), 2015 WL 736102, at *7 (S.D.N.Y. Feb. 20, 2015). *Cf. Rosa v. Callahan,* 168 F.3d 72, 79–80 (2d Cir.1999) (finding the ALJ committed legal error where the ALJ failed to develop the facts of the case where there were "scant" medical notes and the ALJ did not seek records from numerous physicians referenced in the claimant's testimony).

**[16]** "Under the particular circumstances of this case, the Court finds that the ALJ was not remiss with regard to her duty to request opinions from Plaintiff's treating sources." *Hogan v. Colvin,* No. 1:12–cv–1093(MAT), 2015 WL 667906, at *6 (W.D.N.Y. Feb. 17, 2015). The report of consultative examiner Dr. Meade and the opinion of Dr. Kung were not "inconsistent with the relatively benign clinical findings and assessments by Plaintiff's treating physicians." *Id.*

As for Plaintiff's alleged physical impairments, the ALJ properly noted that the ample medical records demonstrated no **\*30** objective findings to identify a source for Plaintiff's alleged pain. (Tr. 19, 21–22). Plaintiff was in a car accident in December 2009, but CT scans and MRIs following that accident were unremarkable. (Tr. 416–17, 429). Scans of Plaintiff's spine in 2012 were also normal. (Tr. 235–36). Plaintiff later complained of radiating pain to her foot, but x-rays showed no abnormalities. (Tr. 184, 193). Notably, Plaintiff complained of foot pain at times that she had also suffered falls. (Tr. 184, 196, 410, 412–13). Plaintiff treated at a pain clinic, but providers at the clinic frequently noted that Plaintiff's pain was controlled with her medication regimen. (Tr. 187, 377, 381, 399, 418). When Plaintiff's treating physician, Dr. Rizk, examined Plaintiff, he assessed mental limitations, but no physical limitations. (Tr. 192). "[T]he Court finds it doubtful that a medical source statement from any of these providers would have altered the ALJ's assessment of Plaintiff's RFC." *Hogan,* 2015 WL 667906, at *6.

**\*\*14** "The ALJ 'did not substitute her medical judgment for any physician's evaluation, but ... relied upon the substantial medical records and the testimony to reach a reasoned determination of the plaintiff's work capacity.' " *O'Neil v. Colvin,* No. 13–CV–575–JTC, 2014 WL 5500662, at *7 (W.D.N.Y. Oct. 30, 2014) (quoting *Rodriguez v. Apfel,* No. 96 Civ. 8330(JGK), 1998 WL 150981, at *11 n. 13 (S.D.N.Y. Mar. 31, 1998)); *see also Gardner v. Colvin,* No. 13–CV–787–JTC, 2014 WL 5149702, at *6 (W.D.N.Y. Oct. 14, 2014) (where ALJ's written decision revealed that he considered all of the medical evidence of record, the court concluded that the ALJ's RFC assessment was based on a sufficiently developed record, and the ALJ did not commit legal error by failing to obtain an assessment from a treating source); *Pellam v. Astrue,* 508 Fed.Appx. 87, 90 (2d Cir.2013) ("[E]specially considering that the ALJ also had all of the treatment notes from [Plaintiff's] treating physicians ... the ALJ [did not have] any further obligation to supplement the record by acquiring a medical source statement from one of the treating physicians.").

The record does not support Plaintiff's argument that a consultative examination or opinion of a treating physician was necessary for the ALJ to reach an informed decision as to Plaintiff's alleged mental impairments. Although Dr. Meade assessed moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace, she concluded, nonetheless, that Plaintiff retained the

ability to understand and follow simple instructions and directions, and perform simple tasks independently. (Tr. 247, 251–53). This finding was consistent with the administrative record. Plaintiff completed her high school education and was able to manage her personal and daily living needs independently. (Tr. 32, 43–44). To the extent Plaintiff had cognitive limitations, these limitations were accommodated in the ALJ's RFC, which limited Plaintiff to simple tasks. (Tr. 21). *See O'Neil*, 2014 WL 5500662, at *7 (rejecting plaintiffs arguments on these grounds). The RFC also restricted Plaintiff's interactions with others, noting that Plaintiff could "relate to and interact with others to the extent necessary to carry out simple tasks but should avoid work requiring more complex interaction or joint effort to achieve work goals." (Tr. 21).

### ii. Stress

[17] Plaintiff argues that stress is "highly individualized," and that the ALJ "misinterpreted the facts when she found that [Plaintiff] would be able to withstand the added stress of employment...." (Dkt. 9 at 33). The ALJ noted that Plaintiff had successfully ended her marriage and participated in an "acrimonious" custody battle, without any evidence of decompensation. **\*31** (Tr. 20). Plaintiff argues that the record demonstrates that she experienced stress, anxiety, nightmares, flashbacks, and auditory hallucinations during this time. (Dkt. 9 at 33–34).

**\*\*15** The ALJ's RFC states that Plaintiff could "handle reasonable levels of simple work related stress in that she can make simple decisions directly related to the completion of her tasks in a stable work environment." (Tr. 21). The record shows that Plaintiff was able to complete household chores, shop, and care for her children. (Tr. 44, 151–54, 160, 253, 279, 355). Treatment notes from Dr. Alam indicated that Plaintiffs symptoms were largely controlled with medications, and Plaintiff denied further auditory hallucinations or suicidal ideations. (Tr. 314, 321, 328, 332, 340). Plaintiff identified coping skills such as reading, walking, listening to music, playing games with her son, spending time with family, and screaming into a pillow. (Tr. 296, 360). Accordingly, the ALJ's finding that Plaintiff could handle work stress related to simple tasks was supported by substantial evidence in the record.

### iii. Borderline IQ

[18] Plaintiff argues that the ALJ did not consider her borderline IQ in formulating the RFC. (Dkt. 9 at 24). Contrary to Plaintiff's argument, the ALJ explicitly referenced Plaintiffs borderline intellectual functioning as a severe impairment and discussed Plaintiffs IQ scores in the text of her decision. (Tr. 17–18, 21–22). In discussing the basis for her RFC finding, the ALJ noted that Plaintiff completed a high school education and had worked as a waitress and cashier with no indication that she left that employment due to intellectual or emotional impairments. (Tr. 21–22). The RFC limits Plaintiff to simple tasks and instructions. (Tr. 21). Accordingly, the ALJ considered Plaintiff's intellectual functioning in formulating her RFC and her RFC was supported by substantial evidence with respect to Plaintiff's borderline intellectual functioning.

### b. Credibility Determination

[19] Plaintiff argues that the ALJ's credibility analysis was unsupported by substantial evidence, and that the ALJ improperly construed various sections of the administrative record in finding Plaintiff's allegations of pain and limiting symptoms to be less than fully credible. (Dkt. 9 at 27–32).

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05–CV–0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symptoms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii).

**\*\*16** In the instant case, the ALJ properly applied the two step analysis. First, the ALJ found that Plaintiff's medically

determinable impairments could be expected to cause the alleged symptoms. (Tr. 21). Second, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these **\*32** symptoms are not credible to the extent they are unsupported by competent medical evidence and opinion[s] and [are] contradicted by other evidence." (Tr. 22).

In evaluating a Plaintiffs credibility, the ALJ must consider several factors, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Stewart v. Barnhart,* 235 F.R.D. 579, 590 (W.D.N.Y.2006); *see* 20 C.F.R. § 404.1529(c).

**[20]** Plaintiff argues that the ALJ improperly construed Plaintiff's activities of daily living. (Dkt. 9 at 30–32). The ALJ found that although Plaintiff testified that she had difficulty leaving home, the record demonstrated that she played volleyball, camped, and fished. (Tr. 22). Plaintiff contends that this was an improper interpretation of her daily activities, as they were only referenced briefly in her treatment notes. (Dkt. 9 at 30). However, Plaintiff self-reported that her hobbies and interests included reading, camping, and swimming. (Tr. 154). Further, Plaintiff reported that she was able to complete household chores, shop, and care for her children. (Tr. 44, 152–54, 160, 253, 279, 355). "[I]t is well-settled that '[s]uch activities do not by themselves contradict allegations of disability,' as people should not be penalized for enduring the pain of their disability in order to

care for themselves." *Knighton v. Astrue,* 861 F.Supp.2d 59, 69 (N.D.N.Y.2012) (quoting *Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y.2000)). But Plaintiff's activities of daily living are only one of many factors the ALJ considered in finding that Plaintiff's allegations of pain and limitations were not as significant as she alleged.

**[21]** The ALJ stated that she found Plaintiff's testimony to be less credible because Plaintiffs allegations of limitations were inconsistent with Plaintiffs reported activities. (Tr. 22). For example, Plaintiff complained of asthma, but continued to smoke. (*Id.*). Plaintiff testified that she could not lift a gallon of milk, but self-reported on an earlier date that she could lift up to 50 pounds. (*Id.*). Plaintiff testified that she was admitted to the hospital for attempting suicide by slitting her wrists with a razor, yet the medical records from her admittance to the hospital show that she was admitted with suicidal ideations, not for an attempt. (*Id.*). The hospital records further note that Plaintiff demonstrated remarkable improvement during her first few days in the hospital. (*Id.*). "The [ALJ] may discount a plaintiff's testimony to the extent that it is inconsistent with medical evidence, the lack of medical treatment, and her own activities during the relevant period." *Morris v. Comm'r of Soc. Sec.,* No. 5:12–cv–1795(MAD/CFH), 2014 WL 1451996, at \*6 (N.D.N.Y. Apr. 14, 2014).

**\*\*17** Treatment notes in the record state that Plaintiff was responding well to treatment and was able to "do more things outside of **\*33** the house since the beginning of treatment and [experienced an] absence of suicidal ideation for more than six months" by Plaintiff's own report. (Tr. 279).

**[22]** In sum, there was substantial evidence in the record to support the ALJ's conclusions with respect to Plaintiff's ability to engage in activities of daily living. Further, "[i]t is the function of the Commissioner, and not the reviewing court, to pass on the credibility of witnesses, including the claimant's description of symptoms and pain, and to resolve material conflicts in the testimony." *Echevarria v. Apfel,* 46 F.Supp.2d 282, 293 (S.D.N.Y.1999).

Plaintiff also contends the ALJ erred by finding that Plaintiff's noncompliance with treatment negatively impacted Plaintiff's credibility because, Plaintiff argues, her mental illness was the cause for her noncompliance. (Dkt. 9 at 27–30).

The ALJ stated that it was "clear that the claimant improve[d] with treatment, yet she [had] repeatedly failed to follow

through with the same. She missed so many mental health appointments that her providers considered closing her case." (Tr. 22). Although some of these appointments were missed as a result of transportation issues, that did not "explain the overwhelming majority" of missed appointments. (*Id.*).

**[23]** A claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as proscribed." SSR 96–7p, 1996 WL 372186, at *7 (July 2, 1996). Yet, "an ALJ must not draw an adverse inference from a claimant's failure to seek or pursue treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *McDowell v. Colvin,* No. 11–CV–1132(NAM/VEB), 2013 WL 1337152, at *13 (N.D.N.Y. Mar. 11, 2013) (quotation omitted).

**[24]** Here, the ALJ was permitted to consider Plaintiff's noncompliance with treatment as a factor weighing against Plaintiff's credibility. *See Jackson v. Barnhart,* No. 06–CV0213, 2008 WL 1848624, at *11 (W.D.N.Y. Apr. 23, 2008) (finding plaintiffs missed appointments with her counselors and failure to adhere to medication regimen weighed against plaintiffs credibility). The fact that the ALJ did not explicitly reference Plaintiff's alleged mental impairments as a cause for noncompliance does not mean that it was not considered. *See Greene v. Colvin,* 936 F.Supp.2d 216, 226 (W.D.N.Y.2013) (ALJ's failure to cite specific evidence does not indicate that it was not considered). Moreover, the treatment notes of Plaintiffs mental health providers do not suggest that Plaintiff missed appointments as a result of Plaintiff's mental health; rather, they often referenced transportation issues, or that Plaintiff was "injured," or that Plaintiff cancelled without an explanation. The ALJ's finding that Plaintiff's credibility was diminished by her failure to regularly attend treatment sessions was supported by ample cancellation and no-show notes in Plaintiff's medical record. (Tr. 270–77, 291, 301, 303–04, 311–13, 319, 326, 330–31, 334–35, 341–46, 348, 364, 366–67).

**\*\*18** Plaintiff further argues that the ALJ was required to consider her "sparse work record" as evidence that Plaintiff was unable to work. (Dkt. 9 at 30–31). Instead, the ALJ found that Plaintiff's "modest work history [did] not evidence a strong attachment to the work force." (Tr. 22). The ALJ

recognized that Plaintiff did not leave her previous work as a result of her impairments, but left because of an automobile accident. (*Id.*). Plaintiff believes the ALJ should have considered her absence **\*34** from work as an impaired ability to work. (Dkt. 9 at 31).

**[25]** **[26]** **[27]** "Although work history may be deemed probative of credibility, it is only one of many factors to be considered." *Hargrave v. Colvin,* No. 13–CV–6308(MAT), 2014 WL 3572427, at *6 (W.D.N.Y. July 21, 2014). "Just as a good work history may be deemed probative of credibility, a poor work history may prove probative as well." *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir.1998); *see also Webb v. Astrue,* No. 3:11–CV–94(GLS), 2012 WL 589660, at *4 (N.D.N.Y. Feb. 22, 2012) (stating it was proper for ALJ to consider Plaintiff's poor work history); *Outley v. Astrue,* No. 5:09–CV–0141(FJS/VEB), 2010 WL 3703065, at *9 (N.D.N.Y. Aug. 26, 2010) (same). Because the ALJ was permitted to consider Plaintiff's sparse work record in assessing Plaintiff's credibility, the ALJ did not commit a reversible legal error. To the extent Plaintiff argues this evidence should have been weighed differently, that is not a proper consideration for this Court. *See Serra v. Sullivan,* 762 F.Supp. 1030, 1034–35 (W.D.N.Y.1991) ("It is the [ALJ's] function not the district court's to appraise the credibility of witnesses, including the plaintiff.").

### 5. Step Five

**[28]** The ALJ then proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed Plaintiff's job qualifications by considering her physical ability, age, and education. (Tr. 23). At the time the application was filed, Plaintiff was 30 years old, she had a high school education, and had no relevant past work. (*Id.*). Second, the ALJ determined whether there were jobs existing in the national economy that a person with Plaintiff's qualifications and RFC could perform. (*Id.*). ALJ Smith found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiffs nonexertional limitations, but determined that those limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (*Id.*). Relying on the Medical–Vocational Guidelines ("Grids"), the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. 23–24).

Plaintiff contends the ALJ erred by relying solely on the Grids to find that Plaintiff was not disabled and was instead required

to call a vocational expert. (Dkt. 9 at 26). The significance of the Grids is as follows:

> If an ALJ determines that a claimant cannot perform past relevant work, he turns to the Medical–Vocational Guidelines ("Grids") to determine whether the claimant can perform other jobs that exist in the national economy based on the claimant's RFC, age, education and experience. In an "ordinary case," in which the claimant has only an exertional limitation, the ALJ may meet this burden by applying the Grids. When a claimant has both exertional and nonexertional limitations, the ALJ, in certain situations, cannot satisfy this burden through use of the Grids alone. If the claimant's nonexertional limitation significantly diminishes his work capacity beyond that caused by his exertional impairment, the ALJ instead must rely on additional vocational resources, such as expert testimony. However, the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert or preclude reliance on the grids. "Significantly diminish" means the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of

work as to deprive him of a meaningful employment opportunity.

**\*\*19** *Morris,* 2014 WL 1451996, at *9 (citations and quotations omitted). Here, the **\*35** ALJ found that Plaintiff's ability to perform work at all exertional levels was compromised by Plaintiff's nonexertional limitations, but determined that those limitations had "little or no effect on the occupational base of unskilled work at all exertional levels." (Tr. 23). The ALJ's findings were otherwise supported by substantial evidence. Accordingly, the ALJ was not required to contact a vocational expert and did not commit a legal error after determining that Plaintiff's nonexertional impairments did not significantly diminish her ability to engage in meaningful employment.

## IV. CONCLUSION

The Court has considered Plaintiff's remaining arguments and finds them to be without merit. For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 13) is granted, and Plaintiffs motion for judgment on the pleadings (Dkt. 9) is denied. Plaintiff's complaint is dismissed with prejudice.

SO ORDERED.

## All Citations

96 F.Supp.3d 14, 2015 WL 1541864, 222 Soc.Sec.Rep.Serv. 28

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.